**No. 23-16026**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

HELEN DOE, parent and next friend of Jane Doe; et al.,

*Plaintiffs-Appellees,*

v.

THOMAS C. HORNE, in his official capacity as State Superintendent of Public Instruction; et al.,

*Defendants-Appellants,*

and

WARREN PETERSEN, Senator, President of the Arizona State Senate; BEN TOMA, Representative, Speaker of the Arizona House of Representatives,

*Intervenor-Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the District of Arizona

## INTERVENOR-DEFENDANTS-APPELLANTS' EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR A STAY PENDING APPEAL

**RELIEF REQUESTED BY: August 14, 2023**

## <u>CIRCUIT RULE 27-3 CERTIFICATE</u>

The undersigned counsel hereby certifies the following:

(1) Contact Information for Attorneys for All Parties:

*Counsel for Intervenor-Defendants-Appellants:*
D. John Sauer
Justin D. Smith
13321 N. Outer Forty Road, Suite 300
St. Louis, MO 63017
(314) 562-0031
john.sauer@james-otis.com
justin.smith@james-otis.com

*Counsel for Plaintiffs-Appellees:*
Colin M. Proksel
2929 N. Central Ave., 21st Fl.
Phoenix, AZ 85012
(602) 640-9000
cproksel@omlaw.com

Amy Zimmerman
Justin R. Rassi
Jyotin Hamid
66 Hudson Blvd.
New York, NY 10001
(212) 909-6000
azimmerman@debevoise.com
jrassi@debevoise.com
jhamid@debevoise.com

Amy E. Whelan
Rachel Berg
870 Market Street, Suite 370
San Francisco, CA 94102
(415) 392-8442
awhelan@nclrights.org
rberg@nclrights.org

*Counsel for Defendant Horne:*
Dennis Wilenchik
2810 N. 3rd Street, Suite 103
Phoenix, AZ 85004
(602) 606-2810
admin@wb-law.com

Maria Syms
1535 W. Jefferson Street, BIN 50
Phoenix, AZ 85007
(602) 542-5240

*Counsel for Defendants Toenjes, Kyrene School District:*
Jordan Ellel
500 W. Guadalupe Road
Tempe, AZ 85283
(480) 345-3746
jellel@tuhsd.k12.az.us

*Counsel for Defendant Gregory School:*
David Potts
40 N. Central Ave., Suite 2700
Phoenix, AZ 85004
(602) 263-4547
dpotts@jshfirm.com

Lisa Smith
2525 E. Broadway Blvd., Suite 200
Tucson, AZ 85716
(520) 322-5000
lasmith@dmyl.com

*Counsel for Defendant Arizona Interscholastic Association:*
Kristian Nelson
2929 N. Central Ave., Suite 1700
Phoenix, AZ 85012
(602) 385-1040
kristian.nelson@lewisbrisbois.com

(2) Facts Demonstrating the Nature of the Emergency:

This motion for stay is filed the day after the district court denied the motion for stay filed by Movants Intervenor-Defendants. Movants filed their motion to stay with the district court on the second business day after the court's preliminary injunction order.

Under the district court's preliminary injunction order, "the [Save Women's Sports] Act shall not prevent Plaintiffs from participating in girls' sports" and "Plaintiffs shall be allowed to play girls' sports at their respective schools." A43. Any success by Plaintiffs in try-outs and meets will displace biological girls from making a team, getting playing time, and succeeding in final results. Biological girls will be irreparably harmed if they are displaced by, forced to compete against, or risk injury from Plaintiffs.

Plaintiffs represented that the earliest sports activity affected by the Save Women's Sports Act was cross-country at Kyrene Middle School for Plaintiff Doe. A15-16. Boys and girls on Kyrene Middle School's cross-country team train together, but boys and girls compete separately. A15. Plaintiffs reported that the first cross-country competitive meet will occur the week of August 14, 2023. A16; A6.

iv

Because the first sports activity affected by the court's preliminary injunction order occurs the week of August 14, 2023, Movants Intervenor-Defendants respectfully request a ruling on this motion for stay by August 14, 2023.

(3) Notice to Counsel:

In addition to electronic notification at the time of filing, Movants Intervenor-Defendants will email a copy of the motion to counsel. Movants conferred with Plaintiffs regarding this Motion. Plaintiffs oppose a stay of the preliminary injunction and do not consent to this Motion.

(4) Submissions to the District Court:

Movants Intervenor-Defendants moved for a stay on Monday, July 24, 2023, just two business days after the district court's preliminary injunction order on Thursday, July 20, 2023. Movants sought a stay or, in the alternative, an administrative stay of the preliminary injunction for seven days to allow time for the Ninth Circuit to consider an emergency motion to stay and request for administrative stay. Intervenor-Defendants respectfully requested a ruling on the motion for stay by July 31, 2023, to allow them time to seek prompt appellate relief, if necessary.

*/s/ D. John Sauer*

## <u>DISCLOSURE STATEMENT</u>

No. 23-16026 – *Helen Doe, et al., v. Thomas C. Horne, et al.*

A disclosure statement pursuant to Federal Rule of Appellate Procedure 26.1

is not required, as Intervenor-Defendants-Appellants are government parties.

*/s/ D. John Sauer*

# **TABLE OF CONTENTS**

CIRCUIT RULE 27-3 CERTIFICATE ................................................... ii

DISCLOSURE STATEMENT ........................................................... vi

TABLE OF CONTENTS ................................................................ vii

TABLE OF AUTHORITIES............................................................ viii

INTRODUCTION .........................................................................1

ARGUMENT ...............................................................................3

   I.   Movants Are Likely to Prevail on Appeal. .......................................3

      A.   The district court misapplied intermediate scrutiny. ...............................4

      B.   The district court's finding that biological males who do not undergo male puberty have no competitive advantage over female athletes is clearly erroneous. ...........................................................................8

      C.   The Act easily satisfies rational-basis review. ........................................11

      D.   The Act does not violate Title IX. ...........................................13

   II.   Issuing a Stay Will Impose No Cognizable Harm on Plaintiffs..................15

   III.   The Injunction Imposes Irreparable Harm on Other Parties Interested in the Proceeding and on the State. ........................................................17

   IV.   The Public Interest Strongly Favors a Stay. ................................20

CONCLUSION ............................................................................20

CERTIFICATE OF SERVICE .........................................................22

CERTIFICATE OF COMPLIANCE ...................................................23

# TABLE OF AUTHORITIES

## CASES

*Animal Legal Def. Fund v. Wasden*,
   878 F.3d 1184 (9th Cir. 2018)...................................................................13

*B. P. J. v. W. Virginia State Bd. of Educ.*,
   No. 2:21-CV-00316, 2023 WL 111875 (S.D. W. Va. Jan. 5, 2023)........... 7, 13, 14

*Boardman v. Inslee*,
   978 F.3d 1092 (9th Cir. 2020).................................................................13

*Bostock v. Clayton County*,
   140 S. Ct. 1731 (2020).........................................................................14

*Bucklew v. Precythe*,
   139 S. Ct. 1112 (2019)...........................................................................8

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
   370 F.3d 151 (1st Cir. 2004)..................................................................16

*Clark By & Through Clark v. Arizona Interscholastic Ass'n*,
   886 F.2d 1191 (9th Cir. 1989).................................................................19

*Clark, By & Through Clark v. Arizona Interscholastic Ass'n*,
   695 F.2d 1126 (9th Cir. 1982).............................................. 1, 4, 8, 12, 13, 14, 17

*Coalition for Economic Equity v. Wilson*,
   122 F.3d 718 (9th Cir. 1997).................................................................19

*F.C.C. v. Beach Commc'ns, Inc.*,
   508 U.S. 307 (1993) ...........................................................................12

*Grabowski v. Arizona Board of Regents*,
   69 F.4th 1110 (9th Cir. 2023).................................................................14

*Hecox v. Little*,
   479 F. Supp. 3d 930 (D. Idaho 2020) ......................................................19

*Hoohuli v. Ariyoshi*,
631 F. Supp. 1153 (D. Haw. 1986) ........................................................11

*Jana-Rock Constr., Inc. v. New York Dep't of Econ. Dev.*,
438 F.3d 195 (2d Cir. 2006) .................................................................11

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) ..............................................................11

*L. W. by & through Williams v. Skrmetti*,
No. 23-5600, 2023 WL 4410576 (6th Cir. July 8, 2023) ....................19

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) ..................................................................3

*Maryland v. King*,
567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ............................19

*Mississippi Univ. for Women v. Hogan*,
458 U.S. 718 (1982) ..............................................................................7

*Mungia v. Judson Indep. Sch. Dist.*,
No. CIV.A SA-09-CV-395-X, 2009 WL 3431397 (W.D. Tex. Oct. 19, 2009).....16

*Nken v. Holder*,
556 U.S. 418 (2009) .........................................................................3, 20

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
762 F.2d 1374 (9th Cir. 1985) ..............................................................16

*Sharon City Sch. Dist. v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*,
No. CIV.A. 9-213, 2009 WL 427373 (W.D. Pa. Feb. 20, 2009) .........16

*Ty, Inc. v. Jones Group, Inc.*,
237 F.3d 891 (7th Cir. 2001).................................................................17

*U. S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973) ..............................................................................12

*United States v. Edge Broadcasting Co.*,
509 U.S. 418 (1993) ................................................................................6

ix

*United States v. Virginia*,
  518 U.S. 515 (1996) .......................................................................7, 8

*United Steelworkers Of Am. Loc. 13792 v. Mikocem Corp. Cemeteries*,
  No. 05-73184, 2005 WL 2090884 (E.D. Mich. Aug. 30, 2005) .........................16

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
  300 U.S. 515 (1937) ........................................................................20

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) .......................................................................6, 7

*Williams v. Sch. Dist. of Bethlehem, Pa.*,
  998 F.2d 168 (3d Cir. 1993)................................................................14

*Young v. Motion Picture Ass'n of Am., Inc.*,
  299 F.2d 119 (D.C. Cir. 1962) .............................................................17

**STATUTES**

A.R.S. § 15-120.02(B) ......................................................................1, 4

**REGULATIONS**

34 C.F.R. § 106.41 ....................................................................... 13, 14

x

**INTRODUCTION**

Arizona enacted the Save Women's Sports Act to promote sex equality and protect women. Under the Act, "Athletic teams or sports designated for 'females,' 'women' or 'girls' may not be open to students of the male sex." A.R.S. § 15-120.02(B); A46. The Act applies to higher education institutions, public schools, and any private school that competes against a public school. *Id.* at § 15-120.02(A), (I); A46-47.

Evidence in the district court supported the Act by conclusively showing that biological males are stronger, run faster, jump higher, throw harder, and kick farther than biological females. These physiological differences exist before, during, and after puberty, and they continue to exist even with puberty blockers or testosterone suppression. Biological females are at a competitive disadvantage and an increased risk of injury when competing against biological males. The Act thus is substantially related to the "legitimate and important" government interest of "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes." *Clark, By & Through Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("*Clark I*").

Movants are likely to prevail on appeal because the district court misapplied intermediate scrutiny by not assessing the validity of the classification that Plaintiffs challenge as a whole and instead requiring perfect tailoring as to these Plaintiffs.

1

Even if tailoring were required, the district court clearly erred by finding against the overwhelming weight of evidence that there is no competitive advantage for biological boys over girls pre-puberty. And the Act does not violate Title IX because that law authorizes separation of sports teams based on biological sex.

Issuing a stay will impose no cognizable harm on Plaintiffs. Plaintiffs would have an unfair competitive advantage if they played on girls' teams. Their exclusion from girls' teams is due to a medical condition, not the States' sex-based separation of sports teams. Furthermore, Plaintiffs' long delay before seeking judicial relief strongly undercuts their claim of irreparable injury.

In contrast, the injunction irreparably harms the State and interested parties. The district court erred by overlooking the injuries to displaced biological girls. Any success by Plaintiffs in try-outs and meets will displace biological girls from making a team, getting playing time, and succeeding in final results. The court also gave no weight to the irreparable injury to the State of Arizona in enforcing its valid statutes.

Finally, the public interest strongly favors a stay. The public has an interest in upholding the law passed by their elected officials. Girls also have an interest in not competing against, being injured by, or being displaced by biological boys.

This Court should enter a stay pending appeal of the preliminary injunction.

## **ARGUMENT**

This Court considers four factors when considering whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). These factors favor Movants here.

Moreover, as the district court acknowledged, a mandatory injunction that changes the status quo "requires a heightened burden of proof and is particularly disfavored." A32 (citing *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). The district court held that its injunction is prohibitory, not mandatory, A32-33, but this holding is incorrect. The Act went into effect on September 24, 2022, A10, and neither Plaintiff brought a challenge at that time. Instead, both Plaintiffs complied with the Act for many months, encompassing multiple sports seasons, before challenging it. *See* A20. The "status quo" is that the Act was continuously in effect before the injunction, and the injunction is thus a "particularly disfavored" mandatory injunction that required a "heightened burden of proof," which the district court did not apply. A32.

### I.      **Movants Are Likely to Prevail on Appeal.**

Movants are likely to succeed on the merits for at least four reasons.

## A.     The district court misapplied intermediate scrutiny.

The district court's formulation and application of intermediate scrutiny contradicts precedent from the Supreme Court. The Act provides that sports teams shall be designated "based on the biological sex of the students who participate on the team or in the sport," and that "[a]thletic teams or sports designated for 'females,' 'women' or 'girls' may not be open to students of the male sex." A.R.S. § 15-120-02; A46. As the district court noted, the Act classifies by biological sex for student-athletes of all ages: "The Act applies equally to kindergarten through college teams . . . ." A21.[1] The district court did not dispute that the Act advances the State's interests in fairness, equality of opportunity, and safety for female student-athletes at least at the older age ranges; the district court stated, "the problems identified as being addressed by the act—opportunity and safety—are limited to high school and college sports." *Id.* In addition, the district court found biological males who have gone through male puberty *do* have a significant competitive advantage in sports. *See* A24. Thus, the exclusion of such athletes from girls' and women's teams significantly advances the Act's interests of fairness, safety, and equality of opportunity for biologically female athletes.

---

[1] The district court criticized the Act's application to kindergartners as an example of "overbreadth." A4. But "the existence of wiser alternatives than the one chosen does not serve to invalidate the policy [of excluding boys from girls' sports] since it is substantially related to the goal." *Clark I*, 695 F.2d at 1132.

Nevertheless, the district court concluded that this substantial body of undisputed evidence establishing the competitive advantage of biological male athletes who transition after going through puberty is "not relevant to the question before the Court: whether transgender girls *like Plaintiffs, who have not experienced male puberty*, have performance advantages that place other girls at a competitive disadvantage or at risk of injury." A24 (emphasis added). The district court thus disregarded the extensive, highly probative evidence of competitive advantages for transgender-female athletes who transition *after* undergoing male puberty, simply because the two individual Plaintiffs in this case claim that they did not or will not undergo male puberty. *Id.* As the district court stated, evidence of male competitive advantage after puberty "is not relevant because the Plaintiffs have not and never will experience male puberty." A25.

This is error. Under intermediate scrutiny, which the district court applied, the validity of the classification that Plaintiffs challenge must be assessed by considering the classification as a whole, not by considering only the narrow application of that classification to the individual Plaintiffs in their unique circumstances. By reasoning otherwise, the district court effectively applied strict scrutiny by requiring perfect tailoring as to these Plaintiffs—which is not required.

The Supreme Court's precedent makes this clear. Under intermediate scrutiny, the question whether the Act advances the government's asserted interests "cannot

be answered by limiting the inquiry to whether the governmental interest is directly advanced as applied to a single person or entity. Even if there were no advancement as applied in that manner . . . there would remain the matter of the regulation's general application to others . . . ." *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 427 (1993) (emphasis added). Thus, by focusing solely on whether the Act advances its fairness, safety, and opportunity interests solely when it applies to Plaintiffs—to the point of treating extensive evidence of the Act's success in advancing its interests as to others as "not relevant," A24—the district court "thus asked the wrong question." *Edge Broadcasting*, 509 U.S. at 472.

Even if the Act did not substantially advance the State's interests by excluding these specific Plaintiffs from girls' teams (which, in fact, it does, *see infra*), "that fact is beside the point, for the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989). "Here, the regulation's effectiveness must be judged by considering all the varied groups" that it affects—including biological males who transition post-puberty—"and it is valid so long as [Arizona] could reasonably have determined that its interests overall would be served less effectively without the . . . guideline than with it." *Id.* "Considering [the State's] proffered justifications together," under intermediate scrutiny the Act is valid if it

6

"directly furthers the [State's] legitimate government interests and . . . those interests would have been less well served in the absence of the . . . guideline." *Id.*

Indeed, this requirement of considering the Act as a whole under intermediate scrutiny—instead of requiring the State to provide a case-specific justification for each individual excluded—is inherent in the very concept of intermediate scrutiny. Intermediate scrutiny for sex-based classifications does not require perfect tailoring. On the contrary, to justify a sex-based classification, the State need only show an important governmental interest and a "substantial relationship" between the classification and that interest: "The State must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cleaned up); *see also, e.g., Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). As a West Virginia district court concisely observed in addressing a similar case: "Sex-based classifications fall under intermediate scrutiny and therefore do not have a 'narrowly-tailored' requirement." *B. P. J. v. W. Virginia State Bd. of Educ.*, No. 2:21-CV-00316, 2023 WL 111875, at *8 (S.D. W. Va. Jan. 5, 2023).

By considering only the Act as applied to the individual Plaintiffs, and disregarding how the Act serves its purposes when applied to transgender-female athletes who transition after undergoing male puberty, the district court incorrectly

conflated the nature of Plaintiffs' challenge with the substantive standard governing the Act's validity. As the Supreme Court has held, "classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding breadth of the remedy, but it does not speak at all *to the substantive rule of law necessary to establish a constitutional violation*." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (emphasis added).

When the correct "substantive rule of law" is applied, *id.*, the Act substantially advances its important government interests in fairness, safety, and equality of opportunity for female athletes. The district court agreed that these are important government interests, A36; *see also Clark I*, 695 F.2d at 1131, and the district court's own findings demonstrate that transgender-female athletes who transition after undergoing male puberty have a significant athletic advantage over biological-female athletes. *See, e.g.,* A25. For example, the district court noted "specific male physiological advantages" that "are a result of testosterone levels in men post-puberty," and did not dispute that "such advantages are not reversed by testosterone suppression after puberty or are reduced only modestly, leaving a large advantage over female athletes." A25. These facts alone demonstrate that the Act is "substantially related" to the interests it advances. *Virginia*, 458 U.S. at 724.

**B.**    **The district court's finding that biological males who do not undergo male puberty have no competitive advantage over female athletes is clearly erroneous.**

8

Even if the State were required to provide a case-specific justification for its exclusion of these particular Plaintiffs instead of justifying the Act as a whole— which it is not—the injunction is still unlikely to be upheld on appeal. The district court's key factual findings used to undermine the Act's justification—*i.e.*, that there is no competitive advantage for biological boys over girls pre-puberty, and thus no competitive advantage for transgender-female athletes who suppress male puberty— are clearly erroneous. All the competent evidence in the record points in the opposite direction. There *is* a competitive advantage for boys over girls in sports before puberty, and there is not a scintilla of evidence that puberty blockers and hormone therapy eliminate this advantage.

As for the competitive advantage for biological boys before puberty, the district court itself acknowledged some of this evidence:

> 50% of 6-year-old boys completed more laps in the 20-meter shuttle (14) than girls (12). (Brown Decl. (Doc. 82-1; 92-1) ¶ 84.) Other fitness data reflects differences between 9 through 17-year-old boys and girls, with 9-year-old boys always exceeding girls' running times by various percentages ranging from 11.1-15.2%, *id.* ¶ 89; arm hang fitness scores (7.48 boys, 5.14 girls), *id.* ¶ 92; standing broad jump (128.3 boys, 118.0 girls), *id.* ¶ 99. (*See also* Brown Decl. (Doc. 82-1; 92-1) ¶106 (quoting Thomas 1985 study at 266) ("Boys exceed girls in throwing velocity by 1.5 standard deviation units as early as 4 to 7 years of age . . ." and throwing distance by 1.5 standard deviation units as early as 2 to 4 years of age).)

A25-26. And there is much more. The evidence of male competitive advantage pre-puberty is overwhelming and effectively uncontradicted. Declaration of Dr. Gregory

A. Brown ("Brown Decl."), A85-102, ¶¶ 77-115; Rebuttal Declaration of Dr. Gregory A. Brown ("Brown Rebuttal Decl."), A171-81, ¶¶ 6-15, 20, 23, 25, 31-32; Declaration of Dr. Emma Hilton ("Hilton Decl."), A299-308, ¶¶ 7.1-7.22; Declaration of Dr. Linda Blade, A354-59.

Plaintiffs' experts contend, and the district court held, that this overwhelming evidence of pre-puberty male competitive advantage should be discounted entirely because it supposedly arises from "other factors such as greater societal encouragement of athleticism in boys, greater opportunities for boys to play sports, *or* differences in the preferences of the boys and girls surveyed." A27 (emphasis added). Notably, by stating "or," the district court declined to specify *which* of these three "other factors" (or combination thereof) supposedly causes the observed pre-pubescent male advantages—*i.e.*, the district court held that *some* other factor(s) must cause the competitive advantages, but did not determine what they are. This is speculation, not evidence. And indeed, Plaintiffs' expert offered only speculation and conjecture—not hard evidence—for his conclusion that other "social" factors cause this discrepancy. *See* Second Rebuttal Declaration of Dr. Daniel Shumer, A373-74, A381, ¶¶ 21, 24, 46. Based on the record evidence before the district court, therefore, the only credible conclusion is that biological males have a significant

10

competitive advantage pre-puberty. The district court's conclusion to the contrary contradicts the overwhelming weight of the evidence and common sense.[2]

Likewise, no evidence supports the Plaintiffs' contention that puberty blockers and hormone treatment eliminate the competitive advantage enjoyed by pre-pubescent males. Brown Decl., A102-105, ¶¶ 116-125; Brown Rebuttal Decl., A181, ¶ 33; Hilton Decl., A315, ¶¶ 11.1-11.4.

### C. The Act easily satisfies rational-basis review.

The Act is subject to rational-basis review because Plaintiffs do not challenge the classification based on sex, but rather how Arizona defines sex. *See, e.g., Jana-Rock Constr., Inc. v. New York Dep't of Econ. Dev.*, 438 F.3d 195, 212-14 (2d Cir. 2006); *Hoohuli v. Ariyoshi*, 631 F. Supp. 1153 (D. Haw. 1986). Unlike the facial discrimination in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019), the Act does not discriminate on the basis of transgender status because all biological boys, whether

---

[2] The three studies cited by the district court all found that in children younger than Plaintiffs, boys had competitive advantages over girls. Handelsman reported that boys had a pre-pubertal advantage over girls in swimming, running, and jumping. Brown Rebuttal Dec., A174-75, ¶ 20 ("This figure demonstrates an average male performance advantage of ~3% in running at age 10, ~4% at age 11, and ~5% at age 12, and this figure also demonstrates an ~6% male advantage in jumping at age 10, and ~5% at ages 11 and 12."). Senefeld reported that the top 100 boy swimmers had greater swim velocity than the top 100 girl swimmers beginning around age 8 (Figure 1), and "beginning at age 10, boys had faster swimming performance than girls." A222, A224. And McKay's data showed males were stronger in 11 of 12 tests from ages 3-9 years (Table 1), and that from 10 years of age "males are significantly stronger in all measures." A253, A255.

they identify as boys or as girls, are excluded from girls' sports. Since the *Clark I* and *II* decisions in the 1980s, boys in Arizona have attempted to play in girls' sports.

The district court's alternative holding that the Act fails rational-basis review, A38-39, is unlikely to be upheld. The Act satisfies rational-basis scrutiny "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Here, there is not just a "conceivable" justification, but an overwhelming one based on extensive scientific evidence, discussed above. *See supra.*

The district court nevertheless held that the Act fails rational-basis scrutiny because it reflects a "bare . . . desire to harm a politically unpopular group." A38-39 (quoting *U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)). This conclusion is insupportable. No competent evidence supports it, and the district court cited none. As *Moreno* makes clear, this conclusion applies only when "[t]he challenged statutory classification … is clearly irrelevant to the stated purposes of the Act." *Id.* Here, the separation of sports based on biological sex is *not* "clearly irrelevant to the stated purposed of the Act," *id.*, as the Ninth Circuit's case law demonstrates. *Clark I*, 695 F.2d at 1131. Separating sports teams by biological sex "simply recogniz[es] the physiological fact that males would have an undue advantage competing against women," and "there is clearly a substantial relationship between the exclusion of males from the team and the goal of redressing past

12

discrimination and providing equal opportunities for women." *Id.* Furthermore, because the Act does not involve a traditionally suspect class, Plaintiffs' animus claim cannot succeed if the Act serves a legitimate government interest, which the Act does. *Boardman v. Inslee*, 978 F.3d 1092, 1119 (9th Cir. 2020); *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1201 (9th Cir. 2018).

> **D.      The Act does not violate Title IX.**

The district court's brief discussion of Title IX, A39-40, is unlikely to be upheld on appeal. The Act is valid under Title IX for many of the same reasons that it is valid under the Equal Protection Clause.

The district court ignored and did not cite evidence that Title IX, from its inception, was understood to specifically *authorize* the separation of sports teams based on biological sex—exactly what the Act does. Title IX's contemporaneous implementing regulation, 34 C.F.R. § 106.41(b) (entitled "Separate teams")—which the district court did not acknowledge or cite—makes this point very clear: "Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* "Title IX permits sex-separate athletic teams 'where selection for such teams is based upon competitive skill or the activity involved is a contact sport.'" *B.P.J.*, 2023 WL 111875, at *9 (quoting 34 C.F.R. § 106.41(b)). "[I]t would require blinders to ignore

13

that the motivation for the promulgation of the regulation was to increase opportunities for women and girls in athletics." *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 175 (3d Cir. 1993). The Act, "which largely mirrors Title IX," does not violate Title IX. *B.P.J.*, 2023 WL 111875, at *10.

In holding to the contrary, the district court relied heavily on *Grabowski v. Arizona Board of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023), and its discussion of *Bostock v. Clayton County*, 140 S. Ct. 1731, 1746-47 (2020). A39-40. This was error. *Bostock* explicitly recognized that "sexual orientation" and "gender identity" (including transgender status) are distinct concepts. *Bostock*, 140 S. Ct. at 1746-47. Pervasive harassment based on perceived sexual orientation violates Title IX under *Grabowski*, see 2023 WL 3961123, at *2, just as employment discrimination based on sexual orientation may violate Title VI under *Bostock*, but neither *Bostock* nor *Grabowski* addressed whether separating sports teams based on biological sex violates Title IX. *See id.* Title IX and its implementing regulations provide that sports teams separated by biological sex are permissible, see 34 C.F.R. § 106.41(b), and binding Ninth Circuit precedent holds the same. *Clark I*, 695 F.2d at 1127. Nothing in *Grabowski* purports to overrule *Clark I* or *II*—nor could it. The district court's only response is that legislation like Arizona's is "currently subject to debate." A5.

14

## II.        Issuing a Stay Will Impose No Cognizable Harm on Plaintiffs.

Because the Act is valid, it imposes no cognizable harm on Plaintiffs.  As discussed above, as biological males, Plaintiffs would have an unfair competitive advantage if they played on girls' teams and forced biological girls to compete against them.  Being required to compete on an even biological footing is not a cognizable harm, while forcing girls to compete on an uneven footing against biological boys *is* a cognizable harm—which the district court ignored.  *See infra.*

To be sure, as the district court held, Plaintiffs contend that they have a medical condition—gender dysphoria—that prevents them from competing on boys' sports teams.  *See* A30-32.  But it is not uncommon for biological males to have medical conditions that prevent them from participating on male sports teams, and those males suffer the same injury of being unable to participate in sports.  Ultimately, that exclusion is due to their medical condition, not due to the States' sex-based separation of sports teams.

Likewise, Plaintiffs' assertions of dignitary harms, "shame," and "humiliation," A41, fail to identify cognizable injuries.  Requiring Plaintiffs to participate on a competitively even footing presents no objective affront to their dignity and provides no objective basis to experience shame or humiliation.  And merely *subjective* feelings of anger, shame, or embarrassment as a result of a government policy, however sincerely felt, do not constitute cognizable irreparable

15

harm—otherwise, every government policy would be subject to an "emotional heckler's veto." *See, e.g., Mungia v. Judson Indep. Sch. Dist.*, No. CIV.A SA-09-CV-395-X, 2009 WL 3431397, at *2 (W.D. Tex. Oct. 19, 2009) ("[Plaintiff] has not provided, nor can this Court locate, any authority in which a Court found irreparable harm based on 'humiliation' or 'embarrassment.'"); *Sharon City Sch. Dist. v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, No. CIV.A. 9-213, 2009 WL 427373, at *2 (W.D. Pa. Feb. 20, 2009) (no irreparable harm based on "embarrassment and humiliation"); *United Steelworkers Of Am. Loc. 13792 v. Mikocem Corp. Cemeteries*, No. 05-73184, 2005 WL 2090884, at *4 (E.D. Mich. Aug. 30, 2005) (no irreparable harm based on "stigmatization and humiliation").

Finally, Plaintiffs' long delay before seeking judicial relief strongly undercuts their claim of irreparable injury. As the district court held, Plaintiffs delayed through three sports seasons—almost a year—before challenging the Act. Plaintiff Roe participated in sports in accordance with the Act for many months before challenging the Act. A20. This significant delay strongly undercuts the urgency of Plaintiffs' asserted injuries. *See, e.g., Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *see also Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004); *Ty, Inc. v. Jones Group,*

16

*Inc*., 237 F.3d 891, 903 (7th Cir. 2001); *Young v. Motion Picture Ass'n of Am., Inc*., 299 F.2d 119, 121 (D.C. Cir. 1962).

## III.     The Injunction Imposes Irreparable Harm on Other Parties Interested in the Proceeding and on the State.

The district court emphasized the injury to Plaintiffs from exclusion in sports, but it disregarded the greater injury to the biological girls unfairly displaced by Plaintiffs' participation in girls' sports. A40-42.  In the district court's discussion of the last three equitable factors, this critical issue was never mentioned.  *Id.* Overlooking the commensurate injuries to the displaced biological *girls* is error.

The district court's finding of irreparable injury to Plaintiffs rested heavily on the district court's findings of social, emotional, and physical benefits from participation in sports:

> School sports offer social, emotional, physical, and mental health benefits.  The social benefits of school sports include the opportunity to make friends and become part of a supportive community of teammates and peers.  School sports provide an opportunity for youth to gain confidence and reduce the effects of risk factors that lead to increases in depression.  Students who play school sports have fewer physical and mental health concerns than those that do not.  Students who participate in high school sports are more likely to finish college and participation in high school sports has a positive impact on academic achievement.

A23 (citations and paragraph divisions omitted).  Needless to say, these same benefits of participating in competitive sports—"social, emotional, physical, and mental health benefits," *id.*—are just as applicable to biological girls as transgender girls.  *See Clark I*, 695 F.2d at 1131.

17

Here, the district court's own findings demonstrated that Plaintiffs' participation in sports threatens to displace biological girls from limited places on sports teams and competitions. The teams on which Doe and Roe wish to compete have competitive try-outs and competitive meets. A15 (Doe "intends to … try out for the girls' soccer and basketball teams"); A16 ("the first cross-country competitive meet will occur the week of August 14, 2023"); A17 (Roe "intends to try out for the girls' volleyball team"). This means that Doe and Roe, to the extent that they succeed in try-outs and meets, *ipso facto* will displace biological girls. In every competitive try-out, a Plaintiff making the team displaces a biological girl who otherwise would have made the team. In every volleyball and basketball game, a Plaintiff getting coveted playing time displaces a biological girl who must sit on the bench. Cross-country meets are scored by ordering *all* runners who participate from first to last. That means that a transgender runner displaces every biological girl who finishes after the transgender runner by at least one place. Competitive sports are zero-sum by their very nature. The district court's analysis ignored the injuries to the biological girls unfairly displaced by biological boys, and it thus relegates them to the status of anonymous, voiceless victims.

The district court held that there will not be much impact on Arizona girls because there are relatively few transgender athletes in Arizona, reasoning as follows: "Less than one percent of the population is transgender, with male and

18

female transgender people being roughly the same in number. . . . It appears untenable that allowing transgender women to compete on women's teams would substantially displace female athletes." A19 (quoting *Hecox v. Little*, 479 F. Supp. 3d 930, 977-78 (D. Idaho 2020)). This holding contradicts the Ninth Circuit's reasoning in *Clark II*, which emphasized the displacement injury that occurs "even to the extent of one player." *Clark By & Through Clark v. Arizona Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989) ("*Clark II*"). "If males are permitted to displace females on the school volleyball team *even to the extent of one player* like Clark, the goal of equal participation by females in interscholastic athletics is set back, not advanced." *Id.* (emphasis added).

The district court also erred by giving no weight to the irreparable injury to the sovereign interest of the State of Arizona when it cannot enforce its valid statutes. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (internal quotation omitted); *see also Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined"); *L. W. by & through Williams v. Skrmetti*, No. 23-5600, 2023 WL 4410576, at *8 (6th Cir. July 8, 2023).

## IV.     The Public Interest Strongly Favors a Stay.

The final factor—public interest—"merge[s]" with the injury to the State and its citizens. *Nken v. Holder*, 556 U.S. 418, 435 (2009).  As noted, the district court held that there are relatively few transgender athletes who have sought access to girls' and women's teams in Arizona so far, and thus it concludes that the injunction will have little impact on the public interest.  A19.  This is error.  *Nken* held that "courts must be mindful that the Government's role as the respondent in every removal proceeding does not make the public interest in each individual one negligible, as some courts have concluded." *Nken*, 556 U.S. at 435.  The fact that such proceedings apply to a single person does not undermine the strong public interest in upholding the law.  Permitting a single transgender-female athlete to participate on girls' teams "permits and prolongs a continuing violation of … law." *Id.* (square brackets omitted).  The Act, as a duly enacted law adopted by Arizona's elected representatives, is itself a clear and authoritative declaration of the public interest in Arizona. *See, e.g., Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (holding that a policy enacted in a statute "is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief").  The district court erred by disregarding these public interests.

## <u>CONCLUSION</u>

The Court should stay the district court's injunction pending appeal.

Dated: August 1, 2023   Respectfully Submitted,

James Otis Law Group, LLC

*/s/ D. John Sauer*
D. John Sauer
Justin D. Smith
13321 N. Outer Forty Road, Suite 300
St. Louis, MO 63017
(314) 562-0031
john.sauer@james-otis.com
*Attorneys for Intervenor-Defendants-Appellants*

21

## **CERTIFICATE OF SERVICE**

I hereby certify that, on August 1, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Circuit Rule 27-1 because it contains 4,944 words and does not exceed 20 pages, excluding those portions pursuant to Federal Rule of Appellate Procedure 32(f), according to Microsoft Word.

This document complies with the typeface requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and the type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Times New Roman font.

*/s/ D. John Sauer*
D. John Sauer
Dated: August 1, 2023