# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HELEN DOE, parent and next friend of Jane Doe, et al., | |
| Plaintiffs-Appellees, | **No. 23-16026** |
| v. | Appeal from the United States District Court for the District of Arizona (No. 4:23-cv-00185-JGZ) |
| THOMAS C. HORNE, in his official capacity as State Superintendent of Public Instruction, et al., | |
| Defendants, | |
| and | |
| WARREN PETERSEN, Senator, President of the Arizona State Senate; BEN TOMA, Representative, Speaker of the Arizona House of Representatives, | |
| Intervenor-Defendants-Appellants. | |

## SUPPLEMENTAL APPENDIX TO RESPONSE TO INTERVENOR-DEFENDANTS-APPELLANTS' EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR A STAY PENDING APPEAL

# TABLE OF CONTENTS

1. Declaration of Dr. Stephanie Budge, Ph.D., in Support of Plaintiffs'
   Motion for a Preliminary Injunction and Plaintiffs' Motion
   to Proceed Under a Pseudonym, Doc. 4 ....................................................SA004

2. Declaration of Dr. Daniel Shumer, M.D., MPH, in Support of
   Plaintiffs' Motion for a Preliminary Injunction and Plaintiffs'
   Motion to Proceed Under a Pseudonym, Doc. 5 ......................................SA050

3. Declaration of Jane Doe in Support of Her Motion for a Preliminary
   Injunction and Her and Helen and James Doe's Motion
   to Proceed Under a Pseudonym, Doc. 6 ..................................................SA077

4. Declaration of Helen Doe in Support of Jane Doe's Motion for a
   Preliminary Injunction and Her and Jane and James Doe's Motion
   to Proceed Under a Pseudonym, Doc. 7 ..................................................SA081

5. Declaration of Megan Roe in Support of Her Motion for a
   Preliminary Injunction and Her and Kate and Robert Roe's Motion
   to Proceed Under a Pseudonym, Doc. 8 ..................................................SA087

6. Declaration of Kate Roe in Support of Megan Roe's Motion for a
   Preliminary Injunction and Her and Megan and Robert Roe's Motion
   to Proceed Under a Pseudonym, Doc. 9 ..................................................SA091

7. Exhibit 1 filed by Defendant Arizona Interscholastic Association,
   Inc. in Response to Plaintiffs' Motion for Preliminary Injunction,
   Doc. 51-1 .................................................................................................SA096

8. Rebuttal Declaration of Dr. Stephanie Budge, Ph.D., in Support of
   Motion for a Preliminary Injunction, Doc. 65-1 ......................................SA119

9. Rebuttal Declaration of Daniel Shumer, M.D., in Support of
   Motion for a Preliminary Injunction, Doc. 65-1 ......................................SA141

10. Second Declaration of Helen Doe in Support of Jane Doe's Motion
    for a Preliminary Injunction, Doc. 78 .....................................................SA164

11. Exhibit 26 filed by Plaintiffs in support of Plaintiffs' Motion for Preliminary Injunction, Third Declaration of Helen Doe in Support of Jane Doe's Motion for a Preliminary Injunction, Doc. 109 .................SA168

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Colin Proksel
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
State Bar No. 034133
Telephone:      (602) 640-9000
Facsimile:       (602) 640-9050
Email:            cproksel@omlaw.com

*Attorney for Plaintiffs*

*Additional counsel listed on following page*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION**

Jane Doe, by her next friend and parents Helen Doe and James Doe; and Megan Roe, by her next friend and parents, Kate Roe and Robert Roe,

                    Plaintiffs,

          v.

Thomas C. Horne in his official capacity as State Superintendent of Public Instruction; Laura Toenjes, in her official capacity as Superintendent of the Kyrene School District; Kyrene School District; The Gregory School; and Arizona Interscholastic Association Inc.,

                    Defendants.

Case No. _____

**DECLARATION OF DR. STEPHANIE BUDGE, PH.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND PLAINTIFFS' MOTION TO PROCEED UNDER A PSEUDONYM**

**SA004**

1
2
Jyotin Hamid*
Justin R. Rassi*
Amy C. Zimmerman*
3   DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
4   New York, New York 10001
5   Telephone: (212) 909-6000
Facsimile: (212) 909-6836
6   Email: jhamid@debevoise.com
Email: jrassi@debevoise.com
7   Email: azimmerman@debevoise.com
8
9   Amy Whelan*
Rachel Berg*
10  NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
11  San Francisco, California 94102
12  Telephone: (415) 343-7679
Facsimile: (415) 392-8442
13  Email: rberg@nclrights.org
Email: awhelan@nclrights.org
14
15  *Pro hac vice application forthcoming

16
17
18
19
20
21
22
23
24
25
26
27
28

**SA005**

1  I, Stephanie Budge, declare as follows:

2  1.   I submit this expert declaration based upon my personal knowledge.

3  2.   If called to testify in this matter, I would testify truthfully based on my

4  expert opinion.

5  **Qualifications and Experience**

6  3.   I am a licensed psychologist who has been specializing in issues of gender

7  identity and gender transition processes for over 15 years. I received a master's degree in

8  educational psychology from the University of Texas at Austin in 2006 and a PhD in

9  counseling psychology in 2011 from the University of Wisconsin-Madison (UW-

10  Madison). My PhD concentration focused on transgender individuals' mental health. As

11  part of my PhD program, I also specialized in psychological assessment. A true and

12  correct copy of my curriculum vitae is attached hereto as **Exhibit A**.

13  4.   I have been a mental health professional since 2006, and I am currently

14  licensed to practice psychology in the state of Wisconsin (license # 3244-57). I have been

15  a faculty member in the UW-Madison Department of Counseling Psychology since 2014.

16  5.   I have expertise working with transgender individuals. Since 2007, I have

17  been a mental health provider to transgender individuals. Since 2011, transgender

18  individuals have comprised the majority of my clinical caseload, and I have worked

19  clinically with over 200 transgender clients through the provision of individual therapy,

20  group therapy, psychological evaluations, and supervision of others' clinical work.

21  6.   As a faculty member at UW-Madison, I teach courses that focus on training

22  master's and doctoral students skills to become mental health professionals and

23  psychological researchers. I provide *pro bono* therapy and train student therapists in best

24  practices in clinical work with transgender clients at the Counseling Psychology Training

25  Clinic (CPTC), the community clinic affiliated with my academic department at UW-

26  Madison.

27

28

7.    As part of my faculty appointment, I am the Director of the Trans CARE Collaborative. In this role, I design research projects that focus on transgender individuals' mental health.

8.    I am also the Director of the Advancing Health Equity and Diversity (AHEAD) program in the School of Medicine and Public Health at UW-Madison. In this role, I mentor postdoctoral scholars and junior faculty in the School of Medicine and Public Health who focus their clinical and research efforts on health equity issues.

9.    I have published 99 invited and peer-reviewed journal articles and book chapters, with the majority of these focusing on transgender individuals. Several of these publications are focused on the impact of discrimination on transgender people's mental health and effective interventions to improve transgender people's mental health. I have been involved in more than 180 academic presentations (internationally, nationally, and regionally), the majority of which have focused on transgender individuals. I am an associate editor for the journal *Psychology of Sexual Orientation and Gender Diversity*. I am on the editorial board for the *International Journal of Transgender Health* and *LGBTQ+ Family: An Interdisciplinary Journal*. Researchers in the United States and internationally have sought my assistance as an expert reviewer for research focused on transgender individuals. A listing of my publications and lectures is included in my curriculum vitae in **Exhibit A**.

10.    I have received several awards for my work with transgender individuals. Most recently, I received the 2021 American Psychological Association (APA) Distinguished Contribution to Counseling Psychology Award for my clinical work and research with transgender people. I also received the 2021 APA Social Justice Award for my contributions to psychotherapeutic practice with transgender people. I was the first recipient of the APA Transgender Research Award in 2010. Locally, I am also a member of the Wisconsin Trans Health Coalition (WTHC), which is an organization focused on

SA007

improving health care for transgender individuals throughout Wisconsin. My primary role in the coalition is to consult on research projects and collect data about transgender individuals in the upper Midwest to tailor health care interventions for local community members. For my community-focused research with the WTHC, I received the 2018 UW-Madison School of Education Community Engaged Scholar Award, the 2021 UW-Madison Exceptional Service Award, and the 2022 UW-Madison School of Education Excellence in Diversity Award.

11.    I am also a member of the Society for the Psychology of Sexual Orientation and Gender Diversity within the APA (of which I am also a member). In August 2021, I completed a 10-year term as co-chair of the Science Committee for the Society and now continue as a member of the committee. We provide programming at the annual APA convention to disseminate cutting-edge research on the best psychological practices and evidence-based treatments with lesbian, gay, bisexual, transgender, and queer (LGBTQ) individuals. At the 2022 APA annual convention, I chaired or participated in six presentations/panels that focused on (a) best practices in psychological science focused on transgender populations; and (b) interventions to reduce psychological distress for transgender individuals. In 2021, I became a Fellow of the APA.

12.    I am also a member of the World Professional Association of Transgender Health (WPATH). WPATH is an interdisciplinary professional and educational organization of individuals worldwide specializing in research and practice in transgender health. A complete list of my involvement in various professional associations is included in my curriculum vitae in **Exhibit A**.

13.    In preparing this declaration, I reviewed the text of Senate Bill 1165 ("SB 1165") at issue in this matter. I also relied on my scientific education and training, my research experience, and my knowledge of the scientific literature in the pertinent fields. The materials I have relied upon in preparing this declaration are the same types of materials that experts in my field of study regularly rely upon when forming opinions on

3

1  these subjects. I may wish to supplement these opinions or the bases for them because of
2  new scientific research or publications or in response to statements and issues that may
3  arise in my area of expertise.

4      14.    I have not met or spoken with the Plaintiffs or their parents for purposes of
5  this declaration. My opinions are based solely on the information that Plaintiffs' attorneys
6  have provided me as well as my extensive background and experience with transgender
7  clients.

8      15.    In the past six years, I have been retained as an expert witness in the
9  following cases: *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. Of Educ.*, No. 16-3522
10  (7th Cir.), *Flack v. Wis. Dep't of Health Servs.*, No. 3:18-cv-00309 (W.D. Wis.), *Boyden*
11  *v. State of Wis. Emp. Trust Funds*, No. 17-cv-00264-wmc (W.D. Wis.), *Cooper v. USA*
12  *Powerlifting & USA Powerlifting Minn.*, No. 62-CV-21-211 (Minn.), *Bridge v. Okla.*
13  *State Dep't of Educ.*, No. CIV-22-787-JD (W.D. Okla.), and *Lusk v. Minn. Dep't of*
14  *Corr.*, No. 62-CV-22-3284 (Minn.). Of these cases, I provided testimony by deposition
15  and at trial in *Boyden* and testimony by deposition in *Cooper*.

16      16.    I am being compensated at an hourly rate of $250/hour for actual time
17  devoted for research, preparation, reports, and/or consulting related to my expert opinion
18  in this case. If deposed or providing testimony in the state of Wisconsin, I will be
19  compensated at a rate of $400/hour. I also receive $3,000 a day for compensation when
20  travel is required for my services. My compensation does not depend on the outcome of
21  this litigation, the opinions I express, or the testimony I provide.

22  **<u>Transgender Youth</u>**

23      17.    The term "gender identity" is well-established in psychology and medicine
24  and refers to a person's internal or psychological sense of having a particular gender. All
25  human beings have a gender identity. Human beings usually begin to explore and
26  understand their gender identity around the age of three (with some variation).

27
28

4

**SA009**

18. At birth, the sex of infants is generally identified as male or female based on external genitalia. Typically, individuals born with the external physical characteristics commonly associated with males grow up to identify as men and experience themselves as male, and individuals born with the external physical characteristics commonly associated with females grow up to identify as women and experience themselves as female. However, for transgender individuals, their gender identity differs from the sex they were identified as at birth.

19. Every individual's sex is comprised of many distinct biologically influenced characteristics, including but not limited to chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and gender identity.

20. Transgender children and adolescents experience a pervasive, consistent, persistent, and insistent sense of being a gender different from the sex assigned to them.

21. Gender identity is innate and cannot be changed through psychological or medical treatments. A girl who is transgender cannot simply turn off her gender identity like a switch, any more than a non-transgender girl or anyone else could. It is not a personal decision, preference, or belief. It is a core sense of oneself.

22. Like all children, transgender youth can thrive and grow into healthy adults when they are supported by their parents and caretakers and their social environment.

**Medical Care for Transgender Youth**

23. The incongruence between a person's gender identity and sex assigned at birth can manifest in clinically significant and disabling distress, which the APA calls gender dysphoria.[1] Gender dysphoria is codified in the APA's Diagnostic and Statistical Manual of Mental Disorders (DSM-5) and is the medical and psychiatric diagnosis for distress associated with gender incongruence.

---

[1] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013).

5

24.   Two current diagnostic categories are used by mental health and medical providers when children and youth are transgender: Gender Dysphoria in Childhood (DSM Diagnostic Code F64.2) and Gender Dysphoria in Adolescents and Adults (DSM Diagnostic Code F64.9). Although individuals who are diagnosed with gender dysphoria can experience a diversity of symptoms, the shared diagnostic criteria that is required for both includes clear, distinct, and significant distress from the incongruence between the sex the individual was assigned at birth and their gender identity.

25.   Gender dysphoria is highly treatable, and the medical community has known for decades how to treat this serious medical condition. Every major medical association in the United States agrees that medical treatment for gender dysphoria is safe, necessary, and effective.

26.   The precise treatment for gender dysphoria depends on the individual. For most transgender individuals, a gender transition is considered psychologically and medically necessary. Transition can take either or both of two forms: (a) social transition, and (b) medical treatments that change a person's body to align with their gender.

27.   For transgender individuals, social transition can be an important aspect of treatment to reduce the symptoms of gender dysphoria. As part of a social transition, an individual will typically, among other things, use a name and pronouns congruent with their gender identity and use sex-designated facilities such as restrooms that align with their gender identity. To be clinically effective at alleviating the distress associated with gender dysphoria, a social transition must be respected consistently across all aspects of a transgender individual's life—for example, at home, in school, and at work. It is the aim of treatment to assist the individual in successfully integrating their internal identity into a life that allows them to function consistently in accordance with that identity and not feel shame for who they are. For those transgender adolescents for whom social transition is part of treatment of gender dysphoria, it is likely that serious distress will result if clinically indicated aspects of transition are impeded.

SA011

28.     Many transgender patients also undergo medical procedures to assist them with achieving primary or secondary sex characteristics that are closely aligned with their gender identity. Hormone therapy may be prescribed—either puberty-blocking hormones designed to delay the onset of physical changes associated with puberty and/or hormones designed to masculinize or feminize the individual's appearance. Chest reconstruction may be advised for some older adolescents, depending on several factors. Genital surgery is generally not advised until after the adolescent has reached the age of majority. Whether any of these medical interventions are indicated for a patient depends on the needs of the individual patient.

29.     Transgender girls treated with hormone therapy may appear indistinguishable from non-transgender girls. Transgender girls who are prescribed puberty blockers will not develop the deepened voice, facial hair, and muscle development experienced by boys during puberty, and if that is followed by estrogen and anti-androgen medication, they will have breast development, redistribution of fat (specific to abdomen, buttocks, hips, thighs, and arms), musculature, and hair and skin texture typical of other girls.

30.     Psychotherapy to reduce the harmful effects of stigma and improve resiliency can also be an important form of support for individuals of any age with gender dysphoria. While psychotherapy can be useful as a support tool, it is not a substitute for social transition and medical treatments needed to reduce/eliminate gender dysphoria.

31.     There is no "one size fits all" treatment regimen. In addition, individuals may be constrained by practical limitations—such as medical contraindications or cost—on the ability to obtain particular treatments.

32.     Attempts to "cure" transgender individuals by seeking to change their gender identity to match their assigned sex are ineffective and cause extreme psychological damage. All major associations of medical and mental health providers, including the American Medical Association, the American Psychiatric Association, the

7

**SA012**

1   American Psychological Association, and the American Academy of Pediatrics, consider

2   such efforts unethical.

3      33.    When individuals with gender dysphoria do not obtain competent and

4   necessary treatment, serious and debilitating psychological distress (for example, suicidal

5   ideation, substance use, depression, anxiety, and self-harm) often occurs.

6      34.    Failing to support a transgender minor's gender identity can cause serious

7   harm to their long-term health and wellbeing because transgender youth experience that

8   mistreatment as a profound rejection of their core self. This harm often includes

9   significant psychological distress and difficulty maintaining healthy interpersonal

10  relationships and developing emotional resilience, among others.

11            **Participating in Sports Provides Significant Long-Term Benefits**

12              **to a Child's Mental and Physical Health and Wellbeing**

13      35.    For children and young adults, school-sponsored athletics offer lifelong

14  benefits and have a positive developmental impact that is second only to family support.

15  These benefits can be seen in a variety of realms in students' lives, including social and

16  emotional development as well as physical and mental health. With regards to social

17  benefits, students who participate in sports are given the opportunity to make friends and

18  become part of a supportive community of teammates and peers.[2] Athletes spend

19  considerable time with their teammates, often experiencing high-pressure situations

20  together that lead to deeper friendships. Students who participate in sports also can build

21  teamwork, discipline, and leadership skills. They learn the importance of working as part

22  of a team to achieve a common goal and the importance of each teammate's role in

23  bringing about that goal. Moreover, coaches and other staff members provide students

24

25

26  [2]  *See* Erin M. Boone & Bonnie J. Leadbeater, *Game On: Diminishing Risks for*

27  *Depressive Symptoms in Early Adolescence Through Positive Involvement in Team Sports*, 16 J. Rsch. Adolescence 79 (2006).

28

SA013

1   who participate in sports access to meaningful mentorship and guidance. This mentorship

2   can extend beyond school athletics, guiding students through other areas of their lives.

3         36.    With regards to emotional benefits, school sports provide an opportunity

4   for youth to gain confidence. They also reduce the effects of risk factors, such as stressful

5   life events, that lead to increases in depression.[3] Furthermore, learning how to manage

6   stressful events at a young age provides benefits to student athletes throughout their lives,

7   such as learning how to regulate their emotions.[4] Students who participate in sports

8   experience significantly lower levels of externalizing issues (for example, aggression and

9   delinquency) and anxiety/depression.[5] Students also experience the success and personal

10  fulfillment achieved from discipline, hard work, and perseverance through many hours of

11  practice and competition, all of which helps students develop positive habits that can

12  benefit them in many other areas of life.[6]

13        37.    With regards to physical and mental health benefits, students who play

14  school sports have fewer physical and mental health concerns when compared to those

15  who do not.[7] Participation in sports at a young age also encourages continued

16  participation as an adult, in turn reducing the morbidity and mortality of many diseases

17  that can arise later in life.[8]

18  [3]  *See id.* at 79, 88.

19  [4]  *See, e.g.*, Stewart A. Vella et al., *Sports Participation and Parent-Reported Health-*
       *Related Quality of Life in Children: Longitudinal Associations*, 164(6) J. Pediatrics

20     1469 (2014).

21  [5]  *See* Sarah J. Donaldson & Kevin R. Ronan, *The Effects of Sports Participation on*
       *Young Adolescents' Emotional Well-Being*, 41 Adolescence 369 (2006).

22  [6]  *See, e.g.*, Jennifer Y. Mak & Chong Kim, *Relationship Among Gender, Athletic*
       *Involvement, Student Organization Involvement and Leadership*, 25:2 Hum. Kinetics

23     J. 89 (2016); Robert P. Dobosz & Lee A. Beaty, *The Relationship Between Athletic*
       *Participation and High School Students' Leadership Ability*, 34 Adolescence 215

24     (1999).

25  [7]  Hans Steiner et al., *Adolescents and Sports: Risk or Benefit?*, 39 Clinical Pediatrics
       161, 164 (2000).

26  [8]  Christer Malm et al., *Physical Activity and Sports—Real Health Benefits: A Review*

27     *with Insight into the Public Health of Sweden*, 7 Sports 1, 13–14 (2019).

28

9

SA014

38.    Moreover, students who participate in high school sports are more likely to finish college and to be actively engaged in planning for their future. Participation in sports also has a positive impact on academic achievement.[9]

**The Negative Impact of Banning Transgender Girls from School Sports**

39.    Based on my experience working with transgender youth, it would be psychologically damaging for a transgender girl to be banned from playing sports on equal terms with their non-transgender peers. This specific type of discrimination causes irreversible and severe damage to their development. Specifically, discriminating against transgender youth athletes leads to an increase in youth anxiety, depression, trauma, and suicidal ideation/attempts as well as an increase in physical health concerns for transgender youth.[10] Barrera et al. (2022) report that the physical consequences for transgender youth of not being able to participate in sports include worse cardiovascular outcomes, poor bone mineral density, and poor neurocognitive development when compared to non-transgender youth.[11] In addition, physicians report that participation in sports is often one primary method through which transgender youth gain access to regular medical care, and if they do not participate in sports, it increases the disparity between non-transgender youth and transgender youth.[12] In addition to the physical and mental health consequences of not being able to participate in sports, transgender people

---

[9]    *See, e.g.*, Angela Lumpkin & Judy Favor, *Comparing the Academic Performance of High School Athletes and Non-Athletes in Kansas in 2008-2009*, 4 J. Sport Admin. & Supervision 41 (2012).

[10]    Landon D. Hughes et al., *Pediatric Provider Perspectives on Laws and Policies Impacting Sports Participation for Transgender Youth*, 9(4) LGBT Health 247–53 (2022).

[11]    Ellis Barrera et al., *The Medical Implications of Banning Transgender Youth from Sport Participation*, 176(3) JAMA Pediatrics 223–24 (2022).

[12]    *See* Hughes et al., *supra* note 10.

SA015

report greater experiences of harassment, prejudice, rejection, and bullying as a result of legislation focused on restricting transgender people's rights.[13]

40.   Transgender girls will also internalize the shame and stigma of being excluded for a personal characteristic (being transgender) over which they have no control and that already subjects them to prejudice and social stigma. Fear of additional discrimination and violence are two primary outcomes that stem from transgender girls being excluded from sports. Not only are there the actual consequences outlined above that occur from direct discrimination, but fear of additional sports-related discrimination leads transgender youth to avoid gym/physical education class, locker rooms, and athletic fields and facilities.[14] Also, being misgendered (i.e., requiring transgender girls to participate in boys' sports) is associated with the internalization of stigma and the subsequent mental health consequences that arise from internalized stigma.[15]

41.   For transgender girls who are already playing on girls' teams, a law that requires them to be excluded from continued participation on girls' teams would have a further negative impact on their health and well-being, causing them to feel isolated, rejected, and stigmatized, and thereby putting them at high risk for severe depression and/or anxiety.

---

[13]   Elliot A. Tebbe et al., *A Dangerous Visibility: Moderating Effects of Anti-Trans Legislative Efforts on Trans and Gender-Diverse Mental Health*, 9(3) Psych. Sexual Orientation Gender Diversity 259–71 (2021).

[14]   Joseph G. Kosciw, et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* 10–11 (2022).

[15]   Kevin A. McLemore, *Experiences with Misgendering: Identity Misclassification of Transgender Spectrum Individuals*, 3(1) Stigma & Health 53–64 (2015).

11

1    I declare under criminal penalty under the laws of Arizona that the foregoing is

2    true and correct.

3        Signed on the 7th day of April, 2023 in Madison, Wisconsin.

4

5                                               Stephanie Budge, Ph.D.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    12

# EXHIBIT A

**Stephanie L. Budge, PhD, Licensed Psychologist**
**Curriculum Vitae**
Department of Counseling Psychology, School of Education, Room 305, University of
Wisconsin-Madison, Madison, WI 53706, 608-263-3753, budge@wisc.edu

## EDUCATION

**Doctor of Philosophy**                                             **8/2006 - 8/2011**
University of Wisconsin-Madison
APA Accredited Counseling Psychology Program
Minor: Psychological Assessment
Dissertation Title: *Distress in the transition process for transgender individuals: The role of loss, community, and coping.*

**Master of Science**                                                **8/2004 - 5/2006**
University of Texas at Austin
Educational Psychology
Thesis Title: *Sexual pressure in gay, lesbian, and bisexual relationships.*

**Bachelor of Science**                                              **1/2003 - 12/2003**
University of Utah
Major: Psychology

Pace University                                                      **9/2000 - 12/2002**
Major: Psychology
Minor: Women's and Gender Studies

## POSITIONS HELD

**Associate Professor**, tenured                                     **8/2018 - current**
Department of Counseling Psychology,
University of Wisconsin-Madison

**Director of AHEAD (Advancing Health Equity and Diversity)**        **7/2018 – current**
Institute for Clinical and Translational Research
School of Medicine and Public Health
University of Wisconsin-Madison

**Diversity, Equity, and Inclusion Scholar In Residence**            **1/2022 – 12/2022**
Mental Illness Research Education and Clinical Center
Veterans Affairs

**Health Psychologist**                                              **6/2017 – 2/2019**
University of Wisconsin Hospital & Clinics

**SA019**

Stephanie Budge CV 2023

American Family Children's Hospital

**Assistant Professor**, tenure-track                                                 8/2016 – 8/2018
Department of Counseling Psychology,
University of Wisconsin-Madison

**Assistant Professor**, visiting,                                                   8/2014 - 7/2016
Department of Counseling Psychology,
University of Wisconsin-Madison

**Postdoctoral Clinical Training**                                                   7/2013 - 6/2014
University of Louisville Trans Project

**Assistant Professor**, tenure-track                                                 8/2011 - 8/2014
Department of Educational and Counseling Psychology,
University of Louisville

**Postdoctoral Clinical Training,**                                                  9/2011 - 8/2012
University of Louisville Counseling Center

**Predoctoral Internship**,                                                          8/2010 - 8/2011
University of Minnesota, University
Counseling and Consulting Services,
APA-Accredited, APPIC listed predoctoral internship

## PROFESSIONAL LICENSE

Licensed Psychologist in Wisconsin - 3244-57                                         **2/2015 - current**

Licensed Psychologist (provisional) in Kentucky - 2012-42                            **8/2011 - 6/2014**
(under supervision to gain hours for Health Service Provider status)

## SPECIAL HONORS AND AWARDS
**Excellence in Diversity Award**                                                    **3/2022**
Awarded the School of Education Excellence in Diversity Award at UW-Madison—awarded for
my research, teaching, and service focused on supporting and advocating for LGBTQ people.

**American Psychological Association Division 44 Fellow**                            **10/2021**
Fellow status is an honor bestowed upon APA members who have shown evidence of unusual
and outstanding contributions or performance in the field of psychology. Fellow status requires
that a person's work has had a national impact on the field of psychology beyond a local, state or
regional level. Division 44 focuses on psychological science and issues related to Lesbian, Gay,
Bisexual, Transgender, and Queer people.

**UW-Madison Exceptional Service Award**                                            **4/2021**
Awarded the UW-Madison Exceptional Service Award, provided to faculty who provide service

2

**SA020**

Stephanie Budge CV 2023

"above and beyond" service expectorations in a university environment

**Division 17 Distinguished Contribution to Counseling Psychology**                          **4/2021**
American Psychological Association Division 17 (Society of Counseling Psychology) award for
research and practice with trans and nonbinary populations

**Division 29 Social Justice Award**                                                          **2/2021**
American Psychological Association Division 29 (Society for the Advancement of
Psychotherapy) award for social justice work and research with LGBT populations

**Impact 2030 Faculty Fellow**                                                                **8/2020**
Awarded the Impact 2030 Faculty Fellowship. Chosen to be one of 10 faculty in the School of
Education to be an Impact 2030 Fellow. The fellowship includes 5 years of research support.

**Honorary Rainbow Degree**                                                                   **5/2019**
The University of Wisconsin-Madison's Gender and Sexuality Campus Center provides an
award every year to an individual on campus who is dedicated to making positive change for
LGBTQ students on campus.

**Community Engaged Scholarship Award**                                                       **4/2018**
The University of Wisconsin-Madison School of Education award for researchers engaged in
community-focused scholarship—awarded specifically for my collaborations with the Wisconsin
Trans Health Coalition

**Outstanding Paper Award**                                                                   **6/2017**
American Psychological Association Division 17 (Counseling Psychology) award for a 2016
major contribution published in *The Counseling Psychologist*

**Division 17 Early Career Award**                                                            **7/2017**
American Psychological Association Division 17 (Counseling Psychology) award for social
justice work and research with LGBT populations

**Division 29 Early Career Award**                                                            **5/2015**
American Psychological Association Division 29 (Society for the Advancement of
Psychotherapy) award for psychotherapy research

**University of Louisville Trustees Award Nomination**                                        **2/2013**
Nomination provided to faculty for excelling in mentoring students

**Outstanding Graduate Student Award**                                                        **7/2010**
American Psychological Association Division 17 (Counseling Psychology) LGBT award given
for community contributions with the LGBT population during my doctoral studies

**Graduate Student Research Award**                                                           **7/2010**
American Psychological Association Division 17 (Counseling Psychology)
Society for Vocational Psychology/ACT for career research regarding transgender

3

**SA021**

Stephanie Budge CV 2023

individuals

**Transgender Research Award**                                                                 6/2010
Recipient of the inaugural American Psychological Association Division 44
(Society for the Psychological Study of Lesbian, Gay, Bisexual, and Transgender
Issues) award for research with transgender populations

**John W. M. Rothney Memorial Research Award**                                    2/2010
University of Wisconsin-Madison Counseling Psychology Department award provided to an
outstanding doctoral student excelling in research

**Outstanding Student Poster Award**                                                       8/2009
American Psychological Association Division 17 (Counseling Psychology)

**EXPERT WITNESS AND PUBLIC INTEREST EXPERIENCE**

Lusk v. Minnesota Department of Corrections, No. 62-CV-22-3284 (Minnesota, 2022)

Bridge v. Oklahoma State Department of Education, No. CIV-22-787-JD (Oklahoma, 2022)

Cooper v. USA Powerlifting & USA Powerlifting Minnesota, No. 62-CV-21-211 (Minnesota, 2021)

Boyden v. State of Wisconsin Employee Trust Funds, No. 17-cv-264 (Wisconsin, 2018)

Flack v. Wisconsin Department of Health Services, No. 3:18-cv-00309 (Wisconsin, 2018)

Whitaker v. Kenosha Unified School District, No. 2:16-cv-00943-PP (7th Cir. 2016)

Name redacted (private case of a transgender woman seeking asylum), United States DOJ
Immigration Court Case (2015)

## RESEARCH
**JOURNAL PUBLICATIONS**
Underlining denotes student

1. **Budge, S.L.,** Shoenike, D., Lee, J., Norton, M., & Sinnard, M.T. (In press). Transgender and nonbinary patients' psychotherapy goals: A secondary analysis from a randomized controlled trial. *Journal of Psychiatric Research.*
2. Raines, C., Lindley, L., & **Budge, S.L.** (In press). Development and validation of the Masculine Sexual Entitlement Norms Scale. *Psychology of Men & Masculinities.*
3. **Budge, S.L.,** Sinnard, M.T, Lindley, L., Dillard, Q., & Katz-Wise, S.L. (In press). Content analyses of concordance and discordance regarding identity, affect, and coping in families with transgender and nonbinary youth. *LGBTQ+ Family: An Interdisciplinary Journal.*

4

**SA022**

Stephanie Budge CV 2023

4. **Budge, S.L.,** Tebbe, E.A., & Love, D. (In press). The development and pilot testing of a minority stress psychoeducation tool for transgender and nonbinary people. *Transgender Health.*

5. Lindey, L., Pulice-Farrow, L., & **Budge, S.L.** (In press).  The antecedents of gender dysphoria and the associated thoughts, emotions, and ways of coping: A qualitative analysis and clinical implications. *Counselling Psychology Quarterly.*

6. Lindley, L., & **Budge, S.L.** (In press). Development and validation of the Trans and Nonbinary Coping Measure (TNCM): A measure of trans and nonbinary specific ways of coping with gender-related stress. *Psychology of Sexual Orientation and Gender Diversity.*

7. Tebbe, E., Bell, H., Cassidy, K., Lindner, S., Wilson, E., & **Budge, S.L.** (In press). "It's loving yourself for you": Happiness in trans and nonbinary adults. *Psychology of Sexual Orientation and Gender Diversity.*

8. Xu, G., Wang, K., **Budge, S.L.,** & Sun, S. (2023). "We don't have a template to follow": Sexual identity development and its facilitative factors among sexual minority men in the context of China. *Journal of Counseling Psychology, 70,* 46–158.

9. Tebbe, E.A. & **Budge, S.L.** (2022). Mental health and the factors driving disparities and promoting well-being in trans and nonbinary people. *Nature Reviews Psychology, 12,* 694-707.

10. dickey, l. m., Thomas, K., Andert, B., Ibarra, N., & **Budge, S. L.** (2022). The relationship between realization of transgender identity and transition processes with nonsuicidal self-injury in transgender populations. *Psychiatry Research, 310,* 114332.

11. Minero, L.M., Domínguez, S. Jr., **Budge, S.L.,** & Salcedo, B. (2022). Latinx trans immigrants' survival of torture in U.S. detention: A qualitative investigation of the psychological impact of abuse and mistreatment. *International Journal of Transgender Health, 23,* 35-59.

12. Sinnard, M.T., **Budge, S.L.,** & Rossman, H.R. (2022). Nonbinary individuals' emotional experiences: implications for advancing counseling psychology beyond the binary. *Counselling Psychology Quarterly, 35,* 19-42.

13. Barr, S.M., Snyder, K., Adelson, J., & **Budge, S.L.** (2021). Post-traumatic stress in the trans community: The roles of anti-transgender bias, non-affirmation, and internalized transphobia. *Psychology of Sexual Orientation and Gender Diversity, 9*(4), 410–421.

14. **Budge, S.L.,** Guo, E., Mauk, E., Tebbe, E.A. (2021). The development of an observational coding scheme to assess transgender and nonbinary clients' reported minority stress experiences. *Psychotherapy, 58,* 288-300.

15. Thai, J.L., **Budge, S.L.,** & McCubbin, L. (2021). Qualitative examination of transgender Asian Americans navigating and negotiating cultural identities and values. *Asian American Journal of Psychology, 12,* 301–316.

16. Bhattacharya, N., **Budge, S.L.,** Pantalone, D.W., & Katz-Wise, S.L. (2021). Conceptualizing relationships among transgender and gender diverse youth and their caregivers. *Journal of Family Psychology, 35,* 595-605.

17. **Budge, S.L.,** Sinnard, M.T., & Hoyt, W.T. (2021). Longitudinal effects of psychotherapy with transgender and nonbinary clients: A randomized controlled pilot trial. *Psychotherapy, 58,* 1-11.

**SA023**

Stephanie Budge CV 2023

18. **Budge, S.L.,** Orzechowski, M., Lavender, A., Schamms, S., Onsgard, K., Leibowitz, S., & Katz-Wise, S.L. (2021). Transgender and gender nonconforming youths' emotions: The Appraisal, Valence, Arousal Model. *The Counseling Psychologist, 49, 138-172.*

19. **Budge, S.L.,** Lee, J., Lindley, L. (2020). Therapy with transmasculine clients. *Psychotherapie im Dialogue, 21, 52-56.*

20. Sun, S., **Budge, S.L.,** Shen, W., Ge, X., Liu, M., & Feng, S. (2020). Minority stress and health: A grounded theory exploration among men who have sex with men in China and implications for health research and interventions. *Social Science and Medicine.*

21. Allen, B.J., Andert, B., Botsford, J., **Budge, S.L.,** & Rehm, J. (2020). Intersections at the margins: Comparing school experiences of nonbinary and binary-identified transgender youth. *Journal of School Health, 90, 358-367.*

22. dicky, l.m. & **Budge, S.L.** (2020). Suicide and the transgender experience: A public health crisis. *American Psychologist, 75,* 380-390.

23. **Budge, S.L.,** Domínguez, S. Jr., & Goldberg, A.E. (2020). Minority stress in nonbinary students in higher education: The role of campus climate and belongingness. *Psychology of Sexual Orientation and Gender Diversity,* 7, 222-229.

24. Pantalone, D. & **Budge, S.L.** (2020). Psychotherapy research is needed to improve clinical practice for clients with HIV. *Psychotherapy, 57,* 1-7.

25. Hase, C.N., Meadows, J.C., & **Budge, S.L.** (2019). Inclusion and exclusion in the white space: An investigation of the experiences of people of color in a primarily white American meditation community. *Journal of Global Buddhism, 20,* 1-18.

26. Paquin, J., Tao, K., & **Budge, S.L.** (2019). A social justice framework for ethical psychotherapy research. *Psychotherapy, 56,* 491-502.

27. **Budge, S.L.,** & Katz-Wise, S. L. (2019). Sexual minorities' sexual communication, internalized homophobia, and conformity to gender norms. *International Journal of Sexual Health, 31,* 36-49.

28. Barcelos, C. & **Budge, S.L.** (2019). Inequalities in crowdfunding for transgender health care. *Trans Health, 4,* 81-88..

29. Goldberg, A., Kuvalanka, K., **Budge, S.L.,** Benz, M., & Smith, J. (2019). Mental health and health care experiences of transgender undergraduate and graduate students: A mixed methods study. *The Counseling Psychologist, 47,* 59-97.

30. Rossman, K., Sinnard, M., & **Budge, S.L.** (2019). A qualitative examination of consideration and practice of consensual non-monogamy among sexual and gender minority couples. *Psychology of Sexual Orientation and Gender Diversity, 6,* 11-21.

31. **Budge, S.L.,** Conniff, J., Belcourt, W.S., Parks, R. L., Pantalone, D., & Katz-Wise, S.L. (2018). A grounded theory study of the development of trans youths' awareness of coping with gender identity. *Journal of Child and Family Studies,* 27, 3048-3061.

32. **Budge, S.L**. & Moradi, B. (2018). Attending to gender in psychotherapy: Understanding and incorporating systems of power. *Journal of Clinical Psychology, 74,* 2014-2027.

33. Moradi, M. & **Budge, S.L.** (2018). A meta-analytic approach to studying psychotherapy outcomes for LGBTQ affirmative therapies. *Journal of Clinical Psychology, 74, 2028-2042.*

34. **Budge, S.L.,** Orovecz, J., Owen, J.J., & Sherry, A.R. (2018). The relationship between conformity to gender norms, sexual orientation, and gender identity for sexual minorities. *Counselling Psychology Quarterly, 31,* 79-97.

**SA024**

Stephanie Budge CV 2023

35. Salkas, S., Conniff, J. & **Budge, S.L.** (2018). Provider quality and barriers to care for transgender people: An analysis of data from the Wisconsin transgender community health assessment. *International Journal of Transgenderism, 19,* 59-63.

36. Katz-Wise, **Budge, S.L.** Fugate, E., Flanagan, K., Touloumtzis, C., Rood, B…Leibowitz, S. (2017). Transactional pathways of transgender identity development in transgender and gender nonconforming youth and caregiver perspectives from the Trans Youth Family Study. *International Journal of Transgenderism,18,* 243-263.

37. Nienhuis, J. B., Owen, J., Valentine, J. C., Black, S. W., Halford, T. C. , Parazak, S. E., **Budge, S,** & Hilsenroth, M. J. (2018). Therapeutic alliance, empathy, and genuineness in individual adult psychotherapy: A meta-analytic review. *Psychotherapy Research, 28,* 593-605.

38. **Budge, S.L.,** Israel, T., Merrill, C. (2017). Improving the lives of sexual and gender minorities: The promise of psychotherapy research. *Journal of Counseling Psychology, 64,* 376-384.

39. **Budge, S.L.,** Chin, M.Y. , & Minero, L.P. (2017). Trans individuals' facilitative coping: An analysis of internal and external processes. *Journal of Counseling Psychology, 64, 12-25.*

40. ° Imel, Z.E., **Budge, S.L.,** & Owen, J. (2017). Introduction to special section on advanced methodology: Counseling the dog to wag its methodological tail. *Journal of Counseling Psychology, 64,* 601-603.

41. Katz-Wise, S. L., Williams, D. N., Keo-Meier, C. L., **Budge, S. L**., Pardo, S., & Sharp, C. (2017). Longitudinal associations of sexual fluidity and health in transgender men and cisgender women and men. *Psychology of sexual orientation and gender diversity*, *4,* 460-471

42. ° Matsuno, E. & **Budge, S.L.** (2017). Non-binary/genderqueer identities: A critical review of the literature. *Current Sexual Health Reports*, *9,* 116-120.

43. Katz-Wise, S.L., Reisner, S.L., White, J.M., & **Budge, S.L.** (2017). Self-reported changes in attractions and social determinants of mental health in transgender adults. *Archives of Sexual Behavior, 46,* 1425-1439.

44. **Budge, S.L.** & dickey, l.m. (2017). Barriers, challenges, and decision-making in the letter writing process for gender transition. *Psychiatric Clinics, 40,* 65-78.

45. Katz-Wise, S.L., **Budge, S. B.,** Orovecz, J.O. , Nguyen, B., & Thompson, K. (2017). Imagining the Future: Qualitative findings of future orientation from the Trans Youth Family Study. *Journal of Counseling Psychology, 64, 26-40.*

46. **Budge, S.L.** (2016). To err is human: An introduction to the special issue on clinical errors. *Psychotherapy*, *53,* 255-256.

47. Sinnard, M. , Raines, C. , & **Budge, S.L.** (2016). The association between geographic location and anxiety and depression in transgender individuals: An exploratory study of an online sample. *Transgender Health, 1,* 181-186.

48. **Budge, S.L.** & Pankey, T.L. (2016). Ethnic differences in gender dysphoria. *Current Psychiatry Reviews, 12,* 175-180.

49. dickey, l.m., **Budge, S.L.,** Katz-Wise, S.L., & Garza, M.V. (2016). Health disparities in the transgender community: Exploring differences in insurance coverage. *Psychology of Sexual Orientation and Gender Diversity, 3,* 275-282.

**SA025**

Stephanie Budge CV 2023

50. Barr, S.M. , **Budge, S.L.,** & Adelson, J.L. (2016) Transgender community belongingness as a mediator between strength of transgender identity and well-being. *Journal of Counseling Psychology, 63,* 87-97.

51. **Budge, S.L.,** Thai, J.L., Tebbe, E., & Howard, K.H. (2016) The intersection of socioeconomic status, race, sexual orientation, transgender identity, and mental health outcomes. *The Counseling Psychologist, 44,* 1025-1049.

52. Tebbe, E.A. & **Budge, S.L.** (2016) Research with transgender communities: Applying a process-oriented approach to methodological considerations and research recommendations. *The Counseling Psychologist, 44,* 996-1024.

53. Moradi, B., Tebbe, E., Brewster, M., **Budge, S.L.,** Lenzen, A., Enge, E…Painter, J. (2016). A content analysis of trans people and issues: 2002-2012. *The Counseling Psychologist, 44,* 960-995.

54. Tebbe, E.A., Moradi, B., & **Budge, S.L.** (2016). Enhancing scholarship focused on trans people and issues. *The Counseling Psychologist, 44,* 950-959.

55. **Budge, S.L.** (2015*).* Psychotherapists as gatekeepers: An evidence-based case-study highlighting the role and process of letter-writing for transgender clients. *Psychotherapy, 52,* 287-297.

56. Kopta, M., Owen, J.J., & **Budge, S.L.** (2015). Measuring psychotherapy outcomes with the Behavioral Health Measure-20: Efficient and comprehensive. *Psychotherapy, 52,* 442-448.

57. Watkins, C.E., **Budge, S.L.,** & Callahan, J.L. (2015). Common and specific factors converging in psychotherapy supervision: A supervisory extrapolation of the Wampold/Budge psychotherapy relationship model. *Journal of Psychotherapy Integration, 25,* 214-235.

58. Owen, J.J., Adelson, J.L., **Budge, S.L.,** Wampold, B.E., Kopta, M., Minami, T., & Miller, S.D., (2015). Trajectories of change in short-term psychotherapy. *Journal of Clinical Psychology, 71,* 817-827.

59. **Budge, S.L.** (2015).  The effectiveness of psychotherapeutic treatments for personality disorders: A review and critique of current research practices. *Canadian Psychology, 56,* 191-196.

60. Owen, J.J., Adelson, J.L., **Budge, S.L.,** Reese, R.J., & Kopta, M.M. (2015). Good-Enough Level and Dose-Effect models: Variation among outcomes and therapists. *Psychotherapy Research, 26,* 22-30.

61. Katz-Wise, S.L. & **Budge, S.L.** (2015). Cognitive and interpersonal identity processes related to mid-life gender transitioning in transgender women. *Counselling Psychology Quarterly, 28,* 150-174.

62. **Budge, S.L.,** Orovecz, J., & Thai, J.L. (2015). Trans men's positive emotions: The interaction of gender identity and emotion labels. *The Counseling Psychologist, 43,* 404-434.

63. **Budge, S. L.,** Keller, B.L., & Sherry, A.  (2015) A qualitative investigation of lesbian, gay, bisexual, and queer women's experiences of sexual pressure. *Archives of Sexual Behavior, 44,* 813-824.

64. **Budge, S.L.** (2014). Navigating the balance between positivity and minority stress for LGBTQ clients who are coming out. *Psychology of Sexual Orientation and Gender Diversity, 1,* 350-352.

**SA026**

Stephanie Budge CV 2023

65. **Budge, S.L.,** <u>Rossman, H.K.,</u> & Howard, K.H. (2014). Coping and psychological distress among genderqueer individuals: The moderating effect of social support. *Journal of LGBT Issues in Counseling, 8,* 95-117.

66. **Budge, S.L.,** <u>Moore, J.T.,</u> Del Re, A.C., Wampold, B.E., Baardseth, T.P., & <u>Nienhuis, J.B.</u> (2013). The effectiveness of evidence-based treatments for personality disorders when comparing treatment-as-usual and bona fide treatments. *Clinical Psychology Review, 33,* 1057-1066.

67. **Budge, S.L.** (2013). Interpersonal psychotherapy with transgender clients. *Psychotherapy*, 50, 356-359.

68. Katz-Wise, S.L., **Budge, S.L.,** & Hyde, J.S. (2013). Individuation or identification? Self-objectification and the mother–adolescent relationship. *Psychology of Women Quarterly, 37,* 366-380.

69. **Budge, S.L.,** Adelson, J.L., & Howard, K.H. (2013). Anxiety and depression in transgender individuals: The roles of transition status, loss, social support, and coping. *Journal of Consulting and Clinical Psychology, 81,* 545-557.

70. **Budge, S.L.,** Owen, J.J., Kopta, S.M., Minami, T., Hanson, M.R., & Hirsch, G (2013). Differences among trainees in client outcomes associated with the Phase Model of Change. *Psychotherapy, 50,* 150-157.

71. **Budge, S. L.,** Katz-Wise, S. L., Tebbe, E., Howard, K.A.S., Schneider, C. L., & Rodriguez, A. (2013). Transgender emotional and coping processes: Use of facilitative and avoidant coping throughout the gender transition. *The Counseling Psychologist, 41,* 601-647.

72. Valdez, C. R. & **Budge, S.L.** (2012). Addressing adolescent depression in schools: Effectiveness and acceptability of an in-service training for school staff in the United States. *International Journal of Educational Psychology, 1,* 228-25.

73. Wampold, B.E., & **Budge, S.L.** (2012). The relationship—and its relationship to the common and specific factors of psychotherapy. *The Counseling Psychologist, 40,* 601-623.

74. Wampold, B.E., **Budge, S.L.,** Laska, K. M., Del Re, A.C., Baardseth, T.P., Fluckiger, C., Minami, T., Kivlighan, M., & Gunn, W. (2011). Evidence-based treatments for depression and anxiety versus treatment-as-usual: A meta-analysis of direct comparisons. *Clinical Psychology Review, 31,* 1304-1315.

75. Valdez, C. R., Dvorscek, M., **Budge, S.L.,** & Esmond, S.L. (2011).  Provider perspectives of Latino patients: Determinants of care and implications of treatment. *The Counseling Psychologist, 39,* 497-526.

76. Wampold, B.E., Benish, S.G., Imel, Z.E., Miller, S.D., Laska, K., Del Re, A.C., Baardseth, T.P., &  **Budge, S.L.** (2010).What works in the treatment of  PTSD? A response to Ehlers et al. *Clinical Psychology Review, 30,* 269-276.

77. **Budge, S. L.,** Tebbe, E. N. & Howard, K. A. S. (2010). The work experiences of transgender individuals: Negotiating the transition and coping with barriers. *Journal of Counseling Psychology, 57,* 377-393.

78. Howard, K. A. S., **Budge, S. L.,** Gutierrez, B., Lemke, N. T., & Owen, A. D. (2010) Future plans of urban youth: Influences, perceived barriers, and coping strategies. *Journal of Career Development, 37,* 655-676.

**SA027**

Stephanie Budge CV 2023

79. **Budge, S. L.,** Baardseth, T. P., Wampold, B. H., & Fluckiger, C. (2010). Researcher allegiance and supportive therapy: Pernicious affects on results of randomized clinical trials. *European Journal of Counselling and Psychotherapy, 12,* 23-39.

80. Howard, K. A. S., **Budge, S. L.,** & McKay, K. M. (2010). Youth exposed to violence: The role of protective factors. *Journal of Community Psychology, 38,* 63-79.

81. **Budge, S. L.** (2006) Peer mentoring in post-secondary education: Implications for research and practice. *Journal of College Reading and Learning, 37*, 71-85.

## BOOK CHAPTERS

1. **Budge, S.L.** (2022). Genderqueer. In A. Goldberg (Ed.) *The SAGE Encyclopedia of LGBTQ Studies, 2nd Edition* (pp. xx-xx). Thousand Oaks, CA: SAGE.

2. Dominguez, S. & **Budge, S.L.** (2020). Gender Nonconformity. In A. Goldberg (Ed.) *The SAGE Encyclopedia of Trans Studies* (pp. xx-xx). Thousand Oaks, CA: SAGE.

3. **Budge, S.L.** & Moradi, B. (2019). *Gender Identity.* In J. Norcross and B. Wampold (Eds.) Psychotherapy Relationships That Work, Volume 2. London, England: Oxford University Press.

4. Moradi, B. & **Budge, S.L.** (2019). *Sexual Orientation.* In J. Norcross and B. Wampold (Eds.) Psychotherapy Relationships That Work, Volume 2. London, England: Oxford University Press.

5. **Budge, S.L.** & Orovecz, J.J. (2017). Gender fluidity. In K. Nadal (Ed.) *The SAGE Encyclopedia of Psychology and Gender* (pp. 660-662). Thousand Oaks, CA: SAGE.

6. **Budge, S.L.** & Pankey, T. L. (2017). Interpersonal therapies and gender. In K. Nadal (Ed.) *The SAGE Encyclopedia of Psychology and Gender* (pp. 961-964). Thousand Oaks, CA: SAGE.

7. **Budge, S.L.** & salkas, s. (2017). Experiences of transgender people within the LGBT community. In K. Nadal (Ed.) *The SAGE Encyclopedia of Psychology and Gender* (pp. 1073-1075). Thousand Oaks, CA: SAGE.

8. **Budge, S.L.** & Thai, J.L. (2017). Coming out processes for transgender people. In K. Nadal (Ed.) *The SAGE Encyclopedia of Psychology and Gender* (pp. 357-360). Thousand Oaks, CA: SAGE.

9. **Budge, S.L.** & Sinnard, M. (2017). Trans. In K. Nadal (Ed.) *The SAGE Encyclopedia of Psychology and Gender* (pp. 1685-1685). Thousand Oaks, CA: SAGE.

10. Akinniyi, D. & **Budge, S.L.** (2017). Biological sex and mental health outcomes. In K. Nadal (Ed.) *The SAGE Encyclopedia of Psychology and Gender* (pp. 161-165). Thousand Oaks, CA: SAGE.

11. Lam, J. & **Budge, S.L.** (2017). Help-seeking behaviors and men. In K. Nadal (Ed.) *The SAGE Encyclopedia of Psychology and Gender* (pp. 832-834). Thousand Oaks, CA: SAGE.

12. Jones, T., Chin, M.Y., & **Budge, S.L.** (2017). Sororities. In K. Nadal (Ed.) *The SAGE Encyclopedia of Psychology and Gender* (pp. 1611). Thousand Oaks, CA: SAGE.

13. Sun, S. & **Budge, S.L.** Women's group therapy. (2017). In K. Nadal (Ed.) *The SAGE Encyclopedia of Psychology and Gender* (pp. 1829-1830). Thousand Oaks, CA: SAGE.

14. Sun, S., Minero, L., & **Budge, S.L.** (2017). Multiracial people and gender. In K. Nadal (Ed.) *The SAGE Encyclopedia of Psychology and Gender* (pp. 1208-1212). Thousand Oaks, CA: SAGE.

**SA028**

Stephanie Budge CV 2023

15. Alexander, D., Hunter, C., & **Budge, S.L.** (2017). Experiences of women in religious leadership. In K. Nadal (Ed.) *The SAGE Encyclopedia of Psychology and Gender* (pp. 1813-1815). Thousand Oaks, CA: SAGE.

16. **Budge, S.L.** (2017). Genderqueer. In A. Goldberg (Ed.) *The SAGE Encyclopedia of LGBTQ Studies* (pp. 460-463). Thousand Oaks, CA: SAGE.

17. **Budge, S.L.** & Snyder, K.E. (2016). Sex-related differences research. In A. Goldberg (Ed.) *The Wiley Blackwell Encyclopedia of Gender and Sexuality Studies* (pp. 2125-2129*).* Thousand Oaks, CA: SAGE.

18. **Budge, S. L.**, & Wampold, B. E. (2015). The relationship: How it works. In O. C. G. Gelo, A. Pritz, & B. Rieken (Eds.), *Psychotherapy research: Foundations, process, and outcomes* (pp. 213-228). Dordrecht: Springer.

## GRAPHIC NOVEL

**Budge, S.L.** & Funk, H. (2019). *Longitudinal effects of psychotherapy with transgender clients: A randomized controlled pilot trial.* JKXComics. Available at: https://www.jkxcomics.com/psychotherapy

## RESEARCH REPORTS

Botsford, J.C., Allen, B.J., Andert, B.D., **Budge, S.L.,** & Rehm, J.L. (2018). *Meeting the healthcare needs of transgender, nonbinary, and gender expansive/ nonconforming youth in Wisconsin: A report of the 2017 Wisconsin Transgender Youth Community Needs Assessment.* Available at: https://www.med.wisc.edu/media/medwiscedu/documents/about-us/CH-174891-18-TNG-Youth-Report-Full.pdf

## PRACTICE REPORTS

Matsuno, E., Webb, A., Hashtpari, H., **Budge, S.L.,** Krishnan, M., & Balsam, K. (2021). Nonbinary fact sheet. A publication for the Society for the Psychological Study of Lesbian, Gay, Bisexual, and Transgender Issues: Available at: https://www.apadivisions.org/division-44/resources/advocacy/non-binary-facts.pdf

Paquin, J., Tao, K., & **Budge, S.L.** (2020). Is psychotherapy for everyone? Available at: https://www.apa.org/pubs/highlights/spotlight/issue-192.

Webb, A. Matsuno, E., **Budge, S.L.,** Krishnan, M., & Balsam, K. (2017). Nonbinary gender identities fact sheet. A publication for the Society for the Psychological Study of Lesbian, Gay, Bisexual, and Transgender Issues: Available at: https://www.apadivisions.org/division-44/resources/advocacy/non-binary-facts.pdf

**Budge, S.L.** (2015). Critical considerations in writing letters for trans clients. Available at: https://societyforpsychotherapy.org/critical-considerations-in-writing-letters-for-trans-clients/

11

**SA029**

Stephanie Budge CV 2023

## CURRICULUM GUIDE

McGinley, M., Christie, M. B., Clements, Z., Goldbach, C. M., Kraus, E., Woznicki, N. W., Breslow, A. S., **Budge, S. L**., & Matsuno, E. (2020). A resource for incorporating trans and gender diverse issues into counseling psychology curricula. APA Division 17 Special Task Group, Making Room at the Table: Trans/Nonbinary Pipeline to Counseling Psychology. Available at: https://www.div17.org/wp-content/uploads/Incorporating-Trans-and-Gender-Diverse-Issues-into-Counseling-Psychology-Curricula.pdf

## RESEARCH SUPPORT

**National Institute on Minority Health and Health Disparities**        **7/01/2023-6/30/2028**
**National Institute of Health, $3,500,000, submitted**
This grant focuses on developing and measuring a social support instrument for transgender and nonbinary people with the intent of creating community toolkits for LGBTQ+ community organizations.
Role: Principal Investigator

**Baldwin Seed Grant**                                                  **07/2023-07/2024**
University of Wisconsin-Madison, $4,000—**funded**
Mentoring student (J. Lee) on a grant focused on family attachment processes and PTSD for transgender and nonbinary people.
Role: PI

**National Institute on Minority Health and Health Disparities**        **9/01/2022-5/31/2027**
**National Institute of Health, $1,063,616, funded**
This administrative grant focuses on Northern Arizona University's (NAU's) Southwest Health Equity Research Collaborative (SHERC) to establish community-engaged priorities and strategic plans for addressing a wide range of health disparities; provide the institutional infrastructure for SHERC targeted research projects.
Role: Consultant

**School Mental Health Collaborative IES Grant**                        **9/01/2022-9/01/2024**
**Institute of Education Training Grant, funded**
This grant focuses on training postdoctoral trainees in innovative research methods that will impact communities experiencing marginalization
Role: Collaborator

**Young Investigator Grant**                                            **9/01/2022-9/01/2024**
American Foundation for Suicide Prevention, $90,000—**funded**
This grant focuses on using EMA methods to assist therapists with intervening for transgender adult clients experiencing suicidal ideation.
Role: Co-Investigator

**Diverse & Resilient Community Grant**                                 **9/17/2021-9/17/2022**
Diverse & Resilient, $20,000—**funded**

12

**SA030**

Stephanie Budge CV 2023

Community grant focusing on a program evaluation regarding a training for mental health providers to infuse radical healing into their practice and to reduce internalized stigma.
Role: PI

**Understanding and Reducing Inequities Initiative**          **7/01/2021-7/01/2023**
University of Wisconsin-Madison, $250,000—**funded**
Study focusing on creating a psychotherapy intervention for trans and nonbinary people that includes radical healing and skills to reduce internalized transnegativity.
Role: PI

**Baldwin Seed Grant**                              **07/2021-07/2022**
University of Wisconsin-Madison, $4,000—**funded**
Mentoring student (L. Lindley) on a grant focused on coping mechanisms for transgender and nonbinary people.
Role: PI

**2030 Faculty Fellowship Funds**                  **8/20/2020-8/20/2025**
University of Wisconsin-Madison, $100,000—**funded**
Funds to support community-based research focused on improving mental health and wellness for transgender and nonbinary people.
Role: PI

**Baldwin Seed Grant**                              **06/2019-06/2020**
University of Wisconsin-Madison, $4,000—**funded**
Mentoring student (M. Sinnard) on a grant focused on objectified body consciousness for trans, nonbinary, and gender nonconforming individuals.
Role: PI

**Online Course Development Grant**                 **01/2019-9/2020**
University of Wisconsin-Madison, $15,000—**funded**
This grant funds university faculty to design new and innovative courses at UW-Madison. The funding will cover the creation of a course called "Gender and Queer Issues In Psychology" set to begin in Summer 2020.
Role: Instructor

**Fall Research Competition**                       **6/2018 – 6/2019**
University of Wisconsin-Madison, $34,000 - **funded**
Research project determining the effectiveness of psychotherapy interventions focused on minority stressors for transgender clients.
Role: PI

**UW Institute for Clinical Research (ICTR)**       **6/2017 – 6/2018**
Health Equity and Diversity (AHEAD) research pilot award, $10,000 - **funded**
Research project determining the effectiveness of psychotherapy interventions focused on minority stressors for transgender clients.
Role: PI

13

**SA031**

Stephanie Budge CV 2023

**National Institute of Health**                                    **1/2017 – 1/2019**
NICHD, R21, $206,028—**funded**
Structured pubertal suppression readiness assessment for gender dysphoric youth.
Role: Collaborator

**Gaining STEAM**                                                  **5/2018 – 5/2019**
JKX Comics, $4800, **awarded**
Grant awarded to scientists to pair with a comic book artist to create visual representation
of scientific content.
Role: Scientist

**Fall Research Competition**                                      **5/2017 - 9/2018**
University of Wisconsin-Madison, $60,000 - **funded**
Supplemental research project for the NIH grant (listed below) focusing on pubertal
suppression for transgender youth.
Role: PI

**Wisconsin Partnership Program**                                  **6/2016 – 6/2018**
Community Opportunity Grant, $50,000 **- funded**
A grant that assists with opportunities focused on transgender health and equity in health
care.
Role: Collaborator

**UW Institute for Clinical Research (ICTR)**                      **6/2016 – 6/2018**
Health Equity and Diversity (AHEAD) research pilot award, $10,000 - **funded**
Research project advancing the Wisconsin Survey of Trans Youth: An Assessment of
Resources and Needs.
Role: Co-investigator

**Faculty Research Development Grant**                             **10/2012 - 10/2013**
University of Louisville, $2,200 - **funded**
Research project testing psychotherapy process and outcomes for transgender individuals.
Role: PI

**Faculty Research Development Grant**                             **9/2011- 9/2012**
University of Louisville, $2,200 - **funded**
Research project regarding positive experiences of transgender identity and intersectionality of
identities with genderqueer individuals.
Role: PI

**Charles J. Gelso Research Grant**                                **6/2010 – 6/2012**
American Psychological Association (Division 29), $2,000 - **funded**
Meta-analysis project focusing on personality disorders and treatment effectiveness.
Role: PI

14

**SA032**

Stephanie Budge CV 2023

## INTERNATIONAL PRESENTATIONS
Underlining denotes student;

1. **Budge, S.L.** & Lee, J. (2022, July). *Understanding and Incorporating Trans-Affirmative Therapies When Working With Two Spirit, Trans, and Nonbinary Clients.* Korean Counseling Association/ Korean Counseling Psychology Association Conference. Presented virtually to an audience in Seoul, Korea.

2. **Budge, S.L.** (2021, June;). *Attending to Power, Privilege, and Oppression in Psychotherapy Research.* Panel moderator for a plenary session at the Society for Psychotherapy Research, Heidelberg, Germany (hybrid model online due to COVID-19).

3. **Budge, S.L.** (2020, October). *Mental Health Care for Trans Youth: What Helps Youth Thrive and What Resources are Requested?* World Professional Association for Transgender Health (WPATH) Conference, originally scheduled to be in Hong Kong, online due to COVID-19.

4. **Budge, S.L.** & Sinnard, M.T. (2020, October). *Acceptability and Feasibility of a Randomized Controlled Trial with Transgender and Nonbinary Clients.* World Professional Association for Transgender Health (WPATH) Conference, originally scheduled to be in Hong Kong, online due to COVID-19.

5. Sinnard, M.T & **Budge, S.L.** (2020, October). *Development of the Objectified Body Consciousness Scale for Transgender and Nonbinary Adults.* World Professional Association for Transgender Health (WPATH) Conference, originally scheduled to be in Hong Kong, online due to COVID-19.

6. Allen, B., Rehm, J., **Budge, S.L.**, Botsford, J., & Andert, B. (2018, May). *School Safety and Support for Transgender Youth with Non-binary vs. Binary Gender Identities.* Pediatric Academic Societies (PAS) Conference, Toronto, Canada.

7. Rehm, J., Allen, B., **Budge, S.L.**, Botsford, J., & Andert, B. (2018, May). *Transgender youth who receive gender related care from a specialized provider differ from other transgender youth.* Pediatric Academic Societies (PAS) Conference, Toronto, Canada.

8. Rehm, J., Allen, B., **Budge, S.L.**, Botsford, J., & Andert, B. (2018, May). *Increased awareness of healthcare needs of youth with nonbinary gender identities is needed.* Pediatric Academic Societies (PAS) Conference, Toronto, Canada.

9. **Budge, S.L.** & Katz-Wise, S.L. (2016, July). *Emotional expression of trans youth and their families: A cross-comparison of familial cultures for gender and emotions.* Paper presented at the International Congress of Psychology Conference, Yokohama, Japan.

10. Chin, M.Y., Minero, L., & **Budge, S.L.** (2016, July). *"This is me, and I am happy. I love it": Understanding Internal Coping Processes of Trans-identified Individuals using Grounded Theory.* Paper presented at the International Congress of Psychology Conference, Yokohama, Japan.

11. **Budge, S.L.**, Katz-Wise, S.L., Conniff, J., Belcourt, S., & Parks, R. (2016, July). *Developmental processes of coping for trans youth: Results from the Trans Youth and Family Study (TYFS).* Paper presented at the World Professional Association for Transgender Health Biannual Conference, Amsterdam, The Netherlands.

12. Sinnard, M., Raines, C., & **Budge, S.L.** (2016, July). *Effects of location and transition status on anxiety and depression in trans individuals.* Paper presented at the World Professional Association for Transgender Health Biannual Conference, Amsterdam, The Netherlands.

15

**SA033**

Stephanie Budge CV 2023

13. **Budge, S.L.** & salkas, s. (2016, July). *An overview of non-binary gender identities in the National Transgender Discrimination Survey*, Paper presented at the World Professional Association for Transgender Health Biannual Conference, Amsterdam, The Netherlands.

14. Orovecz, J., salkas, s., & **Budge, S.L.** (2016, July). *External identity processes for individuals with non-binary identities.* Paper presented at the World Professional Association for Transgender Health Biannual Conference, Amsterdam, The Netherlands.

15. Rossman, K., Sinnard, M., & **Budge, S.L.** (2016, July). *The externalization of affect for individuals with non-binary gender identities.* Paper presented at the World Professional Association for Transgender Health Biannual Conference, Amsterdam, The Netherlands.

16. Hase, C.N., Reiland, M.T., **Budge, S.L.** (2015, August). *"Omitting none:" Experience of people of color in a primarily white meditation community.* Poster presented at American Psychological Association. Toronto, ON.

17. Akinniyi, D.A. & **Budge, S.L.** (2015, August*). Genderqueer individuals' conceptualizations of multiple identities: A qualitative investigation using identity maps.* Paper presented at the Annual Meeting for the American   Psychological Association, Toronto, Canada.

18. Sinnard, M. & **Budge, S.L.** (2015, August). *Effects of location and transition status on anxiety and depression in trans individuals.* Poster presented at the Annual Meeting for the American Psychological Association, Toronto, Canada.

19. Watkins, C.E., **Budge, S.L.,** & Wampold, B.E. (2015, August). *Extrapolating the Wampold/Budge psychotherapy relationship model to psychotherapy supervision.* Paper presented at the Annual Meeting for the American Psychological Association, Toronto, Canada.

20. **Budge, S.L.** (2014, February). *Developmental processes of positive emotions for trans individuals: The interplay of interpersonal emotions and transition appraisal.* Paper presented at the World Professional Association for Transgender Health Biannual Conference, Bangkok, Thailand.

21. **Budge, S.L.,** Adelson, J.L., & Howard, K.A.S. (2014, February). *Transgender and Genderqueer individuals' mental health concerns: A moderated mediation analysis of social support and coping.* Paper presented the World Professional Association for Transgender Health Biannual Conference, Bangkok, Thailand.

## NATIONAL PRESENTATIONS
Underlining denotes student;

1. Klessig, C., Dyer, R. L., Teasdale, T., Weber, I. J., & **Budge, S. L.** (2022). *"In most cases, abortion is understandable": A qualitative investigation of psychotherapists' abortion attitudes.* Poster presented at the 2022 American Psychological Association Annual Convention, Minneapolis, MN.

2. Teasdale, T., Dyer, R. L., Weber, I. J., Klessig, C., & **Budge, S. L.** (2022). *Exploring the impact of benevolent sexism on mental health clinicians' abortion attitudes.* Poster presented at the 2022 American Psychological Association Annual Convention, Minneapolis, MN.

3. Weber, I. J., Dyer, R. L., Klessig, C., Teasdale, T., & **Budge, S. L.** (2022). *Mental health clinicians' attitudes about classism and client pregnancy decisions.* Poster presented at the 2022 American Psychological Association Annual Convention, Minneapolis, MN

16

**SA034**

Stephanie Budge CV 2023

4. Smith, C. L., Zubizarreta, D., **Budge, S. L.,** Watson, R. J., Gordon, A. R., Austin, S. B., & Katz-Wise, S. L. (2022, August). *Risk and protective factors related to body image and disordered eating in a longitudinal study of Transgender and Nonbinary adolescents.* Poster presented at the American Psychological Association Convention, Minneapolis, Minnesota.

5. Guan, T., Pham, C., & **Budge, S.L.** (2022, August). *Disrupting white supremacy in psychology training: Recommendations to support trainees of color.* Poster presented at the American Psychological Association Convention, Minneapolis, Minnesota

6. Lee, J. & **Budge, S.L.** (2022, August). *Moving From Gatekeeping to a Companionship Model in Letter Writing for TNB Individuals.* Poster presented at the American Psychological Association Convention, Minneapolis, Minnesota.

7. Dominguez, Jr. S., & **Budge, S.L.** (2022, August). *Using CBPR in Psychotherapy Research to Undermine Gatekeeping Practices.* Paper presented at the American Psychological Association Convention, Minneapolis, Minnesota.

8. Lee, J., Dominguez Jr., S., Matsuno, E., Norton, M., Lindley, L., Tebbe, E., & **Budge, S.L.** (2022, August). *Mixed-Methods Results from Gender, Resilience and Resistance, Empowerment, and Affirmation Training.* Paper presented at the American Psychological Association Convention, Minneapolis, Minnesota

9. Dominguez Jr., S. **Budge, S.L.,** Tebbe, E.A., Norton, M., Lee, J., Lindley, L., & mcneill, j. (2022, August). *Baseline data from an open psychotherapy trial with Two-Spirit, Trans, & Nonbinary Clients of Color.* Paper presented at the American Psychological Association Convention, Minneapolis, Minnesota.

10. **Budge, S.L.** (2022, August). *Changing Cisnormative Spaces: Improving Access to Psychotherapy and Educational Spaces for Trans and Nonbinary People.* Fellows talk provided at the American Psychological Association Convention, Minneapolis, Minnesota.

11. Smith, C. L., Zubizarreta, D., **Budge, S. L.,** Watson, R. J., Gordon, A. R., Austin, S. B., & Katz-Wise, S. L. (2022, June*). Longitudinal associations of risk and protective factors on body image and disordered eating among Transgender and Nonbinary youth*. Paper presented at the International Conference of Eating Disorders, Virtual Conference.

12. **Budge, S.L.** (2021, August). *Gab with the greats.* An invited panelist for Division 29 Society for the Advancement of Psychotherapy at the annual America Psychological Association National Convention, Virtual Conference.

13. **Budge, S.L. (**2021, August). *Attending to Power, Oppression, and Healing with Trans, Nonbinary, and Queer Populations.* Chair of symposium presented at a mini symposium at the at the annual America Psychological Association National Convention, Virtual Conference.

14. Elliott, G., Domínguez, S. Jr., & **Budge, S. L.** (2021, August). *A Case Study Approach to Using a Strong Intersectional Lens in Therapy with Trans and Nonbinary Clients.* Paper presented at a mini symposium at the at the annual America Psychological Association National Convention, Virtual Conference.

15. Norton, M., Domínguez, S. Jr., Elliot, G., & **Budge, S. L.** (2021, August*). Dismantling, Decolonizing, and Deconstructing: Engaging the Possibilities within a Critical Lab Praxes.* Paper presented at a mini symposium at the at the annual America Psychological Association National Convention, Virtual Conference.

17

**SA035**

Stephanie Budge CV 2023

16. McNeill, J. & **Budge, S.L.** (2021, August). *Theory and Practice of Radical Healing for Queer and Trans Black and Indigenous People of Color.* Paper presented at a mini symposium at the at the annual America Psychological Association National Convention, Virtual Conference.

17. Lee, J., Hoyt, W.T., **Budge. S.L.,** & Lee, B. (2021, August). *Parental attachment and internalized transnegativity among Korean TNB populations: Role of Self-shame, Rejection Sensitivity, and self-concept clarity.* Poster presented at the American Psychological Association Convention. Virtual Conference due to COVID-19.

18. Lindley, L. & **Budge, S.L**. (2021, August). *Development of the Transgender/Nonbinary Coping Measure.* Poster presented at the American Psychological Association Convention. Virtual Conference due to COVID-19.

19. Veldhuis, C.B., **Budge, S.L.,** Velez, B., Galupo, M.P., Cascalheira, C., Renteria, R., & Delucio, K. (2021, August). *Thought-Provoking Conversations about LGBTQIA+ Research.* Panelist at the American Psychological Association Convention. Virtual Conference due to COVID-19.

20. Katz-Wise, S., Vishnudas, S., Smith, C., Marchwinski, B., **Budge, S.L.,** Godwin, E., Moore, L., Ehrensaft, D., Rosal, M.C., Thomson, K. (2021, May). *Family Functioning and Mental Health: A Two-Year Longitudinal Study of Families with Transgender and/or Nonbinary Youth.* Paper presented at the LGBTQ Health Conference. Virtual Conference due to COVID-19.

21. Dyer, R.L. & **Budge, S.L.** (2021, March). *Psychotherapist attitudes about client pregnancy decision-making: Developing a scale.* Paper presented at the Association for Women in Psychology. Virtual Conference due to COVID-19.

22. **Budge, S.L.,** Velez, B., Mohr, J., Moradi, B., Puckett, J., & Matsuno, E. (2020, August). *Taking the mystery out of publishing LGBTQ research: Lessons learned.* Symposium accepted at the 2020 American Psychological Association Convention, Washington, D.C.

23. **Budge, S.L.,** Sinnard, M.T., & Hoyt, W.T. (2020, August). *Minority stress outcomes during and post psychotherapy: 6-month follow-up results for trans clients.* Paper accepted at the 2020 American Psychological Association Convention, Washington, D.C.

24. Tao, K., Paquin, J., & **Budge, S.L.** (2020, April). Using a counseling psychology lens to propose and implement a social justice framework for ethical psychotherapy research. Symposium accepted at the 2020 Counseling Psychology Conference, New Orleans, Louisiana. Conference cancelled due to COVID-19.

25. Dyer, R.L. & **Budge, S.L.** (2020, April). *Qualitative examination of transgender clients' reflections on discussing minority stress with psychotherapists.* Poster to be presented at the 2020 Counseling Psychology Conference, New Orleans, Louisiana. Conference cancelled due to COVID-19.

26. Domínguez, S. Jr., **Budge, S. L.** (2020, April). *The Social and Internal Aspects of Gender Dysphoria Scale (SIAGD): A community-engaged measure for gender dysphoria.* Poster to be presented at the 2020 Counseling Psychology Conference, New Orleans, Louisiana. Conference cancelled due to COVID-19.

27. Domínguez, S. Jr., **Budge, S. L.,** & Goldberg, A. E. (2019, August). *Minority stress in nonbinary college students: The impact of campus climate and belongingness.* Poster presented at the 2019 American Psychological Association National Convention, Chicago, IL.

18

**SA036**

Stephanie Budge CV 2023

28. Dyer, R. L., Sinnard, M.T., & **Budge, S. L.** (2019, August). *Working alliance and gender minority stress: Implications for psychotherapy with trans, nonbinary, and gender expansive/nonconforming clients.* Poster presented at the 2019 American Psychological Association Convention, Chicago, Illinois.

29. Sinnard, M.T., Dyer, R. L., & **Budge, S. L.** (2019, August). *Effects of identity concealment on substance use and suicidality among Midwest trans, nonbinary, and gender expansive/nonconforming individuals.* Poster presented at the 2019 American Psychological Association Convention, Chicago, Illinois.

30. Schoenike, D., Wachter, E., & **Budge, S.L.** (2019, August). *The Interaction of Transgender Identity, Race, and Mental Health: A Nationwide Sample.* Poster presented at the 2019 American Psychological Association Convention, Chicago, Illinois.

31. Barcelos, C., **Budge, S.L.,** & Botsford, J. (2019, April). *Uneven Access: The Health of Trans and Gender Nonconforming People in Wisconsin and the Upper Midwest.* Paper to be presented at the Annual National Transgender Health Summit, San Francisco, CA.

32. Bhattacharya, N., **Budge, S.L.,** Pantalone, D., & Katz-Wise, S.L. (2018, November). *Conceptualizing relationships among transgender and gender nonconforming youth and their caregivers.* Paper presented at the American Public Health Association Conference, San Diego, California.

33. **Budge, S.L.,** Sinnard, M.T., & Hoyt, W.T. (2018, September). *Longitudinal Effects of Psychotherapy with Transgender Clients: A 6-month Follow-up.* Paper presented at the Biennial North American Society for Psychotherapy Research Conference, Snowbird, Utah.

34. Sinnard, M.T. & **Budge, S.L.** (2018, September). *"I Want to Correct Past Harmful Counseling Experiences": Goal Attainment in Psychotherapy with Transgender Clients.* Paper presented at the Biennial North American Society for Psychotherapy Research Conference, Snowbird, Utah.

35. **Budge, S.L.** (2018, August). *The feasibility of a clinical trial focusing on trans individuals' minority stress.* Paper presented at the Annual Meeting for the American Psychological Association, San Francisco, California.

36. **Budge, SL.,** Allen, B., Andert, B., Botsford, J., & Rehm, J. (2018, August). *Resources contributing to psychological well-being for trans youth: A CBPR Approach.* Paper presented at the Annual Meeting for the American Psychological Association, San Francisco, California.

37. Sweetnam, M.R., Mauk, E., & **Budge, S.L.** (2018, August). *A qualitative analysis of nonbinary and genderqueer individuals' experiences of proximal and distal minority stress.* Poster presented at the Annual Meeting for the American Psychological Association, San Francisco, California.

38. Dillard, S., Sinnard, M.T., **Budge, S.L.,** & Katz-Wise, S.L. (2018, August). *Triadic analysis of concordance and discordance in families of trans youth.* Poster presented at the Annual Meeting for the American Psychological Association, San Francisco, California.

39. Mauk, E., Guo, E., Stock, C., Eck, M., & **Budge, S.L.** (2018, August). *Minority stress interventions in a psychotherapy pilot trial for transgender clients.* Paper presented at the Annual Meeting for the American Psychological Association, San Francisco, California.

40. Orzechowski, M., **Budge, S.L.,** Lavendar, A., Onsgard, K., Schamms, S., Liebowitz, S., & Katz-Wise, S.L. (2018, August). *Emotions of transgender youth.* Poster presented at

19

**SA037**

Stephanie Budge CV 2023

the Annual Meeting for the American Psychological Association, San Francisco, California.

41. Raines, C.R & **Budge, S.L.** (2018, August). *Measuring masculine sexual entitlement: Subscales of a new instrument.* Poster presented at the Annual Meeting for the American Psychological Association, San Francisco, California.

42. Sinnard, M.T, Orzechowski, M., **Budge, S.L.,** Belcourt, S., Conniff, J., Orovecz, J., Parks, R., Sun, S., & Sutton, J. (2018, August). *Depression and anxiety among transgender compared to cisgender Individuals: A meta-analysis.* Poster presented at the Annual Meeting for the American Psychological Association, San Francisco, California.

43. Sinnard, M.T., **Budge, S.L.,** & Hoyt, W.T. (2018, August). *The effectiveness of psychotherapy for transgender clients: A randomized controlled trial.* Paper presented at the Annual Meeting for the American Psychological Association, San Francisco, California.

44. Sun, S., Hoyt, W.T., & **Budge, S.L.** (2018, August). *Minority stress, HIV risk behaviors, and mental health among Chinese men who have sex with men (MSM): A qualitative analysis.* Poster presented at the Annual Meeting for the American Psychological Association, San Francisco, California.

45. Thomas, K.A., Andert, B., Ibarra, N., **Budge, S.L.,** & dickey, l. (2018, August). *Non-suicidal self-injury in transgender individuals.* Poster presented at the Annual Meeting for the American Psychological Association, San Francisco, California.

46. Dyer, R., **Budge, S.L.,** Rehm, J., Botsford, J., Andert, B., & Allen, B. (2018, August). *Rural-urban differences in perceived safety at school for Wisconsin trans youth.* Poster presented at the Annual Meeting for the American Psychological Association, San Francisco, California.

47. Raines, C.R & **Budge, S.L.** (2018, August). *Understanding the relationships between masculine sexual entitlement, masculinity, and violence.* Poster presented at the Annual Meeting for the American Psychological Association, San Francisco, California.

48. Rehm, J., Botsford, J**.,** **Budge, S.L,** Andert, B., & Allen, B. (2017, September). *Initial results of needs assessment for trans and gender expansive youth in Wisconsin.* Poster presented at the International Joint Meeting of Pediatric Endocrinology, Washington, D.C.

49. Rossman, H. K., Sinnard, M. T., & **Budge, S. L**. (August, 2017). *Bisexuality and Consensual Non-Monogamy for Trans Individuals and Their Romantic Partners.* Paper presented at the Bisexuality Issues Committee Intersectionality Symposium at the Annual Meeting for the American Psychological Association in Washington, D.C.

50. Minero, L.M. & **Budge, S.L.** (2017, February). *Experiences of exclusion and discrimination among undocutrans (undocumented and transgender) individuals in the united states and implications for mental health professionals.* Paper presented at the meeting for the United States Professional Association for Transgender Health, Los Angeles, California.

51. Thai, J.L, Orovecz, J., **Budge, S.L.** (2017, February) *"I was pretty sure I was doing the wrongest thing a wrong thing could be done": A qualitative examination of trans men's experiences of negative emotions.* Presentation in a symposium at the US Professional Association of Transgender Health, Los Angeles, CA.

52. **Budge, S.L.** (2017, February). *Evaluating the effectiveness of psychotherapy with trans clients: using the working alliance inventory.* Paper presented at the meeting for the United States Professional Association for Transgender Health, Los Angeles, California.

20

**SA038**

Stephanie Budge CV 2023

53. **Budge, S.L.** (2016, August). *Psychotherapy interventions, process, and outcome with transgender and gender non-conforming clients.* Chair of invited symposium for Division 29 at the Annual Meeting for the American Psychological Association, Denver, Colorado.

54. **Budge, S.L.** (2016, August). *The impact of minority stress interventions on psychotherapy outcomes with a trans client.* Paper presented at the Annual Meeting for the American Psychological Association, Denver, Colorado.

55. Minero, L.M., Chin, M.Y., & **Budge, S.L.** (2016, August). *Transgender clients' reports of characteristics of effective and trans-competent therapists.* Paper presented at the Annual Meeting for the American Psychological Association, Denver, Colorado.

56. **Budge, S.L.** (2016, August). *The state and future of psychotherapy research with transgender clients.* Paper presented at the Annual Meeting for the American Psychological Association, Denver, Colorado.

57. Orovecz, J., Moon, J., & **Budge, S.L.** (2016, August) *Using transgender emotion labels to expand on emotion models*. Presentation in a symposium at the American Psychological Association Annual Convention, Denver, CO.

58. Minero, L.M., Chin, M.Y., & **Budge, S.L.** (2016, August). *Understanding external coping processes of trans-identified individuals using grounded theory.* Poster presented at the Annual Meeting for the American Psychological Association, Denver, Colorado.

59. Salkas, S. & **Budge, S.L.** (2016, August). *An overview of US population-based data on individuals with non-binary gender identities*. Paper presented at the Annual Meeting for the American Psychological Association, Denver, Colorado.

60. Alexander, D., Orovecz, J., Salkas, S., Stahl, A., & **Budge, S. L.** (2016, August). *Internal identity processes for individuals with non-binary identities*. Paper presented at the Annual Meeting for the American Psychological Association, Denver, Colorado.

61. Rossman, K., Sinnard, M., & **Budge, S.L.,** (2016, August). *The "queering" of emotions-- using non-binary gender identity to label emotional processes.* Paper presented at the Annual Meeting for the American Psychological Association, Denver, Colorado.

62. Barr, S. M. & **Budge, S.L.** (2016, August). *Experiences of self esteem and well-being for individuals with non-binary gender identities*. Paper presented at the Annual Meeting for the American Psychological Association, Denver, Colorado.

63. Chase, A., Lam, J., & **Budge, S.L.** (2016, August). *Culture and masculine ideology: measuring masculinity among japanese american men*. Poster presented at the Annual Meeting for the American Psychological Association, Denver, Colorado.

64. Akinniyi, D. & **Budge, S.L.** (2016, August). *The student-athlete experience: Multiple minority statuses and discrimination*. Poster presented at the Annual Meeting for the American Psychological Association, Denver, Colorado.

65. **Budge, S.L.** (2016, August). *Identity processes, well-being, and emotional processes for individuals with non-binary identities.* Chair of symposium at the Annual Meeting for the American Psychological Association, Denver, Colorado.

66. Hase, C.N., Meadows, J.D., Budge, S.L. (2016, June). *Inclusion and exclusion in the white space: An investigation of the experiences of people of color in a primarily white american meditation community.* Poster presented at Mind & Life Summer Research Institute. Garrison, NY.

67. **Budge, S.L.** (2015, June). *The effectiveness of psychotherapeutic treatments for personality disorders: A review and critique of current research    practices.* Paper

21

**SA039**

Stephanie Budge CV 2023

presented at the Annual Meeting for the Society for Psychotherapy Research, Philadelphia, PA.

68. Kring, M. & **Budge, S.L.** (2015, June*). Re-evaluating outcomes in psychotherapy: Considerations beyond self-report.* Paper presented at the Annual Meeting for the Society for Psychotherapy Research, Philadelphia, PA.

69. Owen, J. J., Wampold, B.E., Miller, S.D., **Budge, S.L.**, & Minami, T. (2015, June). *Trajectories of change in short-term psychotherapy: Lessons from growth curve mixture modeling.* Paper presented at the Annual Meeting for the Society for Psychotherapy Research, Philadelphia, PA.

70. Katz-Wise, S.L. & **Budge, S.L.** (2015, April). *Imaging the future: qualitative findings of future orientation from trans youth and parents/caregivers in the Trans Youth Family Study.* Paper presented at the Annual Transgender Health Summit, Oakland, CA.

82. **Budge, S.L.** (2014, August). *The other side of the story: trans individuals' experiences of positivity and resilience.* Symposium chair for the Annual Meeting for the American Psychological Association, Washington, DC.

83. **Budge, S.L.** (2014, August). *Lessons learned from NIH-grant submission for LGBTQ research.* Invited panelist for the Annual Meeting for the    American Psychological Association, Washington, DC.

71. **Budge, S.L.** & Katz-Wise, S.L. (2014, August). *Emotional and interpersonal experiences of trans youth and their caregivers.* Paper presented at the   Annual Meeting for the American Psychological Association, Washington, DC.

72. Eleazer, J.L., Nguyen, Y., **Budge, S.L.** (2014, August). *"I'm afraid of my therapist": Military policy and access-to-care for transgender US service members.* Paper presented at the Annual Meeting for the American Psychological Association, Washington, DC.

73. Thai, J.L. & **Budge, S.L.** (2014, August). *Mental health outcomes for trans Asian American, Asian, and Pacific Islander populations.* Paper presented at the Annual Meeting for the American Psychological Association, Washington, DC.

74. Alexander, D. & **Budge, S.L.** (2014, August).  *The impact of partner support on symptoms of anxiety for trans women, trans men, and genderqueer individuals.* Poster presented at the Annual Meeting for the American Psychological Association, Washington, DC.

75. Barr, S.M. & **Budge, S.L.** (2014, August).  *Trans identity salience as a predictor for well-being and body control beliefs for trans individuals.*    Poster presented at the Annual Meeting for the American Psychological Association, Washington, DC.

76. Keller, B.L., Barr, S.M., & **Budge, S.L.** (2014, August). *Trans women's emotional resilience: Reactions to the intersection of sexism and transphobia.* Paper presented at the Annual Meeting for the American Psychological Association, Washington, DC.

77. Rossman, H.K., Sinnard, M., **Budge, S.L.** (2014, August). *Adapting a three-tiered model of emotions to genderqueer individuals' identity processes.* Paper presented at the Annual Meeting for the American Psychological Association, Washington, DC.

78. Thai, J.L., Orovecz, J., **Budge, S.L.** (2014, August). *Trans men's experiences of positive emotions: An examination of gender identity and emotion labels.* Paper presented at the Annual Meeting for the American Psychological Association, Washington, DC.

79. Tebbe, E.N., Brewster, M., **Budge, S.L.** (2014, August). *A content analysis of transgender psychological literature.* Poster presented at the American Psychological Association, Washington, DC.

**SA040**

Stephanie Budge CV 2023

80. Thai, J.L. & **Budge, S.L.** (2014, March). *Family relationships and outness for transgender Asian Pacific Islander individuals.* Paper presented at the Society of Counseling Psychology Conference, Atlanta, GA.

81. Hunter, C. & **Budge, S.L.** (2014, March). *The moderating effect of race related to discrimination for transgender individuals.* Paper presented at the Society of Counseling Psychology Conference, Atlanta, GA.

82. Alexander, D. & **Budge, S.L.** (2014, March). *The impact of partner support on symptoms of anxiety for trans women, trans men, and genderqueer individuals.* Paper presented at the Society of Counseling Psychology Conference, Atlanta, GA.

83. Barr, S.M. & **Budge, S.L.** (2014, March). *Validation of the Objectified Body Consciousness Scale for transgender individuals.* Paper presented at the Society of Counseling Psychology Conference, Atlanta, GA.

84. **Budge, S.L.** (2013, October). *Addressing grief and role transitions for transgender clients experiencing gender identity incongruence.* Paper presented at the Biennial North American Society for Psychotherapy Research Conference, Nashville, TN.

85. **Budge, S.L.,** Barr, S.M., Katz-Wise, S.L., Keller, B.L., & Manthos, M. (2013, June). *Incorporating positivity into psychotherapy with trans clients.* Workshop presented at the Annual Philadelphia Transgender Health Conference, Philadelphia, PA.

86. **Budge, S.L.** & Barr, S.M. (2013, April). *Emotional and identity processes of trans youth: A developmental approach.* Paper presented at the Biennial Society for Research on Child Development Conference, Seattle, WA.

87. **Budge, S.L.,** Thai, J., Rossman, H.K. *(*2012, August*) Intersecting identities and mental health outcomes for transsexual, cross-dressing, and genderqueer individuals.* Poster presented at the Annual Meeting for the American Psychological Association, Orlando, Florida.

88. **Budge, S.L.** & Keller, B.L. (2012, August). *"She felt pressured, I felt neglected": LGBQ individuals' experiences of sexual pressure in relationships.* Poster presented at the Annual Meeting for the American Psychological Association, Orlando, Florida.

89. **Budge, S.L.,** Moore, J., Neinhuis, J., Baardseth, T., & Wampold, B.E. (2012, June). *The relative efficacy of bona-fide psychological treatments for personality disorders: A meta-analysis of direct comparisons.* Paper presented at the Annual Meeting for the Society for Psychotherapy Research, Virginia Beach, Virginia.

90. **Budge, S.L.** & Katz-Wise, S.L. (2012, February). *Trans-affirmative therapy: Focusing on emotional and coping processes throughout gender transitioning.* Workshop presented at the Transgender Spectrum Symposium, Annual Meeting of the Gay and Lesbian Affirmative Psychotherapy Association, New York, New York.

91. **Budge, S.L.** & Katz-Wise, S.L. (2011, November). *Transgender emotional and coping processes: Facilitative and avoidant coping throughout the gender transition.* Paper presented at the Annual Meeting for the Society for the Scientific Study of Sexuality, Houston, Texas.

92. **Budge, S.L.** & Howard, K.H. (2011, August). *Gender socialization and genderqueer individuals: The impact of assigned sex on coping and mental health concerns.* Paper presented at the Annual Meeting for the American Psychological Association, Washington, D.C.

93. Tebbe, E.L., **Budge, S.L.,** & Fischer, A. (2011, March). *Transforming the research Goliath: Reflections on research with transgender communities.* Roundtable presented at

23

**SA041**

Stephanie Budge CV 2023

the Bi-Annual Meeting of the Association for Women in Psychology, Philadelphia, Pennsylvania.

94. **Budge, S.L.** & Howard, K.A.S. (2010, August). *Coping, social support, and well-being in the transition process for transgender individuals.* Paper presented at the Annual Meeting for the American Psychological Association, San Diego, California.

95. Baardseth, T.P., **Budge, S.L.,** & Wampold, B.E. (2010, August). *Allegiance and psychotherapy research: The effectiveness of supportive therapy as a control.* Poster presented at the Annual Meeting for the American Psychological Association, San Diego, California.

96. Solberg, V.S., Gresham, S.L., **Budge, S.L.**, & Phelps, A.L. (2010, August). *Impact of learning experiences on students with disabilities career development.* Poster presented at the Annual Meeting for the American Psychological Association, San Diego, California.

97. Katz-Wise, S.L., **Budge, S.L.,** & Hyde, J.S. (2010, August). *Individuation or identification? Objectified body consciousness.* Poster presented at the Annual Meeting for the American Psychological Association, San Diego, California.

98. Solberg, V.S., Gresham, S.L., **Budge, S.L.**, & Phelps, A.L. (2010, August). *Impact of exposure to quality learning experiences on career development.* Paper presented at the Annual Meeting for the American Psychological Association, San Diego, California.

99. **Budge, S.L.** & Fluckiger, C. (2010, June). *Comparison of evidence-based-treatments versus treatment as usual: A meta-analysis.* Paper presented at the Annual Meeting for the Society for Psychotherapy Research, Asilomar, California.

100. **Budge, S.L**. & Howard, K.A.S. (2010, April). *Career decision-making in the transgender population: The role of barriers and discrimination.* Paper presented at the Annual Meeting for the American Educational Research Association, Denver, Colorado.

101. **Budge, S.L.,** Solberg, V.S., Phelps, L.A., Haakenson, K., & Durham, J. (2010, April). *Promising practices for implementing Individualized Learning Plans: Perspectives of teachers, parents, and students.* Paper presented at the Annual Meeting for the American Educational Research Association, Denver, Colorado.

102. Solberg, V.S., Gresham, S.L., Phelps, L.A., & **Budge, S.L.** (2010, April). *Identifying decision-making patterns and its impact on career development and workforce readiness.* Paper presented at the Annual Meeting for the American Educational Research Association, Denver, Colorado.

103. Katz-Wise, S.L., **Budge, S.L.,** & Hyde, J.S. (2010, March). *Objectified body consciousness and the mother-adolescent relationship.* Poster presented at the Biennial Meeting for the Society for Research on Adolescence, Philadelphia, Pennsylvania.

104. **Budge, S. L.,** Tebbe, E. N., Katz-Wise, S. L., Schneider, C. L., & Howard, K. A. (2009, August). *Workplace transitions: Work experiences and the impact of transgender identity.* Paper presented at the Annual Meeting of the American Psychological Association, Toronto, Ontario, Canada.

105. Katz-Wise, S. L., **Budge, S. L.,** & Schneider, C. L. (2009, August). *Navigating the gender binary: A qualitative study of transgender identity development.* Paper presented at the Annual Meeting of the American Psychological Association, Toronto, Ontario, Canada.

106. Nelson, M. L., Thompson, M. N., Huffman, K. L., & **Budge, S. L.** (2009, August). *Development and further validation of the social class identity dissonance scale.* Paper

24

**SA042**

Stephanie Budge CV 2023

presented at the Annual Meeting of the American Psychological Association, Toronto, Ontario, Canada.

107.    Dvorscek, M., **Budge, S. L.**, Bluemner, J. L., & Valdez, C. R. (2009, August). *Health care provider perspectives on Latino patients with depression.* Poster presented at the Annual Meeting of the American Psychological Association, Toronto, Ontario, Canada.

108.    Neumaier, E. R., **Budge, S. L.**, Bohlig, A. J., Doolin, E. M., & Nelson, M. L. (2009, August). *I feel masculine but they think I'm feminine: Toward measuring experienced gender role.* Poster presented at the Annual Meeting of the American Psychological Association during the Division 17    Social Hour, Toronto, Ontario, Canada.

109.    Doolin, E. M., Graham, S. R., Hoyt, W. T., **Budge, S. L.**, & Bohlig, A. J. (2009, January). *Out and about in the South: Defining lesbian communities.* Poster presented at the National Multicultural Conference and Summit, New Orleans, LA.

110.    **Budge, S. L.**, Tebbe, E. N. & Howard, K. A. S. (2009, January) *Transgender individuals' work experiences: Perceived barriers, discrimination, and self-efficacy.* Paper presented at the Annual Meeting of the Career Conference, Madison, WI.

111.    Howard, K. A. S., **Budge, S. L.**, Jones, J., & Higgins, K. (2009, January). *Future plans of urban youth: A qualitative analysis of influences, barriers, & coping strategies.* Paper presented at the Annual Meeting of the Career Conference, Madison, WI.

112.    **Budge, S.,** Schneider, C., Rodriguez, A., Katz-Wise, S., Tebbe, E., & Valdez, C. (2008, August). *The emotional roller coaster: Transgender experiences of positive and negative emotions.* Poster presented at the Annual Meeting of the American Psychological Association, Boston, MA.

113.    Nelson, M. L., Huffman, K. & **Budge, S. L.**, (2008, August). *Initial validation of the Social Class Identity Dissonance Scale.* Poster presented at the Annual Meeting of the American Psychological Association, Boston, MA.

114.    **Budge, S. L.,** Schneider, C., Rodriguez, A., & Howard, K. A. S. (2008, January) *What about the "T"?: Career counseling with transgender populations.* Paper presented at the Annual Meeting of the Career Conference, Madison, WI.

115.    Howard, K. A .S., McKay, K. M., & **Budge, S. L.** (2007, August) *Adolescents' use of SOC strategies: The interaction with low-income and high violence contexts.* Poster presented at the Annual Meeting of the American Psychological Association, San Francisco, CA.

116.    **Budge, S. L.** & Sherry, A. (2007, August) *The influence of gender role on sexual compliance: A preliminary investigation of LGB relationships.* Poster presented at the Annual Meeting of the American Psychological Association, San Francisco, CA.

117.    Howard, K. A. S., Solberg, V. S., & **Budge, S. L.** (2007, August). *Designing culturally responsive school counseling career development programming for youth.* Paper presented at the Annual Meeting of the American Psychological Association, San Francisco, CA.

118.    Howard, K. A. S., Jones, J. E., **Budge, S.,** Gutierrez, B., Lemke, N., Owen, A., & Higgins, K.  (2007, April).  *Academic and career goals of high school youth: processes and challenges.*  Paper presented at the Annual Meeting of the American Educational Research Association, Chicago, IL.

25

**SA043**

Stephanie Budge CV 2023

## REGIONAL PRESENTATIONS
Underlining denotes student;

1. Dominguez, S. Jr., Matsuno, E., **Budge, S. L.,** & Tebbe, E. (2021, September). *Gender, Resilience and Resistance, Empowerment, and Affirmation Training.* Training provided at the University of Wisconsin-Madison via Zoom.
2. Dominguez, S. Jr., & **Budge, S. L.** (2021, May). *Microaggressions, communication, and power dynamics.* Workshop presented at the Madison Inclusive Leadership Conference, Madison, Wisconsin.
3. Tebbe, E.A. & **Budge, S.L.** (2021, April). *Transforming healing spaces: Tips and considerations in creating trans affirming spaces.* Workshop provided at the Wisconsin LGBTQ Health Summit, Madison, Wisconsin.
4. **Budge, S.L.,** Lindley, L., & Dominguez, S. (2021, February). Supporting mental health care for TNB clients. School of Social Work, University of Wisconsin-Madison, Madison, Wisconsin.
5. **Budge, S.L.** (2020, September). *Recruiting LGBTQ populations.* Symposium for Research Administrators. Madison, Wisconsin.
6. **Budge, S.L.** (2020, September). *Best practices for conducting research with LGBTQ populations.* Institute for Clinical and Translational Research training for researchers at the University of Wisconsin-Madison. Madison, Wisconsin.
7. **Budge, S.L.** (2019, April). *Trans affirmative therapy: Therapy for trans and nonbinary clients beyond the "101."* Workshop provided at the Wisconsin LGBTQ Health Summit, Madison, Wisconsin.
8. Guo, E., Mauk, E., & **Budge, S.L.** (2018, November). *Minority stress interventions in a psychotherapy pilot trial for transgender clients.* Paper presented at the Annual Meeting for the Wisconsin Counseling Association, Madison, Wisconsin.
9. **Budge. S.L.** (2018, November). *Mental Health and Wellbeing: Trans, Nonbinary, and Gender Nonconforming People.* Paper presented at the Annual Midwest Family Medicine Conference, Madison, Wisconsin.
10. Dyer, R. L., **Budge, S. L.,** Botsford, J., Andert, B., Rehm, J., & Allen, B. (April 2018). *Supporting trans youth in rural Wisconsin.* Symposium presented at the 2018 Wisqueer Conference, Madison, Wisconsin.
11. Dyer, R. L., **Budge, S. L.,** Botsford, J., Andert, B., Rehm, J., & Allen, B. (April 2018). *Trans youth needs assessment survey results: Nonmetropolitan-metropolitan differences in perceived safety at school for Wisconsin trans and nonbinary youth.* Poster presented at the 2018 Wisconsin Psychological Association Convention, Appleton, Wisconsin.
12. **Budge, S.L.** & Bostford, J. (February, 2018). *Trans experiences in Mental Health.* Symposium presented at the 2018 Wisconsin LGBTQ Summit, Milwaukee, Wisconsin.
13. Dyer, R. L., **Budge, S. L.,** Botsford, J., Andert, B., Rehm, J., & Allen, B. (February 2018). *Supporting trans youth in rural Wisconsin.* Symposium presented at the 2018 Wisconsin LGBTQ Summit, Milwaukee, Wisconsin.
14. **Budge, S.L.** (2017, September). *Transgender individuals and minority stress: The past, present, and future.* Research talk presented for the UW Department of Psychology Diversity series.

26

**SA044**

Stephanie Budge CV 2023

15. **Budge, S.L.** and Karcher, O. (2017, May). *Supporting trans youth and their mental health needs, Part 2.* Paper presented at the Supporting Trans and Gender Expansive Youth conference, Madison, Wisconsin.

16. **Budge, S.L.** (2016, October). *Supporting trans youth and their mental health needs.* Paper presented at the Supporting Trans and Gender Expansive Youth conference, Madison, Wisconsin.

17. **Budge, S.L.** (2013, November). *Incorporating an IPT approach with transgender clients.* Paper presented at the Annual Kentucky Psychological Association Conference, Lexington, Kentucky.

18. **Budge, S.L.** (2013, April). *Using interpersonal therapy with transgender clients.* Workshop provided at the Annual University of Florida Interdisciplinary Conference on LGBT Issues.

19. Barr, S. M. & **Budge, S. L.** (2013, April). *The role of identity integration in the emotional well-being of post-transition individuals.* Poster presentation at the Kentucky Psychological Association Student Research Conference, Louisville, Kentucky.

20. Orovecz, J., Thai, J.L., & **Budge, S.L.** (2013, April). *"I'm stoked about life": The emotional processes of trans men through a qualitative lens.* Poster presented at the Spring Research Conference, Lexington, Kentucky.

21. Rossman, K. & **Budge, S.L.** (2013, April). *Genderqueer individuals' mental health concerns: The relationship between social support and coping.* Paper presented at the Spring Research Conference, Lexington, Kentucky.

22. Barr, S. M. & **Budge, S. L.** (2013, April). *The role of identity integration in the emotional well-being of post-transition individuals.* Poster presented at the Spring Research Conference, Lexington, Kentucky.

23. Rossman, K. & **Budge, S.L.** (2013, June). *Just the fact that I commanded that respect - I got the privilege: Qualitative examination of privilege in the trans community.* Paper presented at the Spring Research Conference, Lexington, Kentucky.

24. Keller, B.L., Barr, S.M., & **Budge, S. L.** (2013, April). "*For every bad, there's 40 good things that happen": A qualitative approach to understanding the positive emotional experiences of trans women.* Poster presentation at the Spring Research Conference, Lexington, Kentucky.

25. Orovecz, J., Thai, J.L., & **Budge, S.L.** (2013, April). *"I'm stoked about life": The emotional processes of trans men through a qualitative lens.* Presented at the Spring Research Conference, Lexington, Kentucky.

26. Orovecz, J., Thai, J.L., & **Budge, S.L.** (2013, March). *"I'm me, and I'm proud to be me": A grounded theory analysis of trans men's emotional processes.* Presented at the Kentucky Psychological Association Foundation Spring Academic Conference, Louisville, Kentucky.

27. Eleazer, J. R. & **Budge, S. L.** (2013, March). *"It would be better for them to have a dead hero for a father than a freak:" Suicidality and trans military service.* Poster presented at the Kentucky Psychological Association Spring Academic Conference, Louisville, Kentucky.

28. Sinnard, M., Rossman, K., & **Budge, S. L.** (2013, March). *Positive emotional experiences of gender non-binary identified individuals.* Poster presentation at the Kentucky Psychological Association Student Research Conference, Louisville, Kentucky.

27

**SA045**

Stephanie Budge CV 2023

29. Barr, S.M., Stahl, A., Manthos, M., & **Budge, S.L.** (2012, November). *"It means there aren't rules and you don't have to ascribe to a specific binary": A qualitative examination of genderqueer identity.* Paper presented at the Chicago LGBTQ Health and Wellness Conference, Chicago, Illinois.

30. Thai, J.L., Orovecz, J., & **Budge, S.L.** (2012, November). *Trans men and positivity: Emotional processes related to identity.* Paper presented at the Chicago LGBTQ Health and Wellness Conference, Chicago, Illinois.

31. **Budge, S.L.,** Barr, S.M., Orovecz, J., & Rossman, H.K. (2012, November). *Clinical work with LGBT youth.* Workshop provided at the Annual Kentucky Psychological Association Conference, Louisville, Kentucky.

32. **Budge, S.L.,** Lee, S., & Monahan-Rial, V. (2011, February). *Bridging institutional gaps: Utilizing transgender-affirmative therapy with college students.* Workshop presented at the Annual Meeting for the Big 10 College Counseling Center Conference, Minneapolis, Minnesota.

33. Lee, J., **Budge, S.L.,** Wilson, J.L., & Roper, J.M. (2011, February). *The Korean Conundrum: Managing stigma in the recruitment of group counseling members.* Workshop presented at the Annual Meeting for the Big 10 College Counseling Center Conference, Minneapolis, Minnesota.

34. **Budge, S.L.** & Katz-Wise, S.L. (2010, February). *Transition to adulthood: Developmental steps for transgender individuals.* Workshop presented at the Conference on Transgender and Gender Variant Youth, Madison, Wisconsin.

35. **Budge, S.L.** (2009, October). *Individualized Learning Plans: Parent, student, and educator focus groups.* Paper presented at the Fall Institute for the National Collaborative on Workforce and Disability/Youth, Charleston, South Carolina.

## KEYNOTE AND INVITED PRESENTATIONS

1. **Budge, S.L.** & Hamer, J. (2022, December). Diversity Management Strategies to Improve Cross-Cultural and Intercultural Communication in Research Teams. Invited training to the Center for Innovations in Quality, Effectiveness, and Safety at the Houston Veterans Affairs, Houston, Texas.

2. **Budge, S.L.** (2022, November). Community-Based Research: A Step-By-Step Guide to Starting and Implementing Research Team and Community Feedback. University of Arkansas Department of Psychiatry and Behavioral Sciences and South Central MIRECC for Veterans Affairs, Little Rock, Arkansas.

3. **Budge, S.L.** (2022, October). Community-centered mental health. Workshop provided to LGBTQ+ Health Fellows in the School of Medicine and Public Health, University of Wisconsin-Madison, Madison, WI.

4. **Budge, S.L.** (2022, October). Barriers and Successful Outcomes in Recruiting Participants for Clinical Trial Research. Invited talk to the Center for Innovations in Quality, Effectiveness, and Safety at the Houston Veterans Affairs, Houston, Texas.

5. **Budge, S.L.** (2022, October). Lessons learned from being an expert witness in discrimination trials. Invited talk University of Wisconsin-Madison Law School, University of Wisconsin-Madison, Madison, Wisconsin.

6. **Budge, S.L.** (2022, October). LGBTQ+ Advocacy and Activism in Psychology. Invited talk at Clark University, Worcester, Massachusetts.

28

**SA046**

Stephanie Budge CV 2023

7. **Budge, S.L.** (2022, October). Reducing barriers to accessing mental health care for Two Spirit, trans, and nonbinary people of color: An open clinical trial. Invited talk at Arizona State University, Tempe, Arizona.

8. **Budge, S.L.** & Tebbe, E.A. (2022, July). Attending to internalized stigma in psychotherapy with Two Spirit, Transgender, and Nonbinary Clients. Workshop provided to Sondermind Therapy. Virtual workshop.

9. **Budge, S.L.** (2022, July). Best practices in supporting trans and nonbinary youth. School of Education Early Career Institute, University of Wisconsin-Madison, Madison, Wisconsin.

10. **Budge, S.L.,** (2022, April). Reducing barriers to accessing mental health care for Two Spirit, trans, and nonbinary people of color: An open clinical trial building upon lessons learned. Invited talk to the Center for Innovations in Quality, Effectiveness, and Safety at the Houston Veterans Affairs, Houston, Texas.

11. **Budge, S.L.,** (2022, April). Conducting psychotherapy research with transgender and nonbinary populations: CBPR Methods and Lessons Learned. University of Arkansas Department of Psychiatry and Behavioral Sciences and South Central MIRECC for Veterans Affairs, Little Rock, Arkansas.

12. **Budge, S.L.** (2022, April). Queering networking. Workshop provided by the APA Division 44 Science Committee. Virtual workshop.

13. **Budge, S.L.** (2022, April). Queering research. Workshop provided by the APA Division 44 Science Committee. Virtual.

14. **Budge, S.L.** (2022, April). Providing evidence-based psychotherapy to transgender and nonbinary clients: Beyond the basics. Keynote presented at the Kentucky Psychological Association conference in Louisville, KY.

15. **Budge, S.L.** Dominguez, Jr., S., & Lee, J. (2022, March). Providing trans affirming care to youth. Intern seminar at the Wisconsin Psychiatric Institute and Clinics, University of Wisconsin-Madison.

16. **Budge, S.L.,** Dominguez Jr., S., & Norton, M. (2022, February). Incorporating radical healing and addressing internalized transnegativity in psychotherapy for transgender, Two Spirit, and nonbinary people of color: A community-based participatory research approach. Workshop provided to the School Psychology Department, University of Wisconsin-Madison.

17. Tebbe, E.A. & **Budge, S.L.** (2022, January). LGBTQ identity development in young people. Training provided to the Central Wisconsin Health Partnership, Appleton, Wisconsin.

18. **Budge, S.L.** (2021, February). Conducting psychotherapy research with trans and nonbinary populations. Presented to the Counseling Psychology department at the University of British Columbia, Vancouver, Canada.

19. **Budge, S.L.** & Dominguez, S. Jr. (2019, November). *Mental health care for transgender, nonbinary, and gender nonconforming clients.* Presented to practitioners at Group Health Cooperative Insurance, Madison, Wisconsin.

20. **Budge, S.L.,** Dominguez, S.Jr., Mauk, E., & Sweetnam, M. (2018, October). *School of Education: At the forefront of transgender studies.* Presented to the Board of Visitors at the School of Education—University of Wisconsin-Madison.

29

**SA047**

Stephanie Budge CV 2023

21. **Budge, S.L.** & <u>Mauk, E.</u> (2017, May). *Health and well-being of LGBTQ students: Lessons learned and recommendations for educators.* Invited presentation at the CESA Conference, Madison, Wisconsin.
22. **Budge, S.L.** (2016, March). *The construction of gender identity as "disordered": A critical examination of mental health using trans narratives.* Invited presentation at the Women's and Gender Studies Forum at the University of Florida, Gainesville, Florida.
23. **Budge, S.L.** (2016, March). *Understanding, acknowledging, and responding to LGBTQ microaggressions in health care settings.* Keynote provided at the Florida Area Health Education Center, Gainesville, Florida.
24. **Budge, S.L.** (2014, September). *Positivity in trans populations: Implications for vocational psychology.* Boston University, Boston, Massachusetts.
25. **Budge, S.L.** (2013, April). *Future directions for research and therapy with trans and gender diverse individuals.* Keynote provided at the Annual University of Florida Interdisciplinary Conference on LGBT Issues.
26. **Budge, S.L.** *(*2013, March*). The psychology of sexual orientation and gender identity: future directions and implications.* Keynote provided at the East Texas Psi Chi Student Research Conference, Tyler, Texas.

**NATIONAL RESEARCH BRIEFINGS**

1. **Budge, S.L.,** & Solberg, V.S., (2010, March) *Career exploration and the use of career narrative data for high school students' career exploration processes: A United States sample.* Research briefing presented at the Department of Labor, Washington, D.C.
2. **Budge, S.L.,** Solberg, V.S., & Phelps, A.L. (2010, March) *Individualized Learning Plans within a community-oriented approach: The usefulness of focus group data with parents, teachers, and students.* Research briefing presented at the Department of Labor, Washington, D.C.

**INTERNATIONAL RESEARCH BRIEFINGS**

1. **Budge, S.L.,** & Solberg, V.S., (2010, February) *A three-tiered approach to analyze the career decision making processes using focus group data with Singaporean parents, students, and staff.* Research briefing presented at the Ministry of Education, Singapore.
2. **Budge, S.L.,** & Solberg, V.S., (2010, February) *Use of narrative analysis for high school students' career exploration processes: A Singapore Sample.* Research briefing presented at the Ministry of Education, Singapore.

**BLOGS**

Paquin, J., Tao, K., & **Budge, S.L. (2020).** *Is psychotherapy effective for everyone?.* *https://www.apa.org/pubs/highlights/spotlight/issue-192*

**Budge, S.L.** (2015). *Critical considerations in writing letters for trans clients.* https://societyforpsychotherapy.org/critical-considerations-in-writing-letters-for-trans-clients/

30

**SA048**

Stephanie Budge CV 2023

## PROFESSIONAL SERVICE

**Associate Editor**
*Psychotherapy*                                                    1/2014 – 1/2022
*Psychology of Sexual Orientation and Gender Diversity*            8/2020 -- current

**Guest Editor of Special Sections**
*Psychotherapy*                                                    5/2019
*Journal of Counseling Psychology*                                 12/2017
*Psychology of Sexual Orientation and Gender Diversity*            12/2017
*Psychotherapy*                                                    9/2016

**Editorial Board**
*Psychotherapy*                                                    1/2011 – 12/2013
*Archives of Sexual Behavior*                                      1/2014 – 12/2016
*Psychology of Sexual Orientation and Gender Diversity*            1/2016 – 8/2020
*International Journal of Transgender Health*                      1/2016 – current
*LGBTQ+ Family: An Interdisciplinary Journal*                      9/2022 - current

**Ad Hoc Reviewer:** Journal of Consulting and Clinical Psychology, Clinical Psychology Review, Journal of Counseling Psychology, The Counseling Psychologist, Feminism and Psychology, Psychology of Religion and Spirituality, Psychology of Women Quarterly, Journal of GLBT Family Issues, BioMed Central Journal, The Cognitive Behavior Therapist, Psychotherapy Research, Routledge Publishers, Harvard University Press, Family Process

### Leadership in Professional Organizations

**Co-Chair of Division 17 Special Task Group**               8/2019 – 8/2020
 "Building a Trans and Nonbinary Pipeline into Counseling Psychology." This special task group included giving a free webinar about increasing access for trans and nonbinary students into doctoral psych programs, creating a curriculum guide for psychology courses, and supporting a research project that focused on trans and nonbinary students' experiences in counseling psychology programs

**Co-Chair of Division 44 Science Committee**                8/2011 – 8/2021
Society for the Psychological Study of Lesbian, Gay, Bisexual, and Transgender Issues (Division 44)

### Membership in Professional Organizations

American Psychological Association (APA)
- Society of Counseling Psychology (Division 17)
- Division of Psychotherapy (Division 29)
- Society for the Psychological Study of Lesbian, Gay, Bisexual, and Transgender Issues (Division 44)

World Professional Association for Transgender Health (WPATH)

31

**SA049**

1  Colin Proksel (034133)
2  OSBORN MALEDON, P.A.
   2929 North Central Avenue, 21st Floor
3  Phoenix, Arizona 85012-2793
   State Bar No. 034133
4  Telephone:    (602) 640-9000
5  Facsimile:    (602) 640-9050
   Email:        cproksel@omlaw.com
6
7  *Attorney for Plaintiffs*

8  *Additional counsel listed on following page*

9              **UNITED STATES DISTRICT COURT**
              **FOR THE DISTRICT OF ARIZONA**
10                   **TUCSON DIVISION**

11 | Jane Doe, by her next friend and parents | Case No. _____ |
12 | Helen Doe and James Doe; and Megan Roe, |  |
   | by her next friend and parents, Kate Roe and | **DECLARATION OF DR. DANIEL** |
13 | Robert Roe, | **SHUMER, M.D., MPH, IN SUPPORT OF** |
   |  | **PLAINTIFFS' MOTION FOR A** |
14 |            Plaintiffs, | **PRELIMINARY INJUNCTION AND** |
15 |  | **PLAINTIFFS' MOTION TO PROCEED** |
   |       v. | **UNDER A PSEUDONYM** |
16 |  |  |
17 | Thomas C. Horne in his official capacity as |  |
   | State Superintendent of Public Instruction; |  |
18 | Laura Toenjes, in her official capacity as |  |
   | Superintendent of the Kyrene School |  |
19 | District; Kyrene School District; The |  |
   | Gregory School; and Arizona Interscholastic |  |
20 | Association Inc., |  |
21 |            Defendants. |  |

22

23

24

25

26

27

28

**SA050**

1   Jyotin Hamid*
2   Justin R. Rassi*
    Amy C. Zimmerman*
3   DEBEVOISE & PLIMPTON LLP
    66 Hudson Boulevard
4   New York, New York 10001
5   Telephone: (212) 909-6000
    Facsimile: (212) 909-6836
6   Email: jhamid@debevoise.com
7   Email: jrassi@debevoise.com
    Email: azimmerman@debevoise.com
8
    Amy Whelan*
9   Rachel Berg*
10  NATIONAL CENTER FOR LESBIAN RIGHTS
    870 Market Street, Suite 370
11  San Francisco, California 94102
12  Telephone: (415) 343-7679
    Facsimile: (415) 392-8442
13  Email: awhelan@nclrights.org
    Email: rberg@nclrights.org
14
15  *Pro hac vice application forthcoming
16
17
18
19
20
21
22
23
24
25
26
27
28

I, Daniel Evan Shumer, M.D., declare as follows:

1. I submit this expert declaration based upon my personal knowledge.

2. If called to testify in this matter, I would testify truthfully based on my expert opinion.

### Qualifications and Experience

3. I am a Pediatric Endocrinologist and Medical Director of the Comprehensive Gender Services Program at Michigan Medicine, University of Michigan. I also serve as the Clinical Director of Child and Adolescent Gender Services at C.S. Mott Children's Hospital, and as an Assistant Professor of Medicine at the University of Michigan, where the major focus of my clinical and research work pertains to transgender adolescents. A true and correct copy of my curriculum vitae is attached hereto as **Exhibit A**.

4. I received my medical degree from Northwestern University in 2008. After completing a residency in pediatrics at Vermont Children's Hospital, Fletcher Allen Health Care, University of Vermont, I began a clinical fellowship in pediatric endocrinology at Harvard University's Boston Children's Hospital. During that clinical fellowship, I completed a Master of Public Health from Harvard University's T.H. Chan School of Public Health. I finished both the fellowship and my MPH degree in 2015.

5. As a fellow at Harvard, I was mentored by Dr. Norman Spack, a pioneer in transgender medicine who established the Gender Management Services Clinic (GeMS), the first major program in the U.S. to focus on gender-diverse and transgender adolescents. GeMS is located at Boston Children's Hospital. Working at GeMS, I became a clinical expert in the field of transgender medicine within pediatric endocrinology and began conducting research on gender identity and the evaluation and management of transgender children and adolescents.

6. Based on my work at GeMS, I was recruited to establish a similar program focusing on gender-diverse and transgender children and adolescents at the C.S. Mott

3

**SA052**

Children's Hospital. In October 2015, I founded the hospital's Child and Adolescent Gender Services Clinic.

7.     The Child and Adolescent Gender Services Clinic has treated over 600 patients since its founding. I have personally evaluated and treated over 400 patients for gender dysphoria. As the Clinical Director, I oversee the clinical practice, which includes four other physicians, two clinical social workers, and nursing and administrative staff. I also actively conduct research related to transgender medicine and mental health concerns specific to transgender youth.

8.     In addition to my work with transgender children and adolescents, I also treat children and adolescents with differences of sex development ("DSD"), commonly referred to as intersex conditions. I participate in the DSD Clinic's monthly meetings and approximately 5% of my patients are children and adolescents with DSDs.

9.     My academic duties as an assistant professor include teaching lectures entitled "Puberty," "Transgender Medicine," and "Pediatric Growth and Development." I am also the Director of the Transgender Medicine elective for the University of Michigan Medical School.

10.    My recent publications include *Health Disparities Facing Transgender and Gender Nonconforming Youth Are Not Inevitable*, Pediatrics, 141(3), 1–2 (2018); *Psychological Profile of the First Sample of Transgender Youth Presenting for Medical Intervention in a U.S. Pediatric Gender Center*, Psych. Sexual Orientation & Gender Diversity, 4(3), 374–82 (2017); *The Effect of Lesbian, Gay, Bisexual, and Transgender-Related Legislation on Children*, J. Pediatrics, 178(5-6.e1), 5–7 (2016); *Advances in the Care of Transgender Children and Adolescents*, Advances Pediatrics, 63(1), 79-102 (2016); *The Role of Assent in the Treatment of Transgender Adolescents*, Int'l J. Transgenderism, 16(2), 97-102 (2015); and *Serving Transgender Youth: Challenges, Dilemmas, and Clinical Examples*, Professional Psychology: Research and Practice, 46(1), 37–45 (2015). I have also co-authored chapters of textbooks, including "Medical

4

Treatment of the Adolescent Transgender Patient" in *Gender Affirmation: Medical and Surgical Perspectives* (Christopher J. Salgado et al. eds., 2016). A listing of my publications is included in my curriculum vitae in **Exhibit A**.

11.   I have been invited to speak at numerous hospitals, clinics, and conferences on topics related to clinical care and standards for treating transgender children and youth. For example, in December 2017 I spoke at the Nursing Unit (12-West) Annual Educational Retreat in Michigan on the topic of "Gender Identity at the Children's Hospital," and in October 2017, I planned, hosted, and spoke at a conference in Michigan entitled "Transgender and Gender Non-Conforming Youth: Best Practices for Mental Health Clinicians, Educators, & School Staff."

12.   In October 2019, I was invited by the Michigan Organization on Adolescent Sexual Health to speak to community groups across Southeast Michigan on the topic of "Gender Identity in Adolescents—Supporting Transgender Youth." A listing of my lectures is included in my curriculum vitae in **Exhibit A**.

13.   I belong to a number of professional organizations and associations relating to (i) the health and well-being of children and adolescents, including those who are transgender; and (ii) appropriate medical treatments for transgender individuals. For example, I am currently a member of the Pediatric Endocrine Society where I serve on the Gender Identity Special Interest Group's Education Committee, and the World Professional Association for Transgender Health ("WPATH"), an international multidisciplinary professional association to promote evidence-based care, education, research, advocacy, public policy, and respect in transgender health. Both organizations are central in the development of the standards of care for the treatment of gender dysphoria. A complete list of my involvement in various professional associations is located in my curriculum vitae in **Exhibit A**.

14.   In preparing this declaration, I reviewed the text of Senate Bill 1165 ("SB 1165") at issue in this matter. I also relied on my scientific education and training, my

5

**SA054**

research experience, and my knowledge of the scientific literature in the pertinent fields. The materials I have relied upon in preparing this declaration are the same types of materials that experts in my field of study regularly rely upon when forming opinions on these subjects. I may wish to supplement these opinions or the bases for them as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

15.   I have not met or spoken with the Plaintiffs or their parents for purposes of this declaration. My opinions are based solely on the information that I have been provided by Plaintiffs' attorneys as well as my extensive background and experience treating transgender patients.

16.   In the past four years, I have been retained as an expert and provided testimony on behalf of transgender plaintiffs in the following cases: *Dekker v. Weida*, No. 4:22-cv-00325-RH-MAF (N.D. Fla.); *Boe v. Marshall*, No. 2:22-cv-00184-LCB-CWB (M.D. Ala.); *Roe v. Utah High Sch. Activities Ass'n*, No. 220903262 (3d Jud. Dist. in and for Salt Lake County, Utah); *Menefee v. City of Huntsville Bd. of Educ.*, No. 5:18-cv-01481-LCB (N.D. Ala.); *Flack v. Wis. Dep't of Health Servs.*, No. 3:18-cv-00309-wmc (W.D. Wis.); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 2:16-cv-00943-PP (E.D. Wis.). I also provided expert witness testimony on behalf of a parent in a custody dispute involving a transgender child in the following case: *In the Interest of Younger*, No. DF-15-09887 (Dallas County, Tex.) and have been retained on a case in Arizona related to gender identity and legal documentation of sex.

17.   I am being compensated at an hourly rate for the actual time that I devote to this case, at the rate of $300 per hour for any review of records, preparation of reports, or declarations. I will be compensated with a day rate of $1920 for deposition and trial testimony. My compensation does not depend on the outcome of this litigation, the opinions that I express, or the testimony that I provide.

SA055

**Medical and Scientific Background on Gender Identity and Gender Dysphoria**

18.   "Gender identity" is the medical term for a person's internal, innate sense of belonging to a particular sex. Everyone has a gender identity.

19.   A person's gender identity has a strong biological basis, although the precise causal mechanism is not yet known. Research suggests that differences in prenatal hormonal exposures, genetic factors, and brain structural differences may all contribute.

20.   The terms "gender role" and "gender identity" refer to different things.

21.   Gender roles are behaviors, attitudes, and personality traits that a particular society considers masculine or feminine, or associates with male or female social roles. For example, the convention that girls wear pink and have longer hair, or that boys wear blue and have shorter hair, are socially constructed gender roles from a particular culture and historical period.

22.   By contrast, gender identity does not refer to socially contingent behaviors, attitudes, or personality traits. It is an internal and largely biological phenomenon.

23.   A person's gender identity is innate and cannot be changed by medical or psychological intervention.

24.   Living consistently with one's gender identity is critical to the health and well-being of any person, including transgender people.

25.   Attempts to "cure" transgender individuals by forcing their gender identity into alignment with their birth sex are harmful and ineffective. Those practices have been denounced as unethical by all major professional associations of medical and mental health professionals, such as the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association, among others.

26.   From a medical perspective, a person's sex is comprised of several components, including, among others, internal reproductive organs, external genitalia,

7

1    chromosomes, hormones, gender identity, and secondary-sex characteristics. Diversity

2    and incongruence in these components of sex are a naturally occurring source of human

3    biological diversity.

4    27.    When a child is born, a healthcare provider designates the child's sex as

5    male or female based on the child's observable anatomy. For most people, that initial

6    designation (often referred to as "assigned sex") turns out to be consistent with the

7    person's gender identity. For a transgender person, however, that initial designation turns

8    out to be inaccurate because it does not reflect the person's gender identity.

9    28.    Due to the incongruence between their assigned sex and gender identity,

10    transgender people experience varying degrees of gender dysphoria, a serious medical

11    condition recognized in the American Psychiatric Association's *Diagnostic and*

12    *Statistical Manual of Mental Disorders* ("DSM-5") and the World Health Organization's

13    *International Classification of Diseases* ("ICD-10"), where it is referred to as "gender

14    incongruence." Gender dysphoria is highly treatable and can be effectively managed. If

15    left untreated, however, it can result in severe anxiety and depression, eating disorders,

16    substance abuse, self-harm, and suicidality.

17    29.    When transgender adolescents are provided with appropriate medical

18    treatment and have parental and social support, they can thrive and grow into healthy

19    adults.

20    **The Medical Treatment of Gender Dysphoria in Adolescents**

21    30.    The goal of medical treatment for transgender patients is to alleviate their

22    distress by allowing them to live consistently with their gender identity. Research and

23    clinical experience have consistently shown the medical treatments for gender dysphoria

24    to be safe and effective.

25    31.    The prevailing standards of care for the treatment of gender dysphoria are

26    developed by WPATH. The WPATH Standards of Care represent expert consensus for

27    clinicians related to medical care for transgender people, based on the best science and

28

8

**SA057**

clinical experience. The WPATH Standards of Care were first published in 1979, more than four decades ago, and have been continually updated to reflect new knowledge and research. These standards have been endorsed by the major professional associations of medical and mental health providers in the United States, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, and the Pediatric Endocrine Society.

32.     The Endocrine Society is a 100-year-old global membership organization representing professionals in the field of adult and pediatric endocrinology. In 2017, the Endocrine Society published clinical practice guidelines on treatment recommendations for the medical management of gender dysphoria, in collaboration with the Pediatric Endocrine Society, the European Societies for Endocrinology and Pediatric Endocrinology, and WPATH, among others.

33.     Together, the WPATH Standards of Care and the Endocrine Society's clinical practice guidelines establish the prevailing standards governing the healthcare and treatment of gender dysphoria in both youth and adults.

34.     Undergoing treatment to alleviate gender dysphoria is commonly referred to as transition. The transition process typically includes one or more of the following three components: (i) social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents; (ii) medical transition, including puberty-delaying medication and hormone-replacement therapy; and (iii) for adults, surgeries to alter the appearance and functioning primary- and secondary-sex characteristics. Surgery is rarely indicated for transgender minors.

35.     At the onset of puberty, adolescents diagnosed with gender dysphoria may be prescribed puberty-delaying medications to prevent the distress of developing physical characteristics that conflict with the adolescent's gender identity. For example, a transgender girl will experience no progression of physical changes caused by

9

SA058

1    testosterone, including male muscular development, facial and body hair, an Adam's
2    apple, or masculinized facial structures. And in a transgender boy, puberty-blocking
3    medication will prevent breast development, menstruation, and widening of the hips.

4    36.    Thereafter, the treating provider may prescribe cross-sex hormones to
5    induce the puberty associated with the adolescent's gender identity. This treatment is
6    referred to as hormone therapy. The result of this treatment is that a transgender boy
7    typically has the same levels of circulating testosterone as other boys. Similarly, a
8    transgender girl who receives hormone therapy will typically have the same levels of
9    circulating estrogen and testosterone levels as other girls and significantly lower than
10   boys who have begun pubertal development.

11                                 **Sports and Gender**

12   37.    Being transgender is not an accurate proxy for athletic performance or
13   ability. Sex chromosomes and genitals alone do not meaningfully affect athletic
14   performance.

15   38.    Before puberty, there are no significant differences in athletic performance
16   between boys and girls. After puberty, boys perform better on average than girls in most
17   athletic competitions.

18   39.    The biological driver of these average group differences is testosterone, not
19   anatomy or genetics. Both boys and girls produce testosterone. After puberty, however,
20   boys produce much higher levels of testosterone than girls, which results in increased
21   muscle mass and muscle strength. As a result, post-pubertal boys and men have an
22   athletic advantage over girls and women in many sports. *See*, *e.g.*, David J. Handelsman,
23   et al., *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic*
24   *Performance*, 39 Endocrine Revs. 803–29 (2018).

25   40.    Setting aside the narrow category of individuals with DSDs,[1] the ranges of
26

27   [1]    DSD includes a group of congenital conditions associated with atypical development of
28         internal and external genital structures. These conditions are caused by variations in genes,

10

**SA059**

1    testosterone in males and females do not overlap with each other.

2        41.    There are transgender girls and women who have testosterone in the female

3    range because they are receiving hormone therapy or because, as a result of receiving

4    puberty-blocking medication, they never have gone through male puberty.

5        42.    The fact that a girl is transgender, in itself, does not indicate that she has

6    any athletic advantage over other girls.

7                    **Plaintiffs and Arizona's Ban on Transgender Girls in Sports**

8        43.    There is no medical justification for Arizona to exclude Plaintiffs from

9    girls' interscholastic athletics because they are transgender.

10       44.    Plaintiffs' attorneys have explained to me that Plaintiff Jane Doe is an 11-

11   year-old transgender girl who was diagnosed with gender dysphoria when she was about

12   seven years old and has lived her life as a girl since that time.

13       45.    As part of her medical treatment for gender dysphoria, Jane's doctors have

14   determined that she has not yet started puberty. As a result, Jane has not experienced any

15   of the physiological changes that increased testosterone levels would cause in a pubescent

16   boy.

17       46.    Plaintiffs' attorneys have explained to me that Plaintiff Megan Roe is a 15-

18   year-old transgender girl who was diagnosed with gender dysphoria when she was about

19   10 years old and has lived as a girl since that time.

20       47.    As part of her medical treatment for gender dysphoria, Megan started to

21   receive puberty-blocking medication when she was 11 years old after clinical

22   documentation of the initial signs of puberty. This medication prevented her from

23   undergoing male puberty. Megan then started to receive hormone therapy when she was

24   12 years old. As a result, she has not experienced any of the physiological changes,

25   including muscle development, that increased testosterone levels would cause in a

26

27   development in utero, or hormones. Some women who have certain disorders of sexual
     development may produce levels of testosterone that are typically seen only in men.

28                                              11

**SA060**

pubescent boy. Instead, the hormone therapy she has received has caused her to develop many of the physiological changes associated with puberty in females.

48.    SB 1165 suggests that biological "sex is determined at [fertilization] and revealed at birth or . . . *in utero*." S.B. 1165, 55th Leg., 2d Reg. Sess. (Ariz. 2022), § 2.

49.    By suggesting sex to mean only biological sex determined at fertilization and revealed in utero or at birth, Arizona prevents Plaintiffs from participating on girls' teams because they are transgender girls. But the biological driver of average differences in athletic performance between men and women is circulating testosterone—not a person's transgender status or their biological sex determined at fertilization and revealed in utero or at birth. A person's genetic makeup and anatomy at birth alone are not reliable indicators of athletic performance.

50.    Because both Jane and Megan have not experienced increased testosterone levels that accompany male puberty, they do not have the biological characteristics that would cause them to have an athletic advantage over other girls in some sports.

51.    In addition, requiring Plaintiffs to participate on a boys' team would conflict with the standards of care for treating gender dysphoria in adolescents. Such a requirement would be harmful to Plaintiffs' mental, emotional, and physical health.

52.    I declare under criminal penalty under the laws of Arizona that the foregoing is true and correct.

Signed on the 4th day of April, 2023, in Ann Arbor, Michigan.

Daniel Shumer, M.D.

SA061

# EXHIBIT A

**Daniel Shumer, MD MPH**

Clinical Associate Professor in Pediatrics - Endocrinology

Email: dshumer@umich.edu

## EDUCATION AND TRAINING

### Education

| | |
|---|---|
| 08/2000-08/2003 | BA, Northwestern University, Evanston, United States |
| 08/2004-05/2008 | MD, Northwestern University, Feinberg School of Medicine, Chicago, United States |
| 07/2013-05/2015 | MPH, Harvard T.H. Chan School of Public Health, Boston, United States |

### Postdoctoral Training

| | |
|---|---|
| 06/2008-06/2011 | Residency, Pediatrics, Vermont Children's Hospital at Fletcher Allen Health Care, Burlington, VT |
| 07/2011-06/2012 | Chief Resident, Chief Resident, Vermont Children's Hospital at Fletcher Allen Health Care, Burlington, VT |
| 07/2012-06/2015 | Clinical Fellow, Pediatric Endocrinology, Boston Children's Hospital, Boston, MA |

## CERTIFICATION AND LICENSURE

### Certification

| | |
|---|---|
| 10/2011-Present | American Board of Pediatrics, General |

### Licensure

| | |
|---|---|
| | Michigan, Medical License |
| | Michigan, Controlled Substance |
| 08/2015-Present | Michigan, Medical License |

1

**SA063**

| 09/2015-Present | Michigan, DEA Registration |
|---|---|
| 09/2015-Present | Michigan, Controlled Substance |

## WORK EXPERIENCE

### Academic Appointment

| 10/2015-9/2022 | Clinical Assistant Professor in Pediatrics - Endocrinology, University of Michigan - Ann Arbor, Ann Arbor |
|---|---|
| 09/2022-Present | Clinical Associate Professor in Pediatrics - Endocrinology, University of Michigan - Ann Arbor, Ann Arbor |

### Administrative Appointment

| 07/2019-Present | Fellowship Director - Pediatric Endocrinology, Michigan Medicine, Department of Pediatrics, Ann Arbor |
|---|---|
| 07/2020-Present | Medical Director of the University of Michigan Comprehensive Gender Services Program, Michigan Medicine, Ann Arbor |
| | *Oversee the provision of care to transgender and gender non-conforming patients at Michigan Medicine.* |
| 07/2020-Present | Education Lead - Pediatric Endocrinology, University of Michigan - Department of Pediatrics, Ann Arbor |

### Clinical Appointments

| 04/2022-05/2023 | Medical Director in UMMG Faculty Benefits Appt., University of Michigan - Ann Arbor, Ann Arbor |
|---|---|

### Private Practice

| 08/2013-09/2015 | Staff Physician, Harvard Vanguard Medical Associates, Braintree |
|---|---|

SA064

**RESEARCH INTERESTS**

- Gender dysphoria

- Prader Willi Syndrome

**CLINICAL INTERESTS**

- Gender dysphoria

- Disorders of Sex Development

- Prader Willi Syndrome

**GRANTS**

**Past Grants**

*A Phase 2b/3 study to evaluate the safety, tolerability, and effects of Livoletide (AZP-531), an unacylated ghrelin analog, on food-related behaviors in patients with Prader-Willi syndrome*
PI
Millendo Therapeutics
04/2019 - 04/2021

**HONORS AND AWARDS**

**National**

| | |
|---|---|
| 2014 | Annual Pediatric Endocrine Society Essay Competition: Ethical Dilemmas in Pediatric Endocrinology: competition winner - The Role of Assent in the Treatment of Transgender Adolescents |

**Institutional**

| | |
|---|---|
| 2012 - 2015 | Harvard Pediatric Health Services Research Fellowship; funded my final two years of pediatric endocrine fellowship and provided tuition support for my public health degree |

SA065

| | |
|---|---|
| 2016 | The University of Michigan Distinguished Diversity Leaders Award, awarded by The Office of Diversity, Equity and Inclusion to the Child and Adolescent Gender Services Team under my leadership |
| 2019 | Lecturer of the Month, Department of Pediatrics, Michigan Medicine |

## TEACHING MENTORSHIP

### Resident

| | |
|---|---|
| 07/2020-Present | Rebecca Warwick, Michigan Medicine (co-author on publication #22) |

### Clinical Fellow

| | |
|---|---|
| 07/2017-06/2020 | Adrian Araya, Michigan Medicine (co-author on publication #22, book chapter #4) |
| 12/2020-Present | Jessica Jary, Michigan Medicine - Division of Adolescent Medicine |

### Medical Student

| | |
|---|---|
| 09/2017-06/2020 | Michael Ho, Michigan Medicine |
| 07/2019-Present | Hadrian Kinnear, University of Michigan Medical School (co-author on book chapter #3, abstract #3) |
| 07/2019-Present | Jourdin Batchelor, University of Michigan |

## TEACHING ACTIVITY

### Regional

| | |
|---|---|
| 08/2018-Present | Pediatric Boards Review Course sponsored by U-M: "Thyroid Disorders and Diabetes". Ann Arbor, MI |

4

SA066

**Institutional**

| | |
|---|---|
| 12/2015-12/2015 | Pediatric Grand Rounds: "Transgender Medicine - A Field in Transition". Michigan Medicine, Ann Arbor, MI |
| 02/2016-02/2016 | Medical Student Education: Panelist for M1 Class Session on LGBT Health, Doctoring Curriculum. Michigan Medicine, Ann Arbor, MI |
| 02/2016-02/2016 | Psychiatry Grand Rounds: "Transgender Medicine - A Field in Transition". Michigan Medicine, Ann Arbor, MI |
| 03/2016-03/2017 | Pharmacy School Education: "LGBT Health".  University of Michigan School of Pharmacy, Ann Arbor, MI |
| 04/2016-Present | Course Director: Medical Student (M4) Elective in Transgender Medicine. Michigan Medicine, Ann Arbor, MI |
| 04/2016-04/2016 | Rheumatology Grand Rounds: "Gender Identity". Michigan Medicine, Ann Arbor, MI |
| 05/2016-05/2016 | Lecture to Pediatric Rheumatology Division: "Gender Dysphoria". Michigan Medicine, Ann Arbor, MI |
| 07/2016-07/2016 | Internal Medicine Resident Education: "Gender Identity". Michigan Medicine, Ann Arbor, MI |
| 09/2016-09/2016 | Presentation to ACU Leadership: "Gender Identity Cultural Competencies". Michigan Medicine, Ann Arbor, MI |
| 10/2016-10/2016 | Presentation to Department of Dermatology: "The iPledge Program and Transgender Patients". Michigan Medicine, Ann Arbor, MI |
| 02/2017-02/2017 | Swartz Rounds Presenter. Michigan Medicine, Ann Arbor, MI |
| 02/2017-02/2017 | Lecture to Division of General Medicine: "Transgender Health". Michigan Medicine, Ann Arbor, MI |

SA067

| 02/2017-02/2017 | Presentation at Collaborative Office Rounds: "Transgender Health". Michigan Medicine, Ann Arbor, MI |
| --- | --- |
| 10/2017-10/2017 | Family Medicine Annual Conference: "Transgender Medicine". Michigan Medicine, Ann Arbor, MI |
| 12/2017-12/2017 | Presenter at Nursing Unit 12-West Annual Educational Retreat: "Gender Identity at the Children's Hospital". Michigan Medicine, Ann Arbor, MI |
| 02/2018-Present | Pediatrics Residency Lecturer: "Puberty". Michigan Medicine, Ann Arbor, MI |
| 02/2019-Present | Medical Student (M1) Lecturer: "Pediatric Growth and Development". Michigan Medicine, Ann Arbor, MI |
| 02/2019-Present | Doctors of Tomorrow Preceptor: offering shadowing opportunities to students from Cass Technical High School in Detroit. Michigan Medicine, Ann Arbor, MI |
| 03/2019-03/2019 | Lecture to Division of Orthopedic Surgery: "Transgender Health". Michigan Medicine, Ann Arbor, MI |

## MEMBERSHIPS IN PROFESSIONAL SOCIETIES

| 2012 - Present | Pediatric Endocrine Society |
| --- | --- |

## COMMITTEE SERVICE

### National

| 2014 - 2016 | Pediatric Endocrine Society - Ethics Committee, Other, Member |
| --- | --- |
| 2017 - present | Pediatric Endocrine Society - Special Interest Group on Gender Identity, Other, Member |
| 2018 - present | Pediatric Endocrine Society - Program Directors Education Committee, Other, Member |

6

SA068

**Regional**

| | |
|---|---|
| 2013 - 2015 | Investigational Review Board - The Fenway Institute, Boston, MA, Other, Voting Member |

**Institutional**

| | |
|---|---|
| 2017 - 2019 | Department of Pediatrics at Michigan Medicine; Diversity, Equity, and Inclusion Committee, Other, Fellowship Lead |
| 2017 - 2019 | University of Michigan Transgender Research Group, Other, Director |

## VOLUNTEER SERVICE

| | |
|---|---|
| 2014 | Camp Physician, Massachusetts, Served at a camp for youth with Type 1 Diabetes |

## SCHOLARLY ACTIVITIES

## PRESENTATIONS

**Extramural Invited Presentation Speaker**

1.  Grand Rounds, Shumer D, Loyola University School of Medicine, 07/2022, Chicago, Illinois

**Other**

1.  Gender Identity, Groton School, 04/2015, Groton, MA

2.  Television Appearance: Gender Identity in Youth, Channel 7 WXYZ Detroit, 04/2016, Southfield, MI

3.  It Gets Better: Promoting Safe and Supportive Healthcare Environments for Sexual Minority and Gender Non-Conforming Youth, Adolescent Health Initiative: Conference on Adolescent Health, 05/2016, Ypsilanti, MI

4.  Gender Identity, Humanists of Southeast Michigan, 09/2016, Farmington Hills, MI

SA069

5.    Gender Identity, Pine Rest Christian Mental Health Services, 10/2016, Grand Rapids, MI

6.    Pediatric Grand Rounds - Hormonal Management of Transgender Youth, Beaumont Children's Hospital, 11/2016, Royal Oak, MI

7.    Transgender Youth: A Field in Transition, Temple Beth Emeth, 11/2016, Ann Arbor, MI

8.    Transgender Youth: A Field in Transition, Washtenaw County Medical Society, 11/2016, Ann Arbor, MI

9.    Pediatric Grand Rounds: Transgender Youth - A Field in Transition, St. John Hospital, 02/2017, Detroit, MI

10.   Transgender Medicine, Veterans Administration - Ann Arbor Healthcare System, 05/2017, Ann Arbor, MI

11.   Gender Identity, Hegira Programs, 05/2017, Detroit, MI

12.   Care of the Transgender Adolescent, Partners in Pediatric Care, 06/2017, Traverse City, MI

13.   Conference planner, host, and presenter: Transgender and Gender Non-Conforming Youth: Best Practices for Mental Health Clinicians, Educators, & School Staff; 200+ attendees from fields of mental health and education from across Michigan, Michigan Medicine, 10/2017, Ypsilanti, MI

14.   Endocrinology Grand Rounds: Transgender Medicine, Wayne State University, 11/2017, Detroit, MI

15.   Care of the Transgender Adolescent, St. John Hospital Conference: Transgender Patients: Providing Compassionate, Affirmative and Evidence Based Care, 11/2017, Grosse Pointe Farms, MI

16.   Hormonal Care in Transgender Adolescents, Michigan State University School of Osteopathic Medicine, 11/2017, East Lansing, MI

17.   Working with Transgender and Gender Non-Conforming Youth, Michigan Association of Osteopathic Family Physicians, 01/2018, Bellaire, MI

**SA070**

18.     Community Conversations, Lake Orion, 01/2018, Lake Orion, MI

19.     "I Am Jazz" Reading and Discussion, St. James Episcopal Church, 03/2019, Dexter, MI

20.     Gender Identity, Michigan Organization on Adolescent Sexual Health, 10/2019, Brighton, MI; Port Huron, MI

21.     Ask The Expert, Stand With Trans, 05/2020, Farmington Hills, MI (Virtual due to COVID)

22.     Transgender Medicine, Michigan Association of Clinical Endocrinologists Annual Symposium, 10/2020, Grand Rapids, MI (Virtual due to COVID)

23.     Transgender Youth in Primary Care, Michigan Child Care Collaborative (MC3), 10/2020, Ann Arbor, MI (Virtual due to COVID)

24.     Lets Talk About Hormones, Stand With Trans, 10/2020, Farmington Hills, MI (Virtual due to COVID)

25.     Gender Identity, Universalist Unitarian Church of East Liberty, 04/2021, Virtual due to COVID

26.     Unconscious Bias, Ascension St. John Hospital, 05/2021, Virtual due to COVID

**PUBLICATIONS/SCHOLARSHIP**

**<u>Peer-Reviewed Articles</u>**

1.     Vengalil N, Shumer D, Wang F: Developing an LGBT curriculum and evaluating its impact on dermatology residents, *Int J Dermatol*.61: 99-102, 01/2022. PM34416015

**<u>Chapters</u>**

1.     Shumer: Coma. In Schwartz MW6, Lippincott Williams & Wilkins, Philadelphia, PA, (2012)

2.     Shumer, Spack: Medical Treatment of the Adolescent Transgender Patient. In Đorđević M; Monstrey SJ; Salgado CJ Eds. CRC Press/Taylor & Francis, (2016)

SA071

3.    Kinnear HA, **Shumer DE**: Duration of Pubertal Suppression and Initiation of Gender-Affirming Hormone Treatment in Youth. In FinlaysonElsevier, (2018)

4.    Araya, **Shumer DE**: Endocrinology of Transgender Care – Children and Adolescents. In Poretsky; Hembree Ed. Springer, (2019)

**<u>Non-Peer Reviewed Articles</u>**

1.    Shumer D: The Effect of Race and Gender Labels in the Induction of Traits, *Northwestern Journal of Race and Gender Criticism*.NA01/2014

2.    Shumer D: A Tribute to Medical Stereotypes, *The Pharos, Journal of the Alpha Omega Alpha Medical Society*.Summer07/2017

3.    Mohnach L, Mazzola S, Shumer D, Berman DR: Prenatal diagnosis of 17-hydroxylase/17,20-lyase deficiency (17OHD) in a case of 46,XY sex discordance and low maternal serum estriol, *Case Reports in Perinatal Medicine*.8(1)01/2018

4.    Mohnach L, Mazzola S, Shumer D, Berman DR: Prenatal Diagnosis of 17-hydroxylase/17,20-lyase deficiency (17OHD) in a case of 46,XY sex discordance and low maternal serum estriol, *Case Reports in Perinatal Medicine*.8(1)12/2018

5.    Kim C, Harrall KK, Glueck DH, **Shumer DE**, Dabelea D: Childhood adiposity and adolescent sex steroids in the EPOCH (Exploring Perinatal Outcomes among Children) study, *Clin Endocrinol (Oxf)*.91(4): 525-533, 01/2019. PM31278867

6.    Araya A, Shumer D, Warwick R, Selkie E: 37. "I've Been Happily Dating For 5 Years" - Romantic and Sexual Health, Experience and Expectations in Transgender Youth, *Journal of Adolescent Health*.66(2): s20, 02/2020

7.    Araya A, Shumer D, Warwick R, Selkie E: 73. "I think sex is different for everybody" - Sexual Experiences and Expectations in Transgender Youth, *Journal of Pediatric and Adolescent Gynecology*.33(2): 209-210, 04/2020

8.    Araya AC, Warwick R, Shumer D, Selkie E, Rath T, Ibrahim M, Srinivasan A: Romantic Health in Transgender Adolescents, *Pediatrics*.Pediatrics01/2021

9.    Martin S, Sandberg ES, **Shumer DE**: Criminalization of Gender-Affirming Care - Interfering with Essential Treatment for Transgender Children and

10

**SA072**

Adolescents, *New England Journal of Medicine*.385(7): 579-581, 08/2021. PM34010528

**Editorial Comment**

1.    **Shumer DE**, Harris LH, Opipari VP: The Effect of Lesbian, Gay, Bisexual, and Transgender-Related Legislation on Children, 01/2016. PM27575000

2.    **Shumer DE**: Health Disparities Facing Transgender and Gender Nonconforming Youth Are Not Inevitable, 01/2018. PM29437859

3.    Martin S, Sandberg ES, Shumer DE: Criminalization of Gender-Affirming Care - Interfering with Essential Treatment for Transgender Children and Adolescents, 01/2021

**Erratum**

1.    Tishelman AC, Kaufman R, Edwards-Leeper L, Mandel FH, **Shumer DE**, Spack NP: Correction to Serving Transgender Youth: Challenges, Dilemmas, and Clinical Examples, [Professional Psychology: Research and Practice, 46(1), (2015) 37-45], *Professional Psychology: Research and Practice*.46(4): 249, 08/2015

**Journal Articles**

1.    **Shumer DE**, Thaker V, Taylor GA, Wassner AJ: Severe hypercalcaemia due to subcutaneous fat necrosis: Presentation, management and complications, *Archives of Disease in Childhood: Fetal and Neonatal Edition*.99(5)01/2014. PM24907163

2.    Tishelman AC, Kaufman R, Edwards-Leeper L, Mandel FH, **Shumer DE**, Spack NP: Serving transgender youth: Challenges, dilemmas, and clinical examples, *Professional Psychology: Research and Practice*.46(1): 37-45, 02/2015. PM26807001

3.    Reisner SL, Vetters R, Leclerc M, Zaslow S, Wolfrum S, **Shumer DE**, Mimiaga MJ: Mental health of transgender youth in care at an adolescent Urban community health center: A matched retrospective cohort study, *Journal of Adolescent Health*.56(3): 274-279, 03/2015. PM25577670

11

**SA073**

4.    **Shumer DE**, Tishelman AC: The Role of Assent in the Treatment of Transgender Adolescents, *International Journal of Transgenderism*.16(2): 97-102, 04/2015. PM27175107

5.    **Shumer DE**, Roberts AL, Reisner SL, Lyall K, Austin SB: Brief Report: Autistic Traits in Mothers and Children Associated with Child's Gender Nonconformity, *Journal of Autism and Developmental Disorders*.45(5): 1489-1494, 05/2015. PM25358249

6.    Tishelman AC, Kaufman R, Edwards-Leeper L, Mandel FH, **Shumer DE**, Spack NP: Reply to comment on "serving transgender youth: Challenges, dilemmas, and clinical examples" by Tishelman et al. (2015), *Professional Psychology: Research and Practice*.46(4): 307, 08/2015. PM26858509

7.    **Shumer DE**, Reisner SL, Edwards-Leeper L, Tishelman A: Evaluation of Asperger Syndrome in Youth Presenting to a Gender Dysphoria Clinic, *LGBT Health*.3(5): 387-390, 10/2016. PM26651183

8.    Tishelman AC, **Shumer DE**, Nahata L: Disorders of sex development: Pediatric psychology and the genital exam, *Journal of Pediatric Psychology*.42(5): 530-543, 01/2017. PM27098964

9.    Edwards-Leeper L, **Shumer DE**, Feldman HA, Lash BR, Tishelman AC: Psychological profile of the first sample of transgender youth presenting for medical intervention in a U.S. pediatric gender center, *Psychology of Sexual Orientation and Gender Diversity*.4(3): 374-382, 01/2017

10.    **Shumer DE**, Abrha A, Feldman HA, Carswell J: Overrepresentation of adopted adolescents at a hospital-based gender dysphoria clinic, *Transgender Health*.2(1): 76-79, 07/2017. PM28861549

11.    Strang JF, Meagher H, Kenworthy L, de Vries AL C, Menvielle E, Leibowitz S, Janssen A, Cohen-Kettenis P, **Shumer DE**, Edwards-Leeper L, Pleak RR, Spack N, Karasic DH, Schreier H, Balleur A, Tishelman A, Ehrensaft D, Rodnan L, Kuschner ES, Mandel F, Caretto A, Lewis HC, Anthony LG: Initial Clinical Guidelines for Co-Occurring Autism Spectrum Disorder and Gender Dysphoria or Incongruence in Adolescents, *Journal of Clinical Child and Adolescent Psychology*.47(1): 105-115, 01/2018. PM27775428

**SA074**

12.    Selkie E, Adkins V, Masters E, Bajpai A, **Shumer DE**: Transgender Adolescents' Uses of Social Media for Social Support, *Journal of Adolescent Health*.66(3): 275-280, 03/2020. PM31690534

13.    Warwick RM, **Shumer DE**: Gender-affirming multidisciplinary care for transgender and non-binary children and adolescents, *Children's Health Care*.01/2021

14.    Araya AC, Warwick R, **Shumer DE**, Selkie E: Romantic relationships in transgender adolescents: A qualitative study, *Pediatrics*.147(2)02/2021. PM33468600

15.    Warwick RM, Araya AC, **Shumer DE**, Selkie EM: Transgender Youths' Sexual Health and Education: A Qualitative Analysis, *Journal of Pediatric and Adolescent Gynecology*.35(2): 138-146, 04/2022. PM34619356

### Letters

1.    Strang JF, Janssen A, Tishelman A, Leibowitz SF, Kenworthy L, McGuire JK, Edwards-Leeper L, Mazefsky CA, Rofey D, Bascom J, Caplan R, Gomez-Lobo V, Berg D, Zaks Z, Wallace GL, Wimms H, Pine-Twaddell E, **Shumer DE**, Register-Brown K, Sadikova E, Anthony LG: Revisiting the Link: Evidence of the Rates of Autism in Studies of Gender Diverse Individuals, *Journal of the American Academy of Child and Adolescent Psychiatry*.57(11): 885-887, 11/2018. PM30392631

### Letters to editor

1.    **Shumer DE**: Doctor as environmental steward, 01/2009. PM19364173

### Notes

1.    **Shumer DE**, Mehringer J, Braverman L, Dauber A: Acquired hypothyroidism in an infant related to excessive maternal iodine intake: Food for thought, *Endocrine Practice*.19(4): 729-731, 07/2013. PM23512394

### Podcasts

1.    Gaggino L, Shumer WG D: Pediatric Meltdown: Caring for Transgender Youth with Compassion: What Pediatricians Must Know, 01/2020

13

**SA075**

**Reviews**

1.   **Shumer DE**, Spack NP: Current management of gender identity disorder in childhood and adolescence: Guidelines, barriers and areas of controversy, *Current Opinion in Endocrinology, Diabetes and Obesity*.20(1): 69-73, 02/2013. PM23221495

2.   Guss C, **Shumer DE**, Katz-Wise SL: Transgender and gender nonconforming adolescent care: Psychosocial and medical considerations, *Current Opinion in Pediatrics*.27(4): 421-426, 08/2015. PM26087416

3.   **Shumer DE**, Nokoff NJ, Spack NP: Advances in the Care of Transgender Children and Adolescents, *Advances in Pediatrics*.63(1): 79-102, 08/2016. PM27426896

**Short Surveys**

1.   **Shumer DE**, Spack NP: Transgender medicine-long-term outcomes from 'the Dutch model', *Nature Reviews Urology*.12(1): 12-13, 01/2015. PM25403246

**Abstracts/Posters**

1.   Shumer D, Kinnear H, McLain K, Morgan H: Development of a Transgender Medicine Elective for 4th Year Medical Students, National Transgender Health Summit, Oakland, CA, 2017

2.   Shumer D: Overrepresentation of Adopted Children in a Hospital Based Gender Program, World Professional Association of Transgender Health Biennial International Symposium, Amsterdam, The Netherlands, 2016

3.   Shumer D: Mental Health Presentation of Transgender Youth Seeking Medical Intervention, World Professional Association of Transgender Health Biennial International Symposium, Amsterdam, The Netherlands, 2016

4.   Adkins V, Masters E, Shumer D, Selkie E: Exploring Transgender Adolescents' Use of Social Media for Support and Health Information Seeking (Poster Presentation), Pediatric Research Symposium, Ann Arbor, MI, 2017

**SA076**

1  Colin M. Proksel
   OSBORN MALEDON, P.A.
2  2929 North Central Avenue, 21st Floor
   Phoenix, Arizona 85012-2793
3  State Bar No. 034133
   Telephone: (602) 640-9000
4  Facsimile: (602) 640-9050
   Email: cproksel@omlaw.com
5

6  *Attorney for Plaintiffs*

7  *Additional counsel listed on following page*

8              **UNITED STATES DISTRICT COURT**
              **FOR THE DISTRICT OF ARIZONA**
9                    **TUCSON DIVISION**

10 | Jane Doe, by her next friend and parents | Case No. _____
   | Helen Doe and James Doe, and Megan       |
11 | Roe, by her next friend and parents, Kate | **DECLARATION OF JANE DOE IN**
   | Roe and Robert Roe,                       | **SUPPORT OF HER MOTION FOR A**
12 |                                           | **PRELIMINARY INJUNCTION AND HER**
   |                 Plaintiffs,               | **AND HELEN AND JAMES DOE'S**
13 |                                           | **MOTION TO PROCEED UNDER A**
   |        v.                                 | **PSEUDONYM**
14 |
15 | Thomas C. Horne in his official capacity
   | as State Superintendent of Public
16 | Instruction; Laura Toenjes, in her official
   | capacity as Superintendent of the Kyrene
17 | School District; Kyrene School District;
   | The Gregory School; and Arizona
18 | Interscholastic Association Inc.,
19 |                 Defendants.
20
21
22
23
24
25
26
27
28

**SA077**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jyotin Hamid*
Justin R. Rassi*
Amy C. Zimmerman*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: jhamid@debevoise.com
Email: jrassi@debevoise.com
Email: azimmerman@debevoise.com

Amy Whelan*
Rachel Berg*
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 343-7679
Facsimile: (415) 392-8442
Email: awhelan@nclrights.org
Email: rberg@nclrights.org

*Pro hac vice application forthcoming

SA078

I, Jane Doe, declare as follows:

1. I am 11 years old and will be starting middle school in the Kyrene School District in July. I am a transgender girl.

2. I have always known I am a girl. My parents have told me that I would tell them I was a girl when I was only a few years old. My parents have always supported me.

3. When I was in Kindergarten, I wore a dress to school for the first time. The first time, people made fun of me, but I decided to wear one again anyway, and I have dressed in a way that reflects who I am (a girl) since then..

4. I live as who I am (a girl) in all parts of my life, including at school.

5. Sports are really important to me and my parents.

6. I especially love soccer and have been playing soccer as long as I can remember. I hope I can play soccer for the rest of my life.

7. Playing soccer has helped me make friends and being part of a team makes me feel like I belong.

8. I have played club soccer on a girls' team with some of my friends for almost five years, and I am hoping that I can play with some of them on the school team. We are all excited about it.

9. When I start middle school in July, I am excited to try out for the girls' soccer team, the cross-country team, and the girls' basketball team. Both the soccer and basketball teams have separate teams for boys and girls. The cross-country team trains together, but boys and girls compete separately. The cross-country team starts in mid-July of this year.

10. Because of the Arizona law that passed about transgender girls playing sports, I am really afraid I will not be able to play on the girls' team for soccer or basketball or get to compete with other girls as part of the cross-country team.

1

11.     I cannot play on boys' teams or compete with the boys because I am a girl. I would feel embarrassed if I had to play on a boys' team. Everyone at school knows I'm a girl, including my teachers, my friends, and all the other students. The last thing I want is to draw attention to myself. I just want to go to school like other kids.

12.     I am afraid the law will encourage people in Arizona to treat transgender people differently and harass them. I want to be able to play with my friends and to hopefully make new friends too. It hurts to know that some people want to keep me away from sports and from my friends.

13.     I also do not want to use my real name or initials as part of this lawsuit. People might find out who I am and harass me. I also do not want more people who I do not even know to find out private things about me or my family.

14.     I don't want my parents to use their real names either, because then people could find out my name. I don't want people to harass my parents.

15.     The lawyers representing me explained to me that it is important that I tell the truth. Everything I said in this paper is true.


This declaration was executed this 12th day of April, 2023, in Maricopa County, Arizona.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


By: _Jane Doe_____

Jane Doe

2

**SA080**

1  Colin M. Proksel
   OSBORN MALEDON, P.A.
2  2929 North Central Avenue, 21st Floor
   Phoenix, Arizona 85012-2793
3  State Bar No. 034133
   Telephone: (602) 640-9000
4  Facsimile: (602) 640-9050
   Email: cproksel@omlaw.com
5
6  *Attorney for Plaintiffs*
7  *Additional counsel listed on following page*
8              **UNITED STATES DISTRICT COURT**
              **FOR THE DISTRICT OF ARIZONA**
9                   **TUCSON DIVISION**

10 | Jane Doe, by her next friend and parents | Case No. _____ |
   | Helen Doe and James Doe, and Megan | |
11 | Roe, by her next friend and parents, Kate | **DECLARATION OF HELEN DOE IN** |
   | Roe and Robert Roe, | **SUPPORT OF JANE DOE'S MOTION FOR** |
12 | | **A PRELIMINARY INJUNCTION AND HER** |
   | Plaintiffs, | **AND JANE AND JAMES DOE'S MOTION** |
13 | | **TO PROCEED UNDER A PSEUDONYM** |
   | v. | |
14 | | |
   | Thomas C. Horne in his official capacity | |
15 | as State Superintendent of Public | |
   | Instruction; Laura Toenjes, in her official | |
16 | capacity as Superintendent of the Kyrene | |
   | School District; Kyrene School District; | |
17 | The Gregory School; and Arizona | |
   | Interscholastic Association Inc., | |
18 | | |
19 | Defendants. | |
20
21
22
23
24
25
26
27
28

**SA081**

1

Jyotin Hamid*
Justin R. Rassi*

2

Amy C. Zimmerman*
DEBEVOISE & PLIMPTON LLP

3

66 Hudson Boulevard
New York, New York 10001

4

Telephone: (212) 909-6000
Facsimile: (212) 909-6836

5

Email: jhamid@debevoise.com
Email: jrassi@debevoise.com

6

Email: azimmerman@debevoise.com

7

Amy Whelan*
Rachel Berg*

8

NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370

9

San Francisco, California 94102
Telephone: (415) 343-7679

10

Facsimile: (415) 392-8442
Email: awhelan@nclrights.org

11

Email: rberg@nclrights.org

12

*Pro hac vice application forthcoming

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SA082**

I, Helen Doe, declare as follows:

1.     I make this declaration of my own personal knowledge, and, if called as witness, could and would testify competently to the matters stated here.

2.     I am the mother of Jane Doe, one of the plaintiffs in this case. My husband, James Doe, is Jane's father.

3.     Jane has always known she is a girl. Ever since she could talk, Jane would say "I'm a girl, I'm a girl." When she was about two years old, she told us she was a girl. At five years old, she told her doctor she was a girl at the pediatrician's office, completely spontaneously.

4.     James and I let Jane wear dresses at home and express herself how she wanted.

5.     As parents, we were nervous and scared for Jane as she started school.  Jane came out as transgender in kindergarten, wearing a dress to school one day. When she came home, she told us people made fun of her for wearing the dress and decided she would not wear it anymore. I was disheartened to hear that people teased my daughter. But, a week later, she decided to wear the dress again and told us "this is who I am." She has attended school as a girl since that time.

6.     In second grade, Jane began using the girls' bathroom. At first, a teacher did not let her use the girls' bathroom and even sent Jane to the principal's office. I spoke to the principal about the issue and Jane has been using the girls' bathroom ever since.

7.     Jane was diagnosed with gender dysphoria when she was seven years old.

8.     In third grade, Jane went to a new public school district. We informed the principal at the new school that Jane is transgender and is attending school as a girl, but the principal did not accept that about Jane. We tried to educate the principal throughout the year, as Jane wanted to share her gender identity with her class. Jane's teacher, however, was supportive and wanted to help Jane explain her identity to her school

1

SA083

mates. The principal got nervous and threatened to send a letter to the class saying that the school did not condone it, but thankfully, did not end up sending the letter. Jane was able to explain to her class that she is transgender.

9.     Despite the above incident, Jane's teachers, coaches, and friends have been really supportive of Jane. There is some curiosity, but people in her close circle have been very respectful and loving. Jane has shared she is transgender with her soccer team, and they have been very supportive.

10.     Jane lives as a girl in all aspects of her life.

11.     As part of her medical treatment, Jane sees her doctor in Phoenix every year. Jane is 11 years old and has not yet undergone puberty. These annual check-ins are in part to monitor whether Jane is entering puberty, at which point Jane and our family will decide whether Jane will start taking puberty blockers. Jane currently plans to take puberty blockers when her doctor says it is the right time.

12.     Sports are a vitally important part of Jane's life and our family. We love sharing sports with Jane. Jane has a passion for soccer and has played on the girls' club and recreational sports team for nearly five years. It has been wonderful watching her find a passion for soccer and we are so excited to see her participate on her school teams, for soccer and other sports.

13.     As athletes ourselves, James and I understand the benefits of playing sports from a young age. Aside from the physical and emotional benefits, soccer has also helped Jane make new friends and connect with other girls. Jane wants to be able to compete with her friends on the soccer team when she enters middle school. Jane also would like to participate on the cross-country and basketball teams.

14.     The Arizona law prohibiting transgender girls from playing sports will bar Jane from playing on the girls' soccer and basketball teams and competing against other girls on the cross-country team. The cross-country team starts in mid-July of this year.

2

15. Playing and/or competing on a boys' team is not an option for Jane. It would be harmful to Jane and directly conflict with her medical treatment for gender dysphoria. The last thing she wants to do is to stand out and playing on a boys' team would send the message to other people that she's not really a girl.

16. Jane will be very upset if she is not allowed to play sports on a girls' team. Jane knows this would be because she is transgender, and I worry about how that will affect her self-esteem and her confidence. She also will not receive all the positive benefits that school sports provide. This includes the obvious physical benefits, but also social and emotional benefits of playing with other kids, learning how to win and lose, and having coaches and other adults who support the team.

17. Jane wants to proceed under a pseudonym so that she can maintain her privacy during this lawsuit. Jane wants agency over who knows personal information about her life, especially when it comes to members of the public. While many of her friends and teachers are supportive of Jane, she does not know how other people will treat her if they know she is involved in the lawsuit.

18. I also ask to proceed under a pseudonym, along with my husband James Doe, because using our full names would identify Jane as well. We share an uncommon last name that could easily be linked to Jane. Further, using our real names could expose Jane and our family to harassment from being a part of this case. For those reasons, we request that the Court allow us to use pseudonyms in this case.

3

1

2   This declaration was executed this 12th day of April, 2023, in Maricopa County,

3   Arizona.

4       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

5   is true and correct.

6

7

8                                       By: _____

9                                            Helen Doe

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                      4

28

**SA086**

1
2
3
4
5

Colin M. Proksel
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
State Bar No. 034133
Telephone: (602) 640-9000
Facsimile: (602) 640-9050
Email: cproksel@omlaw.com

6  *Attorney for Plaintiffs*

7  *Additional counsel listed on following page*

8
9

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION**

10
11
12
13
14

Jane Doe, by her next friend and parents
Helen Doe and James Doe, and Megan
Roe, by her next friend and parents, Kate
Roe and Robert Roe,

                    Plaintiffs,

              v.

15
16
17
18
19

Thomas C. Horne in his official capacity
as State Superintendent of Public
Instruction; Laura Toenjes, in her official
capacity as Superintendent of the Kyrene
School District; Kyrene School District;
The Gregory School; and Arizona
Interscholastic Association Inc.,

                    Defendants.

Case No. _____

**DECLARATION OF MEGAN ROE IN
SUPPORT OF HER MOTION FOR A
PRELIMINARY INJUNCTION AND HER
AND KATE AND ROBERT ROE'S
MOTION TO PROCEED UNDER A
PSEUDONYM**

20
21
22
23
24
25
26
27
28

Jyotin Hamid*
Justin R. Rassi*
Amy C. Zimmerman*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: jhamid@debevoise.com
Email: jrassi@debevoise.com
Email: azimmerman@debevoise.com

Amy Whelan*
Rachel Berg*
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 343-7679
Facsimile: (415) 392-8442
Email: awhelan@nclrights.org
Email: rberg@nclrights.org

*Pro hac vice application forthcoming

**SA088**

1   I, Megan Roe, declare as follows:

2        1.     I make this declaration of my own personal knowledge, and, if called as

3   witness, could and would testify competently to the matters stated here.

4        2.     I am 15 years old and I am a transgender girl.

5        3.     Ever since I was really young, I knew I was a girl. I transitioned when I was

6   seven years old with the support of my parents. My friends have always mostly been

7   girls.

8        4.     Sports has always been a part of my life. When I was in elementary school,

9   I swam on the JCC swim team, and I used to also like to dance.

10        5.     Before I started at The Gregory School, my parents shared with the school

11   that I am a transgender girl, and everyone there has been very supportive.

12        6.     When I was 11 years old, my doctor gave me medicine that stops me from

13   going through puberty. I have taken that medicine ever since. When I was 12 years old,

14   my doctor gave me hormone medication, which I continue to take.

15        7.     I would really like to try out for the girls' volleyball team at my school this

16   year. A lot of my friends are on the team, and I am excited to play on the volleyball team

17   with them.

18        8.     One of the reasons I want to join the team is because it's a really important

19   part of our community. A lot of kids show up for the school volleyball games, and I want

20   to be a part of that. I'm also excited to make new friends.

21        9.     Because of the Arizona law banning transgender girls from playing on

22   girls' sports teams, I am afraid I will not be able to play on the girls' team. I cannot play

23   for the boys' team because I am a girl. I would feel embarrassed and humiliated if I had

24   to play on a team where I know I do not belong. I know that some kids do not get to play

25   on teams because there may not be enough spots. But that is very different from telling

26

27

28

SA089

me and all other transgender girls that we are never welcome and can never play on teams with our friends.

10.    I am also afraid that because of the law, other people at school and in Arizona will think it is okay to target transgender people.

11.    I do not want to use my real name or initials as part of this lawsuit. Even though my parents and school have been supportive, I still want to control private information about my life. I am also worried about facing harassment and ridicule for being a part of this case.

12.    I would also like my parents to be able to use pseudonyms. I believe that if my parents' identities are public, the public could determine my identity as well. I also do not want my family to face any harassment.


This declaration was executed this 12th day of April, 2023, in Pima County, Arizona.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


By: _Megan Roe_____

Megan Roe

2

**SA090**

1  Colin M. Proksel
   OSBORN MALEDON, P.A.
2  2929 North Central Avenue, 21st Floor
   Phoenix, Arizona 85012-2793
3  State Bar No. 034133
   Telephone: (602) 640-9000
4  Facsimile: (602) 640-9050
   Email: cproksel@omlaw.com
5

6  *Attorney for Plaintiffs*

7  *Additional counsel listed on following page*

8            **UNITED STATES DISTRICT COURT**
             **FOR THE DISTRICT OF ARIZONA**
9                    **TUCSON DIVISION**

10 | Jane Doe, by her next friend and parents | Case No. _____
   | Helen Doe and James Doe, and Megan Roe, |
11 | by her next friend and parents, Kate Roe and | **DECLARATION OF KATE ROE IN**
   | Robert Roe, | **SUPPORT OF MEGAN ROE'S**
12 | | **MOTION FOR A PRELIMINARY**
   |            Plaintiffs, | **INJUNCTION AND HER AND MEGAN**
13 | | **AND ROBERT ROE'S MOTION TO**
   |        v. | **PROCEED UNDER A PSEUDONYM**
14 |
15 | Thomas C. Horne in his official capacity as
   | State Superintendent of Public Instruction;
16 | Laura Toenjes, in her official capacity as
   | Superintendent of the Kyrene School
17 | District; Kyrene School District; The
   | Gregory School; and Arizona Interscholastic
   | Association Inc.,
18 |
19 |            Defendants.
20
21
22
23
24
25
26
27
28

**SA091**

Jyotin Hamid*
Justin R. Rassi*
Amy C. Zimmerman*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: jhamid@debevoise.com
Email: jrassi@debevoise.com
Email: azimmerman@debevoise.com

Amy Whelan*
Rachel Berg*
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 343-7679
Facsimile: (415) 392-8442
Email: awhelan@nclrights.org
Email: rberg@nclrights.org

*Pro hac vice application forthcoming*

SA092

I, Kate Roe, declare as follows:

1.     I make this declaration of my own personal knowledge, and, if called as witness, could and would testify competently to the matters stated here.

2.     I am the mother of Megan Roe, one of the plaintiffs in this case. My husband, Robert Roe, is Megan's father.

3.     Megan has always known she was a girl. She was always uncomfortable with the gender she was told she had, and told us she was a girl by the time she was three. She was quite consistent and persistent on this fact.

4.     Megan has always been friends primarily with other girls. She transitioned between first and second grade, and it was a fairly seamless transition. We love our child and will support her in every way that we can.

5.     Megan has been living as a girl since she was very young. Her school, coaches, and friends have been very supportive of her.

6.     Megan was formally diagnosed with gender dysphoria at the age of 10. As part of her medical treatment, she has been taking puberty blockers since she was 11, which prevented her from undergoing male puberty. She also began hormone therapy when she was 12 years old.

7.     Megan began playing sports right after she socially transitioned, when she was about seven years old. She joined a swim team, and the coach was supportive of Megan and her gender identity.

8.     Megan is excited to play on the girls' volleyball team at The Gregory School. Volleyball is a very social and competitive sport at Megan's school. A lot of students show up for the games and there is a big community surrounding the sport. Megan hopes to try out and play on the team with her friends.

9.      The Arizona law barring transgender girls from playing on girls' teams is the first time Megan has faced a significant obstacle because she is transgender.   It

1

**SA093**

saddens me that Megan must face this. No parent ever wants their kid to lose out on opportunities and experiences that can help them grow as people. Sports provide all kinds of benefits to kids, and it is very upsetting that they may be completely cut off for my child.

10.    Playing and/or competing with boys would be harmful and painful for Megan and it is not something she would do. It would also directly conflict with her medical treatment for gender dysphoria because Megan's well-being depends on her ability to live and interact with others as a girl. Megan has lived as a girl for as long as she can remember. Playing and competing with boys is simply not an option for her.

11.    Megan will be distraught if she cannot play on the girls' volleyball team this year.

12.    We want Megan to proceed under a pseudonym so that she can maintain her privacy during this lawsuit. She is just a child and it scares me that there has been so much attention placed on transgender kids in recent years, and especially in Arizona because of this law. Megan also wants agency over who knows personal information about her, especially when it comes to members of the public. While many of her friends and teachers are supportive of Megan, we do not know how other people will treat her if they know her identity and that she is a part of the lawsuit.

13.    I also ask to proceed under a pseudonym, along with my husband Robert Roe, because using our full names would identify Megan as well. Our identities could quite easily be linked to Megan, especially given that Megan and Robert share a last name. Further, using our real names could expose our family to harassment from being part of this lawsuit.  For those reasons, we request that the Court allow us to use pseudonyms in this case.

2

SA094

1        This declaration was executed this 12th day of April, 2023, in Pima County,

2  Arizona.

3        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

4  is true and correct.

5

6                       By: _____

7                           Kate Roe

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT 1

# AIA™

## 2022-2023

# CONSTITUTION, BYLAWS, POLICIES AND PROCEDURES

**ARIZONA INTERSCHOLASTIC ASSOCIATION**

7007 N 18TH STREET

PHOENIX, ARIZONA | 85020

WWW.AIAONLINE.ORG   |   WWW.AZPREPS365.COM
WWW.AIAACADEMY.ORG

MAIN: 602-385-3810
OFFICIALS FAX: 602-385-3780



PROUD MEMBER OF THE
NATIONAL FEDERATION OF
STATE HIGH SCHOOL
ASSOCIATIONS

SA097

2.3.2   <u>Private, Parochial and Public Charter Schools</u> – The attendance zone boundaries shall be the county in which the school is located.

2.3.3   <u>BIE Schools</u> – The attendance zone boundaries shall be determined by the Bureau of Indian Affairs.

2.3.4   All member schools shall voluntarily abide by all rules and regulations of the AIA.

2.3.4.1   Should the AIA Executive Board determine that a member or associate member school has willfully or persistently violated the AIA Constitution and Bylaws, it may expel said school from the AIA.

2.3.5   The AIA Executive Board shall assign member schools to the proper Conference in accordance with the AIA Constitution and Bylaws. The Conference shall assign the member school to a Region.

2.3.6   Membership becomes official and operative after the payment of dues at the beginning of the school year in which application for membership was submitted and approved.

2.3.7   The school may schedule interscholastic athletics and activities for the school year following the approval of membership.

**2.4**   **ASSOCIATE MEMBER SCHOOLS** – An associate member school is one that has paid the annual dues and fees and agrees to abide by all AIA rules and regulations, and has the following limitations of membership:

2.4.1   An associate member school that fails to abide by all AIA rules and regulations, may be refused further affiliation with the AIA.

2.4.2   Associate member schools desiring to schedule a member school in any sport shall meet all provisions of the student eligibility rules enumerated in Article 15 of the AIA Bylaws.

2.4.3   Associate member schools may:

2.4.3.1   Schedule interscholastic athletics and activities with member, associate member or nonmember schools.

2.4.3.2   Shall not participate in any AIA regional or state athletic or activity championship tournament.

2.4.3.3   Shall not participate in any district or state nonathletic tournaments

**2.5**   **RESPONSIBILITY OF SCHOOL ADMINISTRATORS**

2.5.1   The school principal or his/her designated representative shall be the responsible administrative officer of a school.

2.5.2   <u>School Principal</u> - Final authority and ultimate responsibility in all matters pertaining to interscholastic activities of each school shall be vested in the school principal.   The school principal's responsibility shall include, but shall not be limited to, the following:

2.5.2.1   <u>Host School</u> - The basic responsibility of the host school is to take every possible measure at any athletic or activity to assure courteous, friendly, safe and fair treatment to visiting players, school representatives, fans and game officials.

2.5.2.2   <u>Administrative Control</u> - The administration and supervision of all facets of all activities in the high school program shall be entirely controlled by the properly constituted administrator.  During all post season and/or play-off competition held at a neutral site an administrator or administrator's designee from each participating school shall be in attendance.

2.5.2.3   <u>Conduct of Participants</u> - The responsibility for the conduct of the coaches, players and spectators at any athletic or activity contest shall lie with the administrators of the schools whose teams are participating in the contest. **This responsibility includes ensuring conduct by the coaches, players and spectators which adheres at all times to the principles and spirit of good sportsmanship.**

4

AIA Constitution; Article 2. Membership                                                    2022-2023

      2.5.2.4   Conduct of Administrators-News Media – A school administrator **should** never use the news media to criticize another school administrator, school team, coach, player, game official or the AIA.

      2.5.2.5   Recruitment - The school administrator must ensure that there is no recruitment of students for athletic or activity purposes as defined in Article 15, Section 12.

2.5.3   The school administration must assume responsibility for verification of all student eligibility rules.

2.5.4   All official communication between member schools and the AIA, including student eligibility inquiries, requests and determinations, shall come only from a responsible administrative officer of a school.

2.5.5   When a request is made by the Executive Board or its designee that a responsible school administrator attends a meeting of the Executive Board, a responsible school administrator shall attend that meeting. Failure of the responsible school administrator to attend that meeting shall not prevent or otherwise delay consideration and decision by the Executive Board on the agenda item about which the administrator was requested to attend.  The failure to appear shall be considered a violation of the AIA Bylaws and may result in sanction as determined by the Executive Board, including termination of and exclusion from AIA membership.

2.5.6   On an annual basis, the school athletic director shall attend the AIA Athletic Director Information Meeting to be held each April. Failure to comply will subject the member school to possible penalty as defined in Article 16, Section 1.

2.5.7   On an annual basis, each varsity head coach, or school designated coach, shall attend the AIA Head Coach Information Meeting to be held at the beginning of each season of sport. Failure to comply will subject the member school to possible penalty as defined in Article 16, Section 1.

SA099

AIA Constitution; Article 2. Membership                                          2022-2023

## <u>LOCAL CONTROL OF INTERSCHOLASTIC RULES</u>

**<u>VOLUNTARY MEMBERSHIP</u>**    Membership in the AIA is voluntary.  No school is required to become a member.  After membership is granted, the only requirement for indefinite membership is to abide by the rules adopted by the AIA members.

**<u>SELF- GOVERNANCE</u>**    Member schools believe in self-governance –ADOPTING AND ENFORCING THEIR OWN RULES.  Self- governance can only succeed when members DEMONSTRATE SELF-DISCIPLINE.

**<u>RULES GOVERN SCHOOLS</u>**    Rules are adopted to govern the interscholastic activities between member schools.

**<u>SELF- POLICING</u>**    Member schools maintain a policy of self-policing including identifying and reporting violations of rules.

**<u>ADMINISTRATOR DETERMINES STUDENT ELIGIBILITY</u>**    Final authority and ultimate responsibility in all matters pertaining to interscholastic activities of each school is vested in the school principal.  The principal must assume responsibility for verification of all student rules of eligibility.

**SA100**

AIA Bylaws; Article 15. Student Eligibility Rules                                                    2022-2023

# ARTICLE 15

## STUDENT ELIGIBILITY RULES

**15.1 STUDENT ELIGIBILITY REQUIREMENTS**

15.1.1  All participants in interscholastic activities must be in compliance with all student eligibility rules. The student eligibility rules are enumerated and presented in detail in Article 15 of the AIA Bylaws.

15.1.1.1  Failure to meet all eligibility requirements by all participants while participating in an interscholastic event may result in forfeiture or disqualification by the offending school and/or such other disciplinary action as the AIA Executive Board may impose. The disciplinary actions authorized in the event of a violation of the AIA rules and regulations are: Advisement, Warning, Probation, Disqualification and Forfeiture. (*See Article 16, Section 1 of the AIA Bylaws.*) The AIA Executive Board shall consider possible violations of the AIA rules and regulations at its regularly scheduled meeting or at a special meeting. A special meeting to hear a violation report may be called by the President of the AIA Executive Board at any time deemed necessary. The President shall call a special meeting when so directed by a majority of the AIA Executive Board. At the discretion of the AIA Executive Board, said special meeting may be held by telephone conference call.

**15.2 APPLICATION OF STUDENT ELIGIBILITY RULES**

15.2.1  No part of the student eligibility rules shall be set aside, nor shall any attempt be made to set aside by mutual agreement of any participating schools or their agents, for any contest whatsoever. The student eligibility rules shall not be supplemented or supplanted in any contest under the jurisdiction of the AIA.

15.2.2  The student eligibility rules apply to all interscholastic competition in sports governed by the association and portions thereof to nonathletic activities, as applicable, and as set forth in Articles 36, 37, 38, 39 and 40 of the AIA Bylaws.

15.2.3  Prior to participation, the school principal or his/her designated representative shall have determined that each participant is in compliance with all provisions of the eligibility rules as enumerated in Article 15.

**15.3 ENROLLMENT RULE**

15.3.1  Only students enrolled at a member school in grades 9 through 12, inclusive, shall be eligible for interscholastic competition, team practices and tryouts. For purposes of this rule, a student's school of enrollment is defined as the school where the student's permanent grades/records are maintained and from which the student will be eligible to graduate. (*Emergency Legislation – Ex. Brd 3/21/22*)

15.3.1.1  EXCEPTION: A home school student may be eligible if said student is in compliance with A.R.S. §15-802.01.

DETERMINATION: *Considering the terms, spirit and intent of ARS §15-802.01, a home school student who has made a full and good faith effort to participate in a particular interscholastic sport or activity at the school in the student's attendance area, but been unsuccessful, may then utilize the provisions and process set out in 15.10.5 and related subsections (Form 550), and obtain eligibility at the receiving school in that particular sport or activity. (Ex. Bd. 8/14/09)*

15.3.1.2  Online Charter School Students – Notwithstanding any other bylaw, a student who is enrolled in an Arizona online charter school and who is domiciled within the attendance zone of a member school, may be allowed to try out for interscholastic athletics and activities on behalf of that member school, if permitted by the member school's governing board.  On an annual basis, prior to the beginning of the school year, the member school governing board shall determine by formal board action whether it will permit online charter school students to try out for interscholastic athletics and activities and said board determination will remain in effect for that school year.  If permitted, the member school may charge online charter school students additional fees to participate in interscholastic athletics and activities.

*(Section 15.3 cont'd on next page)*

**#15 – STUDENT ELIGIBILITY RULES**

**SA101**

AIA Bylaws; Article 15. Student Eligibility Rules                                                 2022-2023

All other eligibility requirements shall apply to online charter school students consistent with requirements established for students enrolled in that member school, including but not limited to, that the online charter school shall submit to the member school written verification that, in a manner and timeline that is consistent with the member school's policies, the student is both: 1) receiving a passing grade in each course or subject being taught, and 2) maintaining satisfactory progress towards advancement or promotion.

A student who is enrolled in an online charter school and who was previously enrolled in a school that is part of a school district is not eligible to participate in interscholastic athletics or activities for the remainder of the school year during which the student was enrolled in a school that is part of a school district.

15.3.2   In order to establish eligibility for that semester, a student's initial enrollment shall be no later than the 14th official school day of the semester. If a student's initial enrollment occurs after the 14th official school day of the semester, he/she is ineligible for that semester.

*DETERMINATION: The AIA Executive Director, as designee of the AIA Executive Board, may rule on the eligibility of a student who enrolls after the 14th official school day of a session. (Ex. Bd. 4/15/96)*

15.3.3   In case of initial enrollment after the first official school day and by the 14th official school day, a student shall have been in attendance for as many days as he/she missed from the opening day of the semester before eligibility can be established.

15.3.4   In order to maintain eligibility, a student shall demonstrate regular attendance.

**15.4   ACADEMIC RULE**
15.4.1   A student must be enrolled in a minimum of five courses the first six semesters of high school and a minimum as determined by the district during the seventh and eighth semesters. The configuration and method of course delivery shall be as determined by the member school.

**15.5   DOMICILE**

15.5.1   Domicile – Except as otherwise stated in Article 15, a domicile is a place where a person has his/her true, fixed and permanent home, and to which, whenever absent, he or she has the intention of returning. A student shall have only one domicile for the purposes of these eligibility rules.

15.5.2   Special Domicile Placements
     15.5.2.1   Ninth-Grade Enrollment – Except as stated in 15.15, an eighth grade student graduate enrolling in the ninth grade for the first time may attend any member high school and be eligible for interscholastic activities. This recognizes the concept of open enrollment. Upon any transfer by the student after the initial enrollment in the ninth grade, the Transfer Rule applies.

     15.5.2.2   Legal Guardian – Except in the case of a foreign exchange student or an international student under 15.15, a student for whom a legal guardian has been appointed by a court of competent jurisdiction may be declared eligible at the school in attendance zone in which said legal guardian is domiciled by petitioning as outlined in the AIA Bylaws under Article 15, Section 15.14 Hardship. (*Form 15.5.3*). For purposes of this rule, a court of competent jurisdiction does not include courts outside the United States.

     *DETERMINATION: The AIA Executive Director, as designee of the AIA Executive Board, may rule on the eligibility of a student for whom a legal guardian has been appointed by a court of competent jurisdiction. (Ex. Bd. 4/15/96)*

          15.5.2.2.1   EXCEPTION: If a legal guardianship appointment has been in effect for at least two years prior to the student's participation in interscholastic competition, it shall not be necessary to petition the AIA Executive Board for domicile hardship eligibility.

          15.5.2.2.2   The use in interscholastic competition of a student for whom a legal guardian has been appointed, without compliance with the above requirements, shall constitute the use of an ineligible player.

*(Section 15.5 cont'd. on next page)*

43

**SA102**

        15.5.2.2.3   Where it is determined by the Executive Board or the Executive Director that athletic motivation and/or circumvention of AIA domicile requirements is involved in the legal guardianship, this is sufficient in and of itself for denial of the hardship request (see 15.14.1.4).

15.5.2.3   <u>Ward of the Court</u> - A student who is a ward of the court or the state and is placed in a school by court order may become eligible for interscholastic competition at that school by petitioning for and receiving approval of the AIA Executive Board as outlined in the AIA Bylaws under Article 15, Section 14 Hardship. *(Form 15.5.3)*.

15.5.2.4   <u>Dual Enrollment</u> - A student registered in dual enrollment or in special programs at a school outside the attendance zone within that school district in which his/her parents are domiciled is eligible to participate in interscholastic competition at the school where the student's permanent records are maintained. The student is eligible for interscholastic competition at that school only.

15.5.2.5   <u>District Alternative School Students</u> - Students attending an AdvancEd Commission on Accreditation & School Improvement accredited alternative school that is void of any AIA interscholastic activity programs are eligible to participate in such activities at their home school (school of domicile).  All AIA and school district eligibility requirements must be met.

15.5.2.6   <u>Deaf and Blind Students</u>
        15.5.2.6.1   A student enrolled in an AIA member or associate member school who also qualifies for enrollment at Phoenix Day School for the Deaf or Arizona State Schools for the Deaf and the Blind shall have primary interscholastic eligibility at the school in which he/she is enrolled.  In the event the handicap precludes the student from participating in an activity at the school in which the student is enrolled, the student shall have eligibility at one of the aforementioned special program schools for that activity while maintaining enrollment and attendance at the school where enrolled.

        15.5.2.6.2   If an Arizona state school for the deaf and blind does not offer a particular AIA sanctioned sport or activity, a student enrolled in said school may participate in that sport or activities at the AIA public member school nearest to the state school for the deaf and blind or at the AIA public member school in which the student's parents or legal guardians are domiciled. The student is not eligible under this provision without the mutual consent of the sending and receiving school principals.

15.5.2.7   <u>First Time Enrollment from Out of State</u> – Except as stated in 15.15, an out of state student whose parents/legal guardian have changed their domicile to and is attending high school for the first time in Arizona may attend any member high school without the transfer ineligibility period(s) provided under 15.10.1, 15.10.1.1 and 15.10.1.2 and be eligible for interscholastic activities and shall not be considered a transfer.

**15.6**    **AGE LIMIT / BIRTH RECORD RULE**
    15.6.1   <u>Age Limits</u> – If a student becomes 19 years of age on or after September 1, he/she is eligible to compete for the remainder of that school year. If he/she becomes 19 years of age before September 1, he/she is not eligible for any part of that school year.

    15.6.2   <u>Birth Records</u> – Acceptable record of birth shall be submitted before a student's name is placed on an eligibility list for varsity participation. Acceptable records shall be:

        15.6.2.1   <u>Certified Birth Certificate</u> – One certified by the appropriate state agency.
        15.6.2.2   <u>Acceptable Substitutes</u> – Hospital Certificate of Birth with seal or appropriate signature; a Department of Commerce Certificate; a Bureau of Immigration Certificate; a Department of Justice Certificate; a Certificate of Indian Blood signed and sealed by the Department of Interior, Bureau of Indian Affairs; a birth registration card issued by the State of Arizona Department of Health Services with seal; or a passport issued to a United States citizen (born in the United States or a naturalized citizen) by the State Department of the United States.
        15.6.2.3   <u>Verification of Birth</u> – Verification of birth may also be established when three reputable sources of information acceptable to the AIA Executive Board all agree as to the date of birth (i.e., school records, immunization records, etc.). Such documents must demonstrate utilization of the birth date over an extended period of time (i.e., each document should reflect issue dates encompassing a number of years).

*(Section 15.6 cont'd. on next page)*

44

AIA Bylaws; Article 15. Student Eligibility Rules                                              2022-2023

15.6.3   <u>Birth Record Retention</u> – A record of the certified birth certificate or an acceptable substitute shall be kept on file by the school. The certified birth certificate or acceptable substitute should be returned to the student.

**15.7   PHYSICAL EXAMINATION RULE**
15.7.1   A student shall not be allowed to practice or compete in interscholastic athletics until there is on file with the principal or his/her designee a record of a preparticipation physical examination (PPE) performed by a doctor of medicine (M.D.), an osteopathic physician (D.O.), a naturopathic physician (N.D., N.M.D.), a certified registered nurse practitioner (N.P.) licensed to practice, a certified physician's assistant (PA-C) registered by the Joint Board Of Medical Examiners and the Osteopathic Examiners in Medicine and Surgery, or a certified chiropractic sports physician (CCSP). The physical examination for the following school year shall be given **on or after March 1**. The physical examination on file shall be signed by one of the aforementioned medical providers and shall state that, in the opinion of the examining provider, the provider did not find any medical reason to disqualify the student from practice or competition in athletic contests.  The principal or his/her designee, if deemed advisable, may require a student to be reexamined.

15.7.2   Member schools shall utilize the physical examination forms provided by the AIA. There shall be four parts:

15.7.2.1   **Part One – Annual Preparticipation Physical Evaluation** – To be completed and signed by the parent or guardian and student athlete. This form must also be signed by the examining medical provider. (*See Form 15.7-A*).
15.7.2.2   **Part Two – Annual Preparticipation Physical Examination** – To be completed and signed by the examining medical provider. (*See Form 15.7-B*).
15.7.2.3   **Part Three – Annual Preparticipation Acknowledgement** – To be completed and signed by parent or guardian and student athlete. (*See Form 15.7-C*).
15.7.2.4   **Part Four – Annual Preparticipation Consent to Treat Form** – to be completed and signed by the parent or guardian and student athlete *(See Form 15.7-D)*.

**15.8   PARENTAL OR LEGAL GUARDIAN CONSENT RULE** – Parental or legal guardian consent is required before a student can be eligible to practice or compete in interscholastic competition. All students shall have on file with the principal or his/her designee appropriate permission in which the parent or legal guardian authorized participation.

15.8.1   It is recommended that such authorization state:
I/We give our permission for _____ to participate in organized interscholastic athletics, realizing that such activity involves the potential for injury, which is inherent in all sports. I/We acknowledge that even with the best coaching, use of the most advanced protective equipment and strict observance of rules, injuries are still a possibility. On rare occasions, the injuries can be so severe as to result in total disability, paralysis, quadriplegia or even death.
I/We acknowledge that I/we have read and understand this warning.

_____
Parent/Guardian

_____
Player

**15.9   MAXIMUM PARTICIPATION RULE** – After a student first enrolls in the ninth grade, he/she has a maximum of eight semesters of opportunity and a maximum of four seasons of opportunity in each sport or activity. **Semesters 1-8 must be consecutive.**

15.9.1   Enrollment for at least fifteen school days during any semester, or participation in any interscholastic contest, constitutes a semester of opportunity and a season of opportunity.

15.9.2   A student's ineligibility during any semester or season does not affect application of the Maximum Participation rule and does not extend the number of semesters of opportunity or seasons of opportunity.

15.9.3   During a school year a student shall be eligible to participate in only one season of competition per sport, except freshman tennis.

15.9.4   <u>Absence for Reason Other Than Confinement or Disabling Illness of Self or Immediate Family</u> – A Student absent from school for a period of more than ten consecutive school days for reasons other than a disabling illness or injury of himself/herself or a member of his/her immediate family shall be ineligible for the remainder of the semester or until he/she has been in attendance for the same number of days as he/she was absent. (*See Article 15, Section 3, Paragraph 5*).

*(Section 15.9 cont'd. on next page)*

45

**SA104**

15.9.5   Any period during which a student is not enrolled or is out of school due to suspension, expulsion or removal for disciplinary reasons shall be included for purposes of the Maximum Participation Rule.

**15.10**   **TRANSFER RULE** – After enrolling and attending one or more classes, a student changing enrollment from one school (sending school) to another school (receiving school) shall be considered a transferring student. For information and record keeping purposes, the receiving and sending school shall reasonably cooperate and complete Form 550.

15.10.1   A student shall be ineligible for all contests at all levels until after the first 50% of the maximum allowable Power Rankings regular season contests in those sports in which the student participated during the twelve (12) months immediately preceding the season in which the student is seeking eligibility. Participation is defined as a student participating in the sport during a regular season game as is specified by the AIA standardized calendar.

15.10.1.1   For individual sports, the student will be ineligible for 50% of allowable competitions for that school on the AIA calendar.

15.10.1.2   If a transfer occurs during the season in which the student is participating, the student is ineligible for one year from the date of first attendance at the receiving school in that sport.

15.10.1.3   In case of any subsequent transfer by the student, the student is ineligible for one year from the date of first attendance at the receiving school.

15.10.1.4   A transfer from an AIA member school (sending school) to a non-AIA member school that does not offer any interscholastic athletics, will not be considered a transfer.

15.10.1.4.1   A subsequent transfer from that non-AIA member school back to the sending school will also not be considered a transfer under 15.10.

15.10.1.4.2   A subsequent transfer from that non-AIA member school to an AIA member school other than the sending school will result in the appropriate transfer rule period of ineligibility.

15.10.2   (Form 550) - The sending school administration shall provide to the receiving school, via Form 550, the verification of activities in which a transferring student has participated. The receiving and sending school(s) shall **reasonably cooperate and complete Form 550.** Upon receipt by the receiving school of a completed Form 550, assuming all other eligibility requirements are met, the student becomes eligible for all interscholastic activities except for those activities in which the student has competed during the current or previous school year.

"Statement of Philosophy / Rationale for Transfer Rule"

- Promotes the educational philosophy that participation in interscholastic athletics is a privilege, which should not take a dominant role over academics;
- Recognizes the overwhelming administrative difficulty in attempting to determine the motives or reasons for each and every transfer, and, therefore, adopts a uniform objective standard to be followed by all member schools.
- Helps to protect opportunities for participation by students who attend school in the attendance zone of their domicile;
- Helps to protect and promote continuity of school programs;
- Serves as a deterrent to students running from or avoiding an athletic discipline that has been or may be imposed;

Except as otherwise stated, this rule is intended to and shall encompass any and all transfer situations and shall apply to any and all member schools, be they public, private or parochial.
_NOTE: The fact that a student may or may not have paid tuition has no bearing on the applicability of transfer rules._

15.10.3   Transfer Rule Exceptions – A student who transfers from one high school (the "sending school") to another high school (the "receiving school"), where there has been no change in domicile of parents or legal guardian, shall be eligible to participate in interscholastic activities at the receiving school when one of the following eligibility requirements has been fulfilled:

15.10.3.1   Ethnic Balance – In case of a transfer within a school district by a student under an approved compliance plan for racial balance (ethnic transfer), the period of ineligibility subsequent to such a transfer, if any, shall be determined by the district.

_(Section 15.10 cont'd. on next page)_

**SA105**

AIA Bylaws; Article 15. Student Eligibility Rules                                                              2022-2023

15.10.4  <u>School Closures / Drop of AIA Membership</u> – Upon closure or drop of AIA membership by the governing board, students may transfer at the beginning of the following semester to another school in the district as approved by the governing board, to the public high school of another district closet to the domicile of the parents, or to a private, parochial or BIE school and be automatically granted athletic eligibility.

15.10.5  <u>When Sport or Nonathletic Activity Is Dropped by an AIA Member School</u> – When a sport or nonathletic activity is dropped by a governing board, a student may transfer to a school that offers that sport or nonathletic activity and shall be eligible only in the sport or nonathletic activity that has been dropped at the school from which the student transferred. Said eligibility will be granted when the student enrolls in one of the following schools:

15.10.5.1  A private or parochial high school in the county in which the parents are domiciled.

15.10.5.2  The public high school within the same school district closest to the domicile of the parents.

15.10.5.3  In the event the district does not offer the sport or nonathletic activity in any of its schools, the student may transfer to the public high school of another district closest to the domicile of the parents.

15.10.5.4  The transfer rule shall apply to other interscholastic sports and activities in which the student participates.

15.10.6  <u>Disciplinary Removal</u> - A student suspended, expelled or otherwise removed for disciplinary reasons, including revocation or non-renewal of open enrollment, from one high school shall be ineligible for interscholastic competition in any other high school for one year or until all conditions for re-admittance have been fulfilled at the high school where the suspension, expulsion, open enrollment revocation or removal for disciplinary reasons occurred, whichever occurs first.

**15.11  <u>AMATEUR RULE</u>**

15.11.1  Each student, in order to represent his/her school in any AIA sanctioned contest, shall be and shall remain an amateur.

15.11.1.1  Name Image and Likeness (NIL): A student is in violation of this bylaw and shall immediately lose eligibility if that student, his/her family member, or anyone else on behalf of that student, enters into an agreement with an individual, corporate entity, partnership, association, or any other party or organization, for use of that student's NiL which in any way relates to the student's connection to his/her high school team or activity program, or to any other non-school athletic team or activity program with which the student is connected. *(Emergency Legislation – Ex. Brd 10/18/2021)*

15.11.2  An amateur athlete is one who has never used or is not using his/her knowledge of athletics or athletic skill in an athletic contest for financial gain.
<u>*DETERMINATION: The AIA Executive Board determined that an amateur may receive merchandise awards that do not exceed the limit as set forth in Article 13, Section 1.*</u>

15.11.3  A person who has lost his/her amateur standing in any AIA sanctioned sport loses his/her amateur standing in all sports in interscholastic competition for a maximum of one full calendar year from the date of discovery of the infraction or until reinstated by the AIA Executive Board.

15.11.4  Amateur athletes shall retain their amateur standing even though they participate during the summer vacation in schools or clinics sponsored by professionals.  *(See Article 14, Section 9).*

15.11.5  Individual students may receive monetary rewards for participation in luck-of-the-draw or lottery-type programs. This type of competition must be limited to individual type competition and not put one contestant against another. There is no limit on the amount of monetary award for this type of competition. (Examples: Shooting baskets at half-time at professional basketball games; shooting hockey pucks at goals during intermissions at hockey events).

15.11.6  Amateur athletes shall participate and always have participated under their own name

15.11.7  An amateur athlete shall not compete for money or other monetary compensation.

15.11.7.1  Amateur athletes may receive actual expenses for participating in out-of-town games. This amount shall not exceed the state of Arizona per diem.

15.11.7.2  Amateur athletes may receive a fee for officiating non-interscholastic high school and non-intercollegiate sports without jeopardizing their amateur standing.

15.11.7.3  Amateur athletes shall retain their amateur standing even though they receive compensation from private clubs for instructing students not enrolled in high school.

**SA106**

AIA Bylaws; Article 15. Student Eligibility Rules                                                      2022-2023

15.11.7.2   Amateur athletes may receive a fee for officiating non-interscholastic high school and non-intercollegiate sports without jeopardizing their amateur standing.

15.11.7.3   Amateur athletes shall retain their amateur standing even though they receive compensation from private clubs for instructing students not enrolled in high school.

15.11.7.4   Amateur athletes shall retain their amateur standing even though they receive compensation from state, county, city, parks or recreation departments.

15.11.7.5   Amateur athletes may enter a tournament with or against professionals without jeopardizing their amateur standing providing they do not receive, or anyone receives for them, any monetary awards, gift certificates or merchandise awards which exceed the limits as set forth in Article 13.1.4.

15.11.8   Except for a Letter of Intent to attend a college or university, amateur athletes shall not enter into any agreement with any corporation, association, partnership or individual for their services as an athlete until they have terminated their attendance in high school.  This includes professional clubs and/or teams for training and competition.

15.11.9   An amateur athlete, or any member of his/her family, shall not receive remuneration, either directly or indirectly; such remuneration being given to influence the student or the family to reside in a given high school district for purposes of establishing the student's eligibility on a team and/or participation with a club and/or team in the form of a scholarship and/or room and board. *(See also Article 15, Section 12)*.

15.11.10   A student may participate and receive monetary awards in non-interscholastic and/or non AIA sanctioned activities/contests (such as rodeo, boxing, bowling, judo) and be classified as an amateur under AIA rules. *(See Article 11, Section 1, Paragraph 2)*.

15.12   **RECRUITMENT RULE** – There shall be no recruitment of athletes.  Recruitment is defined as the act of influencing a student to enroll in a school or to transfer from one school to another in order that the student may participate in interscholastic athletics.  No school administrator, athletic coach or employee of a high school district shall engage in recruitment either by direct contact with a student or indirectly through parents, legal guardians, common school employees, directors of summer athletic programs or other persons who are in a position to influence the student's choice of a school.

15.12.1   If the recruitment rule is violated, the student will not be eligible at a member school until reinstated by the AIA Executive Board.

15.12.2   If school personnel condone or actively engage in recruitment or a school uses a recruited student, the school shall be subject to disciplinary action by the AIA Executive Board.  *(See Article 16, Section 1)*.

15.12.3   Contact procedures used in the soliciting of students to enroll in any public, private or parochial school shall be the same for all students.

15.12.4   Interpretations

15.12.4.1   Funds which have been donated to schools by clubs and individuals may be given as financial aid to students through the normal financial aid program of the school for all students, without regard to athletic potential. Financial aid based even partially on athletic potential or performance is not permitted from the school or from groups that exist because of or for the benefit of the school (e.g., booster clubs).

15.12.4.2   Individuals not exclusively representing athletic interests of a high school may make general presentations (not just athletic) to eighth grade students (not just athletes). There should be a diversity of presenters, speaking on a variety of topics to students of all interests.

15.12.4.3   It is a violation of this section for a coach or any other unauthorized representative of a school to suggest or promise that any part of tuition will be waived for a prospective student for any reason, including financial need. The only person who may address the possibility of fee reduction is that person who has specific responsibility for admissions and financial aid policies and procedures.

*(Section 15.12 cont'd. on next page)*

48

**SA107**

AIA Bylaws; Article 15. Student Eligibility Rules                                              2022-2023

15.12.4.4    If it is a faculty member's responsibility to recruit students (not just athletes) and that person makes such contact irrespective of athletic eligibility, such contact is permitted. However, anything done for an athlete that is not done in a comparable fashion for all students is a violation of the Recruitment Rule.

15.12.4.5    When a student at a junior high/middle school or other high school, or the parents of that student, contacts the coach about attending the coach's school, the coach shall refer the student or parent to the appropriate school personnel (those who have the responsibilities for seeking and processing prospective students).

15.12.4.6    A high school coach may not initiate contact with a student at a junior high/middle school or other high school, or the parents of that student, about attendance at the school. It is not a violation for a coach to have normal community contact with a student who attends a junior high/middle school of the same system, which is a feeder to the high school.

15.12.4.7    It is a violation of the Recruitment Rule if coaches or their representatives call, send questionnaires, cards or letters or visit prospective athletes and their families for the purpose of evaluating and recruiting specific prospective athletes.

15.12.4.8    High school coaches or their representatives may not attend grade school or youth sports games (e.g., Pop Warner) for the purpose of evaluating and recruiting specific prospective athletes.

15.12.4.9    High school coaches and administrators may not request booster clubs, parents, players, former players or alumni from the high school to discuss the merits of their athletic program with prospective athletes or their parents by phone, in person or through letters.

15.12.4.10   Any high school may allow all students of any junior high/middle school to attend its athletic events without charge.

15.12.4.11   Persons "indirectly associated with the school" include, but are not limited to, parents of players and booster club members. Such persons are prohibited from providing or performing any of the examples of recruitment listed in this section and its interpretations.

15.12.4.12   Examples of recruitment shall include, but are not limited to:

    15.12.4.12.1    Offer or acceptance of money or other valuable consideration such as free or reduced tuition during the regular year or summer school by anyone connected with the school.

    15.12.4.12.2    Offer or acceptance of room, board or clothing or financial allotment for clothing.

    15.12.4.12.3    Offer or acceptance of pay for work that is not performed or that is in excess of the amount regularly paid for such service.

    15.12.4.12.4    Offer or acceptance of free transportation by any school connected person.

    15.12.4.12.5    Offer or acceptance of a residence with any school connected person.

    15.12.4.12.6    Offer or acceptance of any privilege not afforded to non-athletes.

    15.12.4.12.7    Offer or acceptance of free or reduced rent for parents.

    15.12.4.12.8    Offer or acceptance of payment of moving expenses of parents or assistance with the moving of parents.

    15.12.4.12.9    Offer or acceptance of employment of parent(s) in order to entice the family to move to a certain community if someone connected with the school makes the offer.

    15.12.4.12.10   Offer or acceptance of help in securing a college athletic scholarship.

15.12.4.13   **OPEN HOUSE** – The intent of an open house is to allow incoming students to gather information regarding curriculum, programs, and the admissions process. Coaches may provide general information to prospective incoming students but no specific details or enticements as to participation if they were to enroll.

15.12.4.14   **PRIOR CONTACT** – Prefatory statement:  In an effort to preserve and promote competitive fairness and equity, and consistent with the AIA's mission to ensure that academics remain the primary focus of its member schools, the Prior Contact rule is an effort to deter recruiting of student-athletes and minimize athletically motivated transfers.  However, the rule applies regardless of whether there is any evidence of athletic motivation or recruitment.

Despite compliance with the other provisions of AIA Bylaws, a student who transfers from one school (sending school) to another school (receiving school) is ineligible in the sport involved for one year from the date of attendance at the receiving school, if any of the following circumstances existed during the one year preceding the transfer:

- The student participated or practiced as an individual, on a school team, or on a non-school team coached, directed, supervised, managed, coordinated, owned or operated by any of the receiving school's coaches (in the sport involved), administrators or parents.
- The student participated or attended an open gym, open weight room, or open athletic facilities at the receiving school.  For this circumstance, the sport involved is deemed to be any interscholastic sport in which the student has participated or practiced during the current or previous school year.
- A coach at the receiving school has served as a personal trainer, coach, conditioner or instructor for the student.  For this circumstance, the sport involved is deemed to be any interscholastic sport in which the student has participated or practiced during the current or previous school year.
- The student participated or attended a camp, clinic, combine, showcase or similar event where a coach, trainer, or instructor in the sport involved at the receiving school worked, whether on a paid or volunteer basis.

As used in this rule, the term "coach" includes any person who coaches, volunteers, manages, administers, or assists in any capacity with the coaching or training of the school or non-school team, regardless of compensation or contract status.  No personal relationship, individual instruction or direct contact between the coach and the student is required for application of this rule.  For example, a coach of a football team, regardless of position or group he/she coaches, is considered to be a coach of the entire football team, at all levels (freshman, junior varsity, varsity), and this rule applies. *(Emergency Legislation – 3/1/2019)*

15.12.4.14.1   <u>During Summer Enrollment</u> – Beginning with the week identified in the AIA calendar as summer and ending with the week that begins fall practice, a student is considered to have transferred when the student has demonstrated intent to enroll in the receiving school. Intent is identified by the school or school district.

## 15.13   ELIGIBILITY APPEAL PROCEDURES

15.13.1  In the case of an alleged hardship, a member school may appeal on behalf of a student his/her ineligibility by utilizing the process provided in AIA Bylaw 15.14, Hardship. (Form 15.10)

15.13.2  In all other cases, a member school may appeal on behalf of a student his/her ineligibility by notifying the Executive Director of the appeal in writing, setting out fully and completely the basis for the appeal.  The Executive Director, utilizing the authority under AIA Bylaw 7.2.3.7, shall respond in writing within a reasonable time.  Should the member school disagree with the determination of the Executive Director, it may ask that the matter be considered by the Executive Board (AIA Bylaw 7.2.3.7).

15.13.3  <u>Review of Prior AIA Hardship Appeals Committee Decision</u> - The AIA Executive Board may review prior decisions regarding eligibility of a student at any regular or special meeting provided:

15.13.3.1   Substantially new and different information has been submitted in written form to the AIA Executive Director.

15.13.3.2   If, in the opinion of the AIA Executive Director, the information is not new and different, the item will not be placed on the agenda.

**SA109**

AIA Bylaws; Article 15. Student Eligibility Rules                                               2022-2023

**15.14** **HARDSHIP (Form 15.10)** - In individual hardship cases the AIA Executive Board or the Hardship Appeals Committee may, at their discretion and upon such terms and conditions as may be imposed, waive or modify the Enrollment Rule (Article 15, Section 3, Paragraph 4 only), Domicile Rule (Article 15, Section 5), Maximum Participation Rule (Article 15, Section 9, Paragraph 1 only), Transfer Rule (Article 15, Section 10), and/or Recruitment Rule (Article 15.12.4.14 only), and/or the International Student Eligibility Rule (Article 15.15.2 only). The appeal shall initially be heard and decided by the Hardship Appeals Committee. The decision of the Hardship Appeals Committee shall be final unless appealed to the AIA Executive Board within five business days from the date of said decision.  AIA Executive Board consideration of such appeals will take place only at regularly scheduled monthly meetings, unless otherwise scheduled by the Board.  (*See Article 6, Section 3 regarding procedures for meetings of the AIA Executive Board.*)  Procedures for appeals to the Hardship Appeals Committee shall be as determined by the AIA Executive Board.

15.14.1 Hardship Defined - Each case is dependent upon its facts, but as a general guideline, the Executive Board will use the following criteria:

15.14.1.1   An unforeseeable, unavoidable, and uncorrectable act, condition or event, over which the student and his/her family has no control; and

15.14.1.2   Which has caused a severe burden upon the student or his/her family; and

15.14.1.3   Which has caused the student's noncompliance with the eligibility rule(s) involved.

15.14.1.4   Whether athletics plays a role in the circumstances involved in the hardship request.
*NOTE: Where it is determined that athletic motivation is present; this would be sufficient, in and of itself, for denial of the hardship request.*

15.14.1.5   Loss of eligibility in itself is not to be considered a hardship.

15.14.2 Burden of Proof - The burden of providing evidence of hardship shall be on the student.  Full particulars must be given by the student and the school principal must certify that the information given is correct to the best of his/her knowledge and belief.

15.14.3 Enrollment Limitation Hardship - A ninth grade student applying for admission or a student transferring who is denied enrollment because of lack of space may be declared eligible.

15.14.4 Age Rule Exemption - In individual cases the AIA Executive Board may, at their discretion and upon such terms and conditions as may be imposed, waive or modify the age rule (15.6.1), utilizing the information and process set out in Form 15.14.

15.14.5 Upon request by the Executive Director or designee, the sending school shall provide a representative during the hardship appeal hearing(s) before the Hardship Appeals Committee and/or the Executive Board.  Failure of the sending school representative to attend shall not prevent or otherwise delay any hearing or decision on the appeal, but the failure to appear SHALL be considered a violation of the AIA Bylaws and may result in sanction as determined by the Executive Board.

**15.15** **INTERNATIONAL STUDENT ELIGIBILITY** – Prefatory Statement: In an effort to preserve and promote interscholastic competitive opportunities for Arizona students and further the goals of competitive fairness and equity, and recognizing the concerns of AIA member schools related to displacement of Arizona students by students from foreign countries, the following bylaw addresses the interscholastic eligibility status of international students attending an AIA member school:

15.15.1 **Foreign Exchange Students**: A foreign exchange student is a student that is in the U.S. under a J-1 Visa, and who is placed in a school by an educational exchange program approved by the Council on Standards for International Educational Travel (CSIET). A foreign exchange student is eligible at a school in the attendance zone of the home in which the student is placed. A foreign exchange student must meet all other eligibility requirements and is eligible for a maximum of one school year.

15.15.2 **International Students**: An international student is a student who is in the U.S. under any Visa or document other than a J-1 Visa and who is attending an AIA member school. Except as stated below with regard to domicile, an international student must meet all eligibility requirements of any regularly enrolled student. An international student is eligible only for non-varsity level competition, which may include only 9th through 11th grade, and is not at any time of enrollment eligible for varsity level competition. With regard to domicile, an international student's non-varsity eligibility shall be at a school in the attendance zone of the home in which the student is placed.

51

AIA Policies and Procedures; Article 41. Sports Medicine                                    2022-2023

# **ARTICLE 41**

## **SPORTS MEDICINE**

**41.1**   **DRUGS, ALCOHOL, TOBACCO**

    41.1.1   **AIA POSITION STATEMENT – SUPPLEMENTS, DRUGS AND PERFORMANCE ENHANCING SUBSTANCES**

The Arizona Interscholastic Association (AIA) views sports, and the participation of student-athletes in sport, as an activity that enhances the student-athlete's well-being by providing an environment and stimulus that promotes growth and development along a healthy and ethically based path.

- It is the position of the AIA that a balanced diet, providing sufficient calories, is optimal for meeting the nutritional needs of the growing student-athlete.
- It is the position of the AIA that nutritional supplements are rarely, if ever, needed to replace a healthy diet.
- Nutritional supplement use for specific medical conditions may be given individual consideration.
- The AIA is strongly opposed to "doping", defined as those substances and procedures listed on the World Anti-Doping Agency's Prohibited List (www.wada-ama.org).
- It is the position of the AIA that there is no place for the use of recreational drugs, alcohol or tobacco (e-cigarettes) in the lifestyle of the student-athlete. The legal consequences for the use of these products by a student-athlete are supported by the AIA.

In pursuit of Victory with Honor, the AIA promotes the use of exercise and sport as a mechanism to establish current fitness and long-term healthy lifestyle behaviors. It is the position of the AIA that the student-athlete, who consumes a balanced diet practice sport frequently and consistently, and perseveres in the face of challenges, can meet these goals.

    41.1.2   At least annually, each member school shall communicate to its students participating in interscholastic activities the AIA Position Statement on the use of supplement, drugs and performance enhancing substances. (See Form 14.13)

    41.1.3   Any coach or competitor using tobacco, alcoholic beverages or misusing drugs while participating in interscholastic competition shall be disqualified from the contest or tournament.

**41.2**   **OPIOID EDUCATION** - All student athletes shall complete the Opioid online education course. Student athletes participating in sports as of the 2021-2022 school year shall complete the course. All student-athletes shall complete the course prior to participation in practice or competition.

**41.3**   **CONCUSSION EDUCATION** – All student athletes shall complete the Brainbook online concussion education course. Student athletes participating in sports as of the 2011-12 school year shall complete the course. All student-athletes shall complete the course prior to participation in practice or competition.

    NOTE: The Brainbook online concussion education course must be completed by a student-athlete only once.

**41.4**   **CONCUSSION POLICY**
    41.4.1   Education

        41.4.1.1 All AIA Participating schools must have a concussion policy on file: The policy must address the following:
- Concussion Education
- Removal from Play
- Return to Play

        41.4.1.2 Parents and athletes must sign a form acknowledging education regarding concussion.

    41.4.2   Mechanics and Criteria for Removal from Play

        41.4.2.1 An athlete, coach, licensed athletic trainer, team physician, official or parent can remove an athlete from play.

        41.4.2.2 Only an appropriate health care professional can refute the diagnosis of a concussion.

*(Section 41.1 cont'd. on next page)*

**SA111**

AIA Policies and Procedures; Article 41, Sports Medicine                                    2022-2023

41.4.3    Return to Play Criteria
- No athlete should return to play (RTP) or practice on the same day of a concussion.
- Any athlete suspected of having a concussion should be evaluated by an appropriate health-care professional that day.
- Any athlete with a concussion should be medically cleared by an appropriate health-care professional prior to resuming participation in any practice or competition.
- After medical clearance, return to play shall follow a step-wise protocol with provisions for delayed return to play based as directed by an appropriate health-care professional.
- Return to play should only occur after an athlete has returned to full school attendance without academic accommodations.

41.4.4    Appropriate Health-Care Professionals for Return to Play
An appropriate health-care professional is defined as the following:
- Licensed Athletic Trainer
- Physician (MD/DO)
- Licensed Nurse Practitioner
- Physician's Assistant

41.4.5    Return to Academics
- Cognitive rest should be recommended for symptomatic athletes. This may include limiting activities such as reading, texting and computer usage.
- In some instances, this may also involve school absences and/or the use of academic adjustments or accommodations as prescribed by the appropriate healthcare professional and school academic team (school nurse, school counselor, administration, etc.).
- Returning an athlete to the classroom following a concussion should follow a return to learn progression.

41.4.6    Other
41.4.6.1 At the beginning of a game, the coach must certify to the official that the equipment is in compliance with safety regulations and properly fitted.

41.4.6.2 If a helmet comes off or becomes dislodged during play, must remain out for one play or call a time out to have the equipment reassessed.

**41.5    HEAT ACCLIMATIZATION & EXERTIONAL HEAT ILLNESS MANAGEMENT POLICY**

41.5.1    It is the position of the AIA that prevention is the best way to avoid exertional heat stroke. Prevention includes educating athletes and coaches about:
- Recognition and management of exertional heat illness;
- The risks associated with exercising in hot, humid environmental conditions;
- The need for gradual acclimatization over a 14 day period;
- Guidelines for proper hydrations;
- Implementing practice / competition modifications according to local temperature and relative humidity readings;
- Management/Treatment guidelines for cases of heat illness including heat stroke;
- Appropriate guidelines for Return to Play after Heat Illness.

41.5.2    **Definitions**
Exertional heat illness includes the following conditions, ordered from the least to the most dangerous:

a) **Exercise associated muscle cramps**: an acute, painful, involuntary muscle contraction usually occurring during or after intense exercise, often in the heat, lasting approximately 1-3 minutes.
b) **Heat syncope**: also known as orthostatic dizziness, it refers to a fainting episode that can occur in high environmental temperatures, usually during the initial days of heat exposure.
c) **Exercise (heat) exhaustion**: the inability to continue exercise due to cardiovascular insufficiency and energy depletion that may or may not be associated with physical collapse.
d) **Exertional heat stroke**: a severe condition characterized by core body temperature >40°C (105°F), central nervous system (CNS) dysfunction, and multiple organ system failure induced by strenuous exercise, often occurring in the hot environments.
e) **Excessive Heat Warning**: Extreme heat is occurring or imminent. Studies have shown that our bodies have a greater ability to tolerate heat as the summer wears on. There is not one single, constant temperature used by NOAA/NWS Phoenix to determine when an alert will be issued. Instead, the NOAA/NWS HeatRisk product is leveraged to identify unusually hot days.
(HeatRisk product link: https://www.wrh.noaa.gov/wrh/heatrisk/)
(Reference: National Weather Services; https://www.weather.gov/psr//Heat)

*(Section 41.5 cont'd. on next page)*

**SA112**

AIA Policies and Procedures; Article 41. Sports Medicine                                    2022-2023

**Heat Acclimatization Protocol**
**(A team may not choose to train in a less severe climate)**

**Days 1-5:**
- Days 1 through 5 of the heat-acclimatization period consist of the first 5 days of formal practice. During this time, athletes may not participate in more than 1 practice per day.
- If a practice is interrupted by inclement weather or heat restrictions, the practice should recommence once conditions are deemed safe. Total practice time should not exceed 3 hours in any 1 day. In addition to practice, a 1-hour maximum walk-through is permitted during days 1-5 of the heat acclimatization period. However, a 3-hour recovery period should be inserted between the practice and walk0through (or vice versa). (Note: a walk-through is defined as no contact with other individuals, dummies, sleds or shields).
- During days 1-3 of the heat-acclimatization period, in sports requiring helmets or shoulder pads, a helmet is the only protective equipment permitted. The use of shields and dummies during this time is permissible as a non-contact teaching tool.
- During days 4-6, only helmets and shoulder pads may be worn.
- Football only: on days 4-6, contact with blocking sleds and tackling dummies may be initiated.

**Days 6-14:**
- Beginning no earlier than day 6 and continuing through day 14, double-practice days must be followed by a single-practice day.
- On single-practice days, 1 walk-through is permitted, separated from the practice by at least 3 hours of continuous rest. When a double-practice day is followed by a rest day, another double-practice day is permitted after the rest day.
- On a double-practice day, neither practice should exceed 3 hours in duration, nor should student-athletes participate in more than 5 total hours of practice. Warm-up, stretching, cool-down, walkthrough, conditioning and weight-room activities are included as part of practice time. The two practices should be separated by at least 3 continuous hours in a cool environment.
- Beginning on day 7, all protective equipment may be worn and full contact may begin.
- Full-contact sports may begin 100% live contact drills no earlier than day 7.
- Because the risk of exertional heat illnesses during the preseason heat-acclimatization period is high, we strongly recommend that an athletic trainer be on site before, during and after all practices.

41.5.3  **Hydration Strategies**
- Sufficient, sanitary and appropriate fluid should be readily accessible and consumed at regular intervals before, during and after all sports participation and other physical activities to offset sweat loss and maintain adequate hydration while avoiding overdrinking.
- Generally, 100 to 250 mL (approximately 3-8oz) up to 1.0 to 1.5 L (approximately 34-50oz) per hour for adolescent boys and girls is enough to sufficiently minimize sweating-induced body-water deficits during exercise and other physical activity as long as their pre-activity hydration status is good.
- Pre-activity to post-activity body-weight changes can provide more specific insight to a person's hydration status and rehydration needs. Athletes should be well hydrated before commencing all activities.
- The following guidelines are suggested:

| Condition | % Body Weight Change |
|---|---|
| Well Hydrated | +1 to -1 |
| Minimal dehydration | -1 to -3 |
| Significant dehydration | -3 to -5 |
| Serious dehydration | >-5 |

% Body weight change = [(pre-exercise body weight – post-exercise body weight) / pre-exercise body weight] x 100

*(Section 41.5 cont'd. on next page)*

**SA113**

AIA Policies and Procedures; Article 41. Sports Medicine                    2022-2023

41.5.4   **Prevention**

*Pre-participation history and physical exam*
- A thorough medical history will be gathered (history of heat illness, sickle cell trait/disease, etc.)
- Individuals with risk factors will be identified and counseled (see table below):

| Risk Factors for Heat Illness | |
|---|---|
| *Intrinsic* | *Strategies to Minimize Risk* |
| High intensity exercise | Gradually phase in exercise and conditioning |
| Fever or illness | Monitor and remove at risk athletes as necessary |
| Dehydration | Educate coaches/athletes on proper hydration |
| | Provide adequate access to water |
| Overweight/obesity | Gradually phase in exercise and conditioning |
| Lack of heat acclimatization | Follow heat acclimatization program |
| Medications (antihistamines, diuretics, ADHD drugs) | Monitor and remove at risk athletes as necessary |
| Skin disorder (sunburn or malaria rubra) | Monitor athletes closely |
| Predisposing medical conditions | Monitor and remove at risk athletes as necessary |
| *Extrinsic* | *Strategies to Minimize Risk* |
| High ambient temperature, solar radiation or humidity | Avoid exercise in hotter parts of the day |
| Heavy gear or equipment | Gradually introduce equipment |
| Poor practice design | Educate coaches regarding strategies to minimize risk |

- When applicable the Athletic Trainer or persons responsible will be notified of individuals with pre-existing conditions that place the individual at risk of exertional heat illness.
- As necessary, coaches are notified of individuals at higher risk.

*Environmental Monitoring and Activity Modifications/Cancellation*
- It is recommended environmental monitoring occur utilizing a WBGT device equivalent to **Kestrel 5400.**
- It is recommended environmental monitoring occur any time it is warm outside (i.e. over 80°F)
- Environmental monitoring and activity modifications may be necessary for certain of indoor facilities.
- Recommend monitoring of WBGT occur every 30 minutes beginning 15 minutes prior to the scheduled practice time.
  - If school designee/athletic trainer is present he/she will monitor WBGT and recommend appropriate modification of activity. If the school designee/athletic trainer is not present the head coach or athletic director will monitor WBGT recommend appropriate modification of activity. WBGT will be measured at the practice/event venue on the playing surface.
  - All environmental monitoring should be documented and stored by the school.
- Modifications will be made in accordance with the best practice guidelines for our region. Arizona is located in WBGT **Region 3**, therefore we will follow the activity guidelines for that region *after* the 14 day acclimatization period.
  - *To find what region/category your school is in, please read the Grundstein et al. Regional heat safety thresholds for athletes in the contiguous United States. Applied Geography, 2015 manuscript (https://ksi.uconn.edu/wp-content/uploads/sites/1222/2018/08/RegionalWBGT_2015_AppliedGeography.pdf)*
- Modifications should change based on real time environmental conditions. Therefore, if the environment changes to a higher or lower WBGT that falls in a different category then the activity modifications should reflect the recommendations in the new category.

| During Acclimatization Period (Day 1 – Day 14) | Acclimatized Athletes (Day 15+) | Activity Guidelines |
|---|---|---|
| <79.7 | < 82.0 | Normal Activities – Provide at least three separate rest breaks each hour with a minimum duration of 3 minutes each during the workout. |
| 79.8 - 84.6 | 82.1- 86.9 | Use discretion for intense or prolonged exercise; Provide at least three separate rest breaks each hour with a minimum duration of 4 minutes each.  Make equipment modifications as necessary. |
| 84.7 - 87.6 | 87.0 - 90.0 | Maximum practice time is 2 hours. For Football: players are restricted to helmet, shoulder pads, and shorts during practice.  If the WBGT rises to this level during practice, players may continue to work out wearing football pants without changing to shorts. Make additional equipment modifications as indicated. Including not beginning practice with equipment on for warmups etc. For All Sports: Provide at least four separate rest breaks each hour with a minimum duration of 4 minutes each. Make equipment modifications as indicated. |
| 87.7 – 89.6 | 90.1 - 91.9 | Maximum practice time is 1 hour. For Football: No protective equipment may be worn during practice, and there may be no conditioning activities.  For All Sports: There must be 20 minutes of rest breaks distributed throughout the hour of practice.  Provide at least four separate rest breaks (every 15 minutes) each hour with a minimum duration of 5 minutes each. Off-Campus Sports, (such as Cross Country) practices and games should remain on campus unless dedicated healthcare providers are immediately accessible in case of heat illness.  Reduce or eliminate conditioning drills. |
| ≥ 89.7 | ≥ 92.0 | No outdoor workouts. Delay practice until a cooler WBGT is reached. |

*(Section 41.5 cont'd. on next page)*

149

**SA114**

AIA Policies and Procedures; Article 41. Sports Medicine                      2022-2023

Equipment Considerations
- Wear loose-fitting, light colored and absorbent/moister wicking clothing
- During hot or humid conditions minimize the amount of equipment and clothing worn. (Football: reduce the amount of equipment worn, i.e. helmet and/or shoulder pads)

Practice Structure and Time Considerations
- Direct sunlight and high temperatures are most common between the hours of 10 am and 5 pm. When conditions indicate practices should be moved from this time window.
- As temperatures rise the ability of the athlete to compensate for prolonged activity at high temperatures decreases. Practices should be shortened when indicated by current environmental conditions.
- High intensity and long duration bouts of exercise (sprints, conditioning, etc) should not be completed when conditions indicate.

Education
- Member Schools will ensure education of medical staff, athletes, coaches, emergency personnel, and parents about EHI and proper hydration has been completed.
- Encourage athletes to sleep at least 6–8 hours and eat a well-balanced diet (Reference: Korey Stringer Institute; https://ksi.uconn.edu/emergency-conditions/heat-illnesses/exertional-heat-stroke/heat-stroke-prevention/)

Management
- Monitoring of student-athletes safety will be continuous during any physical activity.
- Athletic trainers, coaches, administrators and other athletics personnel will be educated on the signs and symptoms of exertional heat illness.
  - These signs and symptoms include (but are not limited to) the table below:

| | |
|---|---|
| Rectal temperature greater than 105 (40°C) at time of incident. | Rapid pulse, low blood pressure, quick breathing |
| Headache | Dehydration, dry mouth, thirst |
| Confusion or just look "out of it" | Decreasing performance or weakness |
| Disorientation or dizziness | Profuse sweating |
| Altered consciousness, coma | Collapse, staggering or sluggish feeling |
| Nausea or vomiting | Muscle cramps, loss of muscle function/balance, inability to walk |
| Diarrhea | Irrational behavior, irritability, emotional instability |

41.5.5   **Treatment in the event of an exertional heat stroke (medical emergency)**
Recognition
- Any athlete with signs of central nervous system dysfunction during exercise in the heat should be suspected to be suffering from EHS.
- ***It is important to emphasize that during and following intense exercise in the heat, temporal, aural, oral, skin, axillary and tympanic temperature are not valid and should never be utilized in evaluating a potential exertional heat stroke.***

Cooling
- The patient must be moved to a cooling zone, begin appropriate treatment and continuously monitor the patient.
- Excess clothing shall be removed to aid cooling.
  - If removal of clothing and/or equipment would cause delays of 5+ minutes, do not remove clothing and equipment, simply initiate cooling.
- Place patient in a cold-water immersion (35-59°F) tub up to the neck if possible.
  - Wrap a towel across the chest and beneath both arms to prevent the athlete from sliding into the tub.
  - Ice shall cover the surface of the water at all times.
  - Water shall be continuously and vigorously stirred to maximize cooling.
  - An ice-cold towel will be placed over the head/neck and rewet and replaced every 2 minutes.
  - Cooling shall cease when core body temperature (best measured rectally) reaches ~102°F or when signs and symptoms indicate.
- Cold Water Immersion (CWI) Tub
  - Must be present at the site and readily accessible when practices and games begin.
  - Recommended set-up includes:
    - A tub filled with water. (Or a tub with water ready to be filled. Water temps may climb to over 100°F if pre-filled in the sun.)
    - Two or more chests filled with ice next to the tub ready for treatment.
    - Available bed sheet or large towels.
    - Towels for placement over the head and neck.

*(Section 41.5 cont'd. on next page)*

**SA115**

AIA Policies and Procedures; Article 41. Sports Medicine                                    2022-2023

- Cool First, Transport Second
  - When a patient is diagnosed with EHS, the principle of Cool First, Transport Second should be used.
    - Note: EMS should not transport the patient until they reach ~**102°F** due to the inability to continue vigorous cooling in the ambulance.

Vital Sign Monitoring
- The QHP will monitor vital signs.
- Vital Signs will be monitored in the unstable patient every 5 minutes.

EMS
- EMS must be called immediately if a patient is suspected of EHS
- HOWEVER, any patient with EHS must be **cooled FIRST and then transported via EMS**.
  - This cool first transport second EAP protocol will be communicated/shared with EMS annually PRIOR to the first official sport practice at the school in accordance with the EAP policy and procedures.

41.5.6   **Return to Play Following Exertional Heat Stroke**
The following is the protocol for return to play following heat stroke:
- Refrain from exercise for at least 7 days following the acute event.
- Follow up in about 1 week for physical exam by licensed physician (MD,DO)
- When cleared for activity by a licensed physician, begin exercise in a cool environment and gradually increase the duration, intensity, and heat exposure for 2 weeks to acclimatize and demonstrate heat tolerance under the direction of a licensed healthcare professional.
- If return to activity is difficult, consider a laboratory exercise-heat tolerance test about one month post incident.
- Athlete may be cleared for full competition if heat tolerance exists after 2-4 weeks of training.

The AIA also recommends that any athlete suspected of having suffered exertional heat exhaustion be referred to a licensed physician for follow-up medical examination and clearance.

**41.6   EMERGENCY ACTION PLANS**

41.6.1   An Emergency Action Plan (EAP) for each practice and competition site, used by the school, shall be completed annually by each member school. The EAP must be kept on file at the school and shared with the appropriate coaches and staff.  The emergency action plan should be comprehensive and practical, yet flexible enough to adapt to any emergency situation.

41.6.2   The Emergency Action Plan should contain the following information and/or components:
- Emergency plans must be written documents and should be developed in concert with the member schools' certified athletic trainer(s).
- Emergency plans must be written documents and should be distributed to team and attending physicians, athletic training students, institutional and organizational safety personnel, institutional and organizational administrators, and coaches.
- The emergency plan should be developed in consultation with local emergency medical services personnel.
- An emergency plan for athletics identifies the personnel involved in carrying out the emergency plan and outlines the qualifications of those executing the plan.
- Sports medicine professionals, officials, and coaches should be trained in automatic external defibrillation, cardiopulmonary resuscitation, first aid, and prevention of disease transmission.
- The emergency plan should specify the equipment needed to carry out the tasks required in the event of an emergency. In addition, the emergency plan should outline the location of the emergency equipment. Further, the equipment available should be appropriate to the level of training of the personnel involved.
- Establishment of a clear mechanism for communication to appropriate emergency care service providers and identification of the mode of transportation for the injured participant are critical elements of an emergency plan.
- The emergency plan should be specific to the activity venue. That is, each activity site should have a defined emergency plan that is derived from the overall institutional or organizational policies on emergency planning.
- Emergency plans should incorporate the emergency care facilities to which the injured individual will be taken. Emergency receiving facilities should be notified in advance of scheduled events and contests. Personnel from the emergency receiving facilities should be included in the development of the emergency plan for the institution or organization.

*(Section 41.6 cont'd. on next page)*

**SA116**

AIA Policies and Procedures; Article 41. Sports Medicine                                        2022-2023

- The emergency plan specifies the necessary documentation supporting the implementation and evaluation of the emergency plan. This documentation should identify responsibility for documenting actions taken during the emergency, evaluation of the emergency response, and institutional personnel training.
- The emergency plan should be reviewed and rehearsed annually, although more frequent review and rehearsal may be necessary. The results of these reviews and rehearsals should be documented and should indicate whether the emergency plan was modified, with further documentation reflecting how the plan was changed.
- All personnel involved with the organization and sponsorship of athletic activities share a professional responsibility to provide for the emergency care of an injured person, including the development, implementation and regular, periodic evaluation of an EAP.

**41.7    STUDENT INSURANCE**
41.7.1   It is recommended that each student athlete have on file with the principal or his/her designee proof of insurance coverage or a waiver prior to practice.

**41.8    POST SEASON EVENT PROTOCOL**
41.8.1   Applies for the following AIA Post Season Events:
- Football
- Volleyball
- Soccer
- Basketball
- Wrestling
- Baseball
- Softball
- Spiritline

41.8.2   An Emergency Action Plan (EAP) must be filed with AIA in order to host a post season tournament.

41.8.3   Qualified Medical Profession (QMP)/EMT Coverage.

41.8.3.1 All ATC/QMP/EMT services at AIA Post Season Events will be paid or reimbursed by the AIA.
(Note: "Region" events are not AIA events – ATC/QMP/EMT is not paid by AIA)

41.8.4   AIA State Tournaments at High Seed Sites:

41.8.4.1 Member schools must engage a qualified medical professional (QMP) or Emergency Medical Technician (EMT). One of the following three protocol options must be followed or payment may not be issued:

41.8.4.2 If there is no QMP or EMT at the game, the game shall not be played.

41.8.4.2.1 QMP as defined by Arizona Revised Statute §15-341:
- ATC – Certified Athletic Trainer
- MD – Medical Doctor
- DO – Doctor of Osteopathic Medicine
- NP – Licensed Nurse Practitioner
- PA – Licensed Physician's Assistant

41.8.4.2.2 If a school does not have a QMP or EMT and the opposing school does, in order for the game to proceed, the QMP or EMT agrees to cover the opposing school as well as their own school.

41.8.4.3 If ONLY an EMT is at the game, any player removed due to suspected head injury or concussion will not be allowed to enter or re-enter the game based on an EMT evaluation. Return to play can only be based on evaluation by a QMP.

41.8.5   AIA State Tournaments at Neutral Sites:
- AIA Staff will secure QMPs that will be contracted through the AIA or a third party vendor.
- If the QMP is a Certified Athletic Trainer, **the ATC must provide the AIA with a certificate of professional liability insurance** and be familiar with the AIA/ATC protocol.

SA117

**41.9**   <u>**TRANSGENDER POLICY**</u>

GENDER IDENTITY PARTICIPATION – all students should have the opportunity to participate in Arizona Interscholastic Association (AIA) activities in a manner that is consistent with their gender identity, irrespective of the sex listed on a student's eligibility for participation in interscholastic athletics or in a gender that does not match the sex at birth, via the following procedure below. Once the student has been granted eligibility to participate in interscholastic athletics consistent with the athlete's gender identity, the eligibility is granted for the duration of the student's participation and does not need to be renewed every sport season or school year. All discussion and documentation will be kept confidential, and the proceedings will be sealed unless the student and family make a specific request.

41.9.1   **NOTICE TO THE SCHOOL**: the student and/or parents shall contact the school administrator or athletic director indicating that the student has a consistent gender identity different than the sex listed on the student's school registration records, and that the student desires to participate in activities in a manner consistent with the student's gender identity.

41.9.2   **NOTICE TO THE AIA**: The school administrator shall contact the AIA office, which will assign a facilitator who will assist the school and student in preparation and completion of the AIA Gender Identity eligibility appeal process.

41.9.3   **FIRST LEVEL OF REVIEW**
The appealing student should provide the AIA with a form that includes the following:
   a)   A student request to participate on an athletic team(s) that differs from their sex assigned at birth;
   b)   Support from the student's parent or guardian.
   c)   Support from a school administrator
   d)   A copy of the PPE, signed by a qualified health care provider

The AIA shall schedule a meeting with the Gender Identity Eligibility Committee, a subcommittee of the AIA Sports Medicine Advisory Committee as expeditiously as possible after receipt of all required documentation. The committee may request an in person meeting with the student and parents and/or guardian if there are any additional questions or concerns by the committee after review of above documentation. If the Gender Identity Eligibility Committee, upon review of the above documentation, finds that the student's request is appropriate and is not motivated by an improper purpose and there are no adverse health risks to the athlete, then a supportive recommendation shall be made by the committee to the AIA Executive Board for the athlete's participation in sex-segregated activities consistent with the student's gender identity.

41.9.4   **SECOND LEVEL OF APPEAL**
Per AIA Bylaws 15.13.2 in all other cases, a member school may appeal on behalf of a student his/her ineligibility by notifying the Executive Board of the appeal in writing, setting out fully and completely the basis for the appeal. The Executive Board, utilizing the authority under AIA Bylaw 7.2.3.7, shall respond in writing within a reasonable time.

**SA118**

1  Colin Proksel (034133)
   OSBORN MALEDON, P.A.
2  2929 North Central Avenue, 21st Floor
   Phoenix, Arizona 85012-2793
3  State Bar No. 034133
   Telephone:    (602) 640-9000
4  Facsimile:    (602) 640-9050
   Email:        cproksel@omlaw.com
5
   *Attorney for Plaintiffs*
6  *Additional counsel listed on the following page*

7

8              **UNITED STATES DISTRICT COURT**
               **FOR THE DISTRICT OF ARIZONA**
9                    **TUCSON DIVISION**

10

11 | Jane Doe, by her next friend and parents | Case No. 4:23-cv-00185-JGZ |
   | Helen Doe and James Doe; and Megan Roe, | |
12 | by her next friend and parents, Kate Roe and | **REBUTTAL DECLARATION OF DR.** |
   | Robert Roe, | **STEPHANIE BUDGE, PH.D., IN SUPPORT** |
13 | | **OF MOTION FOR PRELIMINARY** |
   |                    Plaintiffs, | **INJUNCTION** |
14 |           v. | |
15 | Thomas C. Horne in his official capacity as | |
   | State Superintendent of Public Instruction; | |
16 | Laura Toenjes, in her official capacity as | |
   | Superintendent of the Kyrene School | |
17 | District; Kyrene School District; The | |
   | Gregory School; and Arizona Interscholastic | |
18 | Association Inc., | |
19 |                    Defendants. | |

20

21

22

23

24

25

26

27

28

Jyotin Hamid*
Justin R. Rassi*
Amy C. Zimmerman*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: jhamid@debevoise.com
Email: jrassi@debevoise.com
Email: azimmerman@debevoise.com

Amy Whelan*
Rachel Berg*
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 343-7679
Facsimile: (415) 392-8442
Email: rberg@nclrights.org
Email: awhelan@nclrights.org

*Admitted pro hac vice.

**SA120**

I, Stephanie Budge, declare as follows:

1.     I submit this expert declaration based on my personal knowledge.

2.     If called to testify in this matter, I would testify truthfully based on my expert opinion.

3.     In preparing this declaration, I reviewed the expert declaration submitted by Dr. James Cantor, Ph.D. in support of the Proposed Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction. As with my prior expert declaration in this matter, I also relied on my scientific education and training, my research experience, and my knowledge of the scientific literature in the pertinent fields.

4.     The materials I have relied upon in preparing this declaration are the same types of materials that experts in my field of study regularly rely upon when forming opinions on these subjects. I may wish to supplement these opinions or the bases for them as the result of new scientific research or publications in response to statements and issues that may arise in my area of expertise.

5.     My understanding is that this case is a legal challenge to Ariz. Rev. Stat. § 15-120.02, which prohibits transgender girls from participating in school sports.

6.     Dr. Cantor asserts that my claims about transgender youth and their medical care are based solely on my clinical experience. (Cantor Decl. ¶ 153.) That is not true. In addition to my years of clinical experience, I rely on the APA's DSM-5-TR, the World Professional Association for Transgender Health (WPATH) Standards of Care, the Endocrine Society Clinical Practice Guidelines, and the literature cited in those sources as well as the additional research and literature cited in my declarations in this case. As mentioned in my initial declaration, WPATH is an international association of medical and mental health professionals worldwide specializing in the treatment of gender diverse people. The WPATH-promulgated Standards of Care are the internationally recognized guidelines for the treatment of persons with gender dysphoria and inform medical treatment throughout the world and have been endorsed by the American Academy of Child and Adolescent Psychiatry, the American Academy of Pediatrics, the American

3

**SA121**

1  Psychological Association, the American Psychiatric Association, and the American

2  Medical Association, among many other professional medical and mental health

3  organizations.

### Dr. James Cantor does not have the level of expertise required to provide expert opinions regarding the issues raised in my initial declaration

6        7.     There are several reasons why Dr. Cantor does not have the level of

7  expertise to provide expert opinions regarding the issues discussed in my declaration. As

8  part of his introduction, Dr. Cantor mentions his prior association with academic journals

9  and as a member of the American Psychological Association ("APA"). Dr. Cantor has

10  never been on a review board or an editor of a journal that specializes in transgender

11  health, but instead on journals that focus on sexuality, sexual behavior, and sexual abuse;

12  it is also notable that he is no longer in these positions.[1] As well, Dr. Cantor mentions his

13  experience being the chair for the Committee for Science Issues for the American

14  Psychological Association but fails to mention that this was 20 years ago (2002-2003)

15  when the field of transgender science was barely emerging.[2] I have been a member of the

16  LGBT Division of the APA since 2006 and I have never heard anyone in the division or

17  in the greater APA indicating Dr. Cantor's expertise related to transgender issues. As a

18  scholar in the field, I regularly attend transgender-focused academic conferences and

19  larger conferences relating to mental health issues (such as the APA convention). I have

20  never seen Dr. Cantor present at those conferences on any issues relating to transgender

21  health nor have I seen his name listed regarding transgender health on any of the

22  scientific programming at any conference I have attended. In fact, his conference

23  presentations and journal publications primarily focus on pedophilia, sex offenders, and

24

25  [1]   In contrast, I am an associate editor for the *Psychology of Sexual Orientation and*

26  *Gender Diversity* and on the editorial board of two transgender-centered academic journals (*International Journal of Transgender Health* and *LGBTQ+ Family: An*

27  *Interdisciplinary Journal*).

28  [2]   In contrast, I was the co-chair of the same committee from 2011-2021 and am a current member of the committee.

4

**SA122**

1    hypersexuality, with only three presentations mentioning transgender people and four

2    publications mentioning transgender people (three of which were not research).

3         8.    Dr. Cantor downplays the importance of clinical expertise in his

4    declaration, yet he opines on the role that psychotherapy can play in addressing gender

5    dysphoria. It is notable that there is no mention in Dr. Cantor's declaration that he has

6    ever treated a minor with gender dysphoria. In addition, when mentioning his

7    professional expertise, he does not provide any information that he has ever diagnosed a

8    child or adolescent with gender dysphoria, nor does it seem that he has ever monitored or

9    supervised any minor patient receiving gender affirming treatment.

10        **Forcing Transgender Girls to Play on Boys' Teams Is Harmful to Them**

11        9.    Dr. Cantor appears to suggest that transgender girls can play on boys'

12   teams. (Cantor Decl. ¶ 158.) In my initial declaration, I discussed how that would be

13   harmful to transgender girls. Moreover, laws that require transgender girls to participate

14   on a boys' team will put a child who looks, acts, and for years may have been known

15   only as a female student, in the spotlight by requiring them to be on a boys' team, thereby

16   inviting unwanted visibility and attention, putting the student at risk of bullying and

17   discrimination, and causing the student to fear harassment and to feel isolated and

18   stigmatized due to the negation of their identity. Clark and Kosciw (2022) have found

19   that transgender students avoid sports when they cannot play on teams consistent with

20   their gender identity.[3]

21        10.   Dr. Cantor further appears to suggest that excluding transgender girls from

22   playing school sports is not psychologically damaging. (*See* Cantor Decl. ¶ 159.) This is

23   not true. As discussed in my initial declaration, there is a broad consensus among

24   healthcare providers working with transgender youth that laws restricting transgender

25   students' participation in school sports will have severe negative consequences for the

26

27   [3]   Caitlin M. Clark & Joseph G. Kosciw, *Engaged or excluded: LGBTQ youth's
     participation in school sports and their relationship to psychological well-being*, 1
28   Psychology in Schs. 95 (2022).

5

**SA123**

1   health and wellbeing of transgender youth.[4]

2       11.    Dr. Cantor further criticizes several sources I cite in my initial declaration

3   because they involve surveys of physicians. (Cantor Decl. ¶¶ 161–63.) However, as noted

4   below, this is not an issue on which randomized controlled trials would be ethically

5   permissible, and surveys of this type provide a valuable and widely accepted source of

6   information, particularly when multiple studies arrive at similar results.

7       12.    Dr. Cantor further criticizes my initial declaration because it did not address

8   the biological differences between males and females and competitive fairness of

9   transgender girls competing on girls' teams. (Cantor Decl. ¶ 163.) However, as a mental

10   health professional, I do not have expertise in these areas and therefore will not provide

11   an expert opinion on them.

12       **Dr. Cantor's Criticisms of the Standards of Care Are Not Well-Founded**

13       13.    Dr. Cantor spends much of his declaration criticizing the well-established

14   international standards of care for transgender youth. For the reasons stated below, Dr.

15   Cantor's criticisms lack merit and represent an outlier view that is not supported by

16   medical science or best practices in the provision of medical care.

17       14.    Contrary to Dr. Cantor's unsupported claim that these standards lack a

18   sufficient evidentiary basis, WPATH and the Endocrine Society developed these

19   standards for treating gender dysphoria in minors using the same evidence-based

20   approach used to develop standards of care and practice guidelines for the treatment of

21   many other medical conditions. As explained in the most recent edition of WPATH's

22   Standards of Care:

23               Recommendations in the SOC-8 are based on available evidence
            supporting interventions, a discussion of risks and harms, as well as

24               feasibility and acceptability within different contexts and country
            settings. Consensus on the final recommendations was attained using

25               the Delphi process that included all members of the guidelines

26

27        ――――――――――
[4]    Landon D. Hughes, et al., *Pediatric Provider Perspectives on Laws and Policies*

28       *Impacting Sports Participation for Transgender Youth*, 9 LGBT Health 247 (2022).

**SA124**

committee and required that recommendation statements were approved by at least 75% of members.[5]

15.    Similarly, the Endocrine Society's "evidence-based guideline was developed using the Grading of Recommendations, Assessment, Development, and Evaluation approach to describe the strength of recommendations and the quality of evidence. The task force commissioned two systematic reviews and used the best available evidence from other published systematic reviews and individual studies."[6]

16.    Dr. Cantor falsely states that multiple international health care systems that had initially adopted medical transition for transgender youth have reversed that policy because of research on the safety and effectiveness of that treatment. In fact, none of the countries Dr. Cantor discusses—the United Kingdom, Sweden, Finland, Norway, and France—ban either puberty blockers or hormones for transgender adolescents. Similarly, none of the international reports that Dr. Cantor cites is a clinical practice guideline, and none recommends banning medical care for transgender youth. Rather, the primary focus of concern in these countries is improving the delivery of services and quality of care, including ensuring that providers adhere to the standards of care and provide medical treatments only after careful evaluation and assessment.

17.    For example, Dr. Cantor cites a report by Dr. Hilary Cass (2022), which reviewed the delivery of care to transgender youth in England and identified problems related to the centralization of care in a single facility. Dr. Cantor fails to note that this report concludes by recommending that England create *more* centers for providing this care and that providers follow the Endocrine Society Guidelines when providing

---

[5]    Coleman, E., et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, International Journal of Transgender Health, 23(S1), S8 (2022).

[6]    Wylie C Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, Journal of Clinical Endocrinology & Metabolism 102(11) 3874 (2017).

SA125

1   hormone therapy.[7]

2   **Dr. Cantor's View that Transgender Youth Are Mentally Ill and Should Not**

3   **be Given Supportive Medical Care or Permitted to Transition Is Not Well-**

4   **Founded**

5       18.    In addition to lacking a sound foundation, Dr. Cantor fails to explain how

6   his criticisms of the standards of care for treating gender dysphoria in youth are relevant

7   to what I understand to be the central issue in this case: whether Plaintiffs, who are

8   transgender girls, should be able to participate and compete on girls' sports teams.

9   Although it is not entirely clear, Dr. Cantor appears to believe that banning transgender

10  girls from girls' teams is appropriate because, in his view, minors who are diagnosed with

11  gender dysphoria should be required to live in accordance with their sex assigned at birth

12  and should not be permitted to transition either socially or through medications. Instead,

13  Dr. Cantor appears to believe these minor patients should be given counseling to prevent

14  them from identifying as transgender, based on his view that gender dysphoria in minors

15  is a manifestation of some other mental health condition, such as borderline personality

16  disorder. (Cantor Decl. ¶ 122 (advancing the "hypothesis that mental health issues, such

17  as Borderline Personality Disorder (BPD), cause both suicidality and unstable identity

18  formation (including gender identity confusion).")

19      19.    Dr. Cantor's views on this topic have no scientific basis and contradict the

20  medical consensus that some youth are in fact transgender, and that gender dysphoria in

21  minors is a real and distinct medical condition, not a manifestation of "gender identity

22  confusion" caused by other "mental health issues." (*Id.*) There is no basis for Dr. Cantor

23  to claim that patients who have borderline personality disorder are regularly being

24  misdiagnosed with gender dysphoria. None of the studies he cites for this proposition

25  involve transgender youth and there are no studies that support Dr. Cantor's claims

26

27  [7]   Cass, H. *The Cass Review: Independent Review of Gender Identity Services for*

28  *Children and Young People Interim Report*, National Health Service (NHS), UK
    (2022).

8

**SA126**

1    regarding this link.

2         20.    Dr. Cantor's views also contradict the medical consensus that counseling

3    designed to encourage or compel transgender youth to live in accordance with their sex

4    assigned at birth is as ineffective, unethical, and harmful as other types of conversion

5    therapy. As explained in the WPATH Standards of Care:

6         Activities and approaches (sometimes referred to as "treatments")
          aimed at trying to change a person's gender identity and expression
7         to become more congruent with the sex assigned at birth have been
          attempted, but these approaches have not resulted in changes in
8         gender identity (Craig et al., 2017; Green et al., 2020). We
          recommend against such efforts because they have been found to be
9         ineffective and are associated with increases in mental illness and
          poorer psychological functioning (Craig et al., 2017; Green et al.,
10        2020; Turban, Beckwith et al., 2020).[8]

11        21.    Dr. Cantor rejects the use of the term "conversion therapy" when applied to

12   transgender minors, claiming that the research on conversion therapy has exclusively

13   addressed sexual orientation and that its results cannot be extrapolated to gender identity.

14   (Cantor Decl. ¶ 147.) Dr. Cantor's view on this issue has no scientific basis and diverges

15   from the consensus of all major professional associations of medical and mental health

16   providers in the United States that efforts to change a person's gender identity or gender

17   expression are ineffective and harmful.

18        22.    For example, the WPATH Standards of Care explain:

19        Much of the research evaluating 'conversion therapy' and
          'reparative therapy' has investigated the impact of efforts to change
20        gender expression (masculinity or femininity) and has conflated
          sexual orientation with gender identity (APA, 2009; Burnes et  al.,
21        2016; Craig et  al., 2017). Some of these efforts have targeted both
          gender identity and expression (AACAP, 2018).
22        Conversion/reparative therapy has been linked to increased anxiety,
          depression, suicidal ideation, suicide attempts, and health care
23        avoidance (Craig et al., 2017; Green et al., 2020; Turban, Beckwith
          et  al., 2020).[9]
24

25        23.    Similarly, the American Academy of Child and Adolescent Psychiatry has

26   _____

[8]  Coleman, E., et al., *Standards of Care for the Health of Transgender and Gender*
27   *Diverse People, Version 8*, International Journal of Transgender Health, 23(S1), S8
     (2022).
28   [9]  *Id.* at S53.

9

**SA127**

1    noted:

2          [B]ased on the scientific evidence, the AACAP asserts that such
           "conversion therapies" (or other interventions imposed with the
3          intent of promoting a particular sexual orientation and/or gender as a
           preferred outcome) lack scientific credibility and clinical utility.
4          Additionally, there is evidence that such interventions are harmful.
           As a result, "conversion therapies" should not be part of any
5          behavioral health treatment of children and adolescents.[10]

6          24.    Likewise, the American Psychological Association stated:

7          [T]he incongruence between sex and gender in and of itself is not a
           mental disorder so, any behavioral health or [Gender Identity
8          Change Efforts (GICE)] technique or treatment that seeks to change
           an individual's gender identity or expression is not indicated; thus,
9          any behavioral health or GICE effort that attempt to change an
           individual's gender identity or expression is inappropriate.
10

11         . . . .

12         [T]he APA, because of evidence of harm and lack of
13         evidence of efficacy, supports public policies and legislation
           that prohibit, or aim to reduce GICE.[11]
14

15         25.    In 2023, the Substance Abuse and Mental Health Services Administration

16   published a comprehensive review of existing literature on therapeutic efforts to change a

17   child's gender identity or gender expression and found:

18         No research has demonstrated that gender identity change efforts are
           effective in altering gender identity; there is also no evidence of any
19         benefits of such practices to children, adolescents, or their families.
           Recent large, methodologically sound studies have investigated
20         harms associated with gender identity change efforts. These studies
           indicate that exposure to gender identity change efforts—in
21         childhood, adolescence, and/or adulthood—is associated with harm,

22

23

24

---

25   [10]   The AACAP Policy on "Conversion Therapy" (2018), *available at*,
         https://www.aacap.org/aacap/Policy_Statements/2018/Conversion_Therapy.aspx
26       (last visited May 22, 2023).

27   [11]   Am. Psychological Ass'n, APA on Gender Identity Change Efforts at 1, 3 (2021),
         *available at*, https://www.apa.org/about/policy/resolution-gender-identity-change-
28       efforts.pdf (last visited May 22, 2023).

**SA128**

1    including suicidality, suicide attempt, and other negative mental
     health outcomes such as severe psychological distress.[12]

2    26.   It is also my clinical experience that psychotherapy is not effective as the

3    sole treatment for individuals who need to socially transition and who need medical

4    changes to their bodies to reduce gender dysphoria. I have often worked with individuals

5    diagnosed with gender dysphoria who have financial barriers that do not allow them to

6    receive medical treatments. I have also provided psychotherapy to transgender

7    adolescents who experienced interpersonal barriers to social and medical transition.

8    While psychotherapy can assist these patients with coping on a day-to-day basis, many of

9    these patients experience significant distress from delays in social and medical transition

10   and psychotherapy alone does not alleviate their dysphoria. Clinically, I see extremely

11   high rates of suicidal ideation and suicidal intent with patients who have barriers to social

12   and medical transitioning. I have assisted several of these patients with obtaining

13   inpatient care to ensure that they do not die by suicide (which is costly and usually only

14   provides a short-term solution to their immediate distress). As noted in my previous

15   declaration, delaying the transition process can be detrimental for transgender youth, with

16   early recommendations noting the importance of not delaying a gender dysphoria

17   diagnosis and treatments (including social transition) that are most appropriate for the

18   youth[13] and more recent articles noting the immense harms from delaying treatment (de

19   Vries et al., 2021).[14] In sum, Dr. Cantor's view that minors with gender dysphoria should

20   not be permitted to transition and should be counseled to live in their sex assigned at birth

21   contradicts a long-standing and well-established consensus opposing such practices as

22   _____

23   [12]   Substance Abuse and Mental Health Services Administration (SAMHSA), *Moving Beyond Change*, Pages 26-27, *available at*, https://store.samhsa.gov/sites/default/files/pep22-03-12-001.pdf (2023).

24   [13]   Edwards-Leeper, L., & Spack, N. P., *Psychological evaluation and medical treatment of transgender youth in an interdisciplinary "Gender Management Service"(GeMS) in a major pediatric center*, *Journal of Homosexuality*, *59*(3), 321-336 (2012).

27   [14]   de Vries, A. L. C., et al., *Weighing current knowledge and uncertainties in decisions about gender-related treatment for transgender adolescents*, International Journal of Transgender Health, 22, 217-224 (2021).

28

11

**SA129**

ineffective and harmful.[15]

27.    Dr. Cantor similarly disputes that "gender identity is well-established in psychology and medicine"—pointing to a statement taken out of context in the DSM-5-TR. (Cantor Decl. ¶ 155.) In fact, as noted in my prior declaration, gender identity is a well-established term in psychology and medicine that has been in use for decades. It is defined in the DSM-5-TR, which explains: "Gender identity is a category of social identity and refers to an individual's identification as male, female, some category in between (i.e., gender fluid), or a category other than male or female (i.e., gender neutral)." It is a central component of gender dysphoria, which is the distress caused when a person's gender identity diverges from their assigned sex at birth.[16] Gender

---

[15] *See, e.g.*, Am. Coll. of Physicians, *Lesbian, Gay, Bisexual, and Transgender Health Disparities: A Policy Position Paper from the American College of Physicians*, 163 Annals of Internal Medicine (2015); Am. Counseling Ass'n, *Resolution on Reparative Therapy/Conversion Therapy/Sexual Orientation Change Efforts (SOCE) as a Significant and Serious Violation of the ACA Code of Ethics* (2017), *available at*, https://www.counseling.org/docs/default-source/resolutions/reparative-therapy-resolution-letter--final.pdf?sfvrsn=d7ad512c_4 (last visited May 22, 2023); Am. Medical Ass'n & GLMA, *Issue Brief: Sexual orientation and gender identity change efforts (so-called "conversion therapy")* (2022), *available at*, https://www.ama-assn.org/system/files/conversion-therapy-issue-brief.pdf (last visited May 22, 2023); Am. Psychiatric Ass'n, *Position Statement on Conversion Therapy and LGBTQ Patients* (2018), *available at*, https://www.psychiatry.org/getattachment/3d23f2f4-1497-4537-b4de-fe32fe8761bf/Position-Conversion-Therapy.pdf (last visited May 22, 2023); Nat'l Ass'n of Social Workers, Sexual Orientation Change Efforts (SOCE) and Conversion Therapy with Lesbians, Gay Men, Bisexuals, and Transgender Persons (2015), *available at*, https://www.socialworkers.org/LinkClick.aspx?fileticket=yH3UsGQQmYI%3D (last visited May 22, 2023); Jason Rafferty, *American Academy of Pediatrics Policy Statement: Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics (2018); Society for Adolescent Health & Medicine, Position Paper: Recommendations for Promoting the Health and Well-being of Sexual and Gender–diverse Adolescents Through Supportive Families and Affirming Support Networks, 70 J. Adolescent Health (2022).

[16] Coleman, E., et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, International Journal of Transgender Health, 23(S1), S59 (2022) ("Compared with the earlier version, the DSM-5 replaced gender identity disorder with gender dysphoria, acknowledging the distress experienced by some

---

SA130

1  identity is also discussed at length in the WPATH Standards of Care, the Endocrine

2  Society Practice Guidelines, and a large body of medical literature.[17]

3      28.    Dr. Cantor uses outdated, inaccurate, and narrow definitions of sex. Dr.

4  Cantor mentions that sex can only be determined either by "visual inspection" or

5  "chromosomes." There are several significant flaws to this outdated argument, the first

6  being that major medical and psychological associations agree that sex is multifaceted,

7  comprising of chromosomes, hormones, internal and external genitalia, secondary sex

8  characteristics, and gender identity (e.g., American Academy of Pediatrics, 2018;

9  American Psychological Association, 2014; American Psychological Association, 2021;

10  American Psychiatric Association, 2017; American Medical Association, 2018).[18]

11      29.    To be more specific, American Medical Association Board member Dr.

12  William Kobler has explained: "Sex and gender are more complex than previously

13  assumed. It is essential to acknowledge that an individual's gender identity may not align

14  with the sex assigned to them at birth. A narrow limit on the definition of sex would have

15  public health consequences for the transgender population and individuals born with

16        people stemming from the incongruence between experienced gender identity and the

17        sex assigned at birth.").

  [17]  Dr. Cantor criticizes my prior declaration for citing the DSM-5 rather than the

18        updated DSM-5-TR for the meaning of gender dysphoria. (Cantor Decl. ¶ 154.)
      However, the DSM-5-TR also fully supports my statements in that paragraph.

19    [18]  *See, e.g.*, Rafferty, J. et al., *Ensuring comprehensive care and support for transgender

20        and gender-diverse children and adolescents*, Pediatrics, 142(4) (discussing the
      American Academy of Pediatrics) (2018); American Medical Association, *AMA*

21        *Adopts New Policies at 2018 Meeting* (2018), *available at* https://www.ama-
      assn.org/press-center/press-releases/ama-adopts-new-policies-2018-interim-meeting

22        (last accessed on May 27, 2023); American Psychiatric Association, *Definitions of

23        Gender, Sex, Sexual Orientation, and Pronoun Usage* (2017), *available at*
      https://www.psychiatry.org/psychiatrists/diversity/education/transgender-and-gender-

24        nonconforming-patients/definitions-and-pronoun-usage (last accessed on May 27,

25        2023); American Psychological Association, *Answers to your questions about
      transgender people, gender identity, and gender expression* (2014), *available at*

26        http://www.apa.org/topics/lgbt/ transgender.aspx (last accessed on May 27, 2023);
      American Psychological Association, *APA Resolution on Gender Identity Change*

27        *Efforts* (2021), available at https://www.apa.org/about/ policy/resolution-gender-

28        identity-change-efforts.pdf (last accessed on May 27, 2023).

**SA131**

differences in sexual differentiation, also known as intersex traits" (AMA, 2018). The second is that visual inspection is inherently flawed regarding determination—for example, if a non-transgender man sustains injuries to his genitals to make them unrecognizable, that would mean that his sex is undeterminable. Similarly, in the past, babies with intersex conditions that influence their genitals typically had medical providers decide the sex of the baby, usually deciding female since those genitals were easier to reconstruct (Carpenter 2016).[19] Chromosomes are not limited to XX and XY and thus cannot also be deemed as the only major way to determine one's sex. Given that there are biological changes that occur with hormone therapy and gender affirming surgeries, relying solely on one aspect of sex determined in utero is outdated.[20]

30.    In his report, Dr. Cantor contends that the terminology "sex assigned at birth" should not be used. His arguments are grounded in a false and narrow definition of what sex is. As well, "sex assigned at birth" is the terminology that is used by the major medical and psychological organizations when referring to infants being labeled as male or female at birth (see American Academy of Pediatrics, 2018; American Psychological Association, 2014; American Psychological Association, 2021; American Psychiatric Association, 2017; American Medical Association, 2018). In addition to this terminology being the primary terminology that is used in by these organizations, this is also reflected in the field in academic publications and presentations. For example, in March 2023, in the *Journal of Adolescent Health*, Tabb and colleagues published an article titled "The Role of Caregiver Acceptance and Sex Assigned at Birth on Depression Among Gender-diverse Youth."[21] A google scholar search of the terms "sex assigned at birth" and

---

[19]   Carpenter, M., *The human rights of intersex people: Addressing harmful practices and rhetoric of change*, Reproductive Health Matters, 24(47), 74-84 (2016).

[20]   Coleman, E., et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, International Journal of Transgender Health, 23(S1) (2022).

[21]   Tabb, A. et al., *The Role of Caregiver Acceptance and Sex Assigned at Birth on Depression Among Gender-diverse Youth*, Journal of Adolescent Health, 72(3), S18 (2023).

14

1    "assigned sex at birth" elicited 1,959 results for articles published in 2023 alone.

2         31.    Dr. Cantor also incorrectly claims that gender identity is not innate and has

3    no biological foundation. (Cantor Decl. ¶ 157.) This is false. There is consensus among

4    professional organizations that one's gender identity cannot be changed and it is a

5    "deeply felt, inherent sense" (e.g., American Psychological Association, 2021).[22] As the

6    Endocrine Society Clinical Practice Guidelines for Endocrine Treatment of Gender-

7    Dysphoric Persons explain: "although there is much that is still unknown with respect to

8    gender identity and its expression, compelling studies support the concept that biologic

9    factors, in addition to environmental factors, contribute to this fundamental aspect of

10   human development."[23]

11        32.    To support his view that minors should not be permitted to transition, Dr.

12   Cantor claims that "among prepubescent children who feel gender dysphoric, the

13   majority cease to want to be the other gender over the course of puberty." (Cantor Decl.

14   ¶¶ 67-70.) The studies that are cited to promote this argument: a) are often

15   misunderstood, and b) have significant flaws in their design. In these studies, both

16   children who did not have gender dysphoria and children who did not identify as

17   transgender were included in the analyses because they exhibited behaviors that did not

18   conform to gender norms. Therefore, the concept of gender dysphoria being "outgrown"

19   does not make sense for the vast majority of these children since they did not have gender

20   dysphoria to begin with. All of these studies used criteria for diagnosing gender identity

21   disorder that focused mainly on behaviors (and not identity) and had less specific criteria

22   for distinguishing those with the disorder from other children. The current DSM-5-TR

23   (American Psychiatric Association, 2022) gender dysphoria criteria require that

24

25   [22]  American Psychological Association, *APA Resolution on Gender Identity Change
         Efforts* (2021), *available at* https://www.apa.org/about/policy/resolution-gender-
26       identity-change-efforts.pdf (last accessed May 26, 2023).

27   [23]  Wylie C Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-
         Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, Journal of
28       Clinical Endocrinology & Metabolism 102(11) 3874, 3875 (2017).

**SA133**

1   children/adolescents identify with a gender that is different from their assigned gender for

2   at least six months, which was not the case for any of the studies that are cited to indicate

3   whether or not a youth will identify experience gender dysphoria in the future (*see*

4   Temple Newhook et al. (2018) for a comprehensive review of the data).[24]

5         33.    Steensma & Cohen-Kettinis (2018) agree that their data have been cited

6   incorrectly to support the purportedly low persistence rates and have stated that their

7   "studies cannot be used to support" the persistence estimation, in that they never

8   calculated or reported rates of persistence/desistence.[25] They also note that the negative

9   social climate for transgender children and adolescents should be taken into account

10  when reading the data. They further state that their data did not actually reflect gender

11  dysphoria in children and "expect that future follow up studies using the new diagnostic

12  criteria may find higher persistence rates."[26] Finally, they indicate that the terms

13  "desistence" and "persistence" have been misused; they state that when they were

14  researching youth, there were many youth who may have been "hesitating, searching,

15  fluctuating, or exploring" and that those youth have been misclassified as desisting."[27]

16        34.    Today, based on current scientific knowledge and clinical practice,

17  researchers and clinicians are much better equipped to differentiate transgender from

18  non-transgender children and adolescents. As the Endocrine Society Practice Guidelines

19  explain: "It may be that children who only showed some gender nonconforming

20  characteristics have been included in the follow-up studies, because the DSM-IV text

21  revision criteria for a diagnosis were rather broad . . . With the newer, stricter criteria of

22

23

---

24  [24]   Temple Newhook, J., Pyne, J., et al., *A critical commentary on follow-up studies and*
25  *"desistance" theories about transgender and gender-nonconforming children*,
    International Journal of Transgenderism, 19, 212-224 (2018).
26  [25]   Steensma, T. D., & Cohen-Kettenis, P. T., *A critical commentary on follow-up studies*
    *and "desistence" theories about transgender and gender non-conforming*
27  *children*, International Journal of Transgenderism, 19, 225-230 (2018).
    [26]   *Id.* at 226.
28  [27]   *Id.* at 227.

**SA134**

1    the DSM-5, persistence rates may well be different in future studies."[28]

2        35.    Dr. Cantor does not dispute that minors whose transgender identification

3    persists into adolescence are likely to continue to identify as transgender as adults. As

4    recent studies have shown, for "transgender adolescents who, following careful

5    assessment, receive medical necessary gender-affirming medical treatment," "rates of

6    reported regret…are low."[29]

7        **The Medical Treatments for Transgender Youth are Safe and Effective**

8        36.    Dr. Cantor claims that there is insufficient evidence to support the safety or

9    efficacy of medical treatments for gender dysphoria in minors. (Cantor Decl. ¶ 39.) In

10   fact, as both WPATH and the Endocrine Society have concluded based on

11   comprehensive reviews of all existing data, the safety and efficacy of medical treatments

12   for transgender adolescents with gender dysphoria are well-supported. For example, the

13   WPATH Standards of Care concludes that: "Taken as a whole, the data show early

14   medical intervention—as part of broader combined assessment and treatment approaches

15   focused on gender dysphoria and general well-being—can be effective and helpful for

16   many transgender adolescents seeking these treatments."[30] These Standards of Care also

17   include an extensive discussion of the potential benefits and risks of puberty blockers and

18   hormone therapy and the need for providers to consider "the potential physical and

19   psychological benefits and risks of starting treatment with the potential risks and benefits

20   of delaying treatment."[31]

21       37.    Dr. Cantor's claim rests on false or misleading assumptions.  For example,

22   he notes that randomized controlled trials provide the strongest evidence of safety and

---

[28]  Wylie C Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, Journal of Clinical Endocrinology & Metabolism 102(11) 3876 (2017).

[29]  Coleman, E., et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, International Journal of Transgender Health, 23, (S47) (2022).

[30]  *Id.*

[31]  *Id.* at S66.

17

1    efficacy and suggests that the evidence supporting transitioning medications for
2    transgender minors is deficient because it is not based on such trials. (Cantor Decl. ¶ 44.)
3    That criticism has no scientific merit and contradicts fundamental ethical and scientific
4    principles that guide medical knowledge and practice. While randomized controlled trials
5    provide the highest quality of evidence in many contexts, management of gender
6    dysphoria in minors is not ethically amenable to randomized controlled trials. Because
7    there is already substantial evidence that puberty blockers and hormone therapy benefit
8    transgender minors, it would be unethical to propose a study randomly assigning some
9    patients to these treatments and some to a placebo.[32] Deutsch et al. (2016) state that
10   randomizing transgender people to receive or not receive hormone therapy or surgery
11   violates the principle of equipoise (true scientific uncertainty about whether an
12   intervention will help the individual); there are ethical ways to conduct RCTs (randomly
13   controlled trials) with transgender youth and adults, however, these studies would be
14   focused on schedules and delivery modes of treatment, and not on whether or not the
15   treatment is effective. Non-transgender youth receive pubertal suppression treatments and
16   hormone therapy treatments for a host of medical disorders and are considered safe and
17   effective (albeit with side effects, as medical treatments typically have). Given the ethical
18   considerations and bodies of existing evidence, researchers in this field must rely on other
19   types of study design, such as longitudinal cohort studies, which monitor changes in
20   symptoms over the course of treatment,[33] or cross-sectional studies comparing treated and
21   untreated persons.[34]

22

23   [32]  Deutsch, M. B., Radix, A., & Reisner, S., *What's in a guideline? Developing*
24   *collaborative and sound research designs that substantiate best practice*
25   *recommendations for transgender health care*, AMA Journal of Ethics, 18(11), 1098
     (2016).
26   [33]  de Vries A.L.C., et al., *Young adult psychological outcome after puberty suppression*
     *and gender reassignment*, Pediatrics 2014 Oct;134(4):696-704.
27   [34]  Turban J.L., et al., *Access to gender-affirming hormones during adolescence and*
28   *mental health outcomes among transgender adults*, PLoS One 17(1):e0261039
     (2022).

18

**SA136**

38.    Studies have repeatedly documented that puberty blocking medication and hormone therapy are associated with mental health benefits for transgender people in both the short and long term, including a dramatically reduced rate of suicidality.[35]

**The Medical Treatments for Transgender Youth Reduce Suicidality and Suicide**

39.    Dr. Cantor asserts that there is no evidence that medicalized transition significantly reduces rates of suicide or suicidality among transgender youth. (Cantor Decl. ¶ 117.) As discussed above, that is untrue.

40.    Dr. Cantor cites Dhejne (2011) for the proposition that undergoing sex-

---

[35] *See, e.g.*, Tordoff, D.M., et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, Jama Network Open, 5(2):e220978 at 1 (2022) (finding that receipt of medical care, including puberty blockers and gender-affirming hormones, was associated with 60% lower odds of moderate or severe depression and 73% lower odds of suicidality over a 12-month follow-up); Green, A.E., et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, J. Adolesc. Health [ePublication ahead of print] at 1 (2021) (finding that access to hormone therapy during adolescence was associated with lower odds of recent depression and having attempted suicide in the past year); Turban, J.L., et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, Pediatrics 145(2):e20191725 at 1 (2020) (finding that access to puberty blockers during adolescence is associated with a decreased lifetime incidence of suicidal ideation among adults); Achille, C., et al., *Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: Preliminary results*, Int'l J. Pediatric Endocrinology 2020:8 at 1 (2020) (finding that endocrine intervention was associated with decreased depression and suicidal ideation and improved quality of life for transgender youth); Kuper, L.E., et al., *Body Dissatisfaction and Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy*, Pediatrics 145(4):e20193006 at 1 (2020) (showing hormone therapy in youth is associated with reducing body dissatisfaction and modest improvements in mental health); van der Miesen, A.I.R., et al., *Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared with Cisgender General Population Peers*, J. Adolesc. Health 66(6):699-704 (2020) (showing fewer emotional and behavioral problems after puberty suppression and similar or fewer problems compared to same-age non-transgender peers); Costa, R., et al., *Psychological Support, Puberty Suppression, and Psychosocial Functioning in Adolescents with Gender Dysphoria*. J. Sexual Medicine 12(11):2206-14 at 2206 (2015) (finding increased psychological function after six months of puberty suppression).

reassignment surgery does not decrease suicidality among transgender adults.  (Cantor Decl. ¶ 118.) Dr. Cantor's claim misrepresents the data from Dr. Dhejne's study, which found that suicide rates are higher among transgender people than the general population. The study did not compare treated versus untreated transgender women, as Dr. Cantor incorrectly suggests. Dr. Dhejne compared morbidity and mortality statistics from a national database of transgender people with those in the general Swedish population, and only made comparisons between these groups, not before and after surgery, or transgender women with surgery and without surgery. The study itself warns against drawing any conclusions regarding the effectiveness of surgery as a treatment for gender dysphoria: "For the purpose of evaluating whether sex reassignment is an effective treatment for gender dysphoria, it is reasonable to compare reported gender dysphoria pre and post treatment. Such studies have been conducted either prospectively or retrospectively and suggest that sex reassignment of transsexual persons improves quality of life and gender dysphoria."[36] Since the study was published, Dr. Dhejne has cautioned that interpretations like Dr. Cantor's are incorrect.[37]

41.    Dr. Cantor further opines that McNeil, et al. (2017) does not show that transition reduces suicidality among transgender youth. (Cantor Decl. ¶ 120.) In fact, the study concluded that "[d]iscrimination emerged as strongly related to suicidal ideation and attempts, whereas positive social interactions and timely access to interventions appeared protective." Bauer, et al. (2015), which Dr. Cantor erroneously cites for the proposition that social support is associated with increased suicide attempts, further supports that conclusion: "Our findings support a strong effect for social exclusion, discrimination and lack of medical transition (for those needing it) on suicide ideation

[36]    Dhejne, C. et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, PLOS One, 6(2):e16885, doi:10.1371/journal.pone.0016885 (2011).
[37]    Dhejne, C. H, *Science AMA Series: I'm Cecilia Dhejne a fellow of the European Committee of Sexual Medicine, from the Karolinska University Hospital in Sweden. I'm here to talk about transgender health, suicide rates, and my often misinterpreted study. Ask me anything!*, Winnower 10:e150124.46274 (2017).

SA138

1   and attempts, and potentially on the survival of trans persons." The WPATH Standards of
2   Care cite Bauer's study as evidence that "[a]ccess to gender-affirming medical treatment
3   is associated with a substantial reduction in the risk of suicide attempt."[38]

4        42.    Dr. Cantor also cites Canetto, et al. (2021) in support of his implausible
5   claim that providing social support to transgender youth is associated with *increased*
6   suicidal attempts. (Cantor Decl. ¶ 121.) The Canetto study did not include or address
7   transgender youth and does not support Dr. Cantor's claim.

8        43.    Dr. Cantor also places great weight on the fact that there is no research
9   showing that medical treatments for transgender youth reduce suicide as opposed to
10  reducing suicidality—apparently to support his opposition to providing transgender youth
11  with supportive treatment and care. But that argument is faulty for at least three important
12  reasons. First, the absence of data about how treatment impacts suicide as opposed to
13  suicidality largely reflects the difficulty of designing or undertaking such research. Dr.
14  Cantor misleadingly cites the Baker study as though its conclusion was that no positive
15  impact of treatment on suicide can be shown because none exists; in fact, the study found
16  only that it was impossible to answer the question because of "the difficulty of
17  identifying appropriate comparison groups and uncontrolled confounding factors."[39]

18       44.    Second, the harms caused by suicidality are themselves very serious. In a
19  recent systematic review of the impact of suicidal ideation, the harms directly associated
20  with suicidal thoughts are clear: a sense of loss of the self, lack of self-worth, low self-
21  esteem, loss of meaning in life, self-hatred, feelings of worthlessness, increased guilt, and
22  increased shame.[40] These experiences are incredibly painful. Even if suicidality and

23
24  [38]  Coleman, E., et al., *Standards of Care for the Health of Transgender and Gender
          Diverse People, Version 8*, International Journal of Transgender Health, 23(S1), S174
25        (2022).
26  [39]  Baker, K. E., et al., *Hormone Therapy, Mental Health, and Quality of Life Among
          Transgender People: A Systematic Review*, Journal of the Endocrine Society, Vol. 5,
27        Issue 4, 11-12 https://doi.org/10.1210/jendso/bvab011 (2021).
28  [40]  Søndergaard, R., et al., *Living with Suicidal Thoughts: A Scoping Review*,
          Scandinavian Journal of Caring Sciences, 37(1), 60-78 (2023).

SA139

1   suicide were not related, which they are, preventing suicidality alone would be a

2   compelling reason to provide medically needed care to transgender adolescents.

3       45.    And third, because suicide attempts and suicide *are* interrelated, a treatment

4   that reduces the former reduces the latter, even if current research designs cannot quantify

5   that impact precisely.[41] For example, a recent study found that transgender teens were 7.6

6   times as likely to attempt suicide as their non-transgender peers.[42] Providing medically

7   necessary care dramatically reduces the suicidality of transgender youth, including

8   reductions in suicide attempts. In one recent study of transgender youth under 18,

9   receiving hormone therapy was associated with nearly 40% lower odds of having had a

10  suicide attempt in the past year.[43] Given the relationship between suicide attempts and

11  suicide, there can be little doubt that receiving medically necessary care significantly

12  reduces suicide among transgender youth.

13      I declare under criminal penalty under the laws of Arizona that the foregoing is

14  true and correct.

15      Signed on the 31st day of May, 2023 in Madison, Wisconsin.

16

17  _____
    Stephanie Budge, Ph.D.

18

19

20

21

22

---

[41]  Jones, S.E., et al., *Mental Health, Suicidality, and Connectedness Among High School Students During the COVID-19 Pandemic—Adolescent Behaviors and Experiences Survey, United States, January-June 2021*, 71(Suppl-3):16-21 (2022), *available at*, https://www.cdc.gov/mmwr/volumes/71/su/su7103a3.htm.

[42]  Pelc, Corrie, *Transgender Teens 7.6 Times More Likely to Attempt Suicide*, Medical News Today, *available at*, https://www.medicalnewstoday.com/articles/transgender-teens-7-6-times-more-likely-to-attempt-suicide (last visited May 25, 2023).

[43]  Carlisle, Madeleine, *Gender-Affirming Hormone Therapy for LGBTQ Youth Can Help Save Lives, Study Finds*, Time, *available at*, https://time.com/6128131/gender-affirming-hormone-therapy-study/ (last visited May 25, 2023).

22

**SA140**

Colin Proksel (034133)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
State Bar No. 034133
Telephone:    (602) 640-9000
Facsimile:     (602) 640-9050
Email:           cproksel@omlaw.com

*Attorney for Plaintiffs*
*Additional counsel listed on the following page*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION**

| | |
|---|---|
| Jane Doe, by her next friend and parents Helen Doe and James Doe; and Megan Roe, by her next friend and parents, Kate Roe and Robert Roe, | Case No. 4:23-cv-00185-JGZ |
| Plaintiffs, | **REBUTTAL DECLARATION OF DANIEL SHUMER, M.D., IN FURTHER SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| Thomas C. Horne in his official capacity as State Superintendent of Public Instruction; Laura Toenjes, in her official capacity as Superintendent of the Kyrene School District; Kyrene School District; The Gregory School; and Arizona Interscholastic Association Inc., | |
| Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jyotin Hamid*
Justin R. Rassi*
Amy C. Zimmerman*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: jhamid@debevoise.com
Email: jrassi@debevoise.com
Email: azimmerman@debevoise.com

Amy Whelan*
Rachel Berg*
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 343-7679
Facsimile: (415) 392-8442
Email: rberg@nclrights.org
Email: awhelan@nclrights.org

*Admitted pro hac vice.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SA142**

I, Daniel Shumer, declare as follows:

      1.     I submit this expert declaration based on my personal knowledge.

      2.     If called to testify, I would testify truthfully based on my expert opinion.

      3.     In preparing this declaration, I reviewed the expert declarations submitted by Dr. Gregory A. Brown, Ph.D., Dr. James M. Cantor, Ph.D., and Dr. Chad Thomas Carlson, M.D., in support of Proposed Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction, as well as the expert declaration of Dr. Gregory A. Brown, Ph.D. in *Hecox v. Little*, 1:20-cv-00184 (D. Id. 2020), which is attached to Defendant Horne's Opposition to Plaintiffs' Motion for Preliminary Injunction.  As with my prior expert declaration, I relied on my scientific education and training, my research experience, and my knowledge of the scientific literature in the pertinent fields.  The materials I have relied on in preparing this declaration are the same types of materials that experts in my field of study regularly rely on when forming opinions on these subjects.  I may wish to supplement these opinions or the bases for them as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

## Dr. Brown's Declarations

**I.    Testosterone levels are the biological driver of performance differences in sports between males and females.**

      4.     Although Dr. Brown asserts that biological male physiology and anatomy is the basis for the performance advantage between males and females in athletic events (Brown Decl. at 5; Brown *Hecox* Decl. ¶ 11c),[1] the studies and findings discussed throughout Dr. Brown's declaration support the scientific consensus that the biological cause of average group differences in athletic performance between males and females is the rise in circulating levels of testosterone beginning in endogenous male puberty.

---

[1]   The "Brown Declaration" refers to the declaration the Proposed Intervenors submitted in this case.  (ECF No. 38-3.)  The "Brown *Hecox* Declaration" refers to the declaration Defendant Horne submitted in this case. (ECF No. 40-1.)

3

**SA143**

5.     Dr. Brown misrepresents the findings in several of the articles he cites to support his assertion that sex-based differences in sports are a result of male physiology and anatomy, without regard to the impact of the heightened level of testosterone associated with male puberty.   Contrary to what Dr. Brown says, McManus and Armstrong (2011) acknowledge that differences between prepubertal boys and girls in various measurements are minimal or nonexistent.   *See* Alison McManus & Neil Armstrong, *Physiology of elite young female* athletes, 56 Medicine & Science Sports & Exercise 23, 24 (2011) ("Prior to 11 years of age differences in average speed are minimal"); *id.* at 27 ("[S]mall sex difference in fat mass and percent body fat are evident from mid-childhood"); *id.* at 29 ("[B]one characteristics differ little between boys and girls prior to puberty"); *id.* at 32 ("There is little evidence that prior to puberty pulmonary structure or function limits oxygen uptake"); *id.* at 34 ("[N]o sex differences in arterial compliance have been noted in pre- and early- pubertal children").

6.     Dr. Brown also misleadingly cites Staiano and Katzmarzyk (2012) for the proposition that 22 peer reviewed publications conclude that girls have more total body fat than boys throughout childhood and adolescence.  (Brown Decl. ¶ 79.)  Dr. Brown gives the false impression that all 22 of the peer-reviewed publications demonstrated differences on total body fat.  Instead, Staiano and Katzmarzyk expressly note that "not all studies demonstrate sex differences in T[otal]B[ody]F[at] before puberty."   AE Staiano & PT Katzmarzyk, *Ethnic and sex differences in body fat and visceral and subcutaneous adiposity in children and adolescents*, 36 Int. J. Obesity 1261, 1265 (2012). Nor do any of these studies connect these differences to athletic performance.

7.     Dr. Brown further misrepresents Handelsman (2018)'s findings, notably omitting key portions from the study he cites.  Dr. Brown writes, "[t]here is convincing evidence that the sex differences in muscle mass and strength are sufficient to account for the increased strength and aerobic performance of men compared with women and is in keeping with the differences in world records between the sexes."  (Brown Decl. ¶ 59; Brown *Hecox* Decl. ¶ 88.)   But Dr. Brown omits the following sentence from

4

**SA144**

1    Handelsman which explains that "[t]he basis for the sex difference in muscle mass and

2    strength *is the sex difference in circulating testosterone*."   David Handelsman, et al.

3    *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic*

4    *Performance*, 39 Endocrine Revs. 803, 816 (2018) (emphasis added).

5        8.     Handelsman (2018), which Dr. Brown cites throughout his declaration,

6    supports the scientific consensus that the biological cause of average differences in

7    athletic performance between men and women is the rise in circulating levels of

8    testosterone beginning in endogenous male puberty.   (*See* Brown Decl. ¶¶ 127–30;

9    Brown *Hecox* Decl. ¶¶ 20a, 25–28, 77–85.)   As Handelsman states, "evidence makes it

10    highly likely that the sex difference in circulating testosterone of adults explains most, if

11    not all, of the sex differences in sporting performance."  *See* Handelsman (2018) at 823

12    (summarizing evidence rejecting the hypothesis that physiological characteristics are

13    driven by the Y chromosome).

14    **II.**     **There is no evidence that prepubertal boys have a biological athletic**

15          **advantage over prepubertal girls.**

16        9.     Contrary to Dr. Brown's Declarations, there is a well-established scientific

17    consensus that, before puberty, there are no significant differences in athletic

18    performance between boys and girls.  *See, e.g.*, Marnee McKay & Joshua Burns, *When it*

19    *Comes to Sport, Boys "Play Like a Girl*,*"* The Conversation (Aug. 3, 2017),

20    https://theconversation.com/when-it-comes-to-sport-boys-play-like-a-girl-80328

21    (discussing results of research published in American Academy of Neurology Journal).

22        10.     While some studies have found small differences between the performance

23    of boys and girls with respect to some discrete activities, these studies did not control for

24    other factors, particularly age, location, or socioeconomic factors.  *Id.*

25        11.     When research has controlled for those factors by using representative data,

26    researchers have found that "[a]cross all measures of physical performance, there was

27    one consistent finding.  There was no statistical difference in the capabilities of girls and

28    boys until high-school age (commonly age 12)."  *Id.*  These tests included long jump,

1    muscle strength, walking, jumping, and balancing.  *Id.*

2         12.   This finding has been replicated in many other studies, and there is a clear

3    scientific consensus that athletic ability does not diverge significantly until puberty.  *See,*

4    *e.g.*, David Handelsman, *Sex Differences in Athletic Performance Emerge Coinciding*

5    *with the Onset of Male Puberty*, 87 Clinical Endocrinology 68, 70–71 (2017) ("The

6    gender divergence in athletic performance begins at the age of 12–13 years"); Jonathon

7    W. Senefeld et al., *Sex Differences in Youth Elite Swimming*, 14 PLOS ONE 1, 1–2

8    (2019) (studying child and youth swimmers and concluding that the data suggests "girls

9    are faster, or at least not slower, than boys prior to the performance-enhancing effects of

10   puberty").

11        13.   In support of his contention that boys have at least some biological

12   advantages in athletic performance over girls before puberty, Dr. Brown relies primarily

13   on demographic data from physical fitness tests or athletics in which there is a small

14   difference in performance between prepubertal non-transgender boys and prepubertal

15   non-transgender girls.[2]  This data merely observes phenomena across a population sample

16   in isolated areas and does not determine a cause for whatever is observed.  There is no

17   reliable basis for Dr. Brown to attribute those small differences to physiology or anatomy

18   instead of other factors, such as greater societal encouragement of athleticism in boys,

19   greater opportunities for boys to play sports, or different preferences of the boys and girls

20   surveyed (Handelsman 2017).

21   **III.   Transgender girls who receive puberty suppressing medication at the onset of**

22        **puberty have no athletic advantage over other girls.**

23        14.   Dr. Brown incorrectly asserts that the administration of puberty suppressing

24   medication (also sometimes referred to as puberty blocking medication) and hormone

25

26

---

27   [2]   Two of the studies cited by Dr. Brown are also cited in paragraph 6 of the legislative
     findings of Arizona's statute.  *See* S.B. 1165, 55th Leg., 2d Reg. Sess. (Ariz. 2022), §

28   6.

**SA146**

1    replacement therapy to transgender girls does not eliminate the athletic advantage that

2    men and adolescent boys have over women and adolescent girls.

3         15.    Puberty suppressing medication (gonadotropin-releasing hormone agonists,

4    or GnRHa) may be prescribed to transgender girls at the onset of puberty, well before any

5    observable increase in testosterone or muscle mass.

6         16.    Because such girls do not undergo male puberty, they do not gain the

7    increased muscle mass or strength that accounts for why post-pubertal boys as a group

8    have an advantage over post-pubertal girls as a group.

9         17.    For that reason, studies on transgender women who have undergone

10   testosterone suppression as adults are almost meaningless when assessing the athletic

11   abilities of transgender girls who have received pubertal suppression beginning at the

12   onset of puberty.  The women in those studies did not transition until well after puberty

13   and experienced exposure to testosterone over an extended time, allowing their muscles

14   to keep developing.  In sharp contrast, transgender girls who receive GnRHa do not go

15   through male puberty and are not exposed to the heightened level of testosterone

16   associated with male puberty.

17        18.    Even so, those studies of adult transgender women show that testosterone

18   suppression resulted in significant mitigation of muscle mass and development in adult

19   transgender women.

20        19.    For example, the only study directly examining the effects of hormone

21   therapy on the athletic performance of transgender female athletes is a small study of

22   eight long-distance runners.   The study showed that after undergoing medical

23   interventions, which included lowering their testosterone levels, the athletes'

24   performance had reduced so that relative to non-transgender women their performance

25   was now proportionally the same as it had been relative to non-transgender men prior to

26   any medical treatment.  In other words, a transgender woman who performed at about

27   80% as well as the best performer among men of that age before transition would also

28   perform at about 80% as well as the best performer among women of that age after

7

1    transition.  *See* Joanna Harper, *Race Times for Transgender Athletes*, 6 J. Sporting

2    Cultures & Identities 1 (2015).[3]  Given that adolescent transgender girls who receive

3    puberty suppressing medication do not go through male puberty, there is no medical basis

4    to expect that transgender girls receiving such medications would have an athletic

5    advantage.

6         20.    Dr. Brown states that although he is not aware of any research directly

7    addressing the implications of the use of pubertal suppression on athletic capability, "[i]t

8    seems likely that males who have undergone puberty suppression will have physiological

9    and performance advantages over females somewhere between those possessed by pre-

10   pubertal boys, and those who have gone through full male puberty, with the degree of

11   advantage in individual cases depending on that individual's development and timing of

12   the start of puberty blockade."  (Brown Decl. ¶ 116.)  Dr. Brown admits that his

13   speculation about puberty blockers is outside his area of expertise. (Brown Decl. ¶ 116).

14   In fact, Dr. Brown's mere speculation has no basis in scientific evidence and seems to

15   rest on a misunderstanding about the use of puberty suppressing medication to treat

16   gender dysphoria.

17        21.    Tanner staging (also called Sexual Maturity Rating) is used to document

18   and track the development and sequence of secondary sex characteristics of children

19   during puberty.  Under current standards of care, transgender adolescents are eligible to

20   receive puberty blockers when they reach Tanner Stage 2, at the first onset of puberty,

21   and long before the development of increased muscle mass and strength associated with

22   ---

23   [3]    The legislative findings of the Arizona statute incorrectly state that for transgender women who go through male puberty (unlike the plaintiffs here), the benefit conferred by testosterone "is not diminished through the use of testosterone suppression."  *See* S.B. 1165, 55th Leg., 2d Reg. Sess. (Ariz. 2022), § 13.  While that statement conflicts with available evidence, which shows that hormone therapy significantly reduces muscle mass and strength, it is also irrelevant to the situation of the plaintiffs in this case who have not undergone male puberty and thus are not in the position of having to mitigate the increased muscle mass and strength caused by male puberty.  Notably, the legislative findings do not state that transgender girls who receive puberty suppressing medication have any conceivable athletic advantage, nor do they cite any evidence that would support that claim.

8

**SA148**

1    later stages of male puberty.  *See* Wylie C. Hembree et al., *Endocrine Treatment of*

2    *Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice*

3    *Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869–3903 (2017).

4         22.    Following the administration of puberty blockers, transgender girls will

5    also receive hormone replacement therapy to allow them to go through puberty consistent

6    with their female gender identity.  As a result, these transgender girls will develop many

7    of the same physiological and anatomical characteristics of non-transgender girls,

8    including bone size (Brown Decl. ¶¶ 49-51), skeletal structure (*id*. at ¶ 49), and

9    "distinctive aspects of the female pelvis geometry [that] cut against athletic performance"

10   (*id*. at ¶ 54).  Thus, a transgender girl who received puberty suppressing medication

11   followed by hormone replacement therapy does not have the same physiology as a

12   prepubertal non-transgender boy.

13        23.    None of the studies Dr. Brown cites support his hypothesis that transgender

14   girls who receive puberty suppressing medication and hormone therapy have an athletic

15   advantage over other girls.  For example, the primary finding of the Klaver (2018) study

16   is that receiving GnRHa and hormone therapy brings the body composition of young

17   transgender women much closer to their non-transgender female peers than their non-

18   transgender male peers.  (Brown Decl. ¶ 118.)  Those results are more pronounced the

19   earlier a transgender girl starts GnRHa treatment.

20        24.    Dr. Brown also cites to Tack et al. (2018) for the proposition that

21   transgender girls who receive medical treatments around 16 years of age purportedly

22   maintain higher muscle mass, lower percent body fat, higher body mass, higher body

23   height, and higher grip strength than comparable girls of the same age.  (Brown Decl. ¶

24   117.)  However, the medication administered in this study is not used in the United States

25   and does not have nearly the same impact as puberty blockers and hormone therapy for

26   transgender girls.  The medications administered to the study participants did not fully

27   block puberty for the participants.  Yet, even with this less effective medication, the study

28   found that transgender girls "showed a significant increase in fat mass and decrease in

9

lean mass, resulting in an increased body fat percentage" and did not experience any increase in grip strength.  Lloyd Tack et al., *Proandrogenic and Antiandrogenic Progestins in Transgender Youth: Differential Effects on Body Composition and Bone Metabolism*, J. Clinical Endocrinology & Metabolism 2147, 2153–54 (2018).  If anything, this study shows that even with a less effective medication, the physiological impact of medically treating transgender girls in adolescence, rather than when they are adults, is profound.

25.     The World Rugby Transgender Women's Guidelines 2020, which Brown cites throughout his declaration, allow transgender girls and women to participate in women's rugby if they did not experience endogenous puberty, stating: "Transgender women who transitioned pre-puberty and have not experienced the biological effects of testosterone during puberty and adolescence can play women's rugby."

26.     In sum, there is no evidence that transgender girls on puberty suppression medication or hormone therapy have an athletic advantage over other girls.  There are no studies that have documented any such advantage, and there is no medical reason to posit that any such advantage would exist.

27.     In my clinical practice, I have provided medical care to more than 300 adolescent transgender girls.  None of the transgender girls I have treated with the above medical interventions appeared to have any athletic advantage over other girls.

**IV.   There is no evidence linking in-utero development or minipuberty to athletic performance and no credible medical reason to posit any such connection.**

28.     There is no scientific basis for the claim that boys gain an athletic advantage over girls based on exposure to testosterone in utero or during minipuberty.

29.     In a male fetus, testosterone production peaks around 11–14 weeks of gestation (in the first trimester of pregnancy), then declines until it is completely suppressed at birth.  Testosterone is necessary during this time for normal development of the genitals.  *See, e.g.*, Marianne Becker & Volker Hesse, *Minipuberty: Why Does it Happen?*, 93 Hormone Research Paediatrics 76 (2020).  Male babies also experience an

10

1   elevation of testosterone after birth, with levels peaking between one to two months old,

2   and returning to prepubertal levels before six months of age.   As with the in-utero

3   elevation of testosterone, a rise in testosterone during minipuberty correlates positively

4   with growth of the male genitals.  *Id.* at 78–79.

5        30.    Minipuberty does not result in clinically visible physical changes, other

6   than a possible transient increase in testicular volume.

7        31.    No research has linked this brief exposure to elevated testosterone during

8   minipuberty to any lasting physiological impact, much less to an increase in athletic

9   ability.  Nor is there any credible medical basis even to hypothesize such an impact.

10                              **Dr. Carlson's Declaration**

11        32.    Dr. Carlson asserts that permitting transgender girls to play on girls' teams

12   jeopardizes the safety of other girls, but none of the evidence he cites has any relevance

13   to transgender girls—like the plaintiffs in this case—who are either prepubertal or have

14   received puberty blocking medication at the onset of puberty and therefore have not

15   undergone male puberty.

16        33.    For example, Dr. Carlson states "it is [his] opinion that World Rugby's

17   assessment of the evidence is scientifically sound."  (Carlson Decl. at 2.)  But as noted

18   above, the World Rugby Transgender Women's Guidelines 2020 allow transgender girls

19   and women to participate in women's rugby if they did not experience endogenous

20   puberty, stating: "Transgender women who transitioned pre-puberty and have not

21   experienced the biological effects of testosterone during puberty and adolescence can

22   play women's rugby."

23        34.    Dr. Carlson also cites the UK Sports Councils' Equality Group guidance for

24   transgender inclusion in organized sports, which is not a scientific report and did not

25   consider the situation of transgender girls who receive puberty suppression at the onset of

26   puberty.  (Carlson Decl. at 2.)  Notably, however, the guidance stated that "[c]urrent

27   scientific evidence indicates that the difference between the strength, stamina, and

28   physique between the sexes is largely due to the higher testosterone levels of males

11

**SA151**

1   during their lifetime"—a consideration that has no relevance to transgender girls who do

2   not undergo male puberty.  United Kingdom Sports Councils, *Guidance for transgender*

3   *inclusion in domestic sport* (2021), https://equalityinsport.org/docs/300921/Guidance for

4   Transgender Inclusion in Domestic Sport 2021 - Summary of Background

5   Documents.pdf (last accessed May 29, 2023).

6       35.    Throughout his declaration, Dr. Carlson bases his opinion that transgender

7   girls pose a safety risk to other girls on the fact that "[m]ales exhibit large average

8   advantages in size, weight, and physical capacity over females—often falling far outside

9   female ranges." (Carlson Decl. ¶ 11c.)  But that fact has no relevance to transgender girls

10  who receive puberty suppressing medications at the onset of puberty and thus do not

11  develop the size, weight, and physical capacity of individuals who go through male

12  puberty.

13      36.    In particular, transgender girls who receive puberty suppressing medication

14  at the onset of puberty do not differ from other girls with respect to the factors that Dr.

15  Carlson discusses at paragraphs 42 to 56 of his declaration.  They do not have greater

16  bone density or connective tissue strength.  They do not have greater speed, strength,

17  weight, or power.  And they do not have greater throwing or kicking speed.

18      37.    Dr. Carlson notes that girls are more prone to concussions than boys

19  (Carlson Decl. ¶¶ 58–65) and cites research indicating this may be because, on average,

20  adolescent girls have weaker neck muscles than post-pubertal adolescent boys.  (Carlson

21  Decl. ¶ 66.)  If that accounts for girls' higher rates of concussions, transgender girls on

22  puberty suppression would be at the same or similar risk for such injury as non-

23  transgender girls.  There is no evidence, and no medical reason to believe, that their

24  participation on girls' teams would pose any increased threat of such injuries to other

25  girls.

26      38.    Dr. Carlson similarly claims that permitting transgender girls to play on

27  girls' teams increases the risk of ACL injuries because "[w]hen males are permitted to

28  enter into the pool of female athletes based on gender identity rather than biological sex,

**SA152**

1  there is an increased possibility that a statistical outlier in terms of size, weight, speed,

2  and strength—and potentially an extreme outlier—is now entering the female pool.

3  Although injury is not guaranteed, risks to female participants will increase." (Carlson

4  Decl. ¶ 78.)   That rationale for exclusion has no relevance to transgender girls who

5  receive puberty suppressing medications at the onset of puberty and who therefore do not

6  have any advantage over other girls with respect to size, weight, speed, or strength.

7        39.    Dr. Carlson spends a large part of his declaration disputing whether

8  testosterone suppression and hormone therapy can mitigate athletic advantage for

9  transgender women who transition as adults and who have therefore undergone male

10  puberty. (Carlson Decl. ¶¶ 79–96.)  I disagree with his analysis of the evidence on this

11  issue; however, it is irrelevant to this case, which concerns transgender girls who have

12  not yet undergone male puberty or have received puberty suppressing medication at the

13  onset of puberty.  Dr. Carlson does not cite to any evidence, nor does any exist, that such

14  girls have an athletic advantage over other girls.

15        40.    Dr. Carlson states in passing that there are differences in athletic ability

16  between prepubertal boys and girls, but he does not cite any evidence to support that

17  opinion.  For the reasons stated in paragraphs 9 through 13 above, there is no evidence to

18  support that claim.

19        41.    In sum, transgender girls who have not yet undergone male puberty or have

20  received puberty suppressing medication at the onset of puberty do not present any

21  unique safety risks to other girls.  Their physical characteristics in terms of height,

22  weight, and strength overlap with those of other girls.

23        **Dr. Cantor's Declaration**

24        42.    As discussed above, this case concerns a legal challenge to Arizona's law

25  prohibiting girls who are transgender from participating on girls' sports teams.  Dr.

26  Cantor's expert declaration does not offer a single expert opinion that directly relates to

27  Arizona's law or to the participation of transgender athletes in sports.  Instead, Dr. Cantor

28  launches a broadside attack against the prevailing model of medical care for transgender

13

youth that has been endorsed by the American Academy of Child and Adolescent Psychiatry, the American Academy of Pediatrics, the American Psychological Association, the American Psychiatric Association, and the American Medical Association, among many other mainstream medical organizations.

43.    Many of Dr. Cantor's criticisms are largely irrelevant to the group targeted by Arizona's law, instead relating to children who no longer identify as transgender once they reach puberty and transgender boys.  But Arizona's law affects only transgender girls.

44.    Dr. Cantor appears to have no experience in child or adolescent psychology and no relevant experience with respect to gender dysphoria in childhood and adolescence.  His academic career has focused on pedophilia and sexual paraphilias in adults.

45.    In terms of substance, Dr. Cantor's declaration demonstrates a basic lack of understanding of the nature, evaluation, and treatment of gender dysphoria, the serious consequences of the condition if left untreated, and the strength of the evidence in support of medical management of gender dysphoria, including the efficacy and safety of these treatments.  His opinions are not consistent with current evidence-based standards of care or the general medical consensus–they run counter to recommendations made by leading and well-respected medical bodies.

**I.    Medical care for transgender adolescents is safe and effective.**

46.    Dr. Cantor devotes much of his declaration to criticizing medical care for transgender adolescents.  Dr. Cantor does not explain how any of his criticisms are relevant to the issue of whether transgender girls should be able to participate on female sports teams.  In any event, his criticisms are not well-founded.

47.    Studies have repeatedly documented that pubertal suppression and hormone therapy are safe and effective treatments for transgender adolescents with gender dysphoria.[4]  These articles represent a small percentage of the full body of literature that

---

[4]    *See, e.g.*, Diana M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 Jama Network Open at 1

**SA154**

1   was utilized to create evidence-based clinical practice guidelines for the treatment of

2   gender dysphoria in children, adolescents, and adults.  These treatments alleviate the

3   increased distress and dysphoria caused by the physical changes accompanying puberty.

4   Hormone therapy also brings a transgender person's body into greater alignment with

5   their identity and reduces the number of surgeries a transgender person may need as an

6   adult.[5]

7        48.    The guidelines were published by long-standing and well-respected bodies,

8   including the World Professional Association for Transgender Health (WPATH) and the

---

(2022) (finding that receipt of medical care, including puberty blockers and gender-affirming hormones, was associated with 60% lower odds of moderate or severe depression and 73% lower odds of suicidality over a 12-month follow-up); Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health [ePublication ahead of print] at 1 (2021) (finding that access to hormone therapy during adolescence was associated with lower odds of recent depression and having attempted suicide in the past year); Jack L. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145 Pediatrics at 1 (2020) (finding that access to puberty blockers during adolescence is associated with a decreased lifetime incidence of suicidal ideation among adults); Christal Achille et al., *Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: Preliminary results*, Int'l J. Pediatric Endocrinology at 1 (2020) (finding that endocrine intervention was associated with decreased depression and suicidal ideation and improved quality of life for transgender youth); Laura E. Kuper et al., *Body Dissatisfaction and Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy*, 145 Pediatrics at 1 (2020) (showing hormone therapy in youth is associated with reducing body dissatisfaction and modest improvements in mental health); Anna I.R. van der Miesen et al., *Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared with Cisgender General Population Peers*, 66 J. Adolescent Health 699–704 (2020) (showing fewer emotional and behavioral problems after puberty suppression and similar or fewer problems compared to same-age non-transgender peers); Rosalia Costa et al., *Psychological Support, Puberty Suppression, and Psychosocial Functioning in Adolescents with Gender Dysphoria*, 12 J. Sexual Medicine at 2206 (2015) (finding increased psychological function after six months of puberty suppression); Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696–704 (2014) (following a cohort of transgender young people in the Netherlands from puberty suppression through surgical treatment and finding that the cohort had global functioning equivalent to the Dutch population).

[5]   *See* de Vries, *supra* n.4.

**SA155**

1   Endocrine Society (Coleman et al. 2022; Coleman et al. 2012; Hembree et al. 2017;

2   Hembree et al. 2009).  Other leading medical bodies such as the American Association of

3   Pediatrics ("AAP"), the American Medical Association ("AMA"), the American

4   Psychological Association, the American Psychiatric Association, and the American

5   Academy of Family Physicians ("AAFP") all support the tenets of these guidelines due

6   to the rigorous nature of their review of scientific evidence in the field (Rafferty et al.

7   2018 (AAP); AMA 2019; American Psychological Association 2015; Drescher et al.

8   2018 (American Psychiatric Association); Klein et al. 2018 (AAFP)).

9        49.    Dr. Cantor's criticisms of the process used to develop the WPATH Standards

10   of Care and the Endocrine Society Guidelines are unfounded.  Both were created based

11   on rigorous reviews of the best available science and expert professional consensus in

12   transgender health.  For WPATH, international professionals were selected to serve on

13   the SOC 8 writing committee.  Recommendation statements were developed based on

14   data derived from independent systemic literature reviews.  Grading of evidence was

15   performed by an Evidence Review Team which determined the strength of evidence

16   presented in each individual study relied upon in the document (Coleman et al. 2022).

17   Similarly, the Endocrine Society Guidelines were developed through rigorous scientific

18   processes that "followed the approach recommended by the Grading of

19   Recommendations, Assessment, Development, and Evaluation group, an international

20   group with expertise in the development and implementation of evidence-based

21   guidelines."  The Endocrine Society published its clinical practice guidelines in

22   collaboration with the Pediatric Endocrine Society, the European Societies for

23   Endocrinology and Pediatric Endocrinology, and WPATH, among others (Hembree et al.

24   2017).

25        50.    Dr. Cantor also spends more than 10 pages of his declaration discussing the

26   "Pyramid of Standards of Evidence" to support his claim that the evidence supporting

27   puberty suppression and hormone therapy is not based on randomized controlled trials

28   and is therefore not reliable.  (Cantor Decl. ¶¶ 38–66.)  While I agree with Dr. Cantor that

**SA156**

1    randomized control trials are an excellent study design in many contexts, such trials are

2    not ethically permissible for treatments that are already known to provide a benefit to

3    patients, which includes the use of GnRHa and hormone therapy to treat gender

4    dysphoria in adolescents.  For this reason, no such study of these treatments would be

5    approved, no patients and families would participate, and no ethical researcher would

6    undertake such a study.  As is true for most other pediatric treatments, researchers in this

7    field must rely on other types of study design. These types of studies can include

8    longitudinal cohort studies, which examine any changes in symptoms over the course of

9    treatment, or cross-sectional studies, which compare persons who are treated with those

10   who are untreated.

11        51.    Dr. Cantor also misstates the risks and benefits associated with GnRHa and

12   hormone therapy.  (Cantor Decl. ¶¶ 125–37.)

13        52.    Dr. Cantor's concerns about bone density in patients prescribed GnRHa are

14   well-known, generally short-lived (as he himself admits), and are specifically managed

15   during patient care.  In practice, risk of lower bone mineral density is mitigated by

16   screening for, and treating, vitamin D deficiency when present, and by limiting the number

17   of years of treatment based on a patient's clinical course (Rosenthal 2014).  It is accurate

18   to state that pubertal hormones (either testosterone or estrogen) contribute to bone density

19   accrual.  A person who was never exposed to any sex hormones for their entire life would

20   be at high risk of osteoporosis.  GnRHa, however, is administered only for a relatively

21   short period of time.  Once a decision is made to either administer gender-affirming

22   hormones or to resume puberty consistent with a patient's birth-assigned sex, bone

23   density accrual rises with exposure to those sex hormones.

24        53.    Dr. Cantor also raises a hypothetical concern regarding the impact of

25   puberty blockers on brain development.  (Cantor Decl. ¶ 128.)  While it is common for

26   researchers and clinicians to consider any possible adverse impacts of medications, there

27   is no evidence that puberty blockers have any adverse impact on brain development.  For

28   example, when considering children with naturally occurring delayed puberty, I find no

1   published evidence of negative consequences to brain development compared with

2   children with normally timed puberty.  Likewise, Dr. Cantor can point to no published

3   evidence in support of this concern in transgender adolescents prescribed GnRHa, instead

4   citing various articles that simply raise the issue.  There are also studies related to

5   children who are prescribed GnRHa for precocious puberty that found that "GnRHa

6   treated girls do not differ in their cognitive functioning … from the same age peers."

7   (Wojniusz et al. 2016).  The authors of this article came to this conclusion because there

8   was not a statistically significant difference in IQ, memory, mental rotation, cognitive

9   executive function, processing speed, attention, or executive function in participants

10   treated with GnRHa for precocious puberty.

11       54.    Dr. Cantor asserts that I have not provided sources showing that gender

12   identity "has a strong biological basis."  (Cantor Decl. ¶ 145.)  Scientific research and

13   medical literature across disciplines demonstrates that gender identity, like other

14   components of sex, has a strong biological foundation.  For example, there are numerous

15   studies detailing the similarities in the brain structures of transgender and non-

16   transgender people with the same gender identity (Luders et al. 2009; Rametti et al. 2011;

17   Berglund et al. 2008).  In one such study, the volume of the bed nucleus of the *stria*

18   *terminalis* (a collection of cells in the central brain) in transgender women was equivalent

19   to the volume found in non-transgender women (Chung et al. 2002).

20       55.    There are also studies highlighting the genetic components of gender

21   identity.  Twin studies are a helpful way to understand genetic influences on human

22   diversity.  Identical twins share the same DNA, while fraternal twins share roughly 50%

23   of the same DNA; however, both types of twins share the same environment.  Therefore,

24   studies comparing differences between identical and fraternal twin pairs can help isolate

25   the genetic contribution of human characteristics.  Twin studies have shown that if an

26   identical twin is transgender, the other twin is much more likely to be transgender

27   compared to fraternal twins, a finding which points to genetic underpinnings to gender

28   identity development  (Heylens et al., 2012).

56.     There is also ongoing research on how differences in fetal exposures to hormones may influence gender identity.  This influence can be examined by studying a medical condition called congenital adrenal hyperplasia.  Female fetuses affected by congenital adrenal hyperplasia produce much higher levels of testosterone compared to fetuses without the condition.  While most females with congenital adrenal hyperplasia have a female gender identity in adulthood, the percentage of those with gender dysphoria is higher than that of the general population.  This suggests that fetal hormone exposures contribute to the later development of gender identity (Dessens et al. 2005).

57.     There has also been research examining specific genetic differences that appear associated with gender identity formation (Rosenthal 2014).  For example, one study examining differences in the estrogen receptor gene among transgender women and non-transgender male controls found that the transgender individuals were more likely to have a genetic difference in this gene (Henningsson et al. 2005).

58.     The above studies are representative examples of scientific research demonstrating biological influences on gender identity.  Gender identity, like other complex human characteristics, is rooted in biology with important contributions from neuroanatomic, genetic, and hormonal variation (Roselli 2018).

59.     Dr. Cantor discounts gender identity on the basis that there is "no means of either falsifying or verifying people's declarations of their gender identities."  (Cantor Decl. ¶ 105.)  He also claims "[i]n science, it is the objective factors—and only the objective factors—that matter to a valid definition."  (Cantor Decl. ¶ 105.)  But just because gender identity is a human characteristic ascertained through observation and conversations rather than a lab test makes it no less valid or "scientific."  Gender identity is a real human characteristic, and it is rooted in biology.

60.     Dr. Cantor also takes issue with my statement in my original declaration that a "person's gender identity is innate and cannot be changed by medical or psychological intervention."  (Shumer Decl. at 7.)  Dr. Cantor notes that a youth may be "mistaken about their gender identity" or may "misinterpret their experiences to indicate

1  they are transgender." (Cantor Decl. ¶ 146.)  It is true that some youth go through a

2  period of exploration and identity development before they understand their gender

3  identity, while others consistently identify as a particular gender from an early age into

4  adulthood.  This is true for both transgender and non-transgender youth and does not

5  show that therapy or any other intervention can change a young person's gender identity.

6  To the contrary, substantial evidence shows that attempts to change a young person's

7  gender identity or gender expression are both ineffective and extremely harmful.[6]

8      61.   Dr. Cantor also appears to dispute that supportive treatments for gender

9  dysphoria reduce suicidality in transgender adolescents.  In fact, there are multiple studies

10  demonstrating this positive impact, which is also consistent with my own clinical

11  practice.[7]

12      62.   Finally, Dr. Cantor claims, without citation, that I somehow violated

13  "medical ethics" in my original declaration by asserting specific conclusions about the

14  medical status of "people not under my care."  Dr. Cantor is presumably referring to the

15  plaintiffs in this case and to my statements about those plaintiffs at the end of my

16  declaration.  There is nothing unethical about those statements, all of which I stand

17  behind.

18  **II.   Other countries provide medical care to transgender adolescents.**

19      63.   Dr. Cantor's declaration references documents from several other countries

20  on the treatment of gender dysphoria, predominantly from Finland, Sweden, and the

21  United Kingdom ("UK"), although they also mention documents from France and

22  Norway.

23      64.   Before addressing the substance of his claims related to these documents,

24  _____

25  [6]  Douglas C. Haldeman (Ed.), *The Case Against Conversion "Therapy": Evidence, Ethics, and Alternatives* (2022).

26  [7]  *See* Diana M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 JAMA Network Open (2022); Amy E.

27  Green et al., *Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary*

28  *Youth*, 7 J. Adolescent Health 643–649 (2022).

20

1   several preliminary points should be made.  Dr. Cantor does not provide a comprehensive

2   review of international practices; rather, he selectively cites documents that he believes

3   support his position.

4        65.    Language differences also make it difficult to fully assess some of the

5   material that the defendants' experts cite to as support for their claims.  For example, the

6   Swedish National Board of Health and Welfare's ("NBHW"'s) guideline for the care of

7   children and adolescents with gender dysphoria is not available as an official English

8   translation; only a 6-page summary is available.[8]

9        66.    With respect to the content of these documents, none is a clinical practice

10  guideline which rates the quality of the evidence and the strength of the

11  recommendations.  Some of the documents are systematic reviews of the literature that

12  rate the quality of the evidence but do not make recommendations.[9]  Direct inferences

13  cannot be drawn from the quality of the evidence to the strength of recommendations;

14  low quality evidence may be a sufficient basis for strong recommendations.  The French

15  document referenced is in fact only a press release.[10]

16       67.    Dr. Cantor mischaracterizes the conclusions of these documents, stating for

17  example that they "range from medical advisories to outright bans on the medical

18  transition of minors." (Cantor Decl. ¶ 16).  None of the documents to which Dr. Cantor

19  refers recommends banning medical care for treating gender dysphoria in adolescents.

20       68.    Finland, Sweden, and the UK are all moving to providing care through

21

22  [8]   The National Board of Health and Welfare, *Care of Children and Adolescents with Gender Dysphoria: Summary* (2022), https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/

23  kunskapsstod/2022-3-7799.pdf (last accessed May 26, 2023).

24  [9]   National Institute for Health and Care Excellence (NICE), *Evidence Review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria* (2020), *available at* https://cass.independent-review.uk/nice-

25  evidence-reviews/ (last accessed May 26, 2023).

26  [10]  Académie Nationale de Médecine, *Medicine and gender transidentity in children and adolescents* (2022), *available at* https://www.academie-medecine.fr/la-medecine-

27  face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/?lang=en   (last

28  accessed May 26, 2023).

21

**SA161**

1    regional multidisciplinary clinics, the type of care commonly provided in the US.[11]  In

2    Finland, for example, medical care is provided by Helsinki University Central Hospital

3    and Tampere University Hospital.  Puberty suppression and hormone treatment are

4    provided to minors with persistent gender dysphoria on a case-by-case basis.[12]

5         69.    Sweden is restructuring care for gender dysphoria into three national

6    specialized medical care units.  While the Swedish recommendations state puberty

7    suppression and gender-affirming hormone treatment "should be offered only in

8    exceptional cases," they later state that "an early (childhood) onset of gender

9    incongruence, persistence of gender incongruence until puberty and a marked

10   psychological strain in response to pubertal development is among the recommended

11   criteria."[13]

12        70.    The UK is moving from a single specialist provider model to regional

13   centers.  The Cass Review encourages providers prescribing puberty blocker and

14   hormone therapy to follow the Endocrine Society Guidelines and UK guidelines

15   regarding informed consent.[14]

16        71.    The documents all emphasize the importance of data collection.  The Cass

17   Review recommends, for example, "[e]xisting and future services should have

18   standardised data collection in order to audit standards and inform understanding of the

19   _____

20   [11]   Sam Hsieh & Jennifer Leininger, *Resource list: Clinical care programs for gender-nonconforming children and adolescents*, 43 Pediatric Annals 238–244 (2014).

21   [12]   Council for Choices in Health Care in Finland, *Medical treatment methods for*
22          *dysphoria associated with variations in gender identity in minors – recommendation* (2020), *available at* https://palveluvalikoima.fi/documents/1237350/22895008/
23          Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474 (last accessed May
24          26, 2023).

25   [13]   The National Board of Health and Welfare, *Care of Children and Adolescents with*
26          *Gender     Dysphoria:     Summary* (2022),     *available     at* https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/
        kunskapsstod/2022-3-7799.pdf (last accessed May 26, 2023).

27   [14]   Hilary Cass, *The Cass Review: Independent Review of Gender Identity Services for*
28          *Children and Young People Interim Report*, National Health Service (NHS), UK at
        71–72 (2022).

**SA162**

1    epidemiology, assessment and treatment of this group of children and young people."[15]

2         72.    The Swedish NBHW similarly states, "[t]o ensure that new knowledge is

3    gathered, the NBHW further deems that treatment with GnRH-analogues and sex

4    hormones for young people should be provided within a research context, which does not

5    necessarily imply the use of randomized controlled trials (RCTs).  As in other healthcare

6    areas where it is difficult to conduct RCTs while retaining sufficient internal validity, it is

7    also important that other prospective study designs are considered for ethical review and

8    that register studies are made possible."[16]

9         I declare under criminal penalty under the laws of Arizona that the foregoing is

10   true and correct.

11        Signed on the 31st day of May, 2023, in Ann Arbor, Michigan.

12

13

14

15                                                    _____

16                                                    Daniel Shumer, M.D.

17

18

19

20

21

22

23

24

25

26   [15] *Id.*
     [16] The National Board of Health and Welfare, Care of Children and Adolescents with
27   Gender       Dysphoria:      Summary      (2022),      *available      at*
     https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/
28   kunskapsstod/2022-3-7799.pdf (last accessed May 26, 2023).

SA163

1  Colin M. Proksel
   OSBORN MALEDON, P.A.
2  2929 North Central Avenue, 21st Floor
   Phoenix, Arizona 85012-2793
3  State Bar No. 034133
   Telephone: (602) 640-9000
4  Facsimile: (602) 640-9050
   Email: cproksel@omlaw.com
5

6  *Attorney for Plaintiffs*

7  *Additional counsel listed on following page*

8              **UNITED STATES DISTRICT COURT**
              **FOR THE DISTRICT OF ARIZONA**
9                    **TUCSON DIVISION**

10 Jane Doe, by her next friend and parents
   Helen Doe and James Doe, and Megan
11 Roe, by her next friend and parents, Kate
   Roe and Robert Roe,
12
                 Plaintiffs,
13                                              Case No. 4:23-cv-00185-JGZ
        v.
14
   Thomas C. Horne in his official capacity
15 as  State  Superintendent  of  Public
   Instruction; Laura Toenjes, in her official
16 capacity as Superintendent of the Kyrene    **SECOND DECLARATION OF HELEN DOE**
   School District; Kyrene School District;    **IN SUPPORT OF JANE DOE'S MOTION**
17 The  Gregory  School;  and  Arizona         **FOR A PRELIMINARY INJUNCTION**
   Interscholastic Association Inc.,
18
19               Defendants.
20
21
22
23
24
25
26
27
28

**SA164**

Jyotin Hamid*
Justin R. Rassi*
Amy C. Zimmerman*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: jhamid@debevoise.com
Email: jrassi@debevoise.com
Email: azimmerman@debevoise.com

Amy Whelan*
Rachel Berg*
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 343-7679
Facsimile: (415) 392-8442
Email: awhelan@nclrights.org
Email: rberg@nclrights.org

*Admitted pro hac vice.

**SA165**

I, Helen Doe, declare as follows:

1.     I make this declaration of my own personal knowledge, and, if called as a witness, I could and would testify competently to the matters stated here.

2.     I am the mother of Jane Doe, one of the plaintiffs in this case. My husband, James Doe, is Jane's father.

3.     Jane's first day of school at Kyrene Aprende Middle School is July 19, 2023.

4.     As I previously stated, Jane wishes to participate and compete on the girls' cross-country, soccer, and basketball teams this year at her school.  Of these sports, the cross-country team starts the earliest in the school year.

5.     The dates for registering, practicing, and competing on Jane's school's cross-country team were only recently finalized on or around June 8 or 9, 2023.

6.     Registration for cross-country opens online on July 1, 2023.  Jane must register before she can practice and compete in cross-country.  Registration is handled through an online system and involves the submission of registration forms and supporting documents, such as a physical report signed by a doctor and an initialed sportsmanship agreement.  Typically, a student's registration takes at least 2-3 days to process after it is submitted.

7.     The first practice for cross-country is on July 31, 2023.  The first cross-country competitive meet will occur the week of August 14, 2023.

This declaration was executed this 10th day of June, 2023, in Maricopa County, Arizona.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

1

**SA166**

By: _____

Helen Doe

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

SA167

Colin Proksel (034133)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
State Bar No. 034133
Telephone:    (602) 640-9000
Facsimile:    (602) 640-9050
Email:        cproksel@omlaw.com
*Attorney for Plaintiffs*
*Additional counsel listed in signature block*

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA
### TUCSON DIVISION

| | |
|---|---|
| Jane Doe, by her next friend and parents Helen Doe and James Doe; and Megan Roe, by her next friend and parents, Kate Roe and Robert Roe,<br><br>      Plaintiffs,<br><br>  v.<br><br>Thomas C. Horne in his official capacity as State Superintendent of Public Instruction; Laura Toenjes, in her official capacity as Superintendent of the Kyrene School District; Kyrene School District; The Gregory School; and Arizona Interscholastic Association Inc.,<br><br>      Defendants. | Case No. 4:23-cv-00185-JGZ<br><br>**PLAINTIFFS' UPDATED EXHIBIT LIST FOR PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiffs submit the following list of exhibits, along with copies of exhibits not already filed on the docket, pursuant to the Court's June 14, 2023 Order (ECF No. 80). Plaintiffs respectfully reserve the right to amend this exhibit list in advance of the hearing.

| Ex. No. | Description | Location |
|---|---|---|
| 1 | Declaration of Jane Doe | ECF No. 6 |
| 2 | Declaration of Helen Doe | ECF No. 7 |
| 3 | Second Declaration of Helen Doe | ECF No. 78 |
| 4 | Declaration of Megan Roe | ECF No. 8 |
| 5 | Declaration of Kate Roe | ECF No. 9 |
| 6 | Declaration of Stephanie Budge, Ph.D. | ECF No. 4 |
| 7 | Rebuttal Declaration of Stephanie Budge, Ph.D. | ECF No. 65-1 |
| 8 | Declaration of Daniel Shumer, M.D., MPH | ECF No. 5 |

**SA168**

| 9 | Rebuttal Declaration of Daniel Shumer, M.D., MPH | ECF No. 65-2 |
|---|---|---|
| 10 | AIA's Constitution, Bylaws, Policies, and Procedures 2022-2023, Transgender Policy | ECF No. 51-1 |
| 11 | Photographs of the Doe Family (*filed under seal*) | ECF No. 108 |
| 12 | Photographs of the Roe Family (*filed under seal*) | ECF No. 108 |
| 13 | Jane Doe's Name Change Court Order (*filed under seal*) | ECF No. 108 |
| 14 | Megan Roe's Name and Gender Change Court Order (*filed under seal*) | ECF No. 108 |
| 15 | Jane Doe's Passport (*filed under seal*) | ECF No. 108 |
| 16 | Megan Roe's Passport (*filed under seal*) | ECF No. 108 |
| 17 | Consideration of Bills: Hearing on S.B. 1165 Before S. Comm. on Judiciary, Jan. 20, 2022, 55th Leg., 2nd Reg. Sess., 00:08:08–01:30:05 (*filed as a non-electronic exhibit*) | ECF No. 88-1 |
| 18 | David Handelsman, et al., *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance*, 39 Endocrine Revs. 803 (2018) | ECF No. 88-2 |
| 19 | David Handelsman, *Sex Differences in Athletic Performance Emerge Coinciding with the Onset of Male Puberty*, 87 Clinical Endocrinology 68 (2017) | ECF No. 88-2 |
| 20 | Jonathon W. Senefeld et al., *Sex Differences in Youth Elite Swimming*, 14 PLOS ONE 1 (2019) | ECF No. 88-2 |
| 21 | Joanna Harper, *Race Times for Transgender Athletes*, 6 J. Sporting Cultures & Identities 1 (2015) | ECF No. 88-2 |
| 22 | Marnee McKay & Joshua Burns, *When it Comes to Sport, Boys "Play Like a Girl,"* The Conversation (Aug. 3, 2017), https://theconversation.com/when-it-comes-to-sport-boys-play-like-a-girl-80328 | ECF No. 88-3 |
| 23 | Marnee McKay, et al., *Normative Reference Values for Strength and Flexibility of 1,000 Children and Adults*, Neurology, 88 (1) (2017) | ECF No. 88-3 |
| 24 | World Rugby Transgender Women's Guidelines (2020), https://www.world.rugby/the-game/player-welfare/guidelines/transgender/women | ECF No. 88-3 |
| 25 | Governor Douglas A. Ducey's Letter to Arizona Secretary of State re: Senate Bill 1138 and 1165 | ECF No. 88-3 |
| 26 | Second Declaration of Helen Doe | Attached |

2

**SA169**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted this 6th day of July, 2023.

*/s/ Colin M. Proksel*
Colin M. Proksel (034133)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
Telephone: (602) 640-9000
Facsimile: (602) 640-9050
Email: cproksel@omlaw.com

Jyotin Hamid*
Justin R. Rassi*
Amy C. Zimmerman*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: jhamid@debevoise.com
Email: jrassi@debevoise.com
Email: azimmerman@debevoise.com

Amy Whelan*
Rachel Berg*
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 343-7679
Facsimile: (415) 392-8442
Email: awhelan@nclrights.org
Email: rberg@nclrights.org

*Admitted pro hac vice.*

3

**SA170**

# Exhibit 26

Colin M. Proksel
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
State Bar No. 034133
Telephone: (602) 640-9000
Facsimile: (602) 640-9050
Email: cproksel@omlaw.com

*Attorney for Plaintiffs*

*Additional counsel listed on following page*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION**

| | |
|---|---|
| Jane Doe, by her next friend and parents Helen Doe and James Doe, and Megan Roe, by her next friend and parents, Kate Roe and Robert Roe,<br><br>Plaintiffs,<br><br>v.<br><br>Thomas C. Horne in his official capacity as State Superintendent of Public Instruction; Laura Toenjes, in her official capacity as Superintendent of the Kyrene School District; Kyrene School District; The Gregory School; and Arizona Interscholastic Association Inc.,<br><br>Defendants. | Case No. 4:23-cv-00185-JGZ<br><br>**THIRD DECLARATION OF HELEN DOE IN SUPPORT OF JANE DOE'S MOTION FOR A PRELIMINARY INJUNCTION** |

**SA172**

Jyotin Hamid*
Justin R. Rassi*
Amy C. Zimmerman*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: jhamid@debevoise.com
Email: jrassi@debevoise.com
Email: azimmerman@debevoise.com

Amy Whelan*
Rachel Berg*
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 343-7679
Facsimile: (415) 392-8442
Email: awhelan@nclrights.org
Email: rberg@nclrights.org

*Admitted pro hac vice.

**SA173**

I, Helen Doe, declare as follows:

1.    I make this declaration of my own personal knowledge, and, if called as a witness, I could and would testify competently to the matters stated here.

2.    I am the mother of Jane Doe, one of the plaintiffs in this case. My husband, James Doe, is Jane's father.

3.    As I indicated in my first declaration, Jane has been monitored by her doctor for signs of the onset of puberty as part of her medical treatment for gender dysphoria.

4.    At an appointment on June 27, 2023, Jane's doctor prescribed a Supprelin implant, which is a puberty-blocking medication, so that Jane does not go through male puberty.

5.    After receiving insurance authorization, we will schedule Jane to have the implant procedure as soon as possible.

This declaration was executed this 30th day of June, 2023, in Maricopa County, Arizona.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

By: _Helen Doe_____

Helen Doe

1

**SA174**