# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HELEN DOE, parent and next friend of Jane Doe; et al.,

Plaintiffs-Appellees,

v.

THOMAS C. HORNE, in his official capacity as State Superintendent of Public Instruction; et al.,

Defendants-Appellants,

and

WARREN PETERSEN, Senator, President of the Arizona State Senate; BEN TOMA, Representative, Speaker of the Arizona House of Representatives,

Intervenor-Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Arizona

---

## INTERVENOR-DEFENDANTS-APPELLANTS' PETITION FOR INITIAL EN BANC CONSIDERATION AND FOR EN BANC CONSIDERATION OF MOTION TO STAY PENDING APPEAL

# DISCLOSURE STATEMENT

No. 23-16026 – *Helen Doe, et al., v. Thomas C. Horne, et al.*
(consolidated with No. 23-16030 – *Helen Doe, et al. al. v. Thomas Horne, et al.*)

A disclosure statement pursuant to Federal Rule of Appellate Procedure 26.1

is not required, as Intervenor-Defendants-Appellants are government parties.

*/s/ D. John Sauer*

# TABLE OF CONTENTS

DISCLOSURE STATEMENT .................................................................... i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES..................................................................... iii

PETITION FOR INITIAL EN BANC HEARING.................................................1

INTRODUCTION ...............................................................................1

BACKGROUND ................................................................................3

ARGUMENT ...................................................................................4

    I    The exceptionally important issues involved in this appeal and the risk of
conflict with prior precedents justify initial en banc hearing................................4

        A.    Whether transgender females must be allowed to play on women's teams
involves exceptionally important issues that have split the circuit courts..........4

            1.    This appeal turns on the exceptionally important question of whether
biological males are identical to biological females if they identify as
female...............................................................................................4

            2.    There is a split between this Court and other circuits on whether
transgender individuals are a quasi-suspect class and whether *Bostock*
applies to Title IX. ...........................................................................8

        B.    The district court's decision conflicts with *Clark I* and *Clark II*, just like
*Hecox*...............................................................................................9

        C.    There are significant efficiencies to initial hearing en banc in this case. 11

    II    The en banc court should stay the district court's ruling...............................13

CONCLUSION .................................................................................17

CERTIFICATE OF SERVICE ...............................................................18

CERTIFICATE OF COMPLIANCE .......................................................19

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Perez*,
138 S. Ct. 2305 (2018)............................................................16

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cty.*,
57 F.4th 791 (11th Cir. 2022)................................................ 5, 6, 8, 9

*B.P.J. v. W. Va. State Bd. of Educ.*,
2023 WL 111875 (S.D. W. Va. Jan. 5, 2023)....................................7, 16

*Belk v. Charlotte-Mecklenburg Bd. of Educ.*,
211 F.3d 853 (4th Cir. 2000)....................................................12

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023)...........................................................6

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020)...........................................................2, 5

*City of Cleburne v. Cleburn Living Ctr.*,
473 U.S. 432 (1985) ............................................................15

*Clark ex rel. Clark v. Arizona Interscholastic Association*,
695 F.2d 1126 (9th Cir. 1982)................................................1, 6, 10, 11

*Clark ex rel. Clark v. Arizona Interscholastic Association*,
886 F.2d 1191 (9th Cir. 1989).........................................................1, 11

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022)...........................................................6

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) ....................................................7, 9

*Garcia v. Google, Inc.*,
786 F.3d 733, 746 (9th Cir. 2015) ...............................................16

*Grabowski v. Ariz. Bd. of Regents*,
69 F.4th 1110 (9th Cir. 2023)....................................................7, 9

iii

*Grimm v. Gloucester Cty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020)...................................................................9

*Hart v. Massanari*,
   266 F.3d 1155 (9th Cir. 2001).................................................................12

*Hecox v. Little*,
   No. 20-35813 (9th Cir. Aug. 17, 2023) ................... 1, 2, 3, 6, 8, 10, 11, 12, 14, 15

*Hibbs v. Dep't of Human Res.*,
   273 F.3d 844 (9th Cir. 2001)...................................................................15

*In re MCP No. 165*,
   20 F.4th 264 (6th Cir. 2021) ...................................................................12

*Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*,
   438 F.3d 195 (2d Cir. 2006)....................................................................15

*Katzenbach v. Morgan*,
   384 U.S. 641 (1966) ................................................................................10

*L.W. ex rel. Williams v. Skrmetti*,
   73 F.4th 408 (6th Cir. 2023) .............................................................. 6, 8, 9

*Nguyen v. INS*,
   533 U.S. 53 (2001) ..................................................................................14

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................16

*Nordlinger v. Hahn*,
   505 U.S. 1 (1992) ......................................................................................5

*United States v. Carrillo-Lopez*,
   68 F.4th 1133 (9th Cir. 2023)..................................................................15

*United States v. Pacheco*,
   977 F.3d 764 (9th Cir. 2020)....................................................................8

*West Virginia v. B.P.J. ex rel. Jackson*,
   143 S. Ct. 889 (2023)............................................................................1, 5

*Williamson v. Lee Optical of Okla.*,
   348 U.S. 483 (1955) ...............................................................................10

**STATUTES**

Ariz. Rev. Stat. § 12-1841 .............................................................16
Ariz. Rev. Stat. § 15-120.02 ........................................................3, 4

**RULES**

9th Cir. R. 35-1............................................................................8, 9
Fed. R. App. P. 35.................................................................... 1, 8, 9

**REGULATIONS**

34 C.F.R. § 106.41 ...........................................................................7

## PETITION FOR INITIAL EN BANC HEARING

Pursuant to Appellate Rule 35(b)(1), Intervenors state:

1) This proceeding involves the following questions of exceptional importance, Fed. R. App. P. 35(b)(1)(B):

   a. Whether Title IX or the Equal Protection Clause prohibits a State from restricting participation in women's or girls' sports based on genes or physiological or anatomical characteristics.

2) The motion panel's summary denial of Intervenors' stay motion, like the recent decision in *Hecox v. Little*, No. 20-35813, conflicts with *Clark ex rel. Clark v. Arizona Interscholastic Association (Clark I)*, 695 F.2d 1126 (9th Cir. 1982), and *Clark ex rel. Clark v. Arizona Interscholastic Association (Clark II)*, 886 F.2d 1191 (9th Cir. 1989), and en banc review is appropriate to secure and maintain uniformity of the court's decisions. Fed. R. App. P. 35(b)(1)(A).

## INTRODUCTION

The question this appeal presents—whether segregating sports on the basis of biological sex, without regard for a student-athlete's gender identity, violates the Equal Protection Clause and Title IX—is clearly one of exceptional importance, as Justice Thomas and Justice Alito have already said. *See West Virginia v. B.P.J. ex rel. Jackson*, 143 S. Ct. 889, 889 (2023) (Alito, J., dissenting from denial of

application to vacate injunction). The reason is plain: Answering that question involves ascertaining whether programs meant to remedy past sex discrimination must provide their benefits to biological males who identify as women. This case therefore involves the appropriate scope and validity of sex-based classifications, which are ubiquitous. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1778–80 (2020) (Alito, J., dissenting) (discussing bathrooms, locker rooms, sports, and housing).

The district court opinion in this case combined with the recent panel decision in *Hecox v. Little*, No. 20-35813 (9th Cir. Aug. 17, 2023),[1] underscore the need for initial en banc hearing. The district court's reasoning throws *all* sex-based laws into constitutional doubt—and, in doing so, splits with the Sixth and Eleventh Circuits. Furthermore, while *Hecox* rests solely on Equal Protection grounds, the district court addressed both Equal Protection and the scope of Title IX and *Bostock*'s relevance to the law. Initial en banc review would provide definitive answers to those pressing questions—and allow the Court to alter or overrule recent panel precedent misreading *Bostock*.

Initial en banc hearing is also appropriate to evaluate the district court and *Hecox*'s conclusion—likely agreed to by the motions panel here based on their denial of Intervenors' request—that two prior precedents upholding sex-segregated sports

---

[1] For reference, *Hecox* is attached along with the order denying the stay (Appx B).

from constitutional challenge—*Clark I and Clark II*—do not control the outcome in cases like this. *See* slip op. at 39–43; *id.* at 74–75 (Christen, J., concurring in part and dissenting in part). That, however, is incorrect. En banc hearing to address the issue is appropriate.

Finally, en banc consideration of the motion panel's summary denial of Intervenors' stay request is appropriate. That denial overlooks the strength of Intervenors' case and the myriad ways that the district court's opinion is flawed.

## **BACKGROUND**

On March 30, 2022, Arizona passed the Save Women's Sports Act (SWSA). A20.[2] On September 24, 2022, the SWSA went into effect. *Id.* Under the SWSA, all school athletic teams must be designated as "males," "men," or "boys"; "females," "women," or "girls"; or "coed" or "mixed" "based on the biological sex of the students who participate on the team or in the sport." Ariz. Rev. Stat. § 15-120.02(A). The law further says "[a]thletic teams or sports designated for 'females', 'women' or 'girls' may not be open to students of the male sex." § 15-120.02(B).

Seven months after the SWSA became effective—and a year after the Arizona legislature passed the SWSA—Plaintiffs Doe and Roe filed this lawsuit. *See* A9. Doe and Roe are transgender females—that is, they are biological males who

---

[2] Citations to the appendix filed with Intervenors' stay motion are styled "A#," citations to Intervenors' stay motion, Docket 7, are styled "Mot. #," and citations to Plaintiffs' response to Intervenors' stay motion, Docket 14-1, are styled "Resp. #."

identify as female, *see* A14–A17—and so cannot compete on female sports teams under the terms of the SWSA, *see* § 15-120.02(B).

Plaintiffs moved for a preliminary injunction, arguing that the Arizona legislature's choice to define "female" by reference only to biological sex, as opposed to biological sex *and* gender identity, violated the Equal Protection Clause and Title IX. Appellants-Defendants-Intervenors ("Intervenors"), the Speaker of the Arizona House and the President of the Arizona Senate, defended the law's constitutionality.

On July 20, 2023, the district court issued a preliminary injunction. *See* A43. Later, that court and a motions panel of this Court denied Intervenors' request for a stay pending appeal. *See* A8; Order, Docket 16, at 2.

## ARGUMENT

**I  The exceptionally important issues involved in this appeal and the risk of conflict with prior precedents justify initial en banc hearing.**

**A.  Whether transgender females must be allowed to play on women's teams involves exceptionally important issues that have split the circuit courts.**

**1.  This appeal turns on the exceptionally important question of whether biological males are identical to biological females if they identify as female.**

This appeal "concerns [the] important issue" of "whether either Title IX … or the … Equal Protection Clause prohibits a State from restricting participation in women's or girls' sports based on genes or physiological or anatomical

4

characteristics." *B.P.J.*, 143 S. Ct. at 889 (Alito, J., dissenting from denial of application to vacate injunction). The importance of sports to American life makes the question significant by itself. But the stakes of this case go well beyond that.

That is because the only way to conclude that the Equal Protection Clause and Title IX prohibit segregating sports on the basis of biological sex is to assume "that transgender status and gender identity are equivalent to biological sex." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cty.*, 57 F.4th 791, 803 n.6 (11th Cir. 2022) (en banc) (rejecting the claim). For if transgender women are not "in all relevant respects" the same as biological women, then there is no Equal Protection issue with treating them differently from biological women. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Likewise, Title IX allows individuals who are not "similarly situated" to be treated differently. *Bostock*, 140 S. Ct. at 1740.

Yet that is the premise upon which the district court rests. By finding that but for puberty, there is no meaningful difference between a biological male and a biological female, the district court's reasoning means that if the former identifies as the latter, he is the latter. Plaintiffs have said it directly: transgender girls "are girls." Resp. 15.

The ramification of that position are astonishing. In the sports context, "removing distinctions based on biological sex from sports, particularly for girls in middle school and high school, harms not only girls' and women's prospects in

sports, but also hinders their development and opportunities beyond the realm of sports." *Adams*, 57 F.4th at 821 (11th Cir. 2022) (en banc) (Lagoa, J., specially concurring). Thus, "after decades of women being denied opportunities to meaningfully participate in athletics in this country, many [biological] women athletes reasonably fear being shut out of competition because of transgender athletes who 'retain an insurmountable athletic advantage over cisgender women.' " *Hecox*, slip op. at 60 (quoting an amicus).

But it also limits—if not disables—legislatures from addressing those concerns. Whether, and to what extent, sports teams can be segregated on the basis of biological sex involves "complex" "line-drawing dilemmas" for legislatures. *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 420 (6th Cir. 2023); *see also Clark I*, 695 F.2d at 1131–32 (listing some possible ways legislatures could decide to equalize "specific athletic opportunities"). Constitutionalizing and federalizing the question takes an issue of great "economic and political significance," *Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023) (quotations omitted), "from the people and the democratic process," *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2265 (2022). "That is not how a constitutional democracy is supposed to work—or at least works best—when confronting evolving social norms and innovative medical options." *L.W.*, 73 F.4th at 420.

Moreover, if biological sex-based classifications constitute gender identity discrimination, then *any* law that seeks to draws lines based on biological sex is vulnerable to legal challenges—including those that remedy past discrimination against women. Consider Title IX. Sex-segregated sports exist because the law's regulations allow for them. *See* 34 C.F.R. § 106.41(b). And "[t]here is no serious dispute that Title IX's endorsement of sex separation in sports refers to biological sex." *B.P.J. v. W. Va. State Bd. of Educ.*, 2023 WL 111875, at *9 (S.D. W. Va. Jan. 5, 2023). If the district court—and the motions panel in this case and *Hecox*—are correct, that exemption is in jeopardy.

Finally, initial en banc hearing would let the court review panel decisions applying *Bostock* to Title IX. *See Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023) (applying *Bostock* and Title VII case law to a sex stereotyping claim under Title IX); *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (reasoning in dicta that *Bostock* cannot be excluded from a claim under Section 1557 of the Affordable Care Act (which references Title IX) simply because it concerned only Title VII).[3] Those decisions did not review Title IX using contemporary dictionary definitions and in light of the statutory scheme "as a whole." *United States v.*

---

[3] Those cases did not involve the question of sex-segregated sports teams, so neither case controls this appeal—but they are also not irrelevant.

*Pacheco*, 977 F.3d 764, 767–68 (9th Cir. 2020) (quotations omitted). That analysis can be done by the en banc Court afresh.

> **2.      There is a split between this Court and other circuits on whether transgender individuals are a quasi-suspect class and whether *Bostock* applies to Title IX.**

Highlighting the need for initial en banc hearing is the fact that the district court's decision and decisions of this court "directly conflict[] with … existing opinion[s] by" other courts of appeals "and substantially affects a rule of national application in which there is a need for national uniformity." 9th Cir. R. 35-1; *see* Fed. R. App. P. 35(b)(1)(B).

To start, the district court ruled that Plaintiffs' transgender status made them "members of a quasi-protected class." A27; *see also Hecox*, slip op. at 34. The Sixth Circuit disagrees. "[N]either the Supreme Court nor [the Sixth Circuit] has recognized transgender status as a suspect class." *L.W.*, 73 F.4th at 419 (applying rational basis review). The Eleventh Circuit likewise has "grave doubt[s]" about whether "transgender persons constitute a quasi-suspect class." *Adams*, 57 F.4th at 803 n.5; *see also Hecox*, slip op. at 36 n.13 (noting the Eleventh Circuit's holding). En banc hearing would let the Court review this conclusion in light of *L.W.* and *Adams*.

There is also a split on whether *Bostock* applies in the Title IX context. The Eleventh Circuit, for example, refused to extend *Bostock* to Title IX, instead holding

"'sex' in Title IX to mean 'biological sex.'" *Adams*, 57 F.4th at 811. Similarly, the Sixth Circuit has said that *Bostock* "applies only to Title VII." *L.W.*, 73 F.4th at 420. Those decisions are in tension with *Grabowski*, *see* 69 F.4th at 1116, dicta in *Doe*, *see* 28 F.4th at 113, the district court's decision, and the motion panel's decision denying a stay. En banc hearing would let this Court consider the law in light of contemporary dictionary definitions, broader statutory context, and authority from sister circuits on both sides of the issue. *Compare L.W.*, 73 F.4th at 420, *and Adams*, 57 F.4th at 811, *with Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) ("*Bostock* … guides our evaluation of claims under Title IX.").

Plainly, "there is an overriding need for national uniformity" as to those issues. 9th Cir. L.R. 35-1. It makes no sense for otherwise similar sex-based classifications to be subject to different levels of scrutiny under Equal Protection analyses and lawfulness under federal laws.

### B.     The district court's decision conflicts with *Clark I* and *Clark II*, just like *Hecox*.

En banc review is also "necessary to secure and maintain uniformity of the court's decisions." Fed. R. App. P. 35(b)(1)(A). In their operation—if not their enforcement—the SWSA and the Idaho law at issue in *Hecox* are indistinguishable from the law that two separate panels of this Court upheld in *Clark I* and *Clark II*. Thus, both decisions should control here, just as they should have controlled in *Hecox*.

The district court disagreed—but its bases for distinguishing the cases are unpersuasive and mirror those in *Hecox*. *See* A37 (relying, like the *Hecox* panel, on the reasoning of the *Hecox* district court). First, the district court reasoned that "Plaintiffs have not experienced male puberty and will experience female puberty." A37; *see also Hecox*, slip op. at 40. But *Clark I* rejected the claim that limiting participation in a team "on the basis of specific physical characteristics other than sex" undermined the law. 695 F.2d at 1131.

Second, the district court pointed to past discrimination against transgender women as a reason to distinguish *Clark I* and *II*. *See* A37; *see also Hecox*, slip op. at 40–41. But there is no constitutional reason why a law meant to promote women's participation in sports must extend its benefits to transgender women. To the contrary, "a legislature need not 'strike at all evils at the same time.'" *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966) (internal citation omitted). Because there is no evidence that the discrimination transgender people face is equivalent to the discrimination women faced in athletics, Idaho and Arizona are free to "requir[e] different remedies" for the different issues, or to address the issues at different times. *Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 489 (1955).

Illustrating that is the next claimed distinction: that transgender women will not be able to play sports at all, "unlike the boys in Clark." A37; *see also Hecox*, slip op. at 41–42. The district court pointed to the deleterious mental health effects

that it said would arise if transgender women had to play on male sports team.  *See* A33; *see also Hecox*, slip op. at 42.  That conflates transgender status with the medical diagnosis and treatment of gender dysphoria.  *See* A33 (noting that playing on a male sports team would "contradict [Doe's and Roe's] medical treatment for gender dysphoria").  In addition, *Clark I* upheld Arizona's policy that prevented boys from playing volleyball on girls' teams when the lack of boys' teams meant that Clark could not play volleyball at all.  695 F.2d at 1130.

Finally, the district court concluded that the statement in *Clark II* that "[i]f males are permitted to displace females on the school volleyball team even to the extent of one player like Clark, the goal of equal participation by females in interscholastic athletics is set back, not advanced," 886 F.2d at 1193, does not apply to the transgender population because it is "very small."  A37; *see also Hecox*, slip op. at 42–43.  That makes no sense.  If minimal displacement is permissible, then there is no harm with letting a *de minimis* number of biological males (one, for example) play women's sports.  Yet that is exactly what *Clark II* rejected.  *See* 886 F.2d at 1193.

### C.    There are significant efficiencies to initial hearing en banc in this case.

Between the "transcendent public significance" of the issues and the real potential (given the similar ways in which the district court here and in *Hecox* distinguished *Clark I* and *II*) for "intracircuit conflicts," en banc review is

11

appropriate. *Hart v. Massanari*, 266 F.3d 1155, 1172 n.29 (9th Cir. 2001). Moreover, unlike other requests for initial en banc hearing, hearing this case initially en banc will not involve magnified risks of delay and inefficiencies. *See In re MCP No. 165*, 20 F.4th 264, 267 (6th Cir. 2021) (Moore, J., concurring in denial of initial hearing en banc). To start, this case raises the opportunity to resolve the conflict between *Hecox* and the Court's prior opinions in *Clark I* and *Clark II*. That minimizes any issues relating to "splintered decisions" or "bypassing the winnowing function of" panel review. *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 211 F.3d 853, 854–55 (4th Cir. 2000) (Wilkinson, C.J., concurring in the denial of an initial hearing en banc).

Furthermore, this case—unlike *Hecox*—involves plaintiffs who have not gone through male puberty or are taking puberty blockers. A15, A16. As a result, there is a significant factual record discussing the athleticism of prepubescent male and female athletes and biologically male athletes who do not go through male puberty. *See*, *e.g.*, A50–A183, A282–A393 (providing some of the expert declarations). That is highly relevant to *Hecox*, which found the Idaho law overbroad because it included prepubescent children and "transgender women [who] take puberty blockers and never experience endogenous puberty." Slip op. at 45. The record in this case thus complements and builds upon the facts and analysis in *Hecox*.

Finally, those efficiencies will be magnified—and any inefficiencies minimized—if the Court rehears *Hecox* en banc.

## II     The en banc court should stay the district court's ruling.

En banc consideration of Intervenors' stay request is appropriate.

**1.** Starting with the merits, the district court's decision is contrary to *Clark I* and *II*—and, as noted above, its attempt to distinguish the two is no different than how *Hecox* distinguished the cases.  It fails for the same reason.

As to Plaintiffs' Equal Protection claim, and assuming that intermediate scrutiny applies, the district court's tailoring analysis rests on the (incorrect) premise that transgender females who have not, and will not, experience male puberty are athletically identical to biological women.  *See* A37–38.  In those instances, the district court said, the SWSA does not "substantially relate[] to an important government interest."  A38.

But over "the past 10 to 12 years," the AIA allowed "seven students to play on a team consistent with their gender identity."  A19.  That is the maximum number of transgender females that the SWSA would have excluded—which contrasts sharply with the "roughly 170,000 students [who] play sports in Arizona" per year. *Id.* (quotations omitted).  The SWSA therefore fails to advance the important governmental interest of ensuring that female athletes can compete in athletics equally and safely, *see* A36, in almost no cases.  That is more than sufficient to pass

intermediate scrutiny, which does not require that a law "be capable of achieving its ultimate objective in every instance." *Nguyen v. INS*, 533 U.S. 53, 70 (2001).

Adding prepubescent children to the seven transgender athletes doesn't alter the calculus. *But see Hecox*, slip op. at 45 (saying Idaho's law is overbroad for including them). For one, Plaintiffs' expert suggested that males gain their athletic advantages over females around age 12. That indicates that, under Plaintiffs' theory, from age 12 through college for any athlete that does not timely take puberty blockers, the SWSA serves its purpose of promoting competition in women's sports—and that is surely most student athletes.

For another, the district court's conclusion that transgender girls who have not experienced puberty are no different than biological girls is clearly erroneous, *see* Mot. 8–11, and inconsistent with the district court's findings. For example, the district court cited a study submitted by Plaintiffs saying that there was no difference in strength between boys and girls aged 3-9, "*except for shoulder internal rotators where boys were stronger*." A26 (emphasis added). But stronger shoulder rotating strength *is* relevant for the numerous sports that involve actions like throwing or hitting, such as volleyball that Plaintiff Roe seeks to play. A17.

Furthermore, Plaintiffs' claim is that the SWSA's definition of "females," "women," and "girls" is underinclusive; they argue that it should be expanded to include transgender women as well as biological women. *See, e.g.*, Resp. 15. But

the SWSA was passed to remedy past discrimination. *See* A48. The scope of an otherwise valid affirmative action program is subject to rational-basis scrutiny. *See*, *e.g.*, *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 212 (2d Cir. 2006). And since the SWSA passes intermediate scrutiny, the law plainly is "rationally related to a legitimate state interest." *City of Cleburne v. Cleburn Living Ctr.*, 473 U.S. 432, 440 (1985).

Similarly problematic is the district court's hinting of legislative animus. The district court said the SWSA rests on a "bare … desire to harm" transgender individuals. A38–A39 (quotations omitted). But that ignores that the SWSA serves its purposes in the case of post pubertal student-athletes, where—as the district court found—men have an athletic advantage over women. *See*, *e.g.*, A29. To the extent the quasi-animus finding rests on the statements of two legislators and the governor, the district court impermissibly relied on "the statements of a handful of lawmakers," *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1140 (9th Cir. 2023), an error *Hecox* also makes, *see* slip op. at 26.

That the SWSA passes Equal Protection scrutiny suffices for Title IX, which generally does not reach "beyond what the Equal Protection Clause itself prohibits." *Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 854 (9th Cir. 2001). Furthermore, Plaintiffs have provided no response to the fact that SWSA's sex-segregation rule is consistent with Title IX (Plaintiffs, in fact, concede they are not challenging the sex-

segregation, *see* Resp. 14–15, they just wish to expand the definition of females to include biological males who identify as female). It cannot be the case that Title IX makes unlawful that which it permits. *See*, *e.g.*, *B.P.J.*, 2023 WL 111875, at *9.

**2.** The motions panel also overlooked the equities. First, Arizona will be irreparably harmed absent a stay.[4] Any time a State cannot "enforce its duly enacted plans"—as here—it suffers "irreparable harm." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). The record also shows that Plaintiffs will displace biological females—either via try-outs or by placing ahead of them in competitions. *See* A15–A17; *see also* A29 (citing expert testimony about how transgender women will compete relative to biological women). Those are losses that cannot be recouped—and remediation of past discriminations that will be delayed.

On the other hand, Plaintiffs will not suffer harm from a stay. The harms they pointed the motions panel to all assume that the SSWA is unlawful. Because it is not, those harms are nonexistent. And Plaintiffs cannot explain away their nearly year-long delay in bringing this challenge, which undercuts their claim of irreparable harm. *See Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015).

Lastly, harms to the State of Arizona and the public interest merge in this analysis. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). So the fact a stay is

---

[4] Intervenors can intervene and defend the State's sovereign interests when the constitutionality of a state law is at issue. *See* Ariz. Rev. Stat. § 12-1841(A).

necessary to prevent irreparable harm to the State also establishes that the public interest warrants relief.

## CONCLUSION

Intervenors respectfully request the en banc Court to grant their petition for initial en banc hearing and to stay the district court's injunction.

Dated: August 18, 2023

Respectfully Submitted,

James Otis Law Group, LLC

*/s/ D. John Sauer*
D. John Sauer
Justin D. Smith
Michael E. Talent
13321 N. Outer Forty Road,
Suite 300
St. Louis, MO 63017
(314) 562-0031
john.sauer@james-otis.com
*Attorneys for Intervenor-Defendants-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 18, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 35(b)(2) and Circuit Rule 35-4 because it contains 3,888 words, excluding those portions pursuant to Federal Rule of Appellate Procedure 32(f), according to Microsoft Word.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Times New Roman font.

*/s/ D. John Sauer*
D. John Sauer
Dated: August 18, 2023