No. 23-16026 c/w No. 23-16030

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

HELEN DOE, parent and next friend of Jane Doe; et al.,

Plaintiffs-Appellees,

v.

THOMAS C. HORNE, in his official capacity as State Superintendent of Public Instruction; et al.,

Defendants-Appellants,

and

WARREN PETERSEN, Senator, President of the Arizona State Senate; BEN TOMA, Representative, Speaker of the Arizona House of Representatives,

Intervenor-Defendants-Appellants.

On Appeal from the United States District Court
for the District of Arizona

## CONSOLIDATED BRIEF OF APPELLANT AND INTERVENOR-DEFENDANTS-APPELLANTS

| | | |
|---|---|---|
| D. John Sauer | Dennis I. Wilenchik | Maria Syms |
| Justin D. Smith | Karl Worthington | Arizona Department |
| Michael E. Talent | Wilenchik & | of Education |
| James Otis Law Group LLC | Bartness, P.C. | 1535 W. Jefferson, BIN #50 |
| 13321 N. Outer Forty Rd., Suite 300 | 2810 N. Third St. Phoenix, AZ 85004 | Phoenix, AZ 85007 |
| St. Louis, MO 63017 | (602) 606-2810 | (602) 542-5240 |
| (314) 562-0031 | | |

*Attorneys for Intervenor-Defendants-Appellants*

*Attorneys for Appellant Thomas C. Horne*

## <u>DISCLOSURE STATEMENT</u>

A disclosure statement pursuant to Federal Rule of Appellate Procedure 26.1 is not required, as Appellant Horne and Intervenor-Defendants-Appellants Petersen and Toma are government parties.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ....................................................................i

TABLE OF CONTENTS ...........................................................................ii

TABLE OF AUTHORITIES.....................................................................iv

INTRODUCTION ..................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 6

ISSUES FOR REVIEW ............................................................................ 6

CONSTITUTIONAL AND STATUTORY AUTHORITY.......................... 7

STATEMENT OF THE CASE .................................................................. 7

   I.   The Save Women's Sports Act. .................................................... 7

   II.   The effect of the SWSA on transgender student-athletes........ 10

     A.   Transgender individuals and gender dysphoria....................... 10

     B.   The SWSA's effect on transgender student-athletes............... 11

   III.   The lawsuit and preliminary injunction decision.................... 12

     A.   Plaintiffs' lawsuit. ................................................................... 12

     B.   The district court's injunction................................................. 14

SUMMARY OF ARGUMENT ................................................................. 18

STANDARD OF REVIEW...................................................................... 23

ARGUMENT .......................................................................................... 24

   I.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Equal Protection and Title IX Claims. ...................................................... 24

     A.   The SWSA does not violate the Equal Protection Clause........ 25

       1.   The SWSA is subject to, and passes, rational-basis scrutiny. 26

         a.   Underinclusive challenges to affirmative action programs are subject to rational basis analysis. .....................................26

         b.   The district court's justifications for applying intermediate scrutiny do not apply................................................................ 31

         c.   *Hecox* does not foreclose application of rational-basis scrutiny..................................................................................... 37

d. The SWSA passes rational basis scrutiny. ........................ 38

2. Alternatively, the SWSA satisfies intermediate scrutiny. .... 39

a. The district court's analysis improperly requires the SWSA to be perfectly tailored. ................................. 41

b. The district court's conclusion that transgender females who have not experienced male puberty do not have athletic advantages over female athletes is clearly erroneous ............ 51

c. *Hecox* does not require a different outcome ..................... 59

B. The SWSA does not violate Title IX. ...................................... 61

II. The remaining equitable factors do not justify relief. .............. 67

CONCLUSION ........................................................................ 71

CERTIFICATE OF RELATED CASES ................................. 73

CERTIFICATE OF COMPLIANCE ...................................... 74

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ................................................................. 39, 68

*Adams ex rel. Kasper v. School Board of St. Johns County,*
57 F.4th 791 (11th Cir. 2022) ........................... 36, 40, 62, 63, 64, 65, 66

*Aleman v. Glickman,*
217 F.3d 1191 (9th Cir. 2000) ............................................................ 26

*Arizona v. Yellen,*
34 F.4th 841 (9th Cir. 2022) .............................................................. 66

*Associated Gen. Contractors of Cal., Inc. v. City and County of San Francisco,*
813 F.2d 922 (9th Cir. 1987) ......................................................... 30, 46

*B.P.J. v. W. Va. State Bd. of Educ.,*
2023 WL 111875 (S.D. W. Va. Jan. 5, 2023) ................................. 42, 67

*Barapind v. Enomoto,*
400 F.3d 744 (9th Cir. 2005) ......................................................... 37, 40

*Barbier v. Connolly,*
113 U.S. 27 (1884) ............................................................................ 38

*Bd. of Trustees of State Univ. of N.Y. v. Fox,*
492 U.S. 469 (1989) .......................................................................... 46

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ...................................................................... 66

*Bond v. United States,*
134 U.S. 844 (2014) .......................................................................... 66

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020) ................................................................. 62, 63

*Buckley v. Valeo,*
424 U.S. 1 (1977) .............................................................................. 28

*Clark ex rel. Clark v. Ariz. Interscholastic Ass'n (Clark I),*
695 F.2d 1126 (9th Cir. 1982) ................... 27, 28, 30, 41, 42, 43, 44, 46

*Clark ex rel. Clark v. Arizona Interscholastic Association,*
886 F.2d 1191 (9th Cir. 1989) .................................................. 42, 44, 70

*Country Classic Dairies, Inc. v. Mont., Dep't of Commerce Milk Control Bureau,*
847 F.2d 593 (9th Cir. 1988) .............................................................. 26

iv

*Craig v. Boren*,
  429 U.S. 190 (1976) ............................................................... 30
*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999) ............................................................... 66
*De La Cruz v. Tormey*,
  582 F.2d 45 (9th Cir. 1978) ................................................... 32
*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022) .......................................................... 32
*Doe v. Snyder*,
  28 F.4th 103 (9th Cir. 2022) .................................................. 63
*Dunn v. Blumstein*,
  405 U.S. 330 (1972) ............................................................... 26
*E. Bay Sanctuary Covenant v. Garland*,
  994 F.3d 962 (9th Cir. 2020) ........................................... 24, 67
*Eknes-Tucker v. Governor of Ala.*,
  2023 WL 5344981 (11th Cir. Aug. 21, 2023) ......................... 33
*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993) ............................................................... 39
*Fitzgerald v. Barnstable Sch. Comm.*,
  555 U.S. 246 (2009) ............................................................... 61
*Frontiero v. Richardson*,
  411 U.S. 677 (1973) ............................................................... 65
*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ........................................... 24, 67
*Grabowski v. Arizona Board of Regents*,
  69 F.4th 1110 (9th Cir. 2023) ......................................... 62, 63
*Grimm v. Gloucester Cty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) .......................................... 64, 66
*Hecox v Little*,
  479 F. Supp. 3d 930 (D. Idaho 2020) ................................... 44
*Hecox v. Little*,
  2023 WL 5283127 (9th Cir. Aug. 17, 2023) 32, 33, 35, 36, 37, 39, 44, 50,
  59, 60, 70
*Hibbs v. Dep't of Human Res.*,
  273 F.3d 844 (9th Cir. 2001) ................................................ 61
*Hoohuli v. Ariyoshi*,
  631 F. Supp. 1153 (D. Haw. 1986) ....................................... 28

*In re R.M.J.*,
  455 U.S. 191 (1982) .................................................................. 46
*Jana-Rock Construction, Inc. v. New York State Dep't of Economic Development*,
  438 F.3d 195 (2d Cir. 2006)................................... 29, 30, 31, 32, 33, 37
*Kahn v. Shevin*,
  416 U.S. 351 (1974) .................................................................. 46
*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) ........................................................... 39
*Katzenbach v. Morgan*,
  384 U.S. 641 (1966) .................................................................. 28
*Kelton Arms Condominium Owners Ass'n v. Homestead Ins. Co.*,
  346 F.3d 1190 (9th Cir. 2003) ......................................................... 38
*Kirchberg v. Feenstra*,
  450 U.S. 455 (1981) .................................................................. 31
*L.W. ex rel. Williams v. Skrmetti*,
  73 F.4th 408 (6th Cir. 2023).................................................... 34, 39, 40
*Lafler v. Athletic Bd. of Control*,
  536 F. Supp. 104 (W.D. Mich. 1982) ................................................. 61
*Ledezma-Cosino v. Sessions*,
  857 F.3d 1042 (9th Cir. 2017) ......................................................... 49
*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ........................................................... 69
*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ......................................................... 24
*Martin v. Int'l Olympic Comm.*,
  740 F.2d 670 (9th Cir. 1984) ........................................................... 32
*Maryland v. King*,
  567 U.S. 1301 (2012) ................................................................. 68
*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) .................................................................. 24
*McDonald v. Bd. of Election Comm'rs of Chi.*,
  394 U.S. 802 (1969) ............................................................... 28, 49
*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
  512 U.S. 218 (1994) .................................................................. 64
*Miller v. Johnson*,
  515 U.S. 900 (1995) .................................................................. 35

*Miranda B. v. Kitzhaber*,
    328 F.3d 1181 (9th Cir. 2003) ........................................................ 37

*Miss. Univ. for Women v. Hogan*,
    458 U.S. 718 (1982) ........................................................................ 31

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
    434 U.S. 1345 (1977) ...................................................................... 69

*Nguyen v. INS*,
    533 U.S. 53 (2001) .......................................................................... 45

*Oakland Tribune, Inc. v. Chron. Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985) ........................................................ 67

*Olson v. California*,
    62 F.4th 1206 (9th Cir. 2023) ......................................................... 23

*Pac. Shore Props., LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013) ........................................................ 32

*Parents for Privacy v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ........................................................ 62

*Peightal v. Metro. Dade Cty.*,
    940 F.2d 1394 (11th Cir. 1991) ................................................. 31, 37

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ............................................................................ 66

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) .................................................................. 32, 36

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) ............................................. 23, 24, 59

*Schilb v. Kuebel*,
    404 U.S. 357 (1971) ....................................................................... 28

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017) .......................................................................... 30

*United States v. Carrillo-Lopez*,
    68 F.4th 1133 (9th Cir. 2023) .................................................... 34, 35

*United States v. Edge Broad. Co.*,
    509 U.S. 418 (1993) .................................................................. 47, 50

*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) .................................................... 23, 58

*United States v. Johnson*,
    256 F.3d 895 (9th Cir. 2001) .......................................................... 37

*United States v. Pacheco*,
    977 F.3d 764 (9th Cir. 2020) .......................................................... 64

*United States v. Ruiz-Chairez,*
  493 F.3d 1089 (9th Cir. 2007) ...................................................... 38
*United States v. Virginia,*
  518 U.S. 515 (1996) .............................................. 1, 27, 40, 48
*Util. Air Regulatory Grp. v. EPA,*
  573 U.S. 302 (2014) ....................................................................... 63
*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,*
  429 U.S. 252 (1977) ....................................................................... 32
*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) .............................................. 4, 46, 48
*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ....................................................................... 65
*Williams v. Sch. Dist. of Bethlehem,*
  998 F.2d 168 (3d Cir. 1993) .......................................................... 61

## STATUTES

20 U.S.C. § 1686 .................................................................................. 65
28 U.S.C. § 1292 .................................................................................... 6
28 U.S.C. § 1331 .................................................................................... 6
28 U.S.C. § 1343 .................................................................................... 6
Ariz. Rev. Stat. § 15-120.02 ................................. 9, 10, 11, 12, 26

## REGULATIONS

34 C.F.R. § 106.33 ............................................................................... 62
34 C.F.R. § 106.41 .......................................................................... 61, 67

## RULES

9th Cir. R. 28-2 ...................................................................................... 7
Fed. R. App. P. 4 .................................................................................... 6

## OTHER AUTHORITIES

Arizona State Legislature, https://www.azleg.gov/ ................................. 34
Ben Church, *World Aquatics Launches Open Category for Transgender Athletes at Swimming World Cup*, CNN (Aug. 17, 2023), https://www.cnn.com/2023/08/17/sport/world-aquatics-transgender-athletes-swimming-spt-intl/index.html ................................................. 35
Jonathon W. Senefeld et al., *Sex Differences in Youth Elite Swimming*, Plos One, Nov. 2019 .......................................................................... 54

Mira A. Atkinson et al., *Sex Differences in Track and Field Elite Youth* (Aug. 31, 2023) (preprint), https://sportrxiv.org/index.php/server/preprint/view/324/654 ...... 55, 60

## **INTRODUCTION**

In 2022, the Arizona legislature passed the "Save Women's Sports Act" ("SWSA" or "Act") to promote fairness, opportunity, and safety in girls' and women's sports. The Act provides that only biological women and girls can play on female sports teams. It advances important governmental objectives of promoting fairness, opportunity, and safety for female athletes, and redressing past sex discrimination in athletics.

Plaintiffs-Appellees Jane Doe and Megan Roe ("Plaintiffs") are biological boys who identify as female and have not gone through male puberty. They contend that Arizona must permit them to play on girls' sports teams because they claim—contrary to extensive evidence—that there are no meaningful differences in athletic performance between prepubescent boys and girls. *Contra United States v. Virginia (VMI)*, 518 U.S. 515, 533 (1996) (noting that the "[i]nherent differences between" boys and girls are a "cause for celebration"). The district court entered a preliminary injunction against the Act based on Plaintiffs' Equal Protection and Title IX claims.

There is no merit to these challenges, and the district court erred in concluding otherwise. Plaintiffs' Equal Protection claim fails for two

1

reasons. First, the Act is subject to rational-basis scrutiny, which it easily satisfies. Plaintiffs admit that Arizona may adopt sex-segregated sports teams and prohibit boys from playing on girls' teams. Instead, they claim that the definition of "females," "women," and "girls" in the SWSA is underinclusive—that the definition should be expanded to include not just biological females, but also at least some biological males who identify as females, *i.e.*, transgender athletes like themselves.

Such underinclusiveness challenges to admittedly valid classifications are subject to rational-basis review. The point of intermediate scrutiny is to ensure that a legislature's decision to create a sex-based classification is not motivated by invidious stereotypes. Where, as here, a classification is admittedly valid, the legislature has discretion in establishing the contours of the program so long as the contours are not too *broad*—that is, they do not violate the requirement that there be a reasonably close means-end fit. Claims that the legislature drafted a remedial program too *narrowly* and must expand the protected class to include additional subclasses are subject to rational-basis scrutiny, not intermediate scrutiny.

Second, the SWSA easily satisfies both rational basis scrutiny and intermediate scrutiny, even if the latter applies. And it does so even if one accepts the baseless factual foundation of Plaintiffs' lawsuit—*i.e.*, their claim that biological boys who have not experienced male puberty have no athletic advantage over biological girls. The SWSA advances its interests as to every biological boy who identifies as such because it promotes fairness, safety, and opportunity for biological females in sports, and it redresses the fact that there have been greater opportunities for boys to participate in athletics. And the law advances important governmental objectives when applied to transgender girls who *have* experienced male puberty because it is undisputed that male puberty confers athletic advantages on those who experience it.

Thus, even on Plaintiffs' and the district court's erroneous factual assumptions, the Act advances its interests of promoting fairness and opportunity in nearly every case. The record demonstrates that over the last decade there have been, at most, seven transgender student-athletes who have participated in Arizona on a team other than their biological sex. Thus, if the SWSA had been in place over the last decade, it would have failed to achieve its purposes in, at the very most, only seven cases.

Since roughly 170,000 students play athletics per year, the SWSA achieves its goal in at least 99.996 percent of cases. If that does not satisfy intermediate scrutiny, nothing does.

Ignoring the whole picture, the district court focused narrowly on the individual Plaintiffs' unique factual circumstances and required Arizona to provide a compelling justification for excluding each individual Plaintiff from girls' teams. This was error. The governing standard for intermediate scrutiny—which the district court purported to apply—requires the court to evaluate whether the SWSA is properly tailored by looking at its *classification as a whole*. Intermediate scrutiny requires the district court to consider how the Act relates "to the *overall problem* the government seeks to correct," *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989) (emphasis added)—not to focus solely on the individual Plaintiffs' unique circumstances. And intermediate scrutiny does not require Arizona to achieve perfect tailoring, or to provide a specific justification for the classification as to each individual affected. Rather, intermediate scrutiny requires only a "substantial" relationship between the classification and the important government interests that it advances. Here, where the Act advances the State's important

interests in the overwhelming majority of cases, if not all, that standard is satisfied.

Moreover, the district court compounded this error by drawing baseless factual conclusions about the individual Plaintiffs' circumstances. The district court's conclusion that prepubescent males have no athletic advantage over prepubescent females is clearly erroneous. The record clearly establishes that prepubescent boys have physiological advantages that translate into better athletic performance. Prepubescent boys outperform prepubescent girls in almost all objective metrics of athletic performance, and they do so consistently across cultures with widely varying encouragement of females in sports. And there is no objective evidence that post-pubertal hormone suppression eliminates these advantages. Neither the district court nor Plaintiffs really dispute those facts—instead, they seek to minimize them, saying that those differences are small and don't matter much. But small differences are crucial in athletic competitions, which are often decided by inches or fractions of seconds. These admitted differences establish that biological boys who do not experience puberty are not similarly

situated to biological girls—and that the SWSA fulfills its purposes as to this group as well.

Finally, the Act does not violate Title IX. The Act does exactly what Title IX permits: It segregates sports teams based on biological sex. To conclude otherwise, as the district court did, ignores every textual clue and canon of construction showing that when Title IX and its implementing regulations refer to "sex," they refer to biological sex.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiffs' federal constitutional and statutory claims pursuant to 28 U.S.C. §§ 1331, 1343. 3-ER-596. The district court granted Plaintiffs' motion for a preliminary injunction on July 20, 2023. 1-ER-36. Intervenor-Defendants-Appellants Petersen and Toma (the "Legislative Leaders") filed their notice of appeal on July 21, 2023. 4-ER-614–15. Superintendent Horne filed his on July 24, 2023. 4-ER-617–18. Both appeals are timely. See Fed. R. App. P. 4(a)(1), (3). This Court has jurisdiction per 28 U.S.C. § 1292(a)(1).

## ISSUES FOR REVIEW

I. Whether the SWSA violates the Equal Protection Clause. This involves two sub-issues:

6

1)  Whether the Arizona legislature's decision to define "females," "women," or "girls" in the SWSA by reference to biological sex is subject to, and passes, rational-basis review.

2)  Alternatively, whether the SWSA satisfies intermediate scrutiny because it is substantially related to advancing the important governmental purposes of encouraging fairness, safety, and opportunity in female sports and remedying past discrimination.

II.   Whether the SWSA violates Title IX by segregating sports by biological sex instead of by biological sex and gender identity.

III.  Whether the equitable factors justify injunctive relief.

## CONSTITUTIONAL AND STATUTORY AUTHORITY

All relevant constitutional provisions and statues are contained in the Addendum filed with this brief.  *See* 9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### I.   The Save Women's Sports Act.

The SWSA recognizes the importance of "the full development of the talent and capacities [of women] in the context of sports and athletics."   2-ER-99 (quotations omitted) (§ 2(11) of the legislative findings).  Allowing men to compete on women's teams in competitive sports impedes that development.  Biological men and women, the

legislature concluded, have "inherent, physiological differences . . . ." 2-ER-99 (§ 2(12)). The Legislature noted that biological males have "'a larger body size with more skeletal-muscle mass, a lower percentage of body fat, and greater maximal delivery of anaerobic and aerobic energy.'" 2-ER-99 (§ 2(7) (quoting a study). "Men also have higher natural levels of testosterone . . . which result[s] in men being able to generate higher speed and power during physical activity." 2-ER-99 (§ 2(8)) (citing another study). These physiological differences between men and women result in different athletic ability. The legislature found that "'boys typically scored higher than girls on cardiovascular endurance, muscular strength, muscular endurance, and speed/agility, but lower on flexibility.'" 2-ER-98 (§ 2(6)) (quoting a study).

The record in the district court supports those findings: Men are taller and heavier, *see*, *e.g.*, 3-ER-366–67, have larger and stronger skeletal structures, *see*, *e.g.*, 3-ER-367–68, have greater muscle mass, *see*, *e.g.*, 3-ER-369, and have greater pulmonary and vascular capacity, *see*, *e.g.*, 3-ER-372–73. Likewise, the data shows that biological men are stronger, *see*, *e.g.*, 3-ER-356–57, and faster, *see*, *e.g.*, 3-ER-359–63, jump

8

higher, *see*, *e.g.*, 3-ER-363–64, and throw, hit, and kick faster and farther, *see*, *e.g.*, 3-ER-364–65, than biological women.

As the Arizona Legislature concluded, there is an "insurmountable" "performance gap between males and females," with biological females disadvantaged relative to biological males. 2-ER-99 (§ 2(9)) (quoting a study); *see also* 2-ER-99 (§ 2(12)). Moreover, female athletes are at greater risk of injury when playing against male athletes. *See* 2-ER-215–30 (Dr. Carlson's declaration) (discussing how differences in physiology relate to physical injury).

The Legislature's solution was to provide for "separate sex-specific teams … ." 2-ER-100 (§ 2(14)). Thus, "[o]n March 30, 2022, Arizona enacted [the SWSA], with an effective date of September 24, 2022." 1-ER-13. The SWSA requires public schools—and private schools that compete against public schools—to designate sports teams as "males," "men," or "boys"; "females," "women," or "girls"; or "coed" or "mixed"; "based on the biological sex of the students who participate on the team or in the sport." Ariz. Rev. Stat. § 15-120.02(A). "Biological sex" refers to a child's sex as "determined at fertilization and revealed at birth or, increasingly, *in utero*." 2-ER-98 (alterations omitted) (quoting § 2(2) of

the SWSA); *see also* 1-ER-14. "Athletic teams or sports designated for [females] may not be open to students of the male sex," though biological females can play on male sports teams. § 15-120.02(B).

## II. The effect of the SWSA on transgender student-athletes.

### A. Transgender individuals and gender dysphoria.

According to Plaintiffs' experts, a transgender individual is someone whose gender identity—their "internal, innate, deeply held sense of their own gender"—does not correspond to their biological sex. *See* 1-ER-4–5. Thus, the district court found that biological sex and gender identity are separate concepts, and "[f]or a transgender person," the former "does not match" the latter. 1-ER-5; *see*, *e.g.*, 2-ER-120, 125–26 (providing Dr. Hilton's opinion that sex and gender identity are separate concepts); 2-ER-167–68, 305–06 (providing Dr. Cantor's view that sex is objectively determined and gender identity is not a component of sex). "Less than one percent of the population is transgender." 1-ER-12. Transgender individuals may suffer from gender dysphoria, a condition "characterized by significant disabling distress due to the incongruence between a person's gender identity and assigned sex." 1-

ER-5; *see id.* (noting transgender individuals "may" suffer from gender dysphoria) (quotations omitted); *see also* 3-ER-554; 3-ER-565.

## B.    The SWSA's effect on transgender student-athletes.

Prior to the SWSA, the Arizona Interscholastic Association (AIA)— a "membership organization of public and private high schools that regulates and oversees interscholastic athletic competition in" Arizona, 3-ER-595—allowed transgender student-athletes "to play on a team consistent with his or her gender identity" after a review "by a committee of medical and psychiatric experts." 1-ER-11. "In the past 10 to 12 years, the AIA fielded approximately 12 requests consistent with their policy and approved seven students to play on a team consistent with their gender identity." 1-ER-12; *see also* 5-ER-673. The gender identity of those seven students is unknown. 1-ER-12. "[R]oughly 170,000 students play[] sports in Arizona" per year. 1-ER-12 (quotations omitted).

The SWSA treats all student-athletes alike by separating sports based on biological sex. *See* Ariz. Rev. Stat. § 15-120.02(B). So—like everyone else—transgender students may play on a team consistent with their biological sex. *See id.* In addition, transgender men (*i.e.*, biological females who identify as male) can play on a team consistent with their

gender identity. *See id.* Moreover, transgender males and transgender females can play on coed teams. *See id.* But transgender females (*i.e.*, biological males who identify as female), like all other biological males, cannot play on women's sports teams. *See id.*

## III. The lawsuit and preliminary injunction decision.

### A. Plaintiffs' lawsuit.

Plaintiffs-Appellees Doe and Roe ("Plaintiffs") are biological boys who allege that they have gender dysphoria, *see* 3-ER-530, 539, and that playing on male sports teams contradicts their "medical treatment for gender dysphoria," 1-ER-23 (Doe); *see* 1-ER-24 (Roe). Doe wants to run cross-country and try out for the girls' soccer and basketball teams at Kyrene Aprende Middle School (Kyrene). 1-ER-8. Roe wants to try out for the girls' volleyball team at The Gregory School (TGS). 1-ER-10.

On April 17, 2023—over a year after SWSA was passed, and three sports seasons after the law went into effect—Plaintiffs sued, claiming the SWSA violates the Equal Protection Clause, Title IX, and the ADA and Section 504 of the Rehabilitation Act. 3-ER-592–612. They named

Appellant, Superintendent Horne, as a defendant.[1]  3-ER-594.  Plaintiffs moved for a preliminary injunction based on their Equal Protection and Title IX claims.  3-ER-577.  The district court permitted the Intervenor-Defendants-Appellants, Arizona Senate President Warren Petersen and Speaker of the Arizona House of Representatives Ben Toma (the "Legislative Leaders"), to intervene to defend the statute.  *See* 4-ER-633.

Plaintiffs do not challenge Arizona's policy of sex-segregation in sports; they "agree that there should be separate teams for boys and girls."  5-ER-664; *see also* 3-ER-514 (disclaiming any challenge to "whether sex-segregated sports are permissible").  Rather, they say, "[t]his case is about one thing only: the exclusion of [Plaintiffs] from girls' sports teams because they are transgender girls."  3-ER-514.

Plaintiffs also seek to limit their challenge in another way:  They allege that neither has gone through male puberty, and both intend to undergo puberty-suppressing treatment to prevent male puberty.  *See* 1-ER-8, 9–10.  Plaintiffs do not directly dispute the fact that men have an athletic advantage over women post-puberty.  *See*, *e.g.*, 3-ER-513

---

[1] Plaintiffs also named Kyrene, Kyrene's superintendent, TGS, and the Arizona Interscholastic Association.  *See* 3-ER-595.  They are not part of this appeal.

(claiming that the well-documented post-puberty athletic advantages of men over women are "irrelevant topics" in this lawsuit); 5-ER-754 (dismissing as "irrelevant" "studies on transgender women who undergo testosterone suppression as adults"); *see also* 1-ER-17. Instead, Plaintiffs contend that "[b]efore puberty, there are no significant differences in athletic performance between boys and girls." 1-ER-22 (citing Plaintiffs' experts).[2]

## B. The district court's injunction.

The district court granted Plaintiffs' preliminary injunction motion on July 20, 2023.[3]

*First*, the district court analyzed the Equal Protection claim. The district court held that heightened, or intermediate, scrutiny applied. *See* 1-ER-28. That was because, the court held, the Act facially discriminates against transgender people: SWSA's "disparate treatment of transgender girls … is clear on the face of the statute and makes it facially discriminatory even if the statute does not expressly employ the

---

[2] Plaintiffs provided declarations from Dr. Shumer and Dr. Budge. The Legislative Leaders and Superintendent Horne provided declarations from Dr. Blade, Dr. Brown, Dr. Cantor, Dr. Carlson, and Dr. Hilton.

[3] The district court's opinion is in Volume 1 of the Record Excerpts and is reported at 2023 WL 4661831.

term 'transgender.'" 1-ER-28. The court also concluded that "[t]he legislative history demonstrates that the purpose of the Act is to exclude transgender girls from girls' sports teams." 1-ER-28; *see* 1-ER-14–15 (finding that the SWSA "was adopted for the purpose of excluding transgender girls from playing on girls' sports teams").

The district court pointed to three statements to support the latter conclusion. One is Senator Leach's statement that, "if we allow transgenders to take over female sports, you will not have females participating." 1-ER-14–15. The second, from Senator Petersen, is his question to the SWSA's opponents about whether they "would 'be opposed to having just a trans league, so that they can all compete in their own league.'" 1-ER-15. The last is a statement from Governor Ducey's signing letter saying the SWSA "creates a statewide policy to ensure biologically female athletes at Arizona public schools, colleges, and universities have a level playing field to compete . . . . This legislation simply ensures that the girls and young women who have dedicated themselves to their sport do not miss out . . . due to unfair competition." 1-ER-15.

The district court then concluded that the SWSA fails intermediate scrutiny. The court conceded that "protect[ing] girls from physical injury in sports and promot[ing] equality and equity in athletic opportunities ... are, in addition to redressing past discrimination against women in athletics, ... legitimate and important governmental interests," 1-ER-29; *see also* 5-ER-663–64, but the court held that the SWSA is not "substantially related to" those goals, 1-ER-30.

In reaching that conclusion, the district court accepted Plaintiffs' premise "that, before puberty, there are no significant physiological differences in athletic performance between boys and girls," and the court found no "evidence that transgender girls who do not undergo male puberty ... have an athletic advantage over other girls." 1-ER-29. As a result, the court said, the SWSA is "overly broad" by prohibiting Plaintiffs from playing on girls' sports teams because they do not "present[] an actual problem of unfair competition or create safety risks to other girls." 1-ER-30–31.

The district court further found that the SWSA "treats transgender boys and transgender girls and boys' and girls' sports differently. Transgender boys ... are allowed to play on boys' sports teams, subject to

the alleged risks of that association which the Act proports to address." 1-ER-31. The district court also said the SWSA creates a "private cause of action" that "burdens only girls' sports programs," and that "only female athletes" are subject to "gender challenges and investigations." 1-ER-31.

Finally, and alternatively, the district court said the SWSA fails rational-basis scrutiny because it was the product of a "desire to harm a politically unpopular group . . . ." 1-ER-31–32 (quotations omitted).

*Second*, the district court analyzed Plaintiffs' Title IX claim. The court concluded that the SWSA violates Title IX because it "discriminates against Plaintiffs based on their status as transgender girls . . . ." 1-ER-32.

*Third*, the district court held that the equitable factors favored Plaintiffs. *See* 1-ER-33–35.

The Legislative Leaders and Superintendent Horne timely appealed. 4-ER-614–19. On August 14, 2023, this Court consolidated the appeals and ordered consolidated briefing. *See* Order, Dkt. 16, at 2.

17

## SUMMARY OF ARGUMENT

I.  The SWSA does not violate the Equal Protection Clause for two reasons:

*First*, the SWSA is subject to rational-basis review, which it easily satisfies.  The SWSA is a remedial statute.  The Arizona legislature passed the law to provide girls and women a benefit—participation on their own sports teams—for the purpose of promoting opportunities for female athletes, ensuring the safety of female athletes, and remedying past discrimination.  In doing so, the legislature defined "females," "women," or "girls" to include only biological women—thus limiting the scope of the benefit to that particular group.

Plaintiffs concede that the sex classification the SWSA makes between biological males and females is valid.  That is, they agree that the SWSA's sex-based classifications in sports are constitutional. Instead, they contend that the definition of the protected class— "females," "women," and "girls"—is underinclusive.  They claim that Arizona must expand the law's benefits to include transgender girls like them—and that the failure to do so is subject to heightened scrutiny.

18

Underinclusive challenges to remedial laws like the SWSA are subject to rational-basis review absent a showing of discriminatory purpose—a showing that cannot be made on this record. To subject the scope of valid sex-classification like the SWSA to heightened scrutiny misunderstands the purpose of intermediate scrutiny, and so is inconsistent with the constitutional test.

The SWSA is thus subject to rational-basis scrutiny, which it withstands easily. The law is rationally related to Arizona's interest in promoting fairness, safety, and equal opportunity for female athletes and remedying past discrimination. Plaintiffs contend that the law fails rational-basis scrutiny because they assert that it reflects a bare desire to harm transgender individuals. Such claims are difficult to make—especially where, as here, all a challenger does is point to statements from a tiny group of legislators that, on their face, do not reflect any animus against transgender people. Plaintiffs therefore do not overcome the presumption of legislative good faith, and so do not undermine the rationality of the SWSA. Moreover, the "bare desire to harm" standard applies only to statutes that do not have any *other* rational basis, so it is plainly inapplicable here.

19

*Second*, even if intermediate scrutiny applies, the SWSA easily satisfies that standard as well. The law undisputedly serves the important governmental purposes of promoting female opportunity for female athletes, ensuring the safety of female athletes, and remedying past discrimination. The SWSA's means for achieving that (limiting participation in girls' sports teams to biological women) is substantially related to that objective.

That is so even assuming the SWSA does not advance its purposes as applied to transgender girls who have not experienced male puberty. The number of such athletes reflects a tiny minority of total athletes, and the record demonstrates that the SWSA accomplishes its purposes as applied to prepubescent and adolescent biological males and females, and as applied to transgender athletes who have experienced male puberty. That is, the SWSA advances its purposes in almost every setting. Intermediate scrutiny requires nothing more—indeed, it requires much less. The district court's requirement that the law advance its purposes in Plaintiffs' *specific case* simply misapplies the governing standard, and so is reversible error.

20

Moreover, the district court clearly erred in concluding that the SWSA does not advance its purposes as to transgender athletes who have not undergone male puberty. The district court found that prepubescent biological boys and biological girls are athletically identical. But the evidence of the Legislative Leaders' and Superintendent Horne's experts establishes that is not so; that evidence shows there are physiological differences between prepubescent boys and girls that confer significant athletic advantages on biological boys, regardless of their gender identity.

Indeed, the evidence is so conclusive that Plaintiffs, and the district court, do not actually contest it. Instead, they seek to minimize it, calling the differences "small" or "not significant." But that concedes the existence of those differences—while ignoring that, in athletics, even a very small difference is often decisive, constituting the margin of victory. Because there are meaningful differences in athletic performance between prepubescent biological boys and biological girls—and thus between transgender girls who have not experienced male puberty and biological girls—the district court's contrary conclusion is clearly

erroneous. That undermines the factual lynchpin of the court's analysis, and so the SWSA passes constitutional scrutiny for this reason as well.

II. The district court also erred in concluding that the SWSA likely violates Title IX. Title IX and its implementing regulations permit sex-segregated sports, and analysis of the text and context of the law establishes that when Title IX references "sex," it means biological sex. Because the SWSA does what Title IX permits, it does not violate the law.

III. Plaintiffs do not establish the equitable factors that justify preliminary relief. As to irreparable harm, Plaintiffs delayed almost a year—and three sports seasons—before bringing suit. That delay undermines their claim to relief. Moreover, the SWSA does not prohibit transgender individuals like Plaintiffs from playing sports; all it says is that they must play on teams that correspond to their biological sex. The reason Plaintiffs cannot play sports is because doing so contradicts the treatment for their gender dysphoria. Thus, a medical issue—a factor that prevents many students from participating in school sports—and not the SWSA is the cause of their irreparable harm.

Finally, the public interest and harm to Arizona mandate reversal. An injunction barring Arizona from enforcing its law inflicts *per se*

irreparable harm on the State. Further, allowing transgender athletes to play on women's sports teams displaces biological females. Sports are inherently zero-sum games. Every time a transgender athlete obtains a place on a sports team or in competition, a biological female is necessarily (and, due to the competitive advantages of male biology, unfairly) displaced. The district court simply ignored the displacement injuries to biological girls, which offset and outweigh Plaintiffs' asserted injuries from being unable to participate on girls' teams. That displacement is irreparable and undermines the undisputed public interest in promoting female athletics.

## STANDARD OF REVIEW

The district court's award of a preliminary injunction is reviewed for abuse of discretion. *See*, *e.g.*, *Olson v. California*, 62 F.4th 1206, 1218 (9th Cir. 2023). "[A] district court abuses its discretion if the court rests its decision on an erroneous legal standard" or "on a clearly erroneous finding of fact." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014). Legal conclusions receive *de novo* review. *See id.*; *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc). Factual findings are clearly erroneous if they are "illogical, implausible,

or without support in inferences that may be drawn from the facts in the record." *Pom Wonderful*, 775 F.3d at 1123 (quotations omitted).

## ARGUMENT

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). To receive a preliminary injunction, a movant "must show that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm without relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 975 (9th Cir. 2020) (quotations omitted).

## I. Plaintiffs Are Unlikely to Succeed on the Merits of Their Equal Protection and Title IX Claims.

Of the preliminary injunction factors, the first—likelihood of success on the merits—"is the most important." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Because the SWSA is lawful, the district court erred in granting Plaintiffs' request for relief.

### A. The SWSA does not violate the Equal Protection Clause.

The SWSA does not violate the Equal Protection Clause for two reasons. First, the SWSA is subject to, and satisfies, rational-basis scrutiny. Plaintiffs contend that the SWSA's protected class—biological females—is underinclusive because it excludes transgender girls from its definition of "females," "women," or "girls." They contend that the benefit the SWSA provides biological females (their own sports teams) must be extended to transgender girls as well. That underinclusive challenge to an admittedly valid classification is subject to rational-basis review, which the SWSA easily passes.

Second, the SWSA also satisfies intermediate scrutiny because it advances important government interests. The district court's analysis improperly considered the law only as applied to prepubescent transgender athletes like Plaintiffs instead of considering the validity of the classification as a whole. Doing so is fatal to Plaintiffs' case, for the SWSA advances important governmental interests in virtually every case. Moreover, the district court's conclusion rests on the clearly erroneous finding that there are no athletic differences between

biological boys and girls before puberty. This conclusion is baseless, and without that factual basis, the entire justification for the injunction falls.

1. **The SWSA is subject to, and passes, rational-basis scrutiny.**

   a. **Underinclusive challenges to affirmative action programs are subject to rational basis analysis.**

"The first step in equal protection analysis is to identify the state's classification of groups." *Country Classic Dairies, Inc. v. Mont., Dep't of Commerce Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988); *see also Dunn v. Blumstein*, 405 U.S. 330, 335 (1972); *Aleman v. Glickman*, 217 F.3d 1191, 1195 (9th Cir. 2000). Here, the SWSA creates two classifications—biological males, who can play only on men or co-ed teams—and biological females, who can play on female, male, or co-ed teams. Ariz. Rev. Stat. § 15-120.02(A)–(B).

Plaintiffs do not challenge the legality of that classification. They "agree there should be separate teams for boys and girls." 5-ER-668; *see also* 1-ER-20 ("Plaintiffs do not challenge the existence of separate teams for girls and boys."). Rather, their claim—as they told this Court—is that they "are girls," Resp. Emergency Mot. for a Stay, Dkt. 13, at 15, and so should be allowed to play on girls' sports teams, *see, e.g.*, 3-ER-587–88

26

(arguing they have no competitive advantage over biological girls). Plaintiffs thus contend that the protected class created by the SWSA—biological girls—is underinclusive and must be expanded to provide the same benefit to transgender girls, *i.e.*, biological boys who identify as girls.

That underinclusiveness challenge is subject to rational-basis scrutiny. The SWSA is a remedial program for women and girls. Arizona enacted the SWSA to provide girls the benefit of competing against only other girls to "allow for the 'full development of the talent and capacities of our Nation's people' … in the context of sports and athletics." 2-ER-99 (§ 2(11) of the SWSA's legislative findings) (quoting *VMI*, 518 U.S. at 533). In the SWSA's absence, women would risk having to compete against biological males. And biological males—the Arizona legislature found—have "insurmountable" athletic advantages over biological women. 2-ER-99 (quotations omitted); *see also Clark ex rel. Clark v. Ariz. Interscholastic Ass'n (Clark I)*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("The record makes clear that due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team."). Moreover, the SWSA

27

seeks to remedy past discrimination against women. *See* 1-ER-29; *Clark I*, 695 F.2d at 1131.

The SWSA is therefore "a reform measure aimed at eliminating an existing barrier" to full female participation in sports, and Plaintiffs' claim that it must be expanded to cover transgender girls as well as biological girls is subject to rational-basis review. *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966); *see, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 105 (1977) (per curiam)[4] (limiting "the reach of … reforms" does not constitute "constitutionally invidious discrimination"); *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807–08 (1969) (refusing to provide unsentenced inmates absentee ballots but providing them to others does not "deny [the inmates] the exercise of the franchise"); *Hoohuli v. Ariyoshi*, 631 F. Supp. 1153, 1159 (D. Haw. 1986); *see also Schilb v. Kuebel*, 404 U.S. 357, 366 (1971) (rejecting the argument that "legislation must be struck down because it does not reform enough").

The Second Circuit's analysis in *Jana-Rock Construction, Inc. v. New York State Dep't of Economic Development*, 438 F.3d 195 (2d Cir.

---

[4] *Superseded by statute as stated in McConnell v. FEC*, 540 U.S. 93 (2003), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010).

2006), is on point and compelling. There, Jana-Rock claimed a race-based affirmative action program was unconstitutionally underinclusive. *Id.* at 200. The program provided set-asides for minority-owned businesses and defined "minorities" to include "'Hispanic persons of Mexican, Puerto Rican, Dominican, Cuban, Central or South American of either Indian or Hispanic origin, regardless of race.'" *Id.* at 202 (quoting the law). The definition did not include Spanish or Portuguese individuals, and Jana-Rock's owner was Spanish. *Id.* Except for that exclusion, Jana-Rock admitted that the set-aside program was otherwise constitutional. *Id.* at 206.

The Second Circuit concluded the law was subject to rational basis scrutiny, analyzing "two distinct ways of construing the plaintiffs' argument," *id.* at 205, both of which are applicable here. First, as in *Jana-Rock*, Plaintiffs' challenge could be construed as claiming the SWSA "as a whole is underinclusive," and Arizona must "justify its decision not to remedy discrimination against other groups as well." *Id.* That, however, is just a claim that the SWSA's "fit … is too tight," a claim that is "incompatible with" the principles behind intermediate scrutiny. *Id.* at 207. Sex-based classifications need only "be substantially related

to achievement of'" "important governmental objectives." *Clark I*, 695 F.2d at 1129 (quoting *Craig v. Boren*, 429 U.S. 190, 197 (1976)). That requires a "close means-end fit" between the law's purposes and its operation. *Sessions v. Morales-Santana*, 582 U.S. 47, 68 (2017). But Plaintiffs' challenge would require Arizona to *broaden* the SWSA's scope and so *loosen* the fit. And the broader a law goes, the more it risks "reinforc[ing] harmful stereotypes." *Associated Gen. Contractors of Cal., Inc. v. City and County of San Francisco*, 813 F.2d 922, 942 (9th Cir. 1987), *overruled in different part by City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989).

Second, *Jana-Rock* analyzed challenges to underinclusive definitions establishing the scope of benefits programs. *See* 438 F.3d at 205 ("Under a second view of the plaintiffs' argument, the program as a whole is valid, but strict scrutiny should be used to evaluate whether [the] particular definition of 'Hispanic' is underinclusive."). Such challenges, the Second Circuit observed, "misconceive[] the purpose behind" constitutional scrutiny, *id.* at 210, where, as here, "the program as a whole is valid," *id.* at 205. For the SWSA as a whole to be valid, its sex-based classification must be justified by "an 'exceedingly persuasive

30

justification' . . . ." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (quoting *Kirchberg v. Feenstra*, 450 U.S. 455, 461 (1981)). Because it is, Arizona "is justified in resorting" to sex-based classifications. *Jana-Rock*, 438 F.3d at 210. The precise *contours* of the classifications are left to the legislature's sound discretion and are not subject to heightened scrutiny: "The purpose of [intermediate scrutiny] is to ensure that the government's choice to use [gender] classifications is justified, not to ensure that the contours of the specific [gender] classification that the government chooses to use are in every particular correct." *Id.* Thus, as the Eleventh Circuit held, "[i]n adopting an affirmative action plan" or other remedial rule, the legislature "may rationally limit its application to those … that are most in need of remedial efforts." *Peightal v. Metro. Dade Cty.*, 940 F.2d 1394, 1409 (11th Cir. 1991). Arizona is not required to remedy *every* alleged form of past discrimination when it adopts a remedial program protecting the specifically identified class.

### b. The district court's justifications for applying intermediate scrutiny do not apply.

The district court did not grapple with this argument. Instead, it held that the SWSA's "disparate treatment of transgender girls because they are transgender is clear on the face of the statute and makes it

facially discriminatory . . . ." *See* 1-ER-28. But the SWSA describes who may play on what sports teams "without referring to" gender identity and so is "facially" neutral with respect to gender identity. *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 678 (9th Cir. 1984). And disproportionate impact, standing alone, does not establish an equal protection violation. *See*, *e.g.*, *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 278–79 (1979); *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–65 (1977); *De La Cruz v. Tormey*, 582 F.2d 45, 58 (9th Cir. 1978). Rather, the only way the SWSA could be constitutionally suspect is if it "is motivated by a discriminatory purpose." *Jana-Rock*, 438 F.3d at 211; *see also*, *e.g.*, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245–46 (2022).

The district court's conclusion that "[t]he Arizona legislature intentionally created a classification, specifically 'biological girls,' that necessarily excludes transgender girls" does not alter the calculus. 1-ER-28. That is an argument that the SWSA engages in "[p]roxy discrimination[, which] is a form of facial discrimination." *Pac. Shore Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013). And in *Hecox v. Little*, 2023 WL 5283127 (9th Cir. Aug. 17, 2023),

a panel of this Court concluded that Idaho's version of the SWSA—which also classifies on the basis of "biological sex"—engages in that form of discrimination. *Id.* at *10.

*Hecox*, however, did not confront the argument the Legislative Leaders and Superintendent Horne make here—and so it does not control. *See infra* Argument § I.A.1.c. A proxy discrimination claim is the same thing as an underinclusiveness challenge in the context of a remedial statute like the SWSA; its utility is in establishing the validity of the classification in the first place. Because the SWSA's classification between males and females is concededly valid, that the legislature chose to exclude transgender athletes from the definition of "females," "women," and "girls" is not proxy discrimination—it is legislative line-drawing. *See Jana-Rock*, 438 F.3d at 210. That is, the definition of "females," "women," and "girls" in the SWSA effectuates the important purposes motivating the law and ensures a tight means-end fit. *See Eknes-Tucker v. Governor of Ala.*, 2023 WL 5344981, at *16 (11th Cir. Aug. 21, 2023) ("[T]he statute refers to sex only because the medical procedures that it regulates—puberty blockers and cross-sex hormones as a treatment for gender dysphoria—are themselves sex-based."); *L.W.*

33

*ex rel. Williams v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023) ("The Act mentions the word 'sex,' true. But how could it not?").

As for discriminatory purpose: The district court said "[t]he legislative history demonstrates that the purpose of the [SWSA] is to exclude transgender girls from girls' sports teams." 1-ER-28; *see also* 1-ER-31–32 (saying the SWSA is driven by "a bare … desire to harm") (quotations omitted). Assuming that is an animus finding, it has no support in the evidence. The district court pointed to statements from two legislators and Governor Ducey. *See* 1-ER-14–15. The Arizona legislature has ninety members. *See* Arizona State Legislature, https://www.azleg.gov/ (last visited Aug. 31, 2023) (the "Members" category). What two of those members plus the Governor thought about the SWSA is plainly "not … probative of the intent of the legislature as a whole." *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1140 (9th Cir. 2023).

In any event, none of the statements to which the district court pointed even remotely shows a discriminatory purpose. Governor Ducey did not reference transgender individuals at all. *See* 1-ER-15. Senator Petersen's statement is an attempt to accommodate transgender athletes

34

by asking whether they "would 'be opposed to having just a trans league.'" 1-ER-15. That can't be discriminatory; for example, the "World Aquatics, swimming's governing body," created "an open category for transgender athletes" as part of its "'unwavering commitment to inclusivity.'" Ben Church, *World Aquatics Launches Open Category for Transgender Athletes at Swimming World Cup*, CNN (Aug. 17, 2023), https://www.cnn.com/2023/08/17/sport/world-aquatics-transgender-athletes-swimming-spt-intl/index.html (quoting the World Aquatics' statement). Finally, Senator Leach's statement reflects a concern that transgender female athletes may displace biological female athletes, 1-ER-14–15, a concern many biological women share, *see Hecox*, 2023 WL 5283127, at *22 ("[M]any … women athletes reasonably fear being shut out of competition because of transgender athletes who retain an insurmountable athletic advantage over" them) (quotations omitted). Those statements reflect no animus and provide no basis to reject "the strong 'presumption of good faith' on the part of legislators." *Carrillo-Lopez*, 68 F.4th at 1140 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).

Moreover, the district court's analysis ignores that the SWSA can "be plausibly explained on" a non-gender-identity based ground, *Feeney*, 442 U.S. at 275: ensuring safety and competitiveness in women's sports and remedying past discrimination, *see* 1-ER-29; 2-ER-99 (§ 2(11)). The SWSA's legislative findings, to be sure, reference testosterone suppression, *see* 2-ER-99–100 (§ 2(13)), as Idaho's law did, *see Hecox*, 2023 WL 5283127, at *8. But that Arizona's legislature was aware that the SWSA would affect transgender athletes and chose to proceed "in spite of" those effects does not establish a discriminatory purpose. *Feeney*, 442 U.S. at 279.

That makes the SWSA akin to the regulation at issue in *Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022) (en banc). In *Adams*, as here, "no animus [is] shown." *Hecox*, 2023 WL 5283127, at *10 (citing *Adams*, 57 F.4th at 811). Indeed, Senator Petersen's statement indicates consideration of "issues raised by the LGBTQ community," and so the SWSA—at most—has "a disparate impact" on transgender students. *Id.* Rational-basis scrutiny applies.

36

### c. *Hecox* does not foreclose application of rational-basis scrutiny.

*Hecox*'s application of intermediate scrutiny, *see* 2023 WL 5283127, at *11–*12, does not foreclose application of rational-basis scrutiny here.

Panel precedent is binding only as to those issues "germane to the eventual resolution of the case and resolve[d] after reasoned consideration in a published opinion." *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1186 (9th Cir. 2003) (quoting *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) (opinion of Kozinski, J.)); *see also Barapind v. Enomoto*, 400 F.3d 744, 751 (9th Cir. 2005) (en banc) (per curiam). *Hecox* did not address the argument the Legislative Leaders and Superintendent Horne make here, and thus it is not controlling on that issue.

To conclude otherwise would assume that *Hecox* splits, *sub silentio*, with at least the Second and Eleventh Circuits, *see Jana-Rock*, 438 F.3d at 205; *Peightal*, 940 F.2d at 1409—as well as standing, at a minimum, in great tension with Supreme Court precedent—on whether challenges premised on the allegedly underinclusive nature of remedial laws are subject to rational-basis scrutiny. That militates against doing so. Only "a compelling reason"—as opposed to unstated ones—justifies "creat[ing]

a circuit split." *Kelton Arms Condominium Owners Ass'n v. Homestead Ins. Co.*, 346 F.3d 1190, 1192 (9th Cir. 2003).[5]

> ### d. The SWSA passes rational basis scrutiny.

The SWSA's definition of "females," women," and "girls" by reference to biological sex "is rationally related to [the] legitimate government interest" of promoting fairness, safety, and opportunity for female athletes. *United States v. Ruiz-Chairez*, 493 F.3d 1089, 1091 (9th Cir. 2007) (quotations omitted). As discussed below, at worst, the SWSA may fail to achieve its purposes only in the vanishingly small number of cases where it precludes a transgender athlete who has not gone through male puberty from playing on a girls' team. *See infra* Argument § I.A.2.a. Arizona could have quite rationally concluded that because drawing the line at biological sex fulfills the law's purposes in almost every case, it was a valid line to draw. *See Barbier v. Connolly*, 113 U.S. 27, 31–32 (1884) (acknowledging that laws may constitutionally "press with more or less weight upon one than upon another").

---

[5] Alternatively, if the Court disagrees, the Court should hear this case en banc and overrule *Hecox*.

38

The district court, to be sure, said that the SWSA failed rational-basis scrutiny because of the legislature's purpose to "harm" transgender girls. 1-ER-31–32 (quotations omitted). But as noted above, *see supra* Argument § I.A.1.b, the animus claim lacks any valid support in the record and improperly ignores "[t]he allocation of the burden of proof and the presumption of legislative good faith … ." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). Animus was the only argument that Plaintiffs advanced to show the SWSA is irrational. *See* 3-ER-522. Thus, they failed to carry their burden to "negative every conceivable basis which might support" the SWSA. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (quotations omitted).

## 2. Alternatively, the SWSA satisfies intermediate scrutiny.

Even if the SWSA is subject to heightened or intermediate scrutiny as a classification based on transgender status or sex, *see Hecox*, 2023 WL 5283127, at *11–*12,[6] it satisfies that standard.

---

[6] *Hecox* said that "gender identity is at least a 'quasi-suspect class.'" 2023 WL 5283127, at *11 (quoting *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019)). But as the Sixth Circuit has noted, "[t]he bar for recognizing a new quasi-suspect class … is a high one." *Skrmetti*, 73 F.4th at 420 (6th Cir. 2023). "The Supreme Court has recognized just

Heightened scrutiny requires the State to show at least that "the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 533 (quotations omitted). The "legitimate and important government interests" of "protect[ing] girls from physical injury in sports[,] … promot[ing] equality and equity in athletic opportunities, … [and] redressing past discrimination against women in athletics" motivate the SWSA. 1-ER-29; *see* 5-ER-663–64 (Plaintiffs' counsel) (acknowledging that redressing past discrimination and promoting equality "can be important state interests"). So the issue is whether the Arizona legislature's decision to restrict participation in women's sports teams to biological women is substantially related to that interest. It is.

---

two such classes, and none in recent years." *Id.* (citation omitted). For that reason, the Eleventh Circuit has "grave doubt that transgender persons constitute a quasi-suspect class." *Adams*, 57 F.4th at 803 n.5. Because only the en banc court can change that rule, *see Barapind*, 400 F.3d at 751, the Legislative Leaders and Superintendent Horne reserve the right to seek such review; indeed, their application for initial en banc consideration of this case is pending.

### a. The district court's analysis improperly requires the SWSA to be perfectly tailored.

Even accepting the district court's erroneous factual findings, the SWSA directly advances Arizona's interests in promoting fairness, safety, and opportunity in female sports, and in remedying past discrimination, in almost every case. Specifically, the SWSA excludes all biological males from female teams, regardless of puberty or transgender status; these thus include (1) postpubertal biological males (whether they identify as male or female) who experienced full male puberty and have taken no steps to suppress their testosterone levels or take cross-sex hormone treatments; (2) postpubertal males who suppressed their testosterone levels and/or took cross-sex hormones only after experiencing full male puberty; and (3) males who began suppressing their male puberty only after they had already experienced some degree of male puberty; and (4) males who suppress their testosterone beginning at the onset of male puberty. Even on the district court's factual analysis, the Act advances its goals in virtually every case.

*First*, there is no debate that, in general, "excluding males from participating on female teams" advances the Act's interests. *See*, *e.g.*, *Clark I*, 695 F.2d at 1131–32; 3-ER-524 (Plaintiffs "do not challenge the

41

existence of sex-segregated sports at all.").  Indeed, Arizona has a history of males seeking to participate on female teams.  *See Clark ex rel. Clark v. Arizona Interscholastic Association (Clark II)*, 886 F.2d 1191, 1192 (9th Cir. 1989); *Clark I*, 695 F.2d at 1127.  It is both undisputed and dictated by precedent that excluding biological males who are not transgender from female teams advances the Act's interests.

*Second*, prohibiting transgender females who have gone through male puberty from playing on women's teams advances the SWSA's interests.  All agree that after puberty, males are "on average, stronger and faster than adolescent girls."  1-ER-22 (citing Dr. Shumer).  In excluding them from women's sports teams, the SWSA advances its legitimate goals.[7]  *See Clark I*, 695 F.2d at 1131 ("[D]ue to…physiological differences, males would displace females to a substantial extent if they were allowed to compete for" the same team); *B.P.J. v. W. Va. State Bd. of Educ.*, 2023 WL 111875, at *7 (S.D. W. Va. Jan. 5, 2023), *injunction*

---

[7] The district court declined to address whether subsequent hormone suppression can "fully eliminate physiological advantages once an individual experienced male puberty … ."  1-ER-19 n.7.  Even assuming that is the case, the SWSA still advances Arizona's interests for that large segment of transgender females who have gone through puberty and not taken hormone therapy.

*pending appeal granted*, 2023 WL 2803113 (4th Cir. Feb. 22, 2023) ("Given B.P.J.'s concession that circulating testosterone in males creates a biological difference in athletic performance, I do not see how … the state's classification based on biological sex is not substantially related to its interest in providing equal athletic opportunities for females.").

*Third*, the SWSA advances its purposes as applied to prepubescent biological males and females. The district court, relying on Plaintiffs' experts, found that the observed differences in athletic performance between prepubescent boys and girls could be the product of, *inter alia*, "greater societal encouragement of athleticism in boys [or] greater opportunities for boys to play sports." 1-ER-19–20. This statement reflected speculation, not a factual conclusion. *See id.* In any event, prohibiting prepubescent biological males from playing on female sports teams addresses that inequality, and so "redress[es] past discrimination against women in athletics … and promot[es] equality of athletic opportunity between the sexes." *Clark I*, 695 F.2d at 1131; *see also* 2-ER-99 (§ 2(11)) (listing "full development of the talent and capacities of our Nation's people…in the context of sports and athletics" as a basis for sex-segregated sports teams) (quotations omitted).

43

Thus, the only time the SWSA fails to advance its purposes (based on the district court's factual findings) is when it excludes "transgender girls who have not experienced male puberty," because as to them there is no "problem of unfair competition or … safety risks," 1-ER-30, since they have "not undergo[ne] male puberty and [have] not experience[d] the physiological changes caused by the increased production of testosterone associated with male puberty," 1-ER-22 (citing Dr. Shumer). *But see infra* Argument § I.A.2.b (explaining that the evidence does not support those findings).[8]

---

[8] Even as to this class of athlete, the SWSA advances its goals by preventing the displacement of a biological female. *Clark II* held that displacing one female athlete sets back "the goal of equal participation by females in interscholastic athletics." 886 F.2d at 1193. Here, Plaintiffs threaten displacement of biological females by taking spots on teams, playing time, and athletic successes away from them. *See* 1-ER-8, 10 (providing the sports in which Plaintiffs wish to participate).

    *Hecox* incorrectly imposed a substantiality requirement that would permit *de minimis* displacement. *See* 2023 WL 5283127, at *15 (affirming the district court because "on the record before it, 'transgender women have not and could not "displace" cisgender women in athletics "to a substantial extent."'") (quoting *Hecox v Little*, 479 F. Supp. 3d 930, 977 (D. Idaho 2020) (quoting *Clark I*, 695 F.2d at 1131)). That is inconsistent with *Clark I* or *Clark II*. If some *de minimis* amount of displacement is permissible, then there is no harm in letting a single male play on a women's team—especially if there is no comparable men's sports team—as was the case in *Clark I*, *see* 695 F.2d at 1127, and *Clark II*, *see* 886 F.2d at 1192. *Hecox* is thus inconsistent with existing precedent, and en banc review is appropriate on this ground.

That means the SWSA fails to advance Arizona's legitimate interests in, at most, a vanishingly small number of cases. Over roughly the last decade, "the AIA … [has] approved seven students to play on a team consistent with their gender identity." 1-ER-12. And there is no evidence that *any* of those seven athletes were prepubescent biological boys who failed to go through male puberty and took hormone therapy to suppress testosterone after transitioning. By contrast, "roughly 170,000 students play[] sports in Arizona" each year. 1-ER-12. Even assuming all seven students are transgender girls who have not experienced male puberty, and all played the same year, application of the SWSA would fail to advance its important governmental interests—*based on the district court's own findings*—just 0.004 percent of the time. If that does not satisfy intermediate scrutiny, nothing does.

Since that is an unrealistic, worst-case number, it is hard to imagine a more narrowly drawn, effective law. It certainly passes intermediate scrutiny, which does not require "that the statute under consideration … be capable of achieving its ultimate objective in every instance." *Nguyen v. INS*, 533 U.S. 53, 70 (2001). All that is required is a "fit that is not necessarily perfect, but reasonable; that represents not

45

necessarily the single best disposition but one whose scope is 'in proportion to the interest served.'" *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (quoting *In re R.M.J.*, 455 U.S. 191, 203 (1982)); *see, e.g.*, *Kahn v. Shevin*, 416 U.S. 351, 356 n.10 (1974) (rejecting the argument that because a law could accomplish its purpose "more precisely" without a sex-based classification it was unconstitutional); *Associated Gen. Contractors of Cal., Inc.*, 813 F.2d at 942, ("[G]overnmental action, particularly where it is plainly remedial in character, need not operate with surgical precision."); *Clark I*, 695 F.2d at 1131 (noting that "absolute necessity is not the standard"). To say the SWSA meets that standard is understatement.

The district court focused solely on how the law advances its interests by excluding transgender girls who have not experienced male puberty—*i.e.*, these specific Plaintiffs. *See* 1-ER-30–31. That is much too narrow a focus. Intermediate scrutiny requires the court to consider the *classification as whole* and whether it substantially advances the government's important interests; it is concerned with how a law relates "to the overall problem the government seeks to correct." *Ward*, 491 U.S. at 801.

46

The Supreme Court's precedent makes that very clear. Under intermediate scrutiny, the question whether the Act advances the government's asserted interests "cannot be answered by limiting the inquiry to whether the governmental interest is directly advanced *as applied to a single person or entity*. Even if there were no advancement as applied in that manner . . . there would remain the matter of the regulation's general application to others . . . ." *United States v. Edge Broad. Co.*, 509 U.S. 418, 427 (1993) (emphasis added). Thus, by focusing solely on whether the Act advances its fairness, safety, and opportunity interests when it applies to the individual Plaintiffs—to the point of treating extensive evidence of the Act's success in advancing its interests as to others as "not relevant," *see* 1-ER-17–18—the district court "thus asked the wrong question." *Edge Broadcasting*, 509 U.S. at 472.

Even if the Act did not substantially advance the State's interests by excluding the two specific Plaintiffs from girls' teams (which, in fact, it does, *see infra* Argument § I.A.2.b), "that fact is beside the point, for the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case."

47

*Ward*, 491 U.S. at 801. "Here, the regulation's effectiveness must be judged by considering all the varied groups" that it affects, "and it is valid so long as [Arizona] could reasonably have determined that its interests overall would be served less effectively without the … guideline than with it." *Id.*

The district court, in effect, required perfect tailoring, which is a requirement of strict scrutiny, not intermediate scrutiny. Under intermediate scrutiny, Arizona need only show "that the challenged classification serves important government objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 533. Here, ensuring competitive, safe female athletics and redressing past gender discrimination requires structuring competitive sports so that biological males are not competing against biological females. Since in those situations—which cover the vast majority of student-athletes—the SWSA admittedly advances its important governmental interests, the law satisfies intermediate scrutiny.

The district court also found that because the SWSA allows transgender boys—*i.e.*, biological females who identify as male—to

48

subject themselves to the risks of playing with biological boys, the law does not fulfill its safety purposes. *See* 1-ER-31. Given the small size of the transgender population, *see* 1-ER-12, that does not change the fact the SWSA accomplishes its purposes almost all the time. Regardless, there is an obvious difference between a biological female who identifies as male voluntarily choosing to compete with males, and a biological female suddenly finding herself forced to compete against a biologically male opponent, that justifies treating the two situations differently. Arizona "'need not run the risk of losing an entire remedial scheme simply because it failed … to cover every evil that might conceivably have been attacked.'" *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1048 (9th Cir. 2017) (en banc) (quoting *McDonald*, 394 U.S. at 809). Moreover, the fact that the Act does *not* restrict transgender boys from competing with biological boys undermines the district court's conclusion that the Act reflects animus against transgender athletes, instead of its stated purpose of protecting the integrity of girls' and women's sports.

The district court also said the SWSA's "private cause of action … burdens only girls' sports programs with transgender challenges, investigations, and litigation [and] subjects only female

athletes, transgender and otherwise, to gender challenges and investigations." 1-ER-31. But there is no evidence about what burdens, if any, the law imposes. Indeed, Plaintiffs asserted an as-applied claim that did not directly challenge the Act's private-cause-of-action provisions at all. Moreover, the SWSA—unlike the Idaho law in *Hecox*—does not provide for "a 'sex verification' process to be invoked by any individual who wishes to 'dispute' a student's sex." *Hecox*, 2023 WL 5283127, at *5 (quoting the law). There is no reason to believe that a similarly intrusive process will appear in SWSA-related suits.

**\*\*\***

In sum, the district court's analysis makes the mistake of judging the validity of the SWSA "by the extent to which it furthers [Arizona's] interest in" Plaintiffs' individual cases, as opposed to assessing the law's "relation … to the general problem of" ensuring safe and competitive female athletes. *Edge Broadcasting*, 509 U.S. at 430–31. That was wrong. Properly analyzed, the SWSA passes intermediate scrutiny.

**b.    The district court's conclusion that transgender females who have not experienced male puberty do not have athletic advantages over female athletes is clearly erroneous.**

The foregoing discussion accepts *arguendo* the district court's conclusion that the SWSA does not advance important governmental interests as applied to transgender girls who have not experienced male puberty.  That conclusion, however, is also wrong.  The record clearly shows—contrary to the district court, *see* 1—ER-30–31—that prepubescent biological boys (including transgender girls who have not gone through male puberty) have significant athletic advantages over prepubescent biological girls.  *See* 1-ER-30–31.  The district court's finding that prepubescent boys and girls are athletically equal is clearly erroneous.

The evidence of these differences is compelling.  To start, the two are physiologically different in relevant ways.  For example, the district court referenced a medical article Dr. Shumer cited finding that, in the 3–9-year-old bracket, boys' "shoulder internal rotators" are stronger than girls.  1-ER-19.  As Dr. Carlson noted, "shoulder internal rotation strength is important for throwing or striking a volleyball and probably a factor in early measured differences in throwing capability between

51

boys and girls." 2-ER-154. But in addition to shoulder rotators, the Legislative Leaders' and Superintendent Horne's experts cited studies showing that young boys are physiologically different from young girls in many categories that correlate with athletic ability—such as muscle and fat mass (more and less, respectively, for boys), *see* 2-ER-127, 188; 3-ER-377–78; height and weight (boys are taller and heavier), *see* 2-ER-189, and lean body mass, *see* 2-ER-192. As discussed below, these physical differences translate into athletic advantages for prepubescent boys over girls in almost all objective metrics. These advantages are observed across cultures and societies with widely varying levels of encouragement for female athletics. *See infra.*

Further, the Legislative Leaders and Superintendent Horne provided abundant evidence showing that preventing male puberty does not eliminate the advantages that males have over females. Height is an example. Dr. Hilton cited a study showing that transgender girls "who had received puberty blockers from around 13 years of age" were, on average, "far larger than the population female average and around the population male average." 2-ER-150 (internal parentheticals omitted). Dr. Brown noted the same thing. *See* 3-ER-395–96. That has obvious

application to sports. A height advantage is useful in volleyball, for example—a sport Roe wants to play. *See* 1-ER-24. Lean body mass and grip strength provide two more examples. *See* 2-ER-150 (Dr. Hilton) (citing "two studies where male puberty was partially-blocked," but lean body mass and grip strength was higher for the transgender girls than for the reference females).

The district court, to be sure, found that "[t]ransgender girls who receive puberty-blocking medication do not have an athletic advantage over other girls" and cited Dr. Shumer's declarations, including paragraphs 15 and 16 of his rebuttal declaration, as support. 1-ER-22. But in paragraph 16 of Dr. Shumer's rebuttal declaration (the most relevant record support for the district court's finding), Dr. Shumer asserts only that transgender girls who receive puberty blockers "do not gain the increased muscle mass or strength . . . ." 3-ER-470; *see also* 3-ER-555–56. But Dr. Hilton and Dr. Brown did not discuss muscle mass or strength; they pointed to male advantages involving height, lean body mass, and grip strength.

Importantly, the district court did not actually find there are *no* athletic differences between prepubescent boys and girls. Rather, relying

53

on Plaintiffs' experts, the court found that any differences between the two are supposedly irrelevant because "transgender girls' physical characteristics, especially in terms of height, weight, and strength, *overlap with* those of other girls." 1-ER-21–22 (emphasis added). Said differently, the district court concluded that prepubescent, biological boys (which include transgender girls who have not experienced puberty) are equivalent to taller, heavier, and stronger girls.

But being, on average, taller, heavier, and stronger means that, on average, prepubescent boys have an athletic advantage over prepubescent girls. The data supports this conclusion—including data Plaintiffs' experts cite. For example, Dr. Shumer cited a study showing that before puberty girls are as fast, or faster, at swimming than boys of the same age. *See* 2-ER-44; 3-ER-469. But that study says its finding "'provide[s] one of the *only* examples of faster (or at least not slower) sports performance for girls than boys,'" 2-ER-190 (emphasis added) (quoting Jonathon W. Senefeld et al., *Sex Differences in Youth Elite Swimming*, Plos One, Nov. 2019, at 8). Moreover, the primary author of that study is the coauthor of another study finding "a small but consistent sex difference" in track and field performance between prepubescent boys

54

and girls, reflecting male advantages. *See* Mira A. Atkinson et al., *Sex Differences in Track and Field Elite Youth* 1 (Aug. 31, 2023) (preprint), https://sportrxiv.org/index.php/server/preprint/view/324/654

As Dr. Brown demonstrated, "differences increase upon puberty, [but] biological males … show even before puberty a 2–5% advantage in swimming, running, jumping, and a range of strength tests." 2-ER-320. For example, the district court pointed to data that the Legislative Leaders' and Superintendent Horne's experts provided which shows "that 50% of 6-year-old boys complete[] more laps in the 20-meter shuttle (14) than girls (12)," that "9-year-old boys always exceed[] girls' running times by various percentages ranging from 11.1-15.2%, arm hang fitness scores (7.48 boys, 5.14 girls), [and] standing broad jump (128.3 boys, 118.0 girls)," and that "[b]oys exceed girls in throwing velocity by 1.5 standard deviation units as early as 4 to 7 years of age and throwing distance by 1.5 standard deviation units as early as 2 to 4 years of age." 1-ER-18–19 (citations, quotations, and alterations omitted).

Arizona-specific data shows similar performance differences. Dr. Brown provided unrebutted data from Arizona showing that, among 6th grade racers, the "average performance of the top 10 boys was

consistently faster than the average performance of the top 10 girls," 3-ER-390–91, and Dr. Hilton provided data from a Kyrene track and field meet showing that males had an athletic advantage in every event except shot put, 2-ER-140–41.

Plaintiffs sought to minimize those differences by saying they are not "significant." *See* 5-ER-664. The district court agreed, *see* 1-ER-22, calling them "minor," 1-ER-20, "minimal or nonexistent," 1-ER-21, and "small," 1-ER-19. *See also* 1-ER-21 (citing Dr. Shumer's declaration, 3-ER-467). But supposedly "minor" and "small" differences have an enormous influence in competitive sports, where outcomes are routinely decided by tiny margins. As Dr. Carlson noted, "'small' is a subjective term" and little more than "framing language." 2-ER-155. Such language is, in effect, an admission that differences exist—and consistently show prepubescent boys athletically outperforming prepubescent females. Those "small" differences make the difference between winning and losing, or being on a team at all.

The district court, relying on Plaintiffs' experts, also said the differences in the physical fitness may be due to "other factors such as greater societal encouragement of athleticism in boys, greater

opportunities for boys to play sports, *or* differences in the preferences of the boys and girls surveyed." 1-ER-19–20 (emphasis added). Notably, the use of "or" demonstrates that the court did not attempt to determine *which* such non-biological factor (or cause of factors) might actually cause the differences, rendering this statement inherently speculative. Moreover, as studies Dr. Carlson provided show, differences persisted even after boys and girls received training. *See* 2-ER-155. Dr. Carlson also noted that prepubescent boys' track and field records are consistently better than those of girls—something that should not occur "[i]f there is really very little difference between boys and girls physiologically." 2-ER-158–59.

The Legislative Leaders' and Superintendent Horne's experts also pointed out that the differences persist across "countries with varying social norms when it comes to gender." 2-ER-155; *see, e.g.*, 2-ER-135–38 (providing international data); 2-ER-156–58 (discussing a study involving "throwing in children" that "found similar consistent findings across all cultures"); 2-ER-188–89 (referencing findings from across the world); 3-ER-376–389 (providing data and observations from, *inter alia*, Canada, the U.S., U.K., Australia, Europe, and Colombia); 3-ER-392–93

(Denmark). Dr. Brown provided a meta-analysis of thirty-eight studies in nineteen countries which found "[s]ignificant differences … favoring boys vs. girls at ages 3, 4, 5, and 6 with at least some of the differences attributable to biology." 2-ER-188. Dr. Carlson pointed out that the "consistency of outcome" among the studies "is striking" and suggests a link between biological sex and athletic performance. *See* 2-ER-155.

In sum, the conclusion that transgender girls who have not experienced male puberty do not have "physiological advantages over other girls," 1-ER-30, is "implausible" and "without support in inferences that may be drawn from the facts in the record." *Hinkson*, 585 F.3d at 1262 (en banc). The record amply demonstrates that there are physiological differences between the two sexes and that prepubescent boys consistently outperform their female counterparts in the vast majority of objective metrics when it comes to athletics. The evidence on this front is so overwhelming that, ultimately, the district court sought to minimize rather than refute it.

But, when it comes to sports, a supposedly small difference is still a critical difference. Even for transgender girls who have not experienced puberty, the SWSA advances the important governmental objectives of

ensuring safe competition and promoting equal opportunity for female athletes. Because the preliminary injunction is based on clearly erroneous findings of fact, it must be reversed. *Pom Wonderful LLC*, 775 F.3d at 1123.

### c. *Hecox* does not require a different outcome.

Thus, even if the SWSA is subject to heightened scrutiny, it satisfies that standard. *Hecox* does not require a different result. "Heightened scrutiny analysis is an extraordinarily fact-bound test," and all *Hecox* did was to "decide the narrow question of whether the district court, on the record before it, abused its discretion" in issuing a preliminary injunction in that case. 2023 WL 5283127, at *22. The different arguments and facts in this case justify a different result.[9]

Indeed, *Hecox* recognized that the record before it would not be the last word on the issue. It acknowledged that "the scientific understanding of transgender women's potential physiological advantage is fast-evolving and somewhat inconclusive." *Hecox*, 2023 WL 5283127,

---

[9] Dr. Brown also provided testimony in *Hecox*, which the district court discounted. *See* 2023 WL 5283127, at *15. Here, however, Dr. Brown has updated his declaration with more current studies, *see, e.g.*, 2-ER-188, and his testimony is consistent with that of the Legislative Leaders' and Superintendent Horne's other experts.

at *16. And, indeed, the record in this case contains fresher data. Dr. Brown, for example, cites studies from 2022 that were not available to the lower court in *Hecox*. *See* 2-ER-188 (two studies analyzing different athletic outcomes between boys and girls). So does Dr. Hilton. *See* 2-ER-150. Dr. Hilton also published a study challenging the assumption "that hormonal intervention is sufficient to secure fairness when transgender women [are] include[ed] in female sports" in 2021. 2-ER-120–21. Indeed, the science is so "fast-evolving," *Hecox*, 2023 WL 5283127, at *16, that a preprint was published eight days before this filing—on August 31, 2023—showing "before the ages of puberty, … a consistent sex difference in performance of about 5% across key track and field events," Atkinson et al., *supra*, at 9.[10] Thus, recent research directly contradicts the district court's findings here.

The record here establishes that the SWSA fulfills its purposes in virtually every case, including as to transgender girls who have not gone through puberty. It therefore passes intermediate scrutiny.

---

[10] This study was co-authored by a researcher (Senefeld) that Dr. Shumer relied upon for his assertion that prepubertal boys do not have a performance advantage over prepubertal girls. *See* 1-ER-44; 3-ER-469.

**B.    The SWSA does not violate Title IX.**

The district court's conclusion that the SWSA violates Title IX, *see* 1-ER-32–33, is also incorrect.  To start, "Title IX prohibit[s] almost no conduct beyond what the Equal Protection Clause itself prohibits." *Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 854 (9th Cir. 2001).  Indeed, that Title IX exempts some sex-based discrimination from its reach indicates it is substantively narrower than the Equal Protection Clause. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009). Because the SWSA is consistent with the Equal Protection Clause, *see supra*, it does not violate Title IX.

In any event, the district court's analysis is faulty.  The court reasoned that "discrimination based on transgender status also constitutes impermissible discrimination under Title IX" because discrimination "on the basis of transgender status is discrimination on the basis of sex."  1-ER-32.  The problem is that Title IX's implementing regulations expressly permit sex-segregated sports teams.  *See* 34 C.F.R. § 106.41(b)–(c); *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993); *Lafler v. Athletic Bd. of Control*, 536 F. Supp. 104, 106 (W.D. Mich. 1982).  So the question is whether Title IX and its regulations, in

authorizing sex-segregated sports teams, refer to biological sex or to biological sex and gender identity. If the carve-out references only biological sex, then the SWSA is valid under Title IX. *See Adams*, 57 F.4th at 811.

The authorities the district court cited do not answer the question. *Bostock v. Clayton Cnty.* considered whether firing an employee "for being ... transgender" violates Title VII, but expressly declined to address "sex-segregated bathrooms, locker rooms, and dress codes ... ." 140 S. Ct. 1731, 1737, 1753 (2020). That list tracks Title IX's exemptions for "separate but comparable 'toilet, locker room, and shower facilities on the basis of sex.'" *Parents for Privacy v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020) (quoting 34 C.F.R. § 106.33). *Bostock* thus does not address the meaning of "sex" in the Title IX context, or the interplay of Title IX's sex discrimination prohibition and the carve-out for sports—which makes sense. "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes." *Adams*, 57 F.4th at 811.

The other two cases the district court cited—*Grabowski v. Arizona Board of Regents*, 69 F.4th 1110 (9th Cir. 2023), and *Doe v. Snyder*, 28

62

F.4th 103 (9th Cir. 2022), *see* 1-ER-32—likewise provide no support for its holding. Those cases say this Court "construe[s] Title VII and Title IX protections consistently." *Grabowski*, 69 F.4th at 1116 (citing *Snyder*, 28 F.4th at 114). But that does not answer the interpretative question of what "sex" means in Title IX, since the statutory schemes are different. *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 320 (2014) ("[T]he presumption of consistent usage readily yields to context and a statutory term … may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.") (quotations omitted).

*Bostock* is not irrelevant, however. *See Doe*, 28 F.4th at 114. In *Bostock*, the Court "'proceeded on the assumption' that the term 'sex,' as used in Title VII, 'referred only to *biological* distinctions between male and female." *Adams*, 57 F.4th at 813 (alterations omitted) (quoting *Bostock*, 140 S. Ct. at 1739). Indeed, *Bostock* stated that "transgender status [is a] distinct concept[] from sex." 140 S. Ct. at 1746–47. The Court's acknowledgment of the separateness of gender identity from sex and that the latter refers just to biological distinctions suggests that "sex" in the Title IX context refers to biological sex. *But see Grimm v.*

63

*Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020) (saying that "sex" in Title IX reflects a person's gender identity, and so the exemptions cannot be based purely on biological sex).

That tracks contemporaneous dictionary definitions of "sex." *See*, *e.g.*, *United States v. Pacheco*, 977 F.3d 764, 767 (9th Cir. 2020). Almost all "[r]eputable dictionary definitions of 'sex' from the time of Title IX's enactment show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex." *Adams*, 57 F.4th at 812 (citing six dictionaries). The Eleventh Circuit identified one dictionary that arguably suggested the word "sex" in Title IX is ambiguous on this point. *Id.* But as that court noted, to conclude from that dictionary—which is "at variance from its peers"—that the word "sex" incorporates gender identity "is wrong *ab initio.*" *Id.*; *see also MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 227 (1994). In any event, the Eleventh Circuit ultimately found that dictionary agreed with the others that the definition of "sex" was "based on biology and reproductive function." *Adams*, 57 F.4th at 811. Thus, at the time Congress passed Title IX, everyone understood that "sex, like race and national origin, is an immutable characteristic determined solely by the

accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion).

Then there is the statutory context. Title IX exempts "separate living facilities for the different sexes." 20 U.S.C. § 1686. If "sex" in Title IX includes gender identity, "transgender persons … would be able to live in both living facilities associated with their biological sex and living facilities associated with their gender identity or transgender status." *Adams*, 57 F.4th at 813. In that case, there would be little reason for the exemption. *See id.* The same is true for every regulatory carve-out— including the one for sports.

More broadly, if "sex" includes gender identity, Title IX "would provide more protection against discrimination on the basis of transgender status under the statute and its implementing regulations than it would against discrimination on the basis of sex." *Id.* at 814. It would be extremely odd for Congress to provide double protection to transgender individuals by using a then-virtually unknown definition of "sex"—which is evidence that Congress did not do so. *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress … does not, one might say, hide elephants in mouseholes.").

The political significance of the issue and the economic importance of Title IX funding, *see*, *e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023), and the fact Title IX touches "on several areas of traditional state responsibility" involving education, *Bond v. United States*, 134 U.S. 844, 858 (2014), underscore the impropriety of inferring that "sex" in Title IX refers to both biological sex and gender identity.

So does the fact that Title IX was "enacted pursuant to Congress' authority under the Spending Clause." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). Conditions on spending legislation must be unambiguous. *See*, *e.g.*, *Arizona v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). And whatever else may be said about the issue, Congress did not unambiguously state in Title IX that "sex" means "something other than biological sex." *Adams*, 57 F.4th at 816.[11]

Thus, "[t]here is no serious debate that Title IX's endorsement of sex separation in sports refers to biological sex." *B.P.J.*,

---

[11] The Fourth Circuit rejected this argument, saying "*Bostock* forecloses that 'on the basis of sex' is ambiguous as to discrimination against transgender persons." *Grimm*, 972 F.3d at 619 n.18. But as noted above, *Bostock* does not speak directly to this issue, so the Fourth Circuit's analysis is unpersuasive on this point.

2023 WL 111875, at *9. Thus, the Act does exactly what Title IX authorizes. The SWSA falls within the law's safe-harbor for sex-separated sports, *see* 34 C.F.R. § 106.41, and there is no Title IX violation.

## II.   The remaining equitable factors do not justify relief.

In addition to the merits, a movant must also show that "they are likely to suffer irreparable harm without relief, the balance of equities tips in their favor, and an injunction is in the public interest" to receive relief. *E. Bay Sanctuary Covenant*, 994 F.3d at 975 (quotations and numbering omitted). Where, as here, "the government is a party, [the] last two factors merge." *Id.* (quotations omitted).

**<u>Irreparable Harm</u>**:  To start, Plaintiffs' claim of irreparable harm is inconsistent with their delay in seeking injunctive relief. Nearly a year passed (more, if counting from the SWSA's passage)—encompassing three sports seasons—before they challenged the SWSA. Their "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chron. Publ'g Co.,* 762 F.2d 1374, 1377 (9th Cir. 1985); *see Garcia*, 786 F.3d at 746 (finding a delay of "months … undercut [plaintiff's] claim of irreparable harm").

Furthermore, Plaintiffs' claims of harm stem from their gender dysphoria diagnosis, not the SWSA. *See* 1-ER-34 ("Playing on a boys' team would directly contradict Plaintiffs' medical treatment for gender dysphoria and would be painful and humiliating."); *see also* 4-ER-531, 541; 5-ER-678. Many students have medical conditions that affect their ability to play sports on the teams of their choice—including many non-transgender biological boys. *See* 5-ER-691 (noting that "if a boy has low testosterone … that boy can't play in biological girls' sports"). The fact that many student-athletes may have medical conditions that interfere with their ability to play on the sports teams of their choice is unfortunate. But, as a matter of equity, the exclusion is attributable to the medical conditions, not to Arizona's structuring of its sports teams.

**Balance of Equities & Public Interest**: By comparison, any time a State cannot "enforce its duly enacted plans" it suffers "irreparable harm … ." *Abbott*, 138 S. Ct. at 2324 n.17. The injunction thus inflicts daily irreparable harm on the State of Arizona's sovereign interests. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in

chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

Moreover, the record establishes that Plaintiffs will displace biologically female athletes. Doe, for example, "intends to participate and compete with the cross-country team and try out for the girls' soccer and basketball team." 1-ER-8. Roe wants to play volleyball. 1-ER-10. But athletics are a zero-sum game. Any spot Doe or Roe takes on a team is a spot a biological girl will not get; any playing time Doe or Roe get is playing time denied to a biological girl; and for each place Doe or Roe achieve in a contest, every biological girl below them receives a place one lower than she otherwise would.[12] The district court gave no consideration or weight to the irreparable harm inflicted on biological girls who will inevitably (and unfairly) be displaced by Plaintiffs' participation in girls' sports. The court effectively treated those girls as

---

[12] Underscoring the risk of displacement are declarations attached to a motion to intervene filed by Arizona women, mothers, and an association "that speaks for" them. *See* 4-ER-635 (ECF 98). The declarations show a real fear that transgender girls will dominate female sports, displace female athletes, and discourage biological girls from athletics. *See* 1-ER-73–75, 80–81, 88–89, 93–94. While the declarations are not part of the preliminary injunction record, the Court may take judicial notice of their contents. *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

anonymous, faceless victims with no valid interests to weigh in the balance. That was error. Every time one of the Plaintiffs takes a spot on a team, or finishes higher in a cross-country meet, or obtains playing time, a biological girl does not do so. "If males are permitted to displace females on the school volleyball team even to the extent of one player ... , the goal of equal participation by females in interscholastic athletics is set back, not advanced." *Clark II*, 886 F.2d at 1193.

Such displacement is sufficient to show that the SWSA is lawful. *See supra* note 8 (arguing that is the standard under *Clark II* and *Hecox* wrongly altered it). *But see Hecox*, 2023 WL 5283127, at *15. In all events, it represents a set-back in "the goal of equal participation by females in interscholastic athletics," *Clark II*, 886 F.2d at 1193, that is relevant in weighing the equities. The injury to biological girls forced to compete on an uneven footing with biological boys decisively outweighs the asserted injury to biological boys who wish to participate in girls' sports. The public interest thus cuts against the district court's injunction.

## <u>CONCLUSION</u>

For those reasons, the Legislative Leaders and Superintendent Horne respectfully request that the Court reverse the district court's order granting Plaintiffs' motion for a preliminary injunction.

Dated: September 8, 2023                Respectfully submitted,

                                        James Otis Law Group, LLC

                                        */s/ D. John Sauer*
                                        D. John Sauer
                                        Justin D. Smith
                                        Michael E. Talent
                                        13321 N. Outer Forty Road,
                                        Suite 300
                                        St. Louis, MO 63017
                                        (314) 562-0031
                                        john.sauer@james-otis.com
                                        *Attorneys      for      Intervenor-
                                        Defendants-Appellants*

                                        WILENCHIK & BARTNESS, P.C.

                                        */s/ Dennis Wilenchik*
                                        Dennis I. Wilenchik, Esq.
                                        Karl Worthington, Esq.
                                        Wilenchik & Bartness Building
                                        2810 North Third Street
                                        Phoenix, Arizona 85004
                                        admin@wb-law.com

                                        */s/ Maria Syms*
                                        Maria Syms, Esq.
                                        Director of Legal Services
                                        Arizona Department of
                                        Education
                                        1535 West Jefferson, BIN #50
                                        Phoenix, Arizona 85007
                                        Maria.Syms@azed.gov

                                        *Counsel for Thomas C. Horne*

## <u>CERTIFICATE OF RELATED CASES</u>

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**: 23-16026 c/w No. 23-16030

The undersigned attorney or self-represented party states the following:

[ ] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[**x**] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*Hecox v. Little*, Nos. 20-35813, 20-35815. This case "raise[s] the same closely related issues." 9th Cir. R. 28-2.6(b).


*/s/* D. John Sauer
September 8, 2023

73

**CERTIFICATE OF COMPLIANCE**

9th Cir. Case Number(s): 23-16026 c/w 23-16030

I am the attorney or self-represented party.

This brief contains **13,673** words, including **0** words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief (select only one):

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[**x**] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

[**x**] it is a joint brief submitted by separately represented parties.

[ ] a party or parties are filing a single brief in response to multiple briefs.

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

*/s/* D. John Sauer
September 8, 2023