No. 23-16026 & 23-16030 (consolidated)

---

## United States Court of Appeals
## for the Ninth Circuit

_____

HELEN DOE, parent and next friend of Jane Doe, et al.,

*Plaintiffs-Appellees*,

v.

THOMAS C. HORNE, in his official capacity as State Superintendent of Public Instruction,

*Defendant-Appellant*,

and

WARREN PETERSEN, Senator, President of the Arizona State Senate; and BEN TOMA, Representative, Speaker of the Arizona House of Representatives,

*Intervenors-Defendants-Appellants.*

_____

### On Appeal from the United States District Court for the
### District of Arizona, Phoenix Cause No. 4:23-cv-00185-JGZ

---

### PLAINTIFFS-APPELLEES' ANSWERING BRIEF

---

Jyotin Hamid
Justin R. Rassi
Amy C. Zimmerman
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
jhamid@debevoise.com
jrassi@debevoise.com
azimmerman@debevoise.com

Eric M. Fraser
Colin M. Proksel
OSBORN MALEDON, P.A.
2929 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 640-9000
efraser@omlaw.com
cproksel@omlaw.com

**Attorneys for Plaintiffs-Appellees**

Amy Whelan
Rachel Berg
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
(415) 343-7679
awhelan@nclrights.org
rberg@nclrights.org

**Attorneys for Plaintiffs-Appellees**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION ............................................................................................. 1

STATEMENT OF JURISDICTION .................................................................. 2

ISSUE PRESENTED ........................................................................................ 2

CONSTITUTIONAL AND STATUTORY AUTHORITIES ............................ 2

STATEMENT OF THE CASE ......................................................................... 3

I.     Gender identity and gender dysphoria. ................................................. 3

II.    Plaintiffs' medical treatment and participation in sports .................... 5

       A.     Jane Doe. ................................................................................ 5

       B.     Megan Roe. ............................................................................ 6

III.   The Ban. .............................................................................................. 7

IV.    The benefits of school sports. ............................................................. 10

V.     There is no scientific evidence that pre-pubescent boys have any
       athletic advantage over pre-pubescent girls. ..................................... 12

VI.    Plaintiffs' motion for a preliminary injunction. ................................ 13

SUMMARY OF THE ARGUMENT ............................................................... 16

STANDARD OF REVIEW ............................................................................. 20

ARGUMENT .................................................................................................. 20

I.     The district court did not abuse its discretion in finding that
       Plaintiffs are likely to succeed on the merits. ................................... 20

       A.     The Ban violates the Equal Protection Clause. ..................... 20

              1.     The district court correctly found that heightened
                     scrutiny applies. ........................................................... 21

(a) Heightened scrutiny applies to laws that discriminate on the basis of transgender status. .............21

(b) The Ban discriminates on the basis of transgender status...........................................22

(c) Appellants' arguments for applying rational basis review fail. .......................................24

i. A law can target a protected class without explicitly naming that class. ................................24

ii. Appellants' attempt to reframe Plaintiffs' challenge as "underinclusive" should be rejected. ...............................................................25

2. The district court correctly held that the Ban fails heightened scrutiny. .................................28

(a) A law violates heightened scrutiny when it is not substantially related to an important government interest. ......................................28

(b) The Ban fails heightened scrutiny because it is not substantially related to any important government interest. ......................................29

(c) Appellants' arguments do not show an abuse of discretion.....................................................31

i. Contrary to Appellants' argument, the district court did not require "perfect tailoring" and was entitled to consider the Ban's application to Plaintiffs in this as-applied challenge. .................31

ii. Contrary to Appellants' argument, the district court's findings regarding girls who do not undergo male puberty are not clearly erroneous. .36

3. The Ban fails even rational basis review. ................................38

B. The Ban violates Title IX. ....................................................41

II.     Plaintiffs will suffer irreparable harm if the Ban is enforced against them. .................................................................................................44

III.    The balance of equities and public interest favor Plaintiffs. ........................48

CONCLUSION ..................................................................................................51

STATEMENT OF RELATED CASES ....................................................53

CERTIFICATE OF COMPLIANCE .......................................................54

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. Perez*,
138 S. Ct. 2305 (2018)..........................................................................40

*Adams by and through Kasper v. School Board of St. Johns County*,
57 F.4th 791 (11th Cir. 2022) (en banc) ..............................................42

*Anders v. Cal. State Univ., Fresno*,
2021 WL 1564448 (E.D. Cal. Apr. 21, 2021) ......................................44

*Animal Legal Def. Fund v. Otter*,
44 F. Supp. 3d 1009 (D. Idaho 2014) ...................................................40

*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014), *vacated and remanded on other
grounds in Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 586 U.S.
606 (2012)..............................................................................................48

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014) ................................................................20

*Associated Gen. Contractors of California, Inc. v. City & Cnty. of San
Francisco*,
813 F.2d 922 (9th Cir. 1987) ................................................................34

*Barbier v. Connolly*,
113 U.S. 27 (1884)................................................................................39

*Bostock v. Clayton Cnty.*,
140 S. Ct. (2020)........................................................................21, 41, 43

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993)..............................................................................25

*City of Cleburne v. Cleburne Living Ctr. Inc.*,
473 U.S. 432 (1985)..............................................................................32

*Clark v. Arizona Interscholastic Association* ("*Clark I*"),
   695 F.2d 1126 (9th Cir. 1982) ........................................................26, 35

*Clark v. Arizona Interscholastic Association* ("*Clark II*"),
   886 F.2d 1191 (9th Cir. 1989) ........................................................35, 36

*Cornhusker Cas. Ins. Co. v. Kachman*,
   553 F.3d 1187 (9th Cir. 2009) ..............................................................46

*Craig v. Boren*,
   429 U.S. 190 (1976)................................................................................29

*Cuviello v. City of Vallejo*,
   944 F.3d 816 (9th Cir. 2019) ................................................................48

*Doe v. Snyder*,
   28 F.4th 103 (9th Cir. 2022) ....................................................14, 40, 42

*F.C.C. v. Beach Communications*,
   508 U.S. 307 (1993) ..............................................................................40

*Garcia v. Google, Inc.*,
   786 F.3d 733, 746 (9th Cir. 2015) ........................................................47

*Grabowski v. Ariz. Bd. of Regents*,
   69 F.4th 1110 (9th Cir. 2023) ....................................14, 42, 43, 44

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) ................................................42, 43, 45

*Harris v. Bd. of Supervisors, L.A. Cnty.*,
   366 F.3d 754 (9th Cir. 2004) ................................................................20

*Hecox v. Little*,
   479 F. Supp. 3d 930 (D. Idaho 2020), *aff'd* 79 F.4th 1009 (9th Cir.
   Aug. 17, 2023) ....................................................................30, 45, 46

*Hecox v. Little*,
   79 F.4th 1009 (9th Cir. 2023) ....................................................*passim*

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ................................................................44

*Hoohuli v. Ariyoshi*,
631 F. Supp. 1153 (D. Haw. 1986) .......................................26, 27, 28

*Indep. Living Ctr. of So. Cal., Inc. v. Maxwell-Jolly*,
572 F.3d 644 (9th Cir. 2009) ...............................................................49

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*,
438 F.3d 195 (2d Cir. 2006) ..........................................................26, 27

*Kahn v. Shevin*,
416 U.S. 351(1974)..............................................................................34

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) ...............................................21, 31, 32

*Katzenbach v. Morgan*,
384 U.S. 641 (1966)..............................................................................28

*Latta v. Otter*,
771 F.3d 496 (9th Cir. 2014) ...........................................24, 25, 30, 49

*Lazy Y Ranch Ltd. v. Behrens*,
546 F.3d 580 (9th Cir. 2008) ...............................................................39

*Ledezma-Cosino v. Sessions*,
857 F.3d 1042 (9th Cir. 2017) .............................................................34

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ...............................................................50

*McDonald v. Bd. of Election Comm'rs*,
394 U.S. 802 (1969)..............................................................................28

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) .........................................................15, 48

*Mi Familia Vota v. Hobbs*,
608 F. Supp. 3d 827 (D. Ariz. 2022) ...................................................41

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*,
422 F.3d 782 (9th Cir. 2005) .........................................................20, 38

*Nguyen v. INS*,
    533 U.S. 53 (2001) .........................................................................34

*Oakland Tribune, Inc. v. Chronicle Publishing Co.*,
    762 F.2d 1374, 1375 (9th Cir. 1985) ........................................47, 48

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) .......................................................................45

*Pac. Shores Props., LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013) ......................................................25

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256, 279 (1979) ..............................................................33

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ................................................48, 49

*Romer v. Evans*,
    517 U.S. 620 (1996) .......................................................................38

*Schilb v. Kuebel*,
    404 U.S. 357 (1971) .......................................................................28

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
    709 F.3d 1281 (9th Cir. 2013) ......................................................20

*SmithKline Beecham Corp. v. Abbott Lab.*,
    740 F.3d 471 (9th Cir. 2014) ........................................................40

*TGP Commc'ns, LLC v. Seller*,
    2022 WL 17484331 (9th Cir. Dec. 5, 2022) ................................50

*United States Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973) .......................................................................39

*United States v. Edge Broad. Co.*,
    509 U.S. 418 (1993) .................................................................33, 34

*United States v. Ruiz-Chairez*,
    493 F.3d 1089, (9th Cir. 2007) .....................................................39

*United States v. Virginia*,
    518 U.S. 515 (1996) ..................................................................... *passim*

*United States v. Windsor*,
    570 U.S. 744 (2013) ....................................................................39, 40

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ............................................................................33

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2022) .........................................................43

*Witt v. Dep't of Air Force*,
    527 F.3d 806 (9th Cir. 2008) ......................................................32, 33

**Statutes**

Ariz. Rev. Stat. § 15-120.02 ..............................................................*passim*

Idaho Code § 33-6203 ........................................................................23, 24

20 U.S.C. § 1681 .....................................................................................41

28 U.S.C. § 1292 .......................................................................................2

28 U.S.C. § 1331 .......................................................................................2

28 U.S.C. § 1343 .......................................................................................2

34 C.F.R. § 106.41 ..................................................................................42

**Other Authorities**

*Consideration of Bills: Hearing on S.B. 1165 Before S. Comm. On
    Judiciary,* 55th Leg., 2d Reg. Sess. (Ariz. 2022),
    https://www.azleg.gov/videoplayer/?eventID=2022011057&startSt
    reamAt=508. ...............................................................................*passim*

General Effective Dates, Ariz. S. Leg.,
    https://www.azleg.gov/general-effective-dates/ (last visited Sept.
    28, 2023) (55th Legislature's laws effective September 24, 2023)...................51

Mira A. Atkinson et al., *Sex Differences in Track and Field Elite Youth* 1 (Aug. 31, 2023)........................................................................37

**Rules**

Fed. R. App. P. 4................................................................................2

## INTRODUCTION

Plaintiffs-Appellees Jane Doe and Megan Roe are two transgender girls who seek nothing more than an equal opportunity to try out for and participate on girls' sports teams at their schools like other girls. Arizona, however, categorically denies Jane and Megan that right because they are transgender. This, Arizona cannot do, as the district court correctly held.

Jane and Megan live as girls in all aspects of their lives. They are accepted and known as girls by their families, friends, and communities. Prior to the enactment of Arizona Rev. Stat. § 15-120.02 (the "Ban"), Jane and Megan played on girls' sports teams as the girls that they are. But for the Ban, their schools, coaches, teammates, and the Arizona Interscholastic Association would all allow them to continue to play on girls' sports teams.

The Ban is sweeping. It unconditionally excludes every transgender girl in Arizona from participating in girls' interscholastic or intramural sports, regardless of their individual circumstances, including girls like Jane and Megan, who have no possible competitive advantage because they have not and will not undergo male puberty.

After extensive briefing, documentary evidence, and a hearing, the district court granted Plaintiffs' motion for a preliminary injunction enjoining the Ban as to them. The district court correctly concluded that Jane and Megan were likely to

succeed on their Equal Protection Clause and Title IX claims, that irreparable harm would result in the absence of an injunction, and that the balance of the equities and public interest favored an injunction. Because the district court did not abuse its discretion, this Court should affirm.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). The district court granted a preliminary injunction on July 20, 2023. Intervenor-Defendants-Appellants State Senator Warren Petersen and State Representative Ben Toma filed their notice of appeal on July 21, 2023, and Defendant-Appellant Thomas C. Horne filed his notice of appeal three days later. Both appeals were timely. *See* Fed. R. App. P. 4(a)(1), (3).

## ISSUE PRESENTED

Did the district court abuse its discretion by preliminarily enjoining, as to Plaintiffs, an Arizona law that categorically bans transgender girls from playing on girls' school sports teams regardless of their individual circumstances?

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

All applicable statutory authorities and constitutional provisions are contained in the Addendum of the Consolidated Brief of Appellant and Intervenor-Defendants-Appellants, Dkt. 20-1.

2

## STATEMENT OF THE CASE

**I.    Gender identity and gender dysphoria.**

When a child is born, a health care provider identifies the child's sex based on the child's observable anatomy.  3-ER-554.  In medical terminology, this provider-identified sex is often referred to as the person's "assigned sex." *Id.*

"Gender identity" is the medical term for a person's internal, innate, and deeply held sense of their own gender.  3-ER-553.  Everyone has a gender identity. *Id.*  There is a medical consensus that a person's gender identity has a significant biological foundation and is not subject to voluntary change.  *Id*.  In most cases, the initial designation of sex turns out to be accurate: most children who are identified as female at birth grow up to identify as female, and most children who are identified as male at birth grow up to identify as male.  3-ER-554.

For a transgender person, however, that initial designation does not match the person's gender identity.  *Id*.  In other words, a transgender person is someone whose gender identity does not align with the sex the person was assigned at birth.  3-ER-565.  This lack of alignment can cause gender dysphoria—a serious medical condition characterized by intense and, in some cases, disabling distress.  *Id.*

Gender dysphoria is highly treatable through well-established standards of care.  3-ER-566; 3-ER-554.  When individuals with gender dysphoria receive appropriate medical care and support, they can thrive.  3-ER-554.  If untreated,

however, gender dysphoria can cause serious harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicide. 3-ER-568; 3-ER-554.

Major associations of medical and mental health providers in the United States, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, and the Pediatric Endocrine Society, have adopted or endorsed standards of care for treating gender dysphoria. 3-ER-554–55. The goal of treatment is to permit transgender people to live consistent with their gender identities in all aspects of their lives. 3-ER-554.

The process of undergoing treatment to alleviate gender dysphoria is commonly referred to as transition. 3-ER-555. The transition process typically includes one or more of the following three components: "(i) social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents; (ii) medical transition, including puberty-suppressing medication and hormone-replacement therapy; and (iii) for adults, surgeries to alter the appearance and functioning of primary- and secondary-sex characteristics." *Id.*

As part of this medical transition, doctors may prescribe a transgender adolescent puberty-blocking medication at the onset of puberty to prevent the distress of developing physical characteristics during puberty that conflict with the

adolescent's gender identity. 3-ER-555–56. Thereafter, the treating provider may prescribe cross-sex hormone medications to induce the puberty associated with the adolescent's gender identity. 3-ER-556. This treatment is referred to as hormone therapy. *Id.* The result of this medical treatment is that a transgender girl who receives hormone therapy will typically have the same levels of circulating estrogen and testosterone levels as other girls. *Id.*

## II. Plaintiffs' medical treatment and participation in sports.

### A. Jane Doe.

Plaintiff Jane Doe is a twelve-year-old transgender girl who began middle school in the Kyrene School District in July 2023. 3-ER-545; 3-ER-462. Jane has lived as a girl in all aspects of her life since she was five years old and was diagnosed with gender dysphoria when she was seven years old. 3-ER-539.

Sports are a vitally important part of both Jane's and her family's lives. 3-ER-545; 3-ER-540. Jane is a passionate soccer player and has played soccer on girls' club and recreational sports teams for nearly five years. 3-ER-545. Soccer has allowed Jane to make new friends and establish a sense of community. *Id.* Jane has shared that she is transgender with her coaches and soccer teammates, who are highly supportive of her identity. 3-ER-540.

As part of her medical treatment for gender dysphoria, Jane's doctors monitored her for signs of the onset of puberty. *Id.* In June 2023, Jane's doctor

prescribed a Supprelin implant, which is a puberty-blocking medication.  2-ER-68.
Accordingly, Jane has not and will not experience any of the physiological changes
that increased testosterone levels would cause in a pubescent boy.  3-ER-567.

After starting at the Kyrene Aprende Middle School in July 2023, Jane
began competing as a member of the girls' cross-country team.  3-ER-545.  Jane
also intends to try out for the girls' soccer team in the winter 2023 to 2024 athletic
season and the girls' basketball team in the spring 2024 season.  *Id.*  Both soccer
and basketball at Kyrene Aprende Middle School have separate teams for boys and
girls.  *Id.*  While the cross-country team practices co-educationally, the sexes
compete separately.  *Id.*  But for the Ban, the Kyrene School District would permit
Jane to play on girls' sports teams.  SER-15.

### B.    Megan Roe.

Plaintiff Megan Roe is a fifteen-year-old transgender girl who attends The
Gregory School.  3-ER-535.  Megan was diagnosed with gender dysphoria when
she was ten years old.  3-ER-530.

Megan enjoys playing volleyball and has competed on the girls' volleyball
team at The Gregory School for this year's fall season.  *Id.*  Volleyball is one of the
most important sports in the school's social fabric; the matches are an important
social occasion and are well-attended by the entire school community.  *Id.*
Megan's school friends are also on the girls' volleyball team.  3-ER-535.  Her

teammates, coaches, and school are supportive of her and have welcomed her participation on the girls' volleyball team. *Id.*; 3-ER-530–31.

As part of her medical treatment for gender dysphoria, Megan has been receiving puberty-blocking medication since she was eleven years old, after clinical documentation of the initial signs of puberty. 3-ER-530. Megan also started hormone therapy when she was twelve years old. *Id.* As a result of these medical treatments, she has not undergone male puberty and has not experienced the physiological changes that increased testosterone levels would cause in a pubescent boy. *Id.*; 3-ER-567. Instead, the hormone treatment she has received has caused her to develop physiological changes associated with puberty in females. 3-ER-557–58; 3-ER-567. But for the Ban, The Gregory School would permit Megan to play on girls' sports teams. SER-19.

## III.   The Ban.

Before the Ban, transgender girls in Arizona could play on girls' sports teams. Defendant Arizona Interscholastic Association, Inc. (the "AIA") set rules for transgender students' participation in interscholastic sports for schools that are members of the AIA. SER-18.

In December 2018, the AIA formalized a policy that allowed transgender students to apply for permission to play on teams consistent with their gender identities. 3-ER-597 (citing *Minutes: Executive Board Meeting*, AIA 7 (Dec. 10,

7

2018), https://aiaonline.org/files/16539/executive-board-meeting-minutes-december-10-2018.pdf.). If a transgender student submitted letters of support from their parent or guardian, a school administrator, and a health care provider and demonstrated that the request was appropriate and would not cause adverse health risks to the student, the AIA would grant the request. SER-18. In the past ten to twelve years, the AIA received approximately twelve requests and approved seven students to play on teams consistent with their gender identity. *Consideration of Bills: Hearing on S.B. 1165 Before S. Comm. on Judiciary*, 55th Leg., 2d. Reg. Sess. 51:40–56 (2022) ("S.B. 1165 Hearing"), https://www.azleg.gov/videoplayer/?eventID=2022011057&startStreamAt=508. Prior to the Ban, both The Gregory School and Kyrene Aprende Middle School followed the AIA's policy. 3-ER-595.

Despite the small number of transgender students in Arizona who had requested to play on teams consistent with their gender identity and the lack of any evidence suggesting that the AIA's policy was inadequate, on March 30, 2022, Arizona enacted the Ban, which categorically bars transgender girls from competing on girls' school sports teams. *See* Ariz. Rev. Stat. § 15-120.02. The Ban requires each public school athletic team and private school athletic team that competes against a public school team to be designated as male, female, or co-ed based on "the biological sex of the students who participate." *Id.* § 15-120.02(A).

The Ban's legislative findings provide that for purposes of school sports, a student's sex is determined at "fertilization and revealed at birth or, increasingly, *in utero.*" 2-ER-98 (internal citation and brackets omitted). The Ban, therefore, classifies all transgender girls as "biologically male." *See* Ariz. Rev. Stat. § 15-120.02. The Ban commands that "[a]thletic teams or sports designated for 'females,' 'women,' or 'girls,' may not be open to students of the male sex." *Id.* § 15-120.02(B).[1] The Ban thus prevents the implementation of the AIA's policy and bars transgender girls, including Jane and Megan, from competing on girls' sports teams.

The Ban was enacted for the purpose of excluding transgender girls from playing on girls' sports teams. Its legislative findings cite an article entitled "Transgender Women in the Female Category of Sport," and refer to "testosterone suppression." 2-ER-98–100. In the hour-plus of testimony before the Senate Judiciary Committee, nearly every speaker specifically discussed how the Ban would target and affect transgender girls.[2] *See generally* S.B. 1165 Hearing. Not one person identified a single example of a transgender girl displacing any other

---

[1] The Ban does not contain a parallel provision for teams designated for "males," "men," or "boys."

[2] While not every person who spoke in support of the Ban used the term "transgender," the majority discussed "biological males" on puberty- and hormone-blocking medication or "males becoming females." *See generally* S.B. 1165 Hearing.

girl on a girls' sports team in Arizona—including Matt Sharp of Alliance Defending Freedom, who spoke on behalf of the Ban's sponsor Senator Nancy Barto and could not provide a single "specific instance" in which this had happened in the state. *Id.* at 15:08–40; *see also id.* at 1:16:55–17:40 (Senator Leach admitting that the Ban is "prescriptive," rather than reacting to an existing issue in the state). Furthermore, Senator Vince Leach explained his vote for the Ban by stating, "[i]f we allow transgenders to take over female sports, you will not have females participating." *Id.* at 1:17:32–39. Appellant Petersen, meanwhile, suggested that those who opposed the legislation could "hav[e] just a trans league, so that they can all compete in their own league." *Id.* at 28:28–38; *see also* SER-13 (acknowledging that the legislation affects "transgender individuals").

## IV.   The benefits of school sports.

School sports offer numerous social, emotional, physical, and mental health benefits to all students who participate, including the opportunity to make friends and become part of a supportive community of teammates. 3-ER-568–69. Moreover, students who play school sports have fewer physical and mental health concerns than those who do not, and students who participate in high school sports experience a positive impact on academic achievement and are more likely to finish college. 3-ER-569–70.

Barring a transgender girl from playing on girls' teams with other girls is psychologically damaging. 3-ER-570; 3-ER-491–92. Transgender girls excluded from girls' sports teams internalize the shame and stigma of being excluded for a personal characteristic—being transgender—over which they have no control and that already subjects them to discrimination. 3-ER-571. For transgender girls who are already playing on girls' sports teams, a law that bars them from continued participation on those teams has a further negative impact on their health and well-being, causing them to feel isolated, rejected, and stigmatized and thereby putting them at high risk for severe depression and anxiety. *Id.* Forcing a transgender girl to play on a boys' sports team is also profoundly damaging because it exposes her to humiliation and shame and jeopardizes her medical treatment, mental well-being, and health. 3-ER-570–71.

For both Jane and Megan, participating on girls' sports teams and the acceptance they have found amongst their peers have been an important part of their lives and critical to their treatment for gender dysphoria. *See* 3-ER-535; 3-ER-545. But if the Ban is enforced as to Jane and Megan, they will be prevented from trying out for and playing on those teams and, indeed, from playing sports at all. Plaintiffs cannot compete on boys' teams because to do so would directly contradict their medical treatment for gender dysphoria and accordingly jeopardize their health. 3-ER-541; ER-546; 3-ER-570–71; 3-ER-539–40; 3-ER-535–36; 3-

ER-530–31.  Thus, if the Ban is enforced as to Plaintiffs, it will negatively affect their educational and social experience and cause them to suffer irreparable emotional, psychological, and developmental harm.  *See* 3-ER-558; 3-ER-570–71.

## V.  There is no scientific evidence that pre-pubescent boys have any athletic advantage over pre-pubescent girls.

There is a well-established scientific consensus that the biological driver of average group differences in athletic performance between adolescent girls and boys is their respective levels of testosterone, which begin to diverge significantly only after the onset of puberty.  3-ER-556.  Before puberty, boys and girls do not differ significantly in either their levels of testosterone or their athletic performance.  2-ER-43–44; 3-ER-468–69; 3-ER-556.  After puberty, adolescent boys begin to produce higher levels of testosterone, causing them to become, on average and over time, stronger and faster than adolescent girls.  3-ER-556.

Transgender girls who receive puberty-blocking medication do not have an athletic advantage over other girls because they do not go through male puberty and do not experience the physiological changes caused by the increased production of testosterone associated with male puberty.  2-ER-43; 3-ER-555–57.  When those girls subsequently receive hormone therapy, their bodies develop the skeletal structure, fat distribution, and muscle and breast development typical of other girls.  3-ER-567; 3-ER-555–56.  Transgender girls who receive these medical treatments typically have testosterone levels in the same range as other girls.

12

3-ER-556. Accordingly, an individual's genetic makeup and anatomy at birth are not reliable indicators of athletic performance because sex chromosomes and genitals alone do not meaningfully affect athletic performance. *Id.* The fact that a girl is transgender reveals nothing about her athletic ability. 3-ER-557.

Neither Jane nor Megan has undergone or intends to undergo male puberty, and both are taking puberty-blocking medication. 3-ER-540; 2-ER-68; 3-ER-530. Megan has also received hormone therapy. 3-ER-535. Accordingly, they have no athletic advantage over other girls and do not pose any safety risk to other girls.

## VI. Plaintiffs' motion for a preliminary injunction.

On April 17, 2023, Plaintiffs filed this suit to prevent the Ban's enforcement as applied to them. 3-ER-592–612. Plaintiffs named Thomas Horne, the State Superintendent of Public Instruction; Laura Toenjes, the Superintendent of the Kyrene School District; the Kyrene School District; The Gregory School; and AIA as Defendants. 3-ER-595–96. The district court later granted Arizona Senate President Warren Petersen and Speaker of the Arizona House of Representatives Ben Toma permission to intervene as Defendants. 4-ER-633. Plaintiffs allege that the Ban violates their rights under the Equal Protection Clause, Title IX, the Americans with Disabilities Act, and the Rehabilitation Act. 3-ER-607–11.

On the same day, Plaintiffs moved for a preliminary injunction on their equal protection and Title IX claims. 3-ER-577. On July 20, 2023, following

extensive briefing, documentary evidence, and a hearing, the district court granted Plaintiffs' motion. *See* 1-ER-2–36.

*First*, the district court found that Plaintiffs demonstrated a likelihood of success on the merits. As to Plaintiffs' equal protection claims, the district court correctly determined that the Ban is subject to heightened scrutiny because it discriminates based on transgender status, which is a sex-based classification. 1-ER-27–29. The district court found that the Ban could not withstand heightened scrutiny because Appellants failed to produce persuasive evidence at the preliminary injunction stage that the Ban was substantially related to either of the important state interests that Appellants advanced—ensuring equal opportunities for girls to play sports and preventing safety risks. 1-ER-30–31. The district court also found that Plaintiffs were likely to succeed on the merits of their Title IX claim because, under controlling Ninth Circuit precedent, discrimination based on transgender status is discrimination based on sex and is impermissible under Title IX. 1-ER-32 (citing *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023) and *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022)).

*Second*, the district court found that, in the absence of a preliminary injunction, Jane and Megan would suffer "severe and irreparable mental, physical, and emotional harm." 1-ER-34. Beyond the presumption that enforcement of the Ban in violation of the Equal Protection Clause and Title IX itself constituted

irreparable harm, the district court found that Jane and Megan's exclusion from girls' sports would directly contradict their medical care for gender dysphoria. 1-ER-33–34. The district court further found that the Ban would deprive Jane and Megan of the myriad "social, educational, physical, and emotional health benefits that both sides acknowledge come from school sports" and cause them to "suffer the shame and humiliation of being unable to participate in a school activity simply because they are transgender." 1-ER-34.

*Third*, the district court found that the remaining factors both favored Plaintiffs, first noting that "it is always in the public interest to prevent the violation of a party's constitutional rights." 1-ER-35 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). As for the balance of the equities, the district court found no harm to the Appellants, as they "cannot suffer harm from an injunction that merely ends an unlawful practice," whereas Jane and Megan would "face serious and ongoing harm" if the Ban was enforced as to them. 1-ER-35 (citation omitted). It further noted that the record did not support Appellants' speculation that other girls would be harmed by having to compete against Jane and Megan. *Id.*

Observing that it was "not a doubtful case," the district court granted Plaintiffs' motion and enjoined Defendants from enforcing the Ban against Jane and Megan. 1-ER-35–36. This appeal followed.[3]

## SUMMARY OF THE ARGUMENT

The district court correctly found that the Ban likely violates both the Equal Protection Clause and Title IX as applied to Plaintiffs, would severely and irreparably harm Jane and Megan if enforced against them, and runs counter to the public interest and that the balance of equities favors injunctive relief. This Court should affirm.

*First*, the Ban violates the Equal Protection Clause. The district court correctly applied controlling Ninth Circuit precedent and analyzed the Ban under heightened scrutiny. 1-ER-27–33. Appellants' attempts to evade that precedent, which this Circuit recently reaffirmed in *Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023), fail. Although Appellants assert that the Ban is neutral because it does not use the word "transgender," heightened scrutiny applies to laws that discriminate against a protected class even when the law does not explicitly refer to that class. (Argument § I(A)(1)(c)(i).) And Appellants' efforts to reframe the Ban—the

---

[3] Following the district court's decision, Appellants filed motions for stay pending appeal with both the district court and the Ninth Circuit. Dist. Ct. Dkt. No. 132; 9th Cir. ECF Nos. 7 & 11. Both courts denied Appellants' motions. *See* SER-11; 9th Cir. ECF No. 16.

purpose and effect of which are to exclude transgender girls from girls' sports—as a remedial or reform measure analogous to an affirmative action program is factually and legally wrong. The Ban does not confer any benefit upon a disadvantaged group and bears no legal relationship to the affirmative action laws at issue in Appellants' cited cases. Moreover, in those cases, unlike here, the benefits program was constitutional. (Argument § I(A)(1)(c)(ii).)

*Second*, the district court correctly found that, as applied to Jane and Megan, the Ban cannot withstand heightened scrutiny. The district court properly found that the government's asserted justifications—promoting equality and equity in athletic opportunities and protecting girls from physical injury—were not substantially related to the Ban as applied to Plaintiffs. Rather, the Ban is impermissibly based on stereotypes and generalizations, overly broad, unsupported by empirical evidence, and based on nothing more than a "hypothesized problem." 1-ER-22, 30–31. (Argument § I(A)(2)(b).)

The district court rightly adhered to this Circuit's law regarding as-applied challenges when it considered Jane's and Megan's individual circumstances. Appellants' argument that the district court engaged in "perfect tailoring" is misconceived. Rather, the district court correctly found that the Ban—with its categorical exclusions—lacked any tailoring at all. (Argument § I(A)(2)(c)(i).)

17

The district court also validly found that the record evidence did not support a factual finding that transgender girls who have not undergone male puberty have an athletic advantage over other girls. Carefully weighing the evidence before it, the district court credited Plaintiffs' experts' evidence that, before puberty, there are no significant differences in athletic performance between boys and girls. The district court found that Appellants' evidence to the contrary was unconvincing and failed to account for other factors which might explain the data. That is not error, much less clear error. (Argument § I(A)(2)(c)(ii).)

*Third*, the district court correctly found that Plaintiffs were likely to succeed on their Title IX claims, because—under this Circuit's precedent—discrimination against transgender individuals violates Title IX. The district court correctly rejected Appellants' arguments that Plaintiffs were not excluded from participating in sports, because they could still permissibly play on boys' teams, stating that "Plaintiffs, who are transgender girls, cannot play on boys' teams because they are transgender girls who have not and will not go through male puberty and will go through female puberty." 1-ER-33. (Argument § I(B).)

*Fourth*, the district court correctly found that Jane and Megan will suffer severe and irreparable harm if the Ban is enforced against them. Beyond the presumptive harm that a violation of their constitutional rights and Title IX rights would cause, the district court properly credited concrete and specific harms to

Jane and Megan. These included the loss of social, educational, physical, and emotional health benefits arising from participation in school sports as well as the shame and humiliation of being excluded from school sports because of a personal characteristic over which they have no control. (Argument § II.)

Appellants do not challenge the district court's findings of irreparable harm. Instead, they argue that: (1) Plaintiffs' alleged "delay" of seven months undercuts these real harms, a position unsupported by law; and (2) Plaintiffs' harms are caused by a "medical condition" rather than the state's action, which Appellants did not argue below. Both arguments should be rejected. (Argument § II.)

*Finally*, the district court did not err in holding that the balance of equities and public interest favored injunctive relief. Arizona cannot be harmed by the enforcement of unconstitutional statutes nor would enjoining the Ban as to Plaintiffs harm the state or anyone else. Transgender girls in Arizona participated in girls' sports without incident before the Ban. Appellants' speculation that other girls in Arizona will be harmed by Jane's and Megan's participation on girls' teams is unsupported by any record evidence and should be rejected. (Argument § III.)

For all of these reasons, this Court should affirm.

## STANDARD OF REVIEW

The Ninth Circuit reviews a district court's decision to grant a preliminary injunction for abuse of discretion. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286 (9th Cir. 2013) (citation omitted). The district court's legal conclusions are considered *de novo* and its factual findings for clear error. *Armstrong v. Brown,* 768 F.3d 975, 979 (9th Cir. 2014). This review is "limited and deferential." *Harris v. Bd. of Supervisors*, 366 F.3d 754, 760 (9th Cir. 2004) (citation and quotation marks omitted). "Under this standard, as long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Shell Offshore*, 709 F.3d at 1286 (citation and alteration omitted); *see also Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 795 (9th Cir. 2005) ("Clear error is not demonstrated by pointing to conflicting evidence in the record." (citation omitted)).

## ARGUMENT

**I. The district court did not abuse its discretion in finding that Plaintiffs are likely to succeed on the merits.**

### A. The Ban violates the Equal Protection Clause.

The district court correctly found that Plaintiffs were likely to prevail on the merits of their equal protection claim. 1-ER-31. Correctly analyzing the Ban—which discriminates against transgender individuals—under heightened scrutiny,

the district court found that the Ban was not substantially related to an important government interest as applied to Jane and Megan. *Id.* Even if rational basis review applied (which it does not), the district court correctly found that the Ban still could not survive. Neither holding should be disturbed.

> **1.    The district court correctly found that heightened scrutiny applies.**
>
> > **(a)    Heightened scrutiny applies to laws that discriminate on the basis of transgender status.**

The district court correctly determined that heightened scrutiny applied. ER-27–28. Under this Circuit's settled law, heightened scrutiny applies to laws that discriminate on the basis of transgender status, as the Ban does. *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019); *see also Hecox*, 79 F.4th at 1026. Heightened scrutiny applies to such cases because transgender individuals constitute at least a "quasi-suspect class" and because discrimination against transgender individuals is "a form of sex-based discrimination." *Hecox*, 79 F.4th at 1026; *see also Karnoski*, 926 F.3d at 1200–01 (policy barring transgender individuals from military service is subject to heightened scrutiny); *see also Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020) (holding in the context of Title VII that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex").

**(b)** **The Ban discriminates on the basis of transgender status.**

The district court correctly found that the Ban discriminates on the basis of transgender status. 1-ER-27–28.

The Ban is facially discriminatory. It discriminates against every transgender girl—and therefore against Plaintiffs—by providing that for purposes of school sports a student's sex is fixed "at birth." 2-ER-98. By design, the Ban classifies all transgender girls as male. Because the Ban prohibits students who are "male" under this definition from playing on girls' teams, Ariz. Rev. Stat. § 15-120.02(B), it intentionally excludes all transgender girls, including Jane and Megan, from participating on girls' teams and deprives them of the benefits of sports programs and activities that their non-transgender classmates enjoy. *Cf. Hecox*, 79 F.4th at 1025 ("The Act's specific classification of 'biological sex' has . . . been carefully drawn to target transgender women and girls.").

The Ban's purpose was to ban transgender girls from girls' sports teams. Its legislative findings cite an article entitled "Transgender Women in the Female Category of Sport," and refer to "testosterone suppression." 2-ER-98–100; *see Hecox*, 79 F.4th at 1022 (holding that legislative findings in an Idaho law "ma[de] clear that its animating purpose was to ban transgender women from 'biologically female' teams"). Moreover, in explaining his vote for the bill, State Senator Vince Leach stated, "If we allow transgenders to take over female sports, you will not

have females participating." S.B. 1165 Hearing. And Appellant Petersen repeatedly asked whether those opposing the bill would "be opposed to having just a trans league, so they can all compete in their own league." *Id.* at 28:28–35.

In *Hecox*, this Court recently examined a nearly-identical Idaho law that "categorically ban[ned] transgender girls and women at all levels from competing" on girls' and women's sports teams and that defines transgender girls as biological males. 79 F.4th at 1016. The designations based on "biological sex" are materially identical:

| Idaho Ban at issue in *Hecox* | Arizona Ban at issue here |
|---|---|
| Interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by a public primary or secondary school, a public institution of higher education, or any school or institution whose students or teams compete against a public school or institution of higher education shall be expressly designated as one (1) of the following based on *biological sex*:<br><br>(a) Males, men, or boys;<br>(b) Females, women, or girls; or<br>(c) Coed or mixed.<br><br>Idaho Code § 33-6203(1) (emphasis added). | Each interscholastic or intramural athletic team or sport that is sponsored by a public school or a private school whose students or teams compete against a public school shall be expressly designated as one of the following based on the *biological sex* of the students who participate on the team or in the sport:<br><br>1. "Males", "men" or "boys".<br>2. "Females", "women" or "girls".<br>3. "Coed" or "mixed".<br><br>Ariz. Rev. Stat. § 15-120.02(A) (emphasis added). |

The bans are likewise materially identical, with both statutes specifying that "athletic teams or sports designated for females, women, or girls" are not "open to students of the male sex":

| Idaho Ban at issue in *Hecox* | Arizona Ban at issue here |
| --- | --- |
| Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex.<br><br>Idaho Code § 33-6203(2) | Athletic teams or sports designated for "females", "women" or "girls" may not be open to students of the male sex.<br><br>Ariz. Rev. Stat. § 15-120.02(B) |

Because the Idaho ban not only "classifie[d] on the basis of sex but also classifie[d] based on transgender status," this Court determined that it "trigger[ed] heightened scrutiny on both grounds." *Hecox*, 79 F.4th at 1021–22; *see also id.* at 1022 (holding that the "plain language" of the Idaho Ban discriminated against transgender women). So too here. As in *Hecox*, heightened scrutiny applies.

> (c)   **Appellants' arguments for applying rational basis review fail.**

> > i.   **A law can target a protected class without explicitly naming that class.**

Appellants contend (at 32) that the Ban does not "'refer[] to' gender identity and so it is 'facially' neutral with respect to gender identity." But constitutional protections cannot be evaded by wordsmithing. This Court has consistently applied heightened scrutiny to laws that discriminate against a protected class even when the law does not explicitly name that group. *See Latta v. Otter*, 771 F.3d

456, 467–68 (9th Cir. 2014) (holding that if a law "[e]ffectively if not explicitly" discriminates against a protected class, it is subject to heightened scrutiny"); *Hecox*, 79 F.4th at 1024 (same). After all, "[a] tax on wearing yarmulkes is a tax on Jews." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). Indeed, in *Hecox*, this Court noted that the nearly identical Idaho law was "carefully drawn to target transgender women and girls, even if it does not use the word 'transgender' in the definition[,]" and thus "functions as a form of '[p]roxy discrimination.'" *Hecox*, 79 F.4th at 1024–25 (quoting *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013)).

Accordingly, the district court correctly rejected Appellant's argument that because the Ban simply avoids using the word "transgender" it does not discriminate based on gender identity and thus is not subject to heightened scrutiny. 1-ER-28.

### ii. Appellants' attempt to reframe Plaintiffs' challenge as "underinclusive" should be rejected.

Appellants cannot avoid heightened scrutiny by reframing (at 26–31) Plaintiffs' equal protection claims as an "underinclusive" challenge.

*First*, in *Hecox,* as discussed above, this Court analyzed a law nearly identical to the Ban under heightened scrutiny because its text and purpose were

discriminatory. *Hecox*, therefore, did not analyze the plaintiff's claim as an underinclusiveness challenge because it was not one. This analysis controls here.

*Second*, contrary to Appellants' contention, the Ban is not a "remedial program for women and girls" analogous to an affirmative action program. Opening Br. at 28–29 (citing *Jana-Rock Constr.*, *Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195 (2d Cir. 2006); *Hoohuli v. Ariyoshi*, 631 F. Supp. 1153 (D. Haw. 1986)). Arizona law has segregated teams by sex at least since 1982, *see Clark v. Ariz. Interscholastic Ass'n* ("*Clark I*"), 695 F.2d 1126, 1131 (9th Cir. 1982), and under Title IX, equal funding for girls and women's sports has been the law of the land for almost fifty years. The Ban had no effect on these issues. In addition, the Ban does not provide funding or other similar material benefits to girls' sports to remedy any past deprivations, thus further distinguishing it from remedial laws. Nor is there any evidence in the record that transgender girls ever injured or displaced other girls before the Ban. *See* S.B. 1165 Hearing 1:15:30–36 (Sharp, on behalf of the Ban's sponsor, conceding that he was "not aware of a specific instance" where a transgender girl had displaced any other girl on a girls' sports team in Arizona). Rather, as discussed above, the Ban's text and purpose show it was designed to exclude transgender girls.

The cases Appellants cite (at 27–28) do not support their contention that the Ban is a remedial program. In *Jana-Rock Construction*, *Inc. v. New York State*

*Department of Economic Development*, 438 F.3d 195, the plaintiffs admitted that New York's affirmative action statute for minority businesses was constitutional and passed strict scrutiny. *Id.* at 206. Indeed, plaintiffs there (individuals of Spanish or Portuguese origin) were not attempting to *escape* the law's discriminatory impact upon them but instead hoping to *access* the law's benefits (participation goals on state projects for minority-owned businesses). *Id.* at 201–03. The *Jana-Rock* court explained that "once the government has shown that its decision to resort to explicit racial classifications survives strict scrutiny . . . it is [not] appropriate to apply automatically strict scrutiny a second time in determining whether an otherwise valid affirmative action program is underinclusive for having excluded a particular plaintiff.*"* *Id.* at 200. Here, however, Plaintiffs challenge the constitutionality of the Ban itself, and therefore the *Jana-Rock* court's analysis does not apply. Regardless, the *Jana-Rock* court explained that "underinclusiveness may trigger [heightened] scrutiny if it is motivated by a discriminatory purpose." *Id.* at 211. As the district court correctly concluded and as discussed above, the Ban has a clear discriminatory purpose. *See* 1-ER-28. Appellants also cite *Hoohuli v. Ariyoshi*, 631 F. Supp. 1153, which does not apply here for the same reasons. Similar to the plaintiffs in *Jana-Rock*, the plaintiffs in *Hoohuli* did not challenge the constitutionality of the affirmative action program but merely the state's decision to "*expand* the class of beneficiaries

27

to all members of the race-based class of aboriginal descendants." *Id.* at 1154, 1159.

*Third*, the Ban is not a "reform" measure aimed at eliminating an existing barrier for the same reasons as discussed above. *See* Opening Br. at 28. The cases Appellants cite for this assertion are not analogous. They concern laws that *expanded* rights, rather than further *limited* a class of persons' rights. *See Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966) (upholding a law that was "aimed at eliminating an existing barrier to the exercise of the franchise" by expanding voting rights); *Schilb v. Kuebel*, 404 U.S. 357, 366 (1971) (upholding a bail reform law that provided an "obvious benefit" in face of the argument that it did "not reform enough"); *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 803, 806 (1969) (validating a law that expanded absentee ballot access for some individuals but not for unsentenced inmates).

### 2. The district court correctly held that the Ban fails heightened scrutiny.

#### (a) A law violates heightened scrutiny when it is not substantially related to an important government interest.

To survive heightened scrutiny, "the defender of the challenged action must show at least that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 524

(1996) (citation and quotation marks omitted). The standard is "demanding," and the burden "rests entirely on the State" to provide an "exceedingly persuasive" justification for the challenged law. *Id.* at 533. "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation," and it "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.*

        **(b)    The Ban fails heightened scrutiny because it is not substantially related to any important government interest.**

      The district court did not abuse its discretion in determining that the Ban failed heightened scrutiny. *See* 1-ER-29–31. As with *Hecox,* the Ban's "sweeping prohibition on transgender female athletes . . . encompassing all students, regardless of whether they have gone through puberty or hormone therapy, and without any evidence of transgender athletes displacing female athletes . . . is too overbroad to satisfy heightened scrutiny." *Hecox*, 79 F.4th at 1030.

      *First*, the district court considered the justifications that Appellants advanced in support of the Ban—promoting equality and equity in athletic opportunities and protecting girls from physical injury in sports—to determine whether they were substantially related to any important government interest. *See* 1-ER-29; *see also Virginia*, 518 U.S. at 524; *Craig v. Boren*, 429 U.S. 190, 197 (1976) ("[C]lassifications by gender must serve important governmental objectives and

must be substantially related to those objectives.").  As part of that analysis, the district court was mindful of the need to examine the Ban's "actual purposes and carefully consider any resulting inequality to ensure that [the] most fundamental institutions neither send nor reinforce messages of stigma or second-class status." 1-ER-29 (quoting *Latta*, 771 F.3d at 468).

Upon a thorough review of the evidence, the district court concluded that, far from providing—as Appellants must—an "exceedingly persuasive justification" for the Ban's exclusion of transgender girls from girls' sports teams, Appellants advanced justifications that were instead impermissibly based on "generalizations and stereotypes that erroneously equate transgender status with athletic ability."  1-ER-31–32 (citing *Virginia*, 518 U.S. at 533 and *Hecox v. Little*, 479 F. Supp. 3d 930, 982 (D. Idaho 2020)).  As in *Hecox*, Appellants have "failed to adduce any evidence demonstrating that the [Ban] is substantially related to its asserted interests in sex equality and opportunity for women athletes."  *Hecox*, 79 F.4th at 1016.  Here, the district court considered similar (and even identical)

evidence as that presented (and rejected) in *Hecox*[4] and found that it could not support the Ban's categorical exclusion of transgender girls at all grade levels and without regard to whether they had or would ever experience male puberty. 1-ER-30–31. The district court thus concluded that Appellants' justifications were not "genuine" and represented no more than a response to a "hypothesized problem."[5] 1-ER-31; *see Virginia*, 518 U.S. at 533; *Karnoski*, 926 F.3d at 1200.

> **(c)    Appellants' arguments do not show an abuse of discretion.**
>
> > **i.    Contrary to Appellants' argument, the district court did not require "perfect tailoring" and was entitled to consider the Ban's application to Plaintiffs in this as-applied challenge.**

Appellants claim (at 41–50) that the district court "improperly require[d] the [Ban] to be perfectly tailored." Not so. The district court correctly considered the

---

[4]    Appellant Horne submitted the same report that Dr. Gregory Brown submitted in *Hecox* in support of his opposition to the preliminary injunction in this action. 3-ER-341. The *Hecox* court discounted that testimony as inconsistent with the studies Dr. Brown cited in his report, some of which actually supported the plaintiffs' argument. *Hecox*, 79 F.4th at 1031. Although Dr. Brown updated his report prior to the preliminary injunction hearing in this case, Dr. Brown did not cite studies comparing the athletic performance of prepubertal transgender girls with other girls, instead opining that "the effect of prescribing puberty blockers to a male child before the onset of puberty on the physical components of athletic performance is largely unknown" and primarily citing studies comparing the performance of post-pubertal transgender women with other women. *See* 3-ER-395.

[5]    The district court further noted that the Ban's policy of allowing "biological girls" to play on boys' sports teams belied its purported safety justification. 1-ER-15.

31

Ban's application to Jane and Megan as part of its heightened scrutiny review. When courts in this Circuit assess an as-applied equal protection challenge, they "must determine not whether [the state] has some hypothetical, post-hoc rationalization in general, but whether a justification exists for the application of the [law] *as applied to [the plaintiffs]*." *Witt v. Dep't of Air Force*, 527 F.3d 806, 819 (9th Cir. 2008) (emphasis added); *see also Karnoski*, 926 F.3d at 1200 (noting that the heightened scrutiny approach "is as-applied rather than facial"). Thus, the consideration of transgender girls like Jane and Megan—who have not undergone and will not undergo male puberty—was essential to the district court's proper and thorough analysis of the Ban's constitutionality as applied to them. And far from demanding "perfect tailoring" of the law, the district court "avoid[ed] making unnecessarily broad constitutional judgments" in determining that there was no justification for excluding Plaintiffs from participating on girls' sports teams. *City of Cleburne v. Cleburne Living Ctr. Inc.,* 473 U.S. 432, 447 (1985).

Appellants attempt (at 41–45) to reframe the narrow, as-applied challenge before the Court by describing other types of transgender women—with different circumstances than Plaintiffs—whose exclusion from girls' sports they claim would serve Appellants' alleged justification for the Ban. As an initial matter, this list reinforces Plaintiffs' argument that the Ban has a discriminatory purpose because the state "selected . . . a particular course of action at least in part 'because

32

of,' not merely 'in spite of' its adverse effects upon an identifiable group," *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979), here transgender women and girls. Furthermore, arguments based on application of a law to hypothetical cases not before the Court are not sufficient to justify the law in an as-applied constitutional challenge. Rather, the Court must determine whether the justification for the law is constitutional as to the plaintiffs before it. *Witt*, 527 F.3d at 819.

Appellants also try to distort the as-applied inquiry under heightened equal protection scrutiny by drawing on aspects of other doctrinal tests under the First Amendment that also happen to be referred to as "heightened scrutiny." Opening Br. at 46–48; *see Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989) (content-neutral time, place, or manner restriction); *United States v. Edge Broad. Co.*, 509 U.S. 418, 427–29 (1993) (commercial speech). But these various other forms of tests labelled "heightened scrutiny" all have different doctrinal elements and were crafted to vindicate different constitutional principles. The Supreme Court has never used the standards for "time, place, or manner" or "commercial speech" cases interchangeably with the standard for equal protection sex discrimination cases, and neither should this Court. In any event, even in the cited cases, the Supreme Court took note of the individual circumstances of the particular plaintiffs in each case when assessing whether the law was unconstitutional. *See, e.g.*, *Edge Broad.*, 509 U.S. at 429–30 (analyzing under the

33

fourth factor of *Central Hudson* whether the regulation was more extensive than necessary as it related to the plaintiff).

The remainder of Appellants' cases fare no better. Appellants cite (at 45) *Nguyen v. INS*, 533 U.S. 53 (2001), to argue that equal protection heightened scrutiny does not require that laws using sex classifications "be capable of achieving [their] ultimate objective in every instance." But heightened scrutiny does require that "[t]he fit between the means and the important end" be "exceedingly persuasive." *Nguyen*, 533 U.S. at 70. As applied to Plaintiffs, who have not and never will go through endogenous male puberty, the fit is not even rational.

In *Kahn v. Shevin*, 416 U.S. 351 (1974), the issue was whether a sex-based classification in the Florida tax code was necessary at all, *see id.* at 353–55, not whether a classification that is necessarily based on sex—such as transgender status—is discriminatory. *Associated General Contractors of California, Inc. v. City & County of San Francisco*, 813 F.2d 922 (9th Cir. 1987), involved a remedial affirmative action program, *id.* at 924, which the Ban is not. (*See* Argument § I(A)(1)(c)(ii).) Finally, in *Ledezma-Cosino v. Sessions*, 857 F.3d 1042 (9th Cir. 2017), the Court applied rational basis review to determine whether "it is irrational to classify habitual drunkards as persons who lack good moral character." *Id.* at 1048.

And as this Court recognized in *Hecox*, *Clark v. Arizona Interscholastic Association* ("*Clark I*"), 695 F.2d 1126, further supports Plaintiffs' position. None of the justifications for excluding males from girls' sports that *Clark* recognized as valid holds true for girls who are transgender: (1) far from being favored in athletics, "women who are transgender have historically been discriminated against"; (2) transgender women—unlike the boys in *Clark*—would not be able to participate in any school sports; (3) based on the very small numbers of transgender girls in the population, "transgender women have not and could not 'displace' cisgender women in athletics 'to a substantial extent;'" and (4) in any event, it is "not clear that transgender women who suppress their testosterone have significant physiological advantages" over other women. *Hecox*, 79 F.4th at 1030 (quoting *Hecox*, 479 F. Supp. 3d at 977). *Hecox*'s analysis of *Clark* is even more compelling here, where there is no evidence that Plaintiffs have any physiological advantage over other girls.

Appellants also argue (at 44) that *Hecox* should be reversed because it is "inconsistent" with a single line from *Clark v. Arizona Interscholastic Association* ("*Clark II*"), 886 F.2d 1191 (9th Cir. 1989), in which the court observed, "[i]f males are permitted to displace females on the school volleyball team even to the extent of one player like Clark, the goal of equal participation by females in interscholastic athletics is set back, not advanced." *Clark II*, 886 F.2d at 1193.

Even assuming there were any evidence of a single girl being displaced by a transgender classmate (which there is not), Appellants' reliance is misplaced. The *Clark II* court was focused on the fact that a ruling in Clark's favor would not help vitiate any existing inequality or advance the goal of equal participation. *See Clark II*, 886 F.2d at 1193; *see also Hecox*, 79 F.4th at 1030 (distinguishing *Clark II*). Here, the goal of equal participation by girls and women in school sports is *advanced* by allowing Jane and Megan to play with other girls at their school.

         **ii.**    **Contrary to Appellants' argument, the district court's findings regarding girls who do not undergo male puberty are not clearly erroneous.**

The district court did not err—let alone clearly err—in its determination that there was inadequate evidence to conclude that transgender girls who have not undergone male puberty have an athletic advantage over other girls. The district court carefully weighed the evidence before it and credited expert evidence from pediatric endocrinologist Dr. Shumer that the well-established scientific consensus is that, before puberty, there are no significant differences in athletic performance between boys and girls. 2-ER-43–44; 3-ER-468–69. In contrast, the district court found that Appellants' expert testimony about some "small differences" in isolated areas between prepubertal boys and girls "merely observes phenomena across a population sample in isolated areas, . . . does not determine a cause for what is observed," and fails to account for other factors that could explain the data. 1-ER-

19–22. These factors include "greater societal encouragement of athleticism in boys, greater opportunities for boys to play sports," and "different preferences of the boys and girls surveyed," among others.[6]  1-ER-44–45.  As the district court correctly found, "transgender girls, who are being raised in conformance with their gender identity, will be subject to the same social and cultural factors that girls face that correlate to lower physical fitness scores."  1-ER-19–20.

The district court also correctly found that "[t]ransgender girls who receive puberty-blocking medication do not have an athletic advantage over other girls," based on extensive testimony from experts in the medical treatment of transgender adolescents, who explained that transgender girls "who receive hormone therapy after receiving puberty-blocking medication will develop the skeletal structure, fat distribution, and muscle and breast development typical of other girls" and "have the same levels of circulating estrogen and testosterone as other girls."  1-ER-22–23 (citing 3-ER-472; 3-ER-555–56; 3-ER-567; 3-ER 556).  The district court also found that transgender girls who "have not yet undergone male puberty or who have received puberty-blocking medication at the onset of puberty do not present

---

[6]  In fact, even the new "fresher data" that Appellants cite, Opening Br. at 60, admits that any small differences observed did not factor in "the potential impact of sociocultural factors, such as biological talent and sex differences in participation."  Mira A. Atkinson et al., *Sex Differences in Track and Field Elite Youth* 1 (Aug. 31, 2023).

any unique safety risk to other girls." 1-ER-23 (citing 2-ER-46, 2-ER-49–50; 3-ER-476).

The above factual findings support the district court's accurate conclusion that Appellants failed to meet their demanding burden to demonstrate that the Ban is substantially related to the important government interests that they allege it advances. *Virginia*, 518 U.S. at 533.

Boiled down, Appellants' challenge to the district court's factual findings is simply that Appellants' experts should be preferred over Plaintiffs' experts. But that is not the test and is far from enough to establish clear error. *See Nat'l Wildlife Fed.*, 422 F.3d at 795 ("Clear error is not demonstrated by pointing to conflicting evidence in the record." (citation omitted)).

### 3. The Ban fails even rational basis review.

While heightened scrutiny applies here, the Ban would fail even rational basis review because "it is not related to any important government interest." 1-ER-31–32. The Ban's sweeping exclusion of all transgender girls from participating in athletics, regardless of their individual circumstances, "is so far removed from the[] particular justifications" put forward in support of it that it is "impossible to credit" those justifications. *Romer v. Evans*, 517 U.S. 620, 635 (1996) (Colorado constitutional amendment denying protections to gay men, lesbians, and bisexuals failed rational basis review because it was too far removed

from the state's purported interests); *see also Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588–89 (9th Cir. 2008) (under rational basis review, a "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational").[7]

As discussed above, the Ban's legislative history demonstrates that it was enacted to exclude transgender girls from school sports in Arizona. (Argument § I(A)(1)(b).)   Because a "bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest," the Ban cannot survive rational basis review. *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also United States v. Windsor*, 570 U.S. 744, 770 (2013) (holding the Defense of Marriage Act unconstitutional where "[t]he avowed

---

[7]   Appellants' cases do not move the needle. *United States v. Ruiz-Chairez*, 493 F.3d 1089 (9th Cir. 2007), upheld a criminal sentencing law that imposed a higher base offense level for people convicted of illegal reentry because the penalty was rationally related to the legitimate government interest of deterring such reentry. *Id.* at 1091.  Here, as the district court correctly found, the Ban serves no important government interest and bears no rational relationship to any of Appellants' claimed interests. *See* 1-ER-31–32.  Similarly, Appellants mischaracterize the language cited in *Barbier v. Connolly*, 113 U.S. 27 (1884), by failing to include that "*[r]egulations for these purposes [supplying water and related public services]* may press with more or less weight upon one than upon another." *Id.* at 31–32 (emphasis added).  The case was a matter for the determination of the "municipality in the execution of its police powers, and *not a violation of any substantial right of the individual*." *Id.* at 32 (emphasis added).

purpose and practical effect of the law" was to "impose a disadvantage, a separate status, and so a stigma" upon same-sex married couples).

Appellants cite (at 39) *F.C.C. v. Beach Communications*, 508 U.S. 307 (1993), for the proposition that Plaintiffs must "negative every conceivable basis which might support" the Ban. To the contrary, however, a court no longer needs to "conceive of hypothetical purposes" but instead must "scrutinize" the government's "actual purposes." *SmithKline Beecham Corp. v. Abbott Lab'ys*, 740 F.3d 471, 482 (9th Cir. 2014); *see also Animal Legal Def. Fund v. Otter*, 44 F. Supp. 3d 1009, 1025–26 (D. Idaho 2014) (noting that the Supreme Court has "shifted its approach to equal protection cases involving allegations of animus" since *Windsor*).

Appellants incorrectly assert that Plaintiffs ignore "[t]he allocation of the burden of proof and the presumption of legislative good faith . . . ." Opening Br. at 39 (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)). *Abbott v. Perez*, 138 S. Ct. 2305, is particular to redistricting cases and is therefore not controlling here. *Id*. at 2324 ("*In assessing the sufficiency of a challenge to a districting plan* . . . the good faith of the state legislature must be presumed." (emphasis added) (citations, alterations, and quotation marks omitted)). Furthermore, *Abbott* stands for the proposition that evidence of past discrimination is not itself enough to reverse the presumption. *See id.* at 2311. Plaintiffs show more than past discrimination,

relying instead on the plain text of the statute, the documented legislative history, and the transparently discriminatory effects. *Cf. Mi Familia Vota v. Hobbs*, 608 F. Supp. 3d 827, 868 (D. Ariz. 2022) ("Plaintiffs do not rely solely on the presence of disparate impacts or the statement of a single legislator or the existence of a 'strange about-face'—factors that, if considered individually, would be insufficient to support a claim of intentional discrimination—but instead rely on the collective weight of those factors.") "When there is proof that a discriminatory purpose has been a motivating factor in the decision"—as there is here—"judicial deference is no longer justified." *Id.* at 867 (internal citation and quotation marks omitted).

## B. The Ban violates Title IX.

The district court also correctly determined that Plaintiffs are likely to succeed on their Title IX claims. Title IX provides, in relevant part, that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). The district court correctly found that discrimination "on the basis of sex" includes discrimination or exclusion "on the basis of transgender status." *See* 1-ER-32 (citing *Bostock,* 140 S. Ct. at 1741).

Settled law supports this finding. In *Bostock v. Clayton County*, 141 S. Ct. 1731, the Supreme Court recognized in the context of Title VII that "it is

impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 1741.  In *Doe v. Snyder*, 28 F.4th 103, this Court extended *Bostock*'s holding to Title IX.  *Id.* at 114; *see also Grabowski,* 69 F.4th at 1116 & n.1 (affirming *Snyder* and approvingly citing to *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) (holding that discrimination against transgender individuals violates Title IX)).

Appellants seek to circumvent this binding precedent, arguing that Title IX's implementing regulations permit sex-segregated sports teams.  *See* Opening Br. at 61 (citing 34 C.F.R. § 106.41(b)–(c)).  However, as discussed above, Plaintiffs do not challenge Title IX's separation of sports by sex; they challenge the Ban because it discriminates against them based on their transgender status, which is sex-based discrimination.

Appellants rely heavily on the Eleventh Circuit's outlier decision, *Adams by and through Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022) (en banc).  *Adams* is neither controlling nor persuasive.  *First*, in that case, the court found that the challenged policy was not enacted to discriminate against transgender students; here, the district court correctly found that it was.  *Compare Adams*, 57 F.4th at 810 ("There is no evidence suggesting that the school Board enacted the bathroom policy because of its adverse effects upon transgender

students" or that the School Board "even ha[d] transgender students in mind." (quotations, citation, and alterations omitted)) *with* 1-ER-28 ("The Arizona legislature intentionally created a classification, specifically 'biological girls,' that necessarily excludes transgender girls."). *Second*, *Adams* is inconsistent with Ninth Circuit precedent. *See Snyder*, 28 F.4th at 114; *Grabowski*, 69 F.4th at 1116 & n.1.[8] *Third*, the *Hecox* court specifically rejected *Adams*'s application to a law very similar to the Ban. *Hecox*, 79 F.4th at 1025.

Appellants' attempt to invoke the Spending Clause to support their position fares no better. *See* Opening Br. at 66. Both the Ninth Circuit and the Supreme Court have clearly held that discrimination "on the basis of sex" applies to discrimination based on transgender status. *See Grabowski*, 69 F.4th at 1116; *Bostock,* 140 S. Ct. at 1741, 1749. When it passed the Ban in 2022, Arizona was therefore on notice that its discrimination against transgender girls violated Title IX. *Cf. Grimm*, 972 F.3d at 619 n.18 (rejecting a similar argument raised before *Bostock* was even decided); *Bostock*, 140 S. Ct. at 1749 ("[T]he fact that a statute has been applied in situations not expressly anticipated by Congress does not

---

[8]  *Adams* is also inconsistent with the law in the Seventh and Fourth Circuits. *See Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2022) (finding likelihood of success that transgender student would succeed in his Title IX claims challenging a bathroom policy); *Grimm*, 972 F.3d at 619 (holding that restroom policy violated Title IX).

demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." (quotation marks, alterations, and citation omitted)).

Finally, allowing Jane and Megan—who, as the district court found, are girls, *see* 1-ER-33—to play on girls' sports teams is fully consistent with Title IX's animating principle of providing equal educational opportunities to girls as to boys. Conversely, denying Jane and Megan the opportunity to play athletics is precisely the type of discrimination that Title IX was enacted to prohibit.

## II.  Plaintiffs will suffer irreparable harm if the Ban is enforced against them.

As the district court correctly found, "Plaintiffs will suffer severe and irreparable mental, physical, and emotional harm" if the Ban is applied to them.  1-ER-34.  Enforcement of the Ban in violation of the Equal Protection Clause is alone sufficient to presume irreparable harm to justify a preliminary injunction. *Hecox*, 79 F.4th at 1035–36 ("[A]s the Act is likely unconstitutional, it follows inexorably that Hecox has carried her burden as to irreparable harm." (internal quotation marks, alterations, and citation omitted)); *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." (internal quotation marks and citation omitted)).  A violation of Title IX also causes irreparable harm.  *See Anders v. Cal. State Univ., Fresno*, 2021 WL 1564448, at *18 (E.D. Cal. Apr. 21, 2021) (finding irreparable harm under Title IX given the

"presumption of irreparable injury where plaintiff shows violation of a civil rights statute" and in light of "the insult that comes from unequal treatment").

Jane and Megan will also suffer concrete and "specific harms for which there is no adequate legal remedy in the absence of an injunction." *Hecox*, 79 F.4th at 1036 (quotation marks and alterations omitted). As the district court rightly found, application of the Ban would "effectively exclude Plaintiffs from school sports and deprive them of the social, educational, physical, and emotional health benefits that both sides acknowledge come from school sports." 1-ER-34 (citing *Grabowski*, 69 F.4th at 1121); *see also Hecox*, 79 F.4th at 1036 (holding that transgender plaintiff was harmed by being excluded from female sports teams and being deprived of "the camaraderie of being on a team" (citation omitted)). If the Ban is enforced as to Jane and Megan, they will also "suffer the shame and humiliation of being unable to participate in a school activity simply because they are transgender—a personal characteristic over which they have no control." 1-ER-34. These are real and serious forms of injury, as the Supreme Court and numerous other courts have recognized. *See, e.g.*, *Obergefell v. Hodges*, 576 U.S. 644, 678 (2015) ("Dignitary wounds cannot always be healed with the stroke of a pen."); *Grimm*, 972 F.3d at 618 (explaining that stigma of exclusion that "publicly brand[s] all transgender students with a scarlet 'T'" constitutes cognizable harm);

*Hecox*, 479 F. Supp. 3d at 987 (dignitary wounds of embarrassment, harassment, and invasion of privacy constituted irreparable injury).

Appellants do not even attempt to show that these factual findings are clearly erroneous. Instead, Appellants raise an argument on appeal that they did not present in their preliminary injunction briefing before the district court: that Plaintiffs' "medical conditions"—and not the Ban—cause their exclusion from girls' teams and any resulting harm. Opening Br. at 68. The Court should not consider this waived argument. "Ordinarily, an appellate court will not hear an issue raised for the first time on appeal." *Cornhusker Cas. Ins. Co. v. Kachman*, 553 F.3d 1187, 1191 (9th Cir. 2009) (quotation marks omitted). The Court should also reject this argument on the merits. Appellants argue (at 68) that "many student-athletes may have medical conditions that interfere with their ability to play sports on the teams of their choice"—but here Plaintiffs are not being harmed by their medical conditions, which do not impact their ability to play on girls' sports teams. They are being harmed because the Ban excludes them based on their transgender status.

Appellants also claim that Plaintiffs delayed bringing this lawsuit. Opening Br. at 67. But Plaintiffs filed this case several months before the start of sports for

the school year, which was merely seven months after the Ban went into effect.[9]

This short period is entirely understandable in light of the weighty decision to file a constitutional action against the state, particularly for two transgender minors already at risk of harassment and discrimination. *See* 3-ER-546 (describing Jane's fear that people might "find out who [she is] and harass [her]" if they knew she was part of this suit); 3-ER-536 (describing Megan's fear of harassment and ridicule for being part of this case). Moreover, Appellants have not identified any prejudice arising from Plaintiffs' alleged "delay."

Appellants cite only two cases in support of their argument; neither salvages their position. Opening Br. at 67. In *Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015), the court determined that there was a "mismatch" between plaintiff's substantive claim (copyright) and the "dangers she hope[d] to remedy" (death threats) and thus her harms were "too attenuated" to grant relief. *Id.* at 746. Moreover, the court determined that plaintiff's claims were unlikely to succeed. *Id.* at 744. Neither is true here. In *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374 (9th Cir. 1985), the alleged harm arose from exclusivity provisions that had been in place for "many years" before the plaintiff sought

---

[9] General Effective Dates, Ariz. S. Leg., https://www.azleg.gov/general-effective-dates/ (last visited Oct. 4, 2023) (55th Legislature's laws effective September 24, 2023).

relief, which the court found to be just one (of many) factors that undercut its claims of injury. *Id.* at 1375. Again, not this case.

In any event, delay "by itself is not a determinative factor in whether the grant of interim relief is just and proper" because courts "are loath to withhold relief solely on that ground." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (quotation marks and citations omitted); *see also Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (holding that "delay is but a single factor to consider in evaluating irreparable injury" and "tardiness is not particularly probative in the context of ongoing, worsening injuries").

## III. The balance of equities and public interest favor Plaintiffs.

The district court also did not abuse its discretion in finding that the balance of equities and public interest—which merge when an injunction is sought against a government entity—favor Plaintiffs.

*First*, the district court correctly applied this Court's precedent in cases involving violations of constitutional and civil rights. The district court correctly held that "it is always in the public interest to prevent the violation of a party's constitutional rights," 1-ER-34 (citing *Melendres*, 695 F.3d at 1002), and that Appellants "cannot suffer harm from an injunction that merely ends an unlawful practice." 1-ER-35 (citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

*Second,* having found that Appellants' alleged harms were unsupported by the record, the district court correctly concluded that the serious and irreparable injury that Plaintiffs will undoubtedly suffer absent an injunction more than outweighs the remote possibility of harm described by the Appellants.  1-ER-35–36.  That was not an abuse of discretion.

Appellants' argument that the state is harmed when its statutes are not enforced, Opening Br. at 68–69, should be rejected: the Ninth Circuit has confirmed that, to the extent this "abstract form of harm" exists, it is "not dispositive" in the balance of harms analysis.  *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009), *vacated and remanded on other grounds in Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 586 U.S. 606 (2012); *see also Latta*, 771 F.3d at 500 (holding that the harm to state residents being deprived of their constitutional rights outweighed any abstract harm to the state that enacted the law).  Moreover, Arizona's legislative powers cannot exceed constitutional limits, and the state therefore cannot be said to suffer harm when it is prevented from enforcing unconstitutional statutes.  *See Rodriguez*, 715 F.3d at 1145.

Furthermore, as in *Hecox*, a preliminary injunction has not harmed and will not harm Appellants because it merely "maintain[s] the status quo."  *Hecox*, 79 F.4th at 1036.  For years, AIA policies have governed how and when transgender students are allowed to participate in school sports, and for years transgender

students have been playing on sports teams. *See* 3-ER-540; 3-ER-530; SER-19. As the district court correctly concluded, "[t]here is no evidence that any Defendant will be harmed by allowing Plaintiffs to continue playing with their peers as they have done until now." 1-ER-35.

In the absence of any harm to the state, much less irreparable harm, Appellants are left to speculate that other girls in Arizona will somehow be harmed because Jane and Megan's participation on girls' sports teams may "displace" other girls.[10] Opening Br. at 69. But the district court properly found that this is a "hypothesized problem" because there is no record evidence of any displacement caused by the AIA's previous policy or relating to Jane or Megan. 1-ER-8, 1-ER-10, 1-ER-16, 1-ER-31, 1-ER-35; *see also* SER-10 (finding "no evidence that the

---

[10] Appellants improperly urge the Court to take judicial notice of the contents of a Motion to Intervene filed in the district court while the preliminary injunction motion was pending. Opening Br. at 69 n.12. The Court should not look beyond the preliminary injunction record in its review. *See, e.g.*, *TGP Commc'ns, LLC v. Seller*, 2022 WL 17484331, at *2 (9th Cir. Dec. 5, 2022) ("At the preliminary injunction stage, our review of the district court's findings is restricted to the limited record available to the district court when it granted or denied the motion." (citation and quotation marks omitted)). Appellants cite *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001), which recognized that in the context of *a motion to dismiss*, courts can take judicial notice of undisputed matters of public record. *Id.* at 689–90. But *Lee* also recognized that a court cannot rely on disputed matters of public record for the truth of the matter asserted, *see id.*, which is what Appellants invite this Court to do. Even if the Court were to consider the Motion to Intervene (it should not), the alleged fear that transgender girls will dominate female sports expressed in that Motion is of no consequence because it is not evidence of actual harm.

schools limit the number of girls who participate in any of the sports at issue" and "no evidence that either Plaintiff would present an advantage, let alone any unfair advantage, if allowed to participate"). Appellants' claim that the district court "gave no consideration" to this argument mischaracterizes its opinion: the district court *did* consider Appellants' concerns but correctly concluded that they were unsupported. 1-ER-35. Given that there was no evidence that any Defendant will be harmed by allowing Plaintiffs to play on girls' sports teams, the district court correctly found that the public interest and the balance of equities favor a preliminary injunction. *Id.*

## CONCLUSION

The Court should affirm the district court's decision to preliminarily enjoin the enforcement of Arizona Rev. Stat. § 15-120.02 as to Jane Doe and Megan Roe.


RESPECTFULLY SUBMITTED this 6th day of October, 2023.

OSBORN MALEDON, P.A.

By s/ Eric M. Fraser
    Eric M. Fraser
    Colin M. Proksel
    2929 North Central Avenue, Suite 2000
    Phoenix, Arizona 85012

DEBEVOISE & PLIMPTON LLP
    Jyotin Hamid
    Justin R. Rassi
    Amy C. Zimmerman
    66 Hudson Boulevard
    New York, New York 10001

NATIONAL CENTER FOR LESBIAN
RIGHTS
    Amy Whelan
    Rachel Berg
    870 Market Street, Suite 370
    San Francisco, California 94102

**Attorneys for Plaintiffs-Appellees**

**STATEMENT OF RELATED CASES**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**: No. 23-16026 & 23-16030 (consolidated)

The undersigned attorney or self-represented party states the following:

☐   I am unaware of any related cases currently pending in this court.

☒   I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

☐   I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**   s/ Eric M. Fraser          **Date**  October 6, 2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*

53

# CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**: No. 23-16026 & 23-16030 (consolidated)

I am the attorney or self-represented party.

**This brief contains** 11,793 **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☒ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties;
    ☐ a party or parties are filing a single brief in response to multiple briefs; or
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Eric M. Fraser      **Date** October 6, 2023