Case Nos. 23-16026, 23-16030

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

HELEN DOE, parent and next friend of Jane Doe, et al.,
*Plaintiffs-Appellees*,

v.

THOMAS C. HORNE, in his official capacity as
State Superintendent of Public Instruction, et al.,
*Defendants-Appellants*,

and

WARREN PETERSEN, Senator, President of the Arizona State Senate;
BEN TOMA, Representative, Speaker of the Arizona House of Representatives,
*Intervenor-Defendants-Appellants*.

_____

On Appeal from the
United States District Court for the District of Arizona
Case No. CV-23-00185
before the Hon. Jennifer G. Zipps

━━━━━━━━━━━━━

**Brief of *Amici Curiae* GLBTQ Legal Advocates & Defenders,
the Human Rights Campaign Foundation, and
the National Center for Transgender Equality
in Support of Plaintiffs-Appellees and Affirmance**

━━━━━━━━━━━━━

Jordan D. Hershman
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
T: (617) 951-8455
F: (617) 341-7701
*Counsel for Amici Curiae*

Stephanie Schuster
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T: (202) 373-6596
F: (202) 739-3001

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* certify that GLBTQ Legal Advocates and Defenders, the Human Rights Campaign Foundation, and the National Center for Transgender Equality are nonprofit organizations, none of which has a parent corporation or issues public stock.

Dated: October 13, 2023

<div align="right">

*s/ Jordan D. Hershman*
Jordan D. Hershman
*Counsel for Amici Curiae*

</div>

i

## TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ..................................................................1

SUMMARY OF ARGUMENT ....................................................................2

ARGUMENT .................................................................................................4

I.     THE ACT FAILS ANY LEVEL OF
       SCRUTINY UNDER THE EQUAL PROTECTION CLAUSE. .................4

       A.     The Act's Manifest Purpose Is To Exclude Transgender
              Girls And Women From Girls' And Women's Sports. ......................7

       B.     The Act Disfavors A Vulnerable Population. ...................................11

       C.     The Act Imposes Immediate, Continuing,
              And Real Injuries On Transgender Girls And Women......................14

       D.     The Act Undermines The
              Interests It Supposedly Seeks To Protect. .........................................15

       E.     The Act Perpetuates Invidious And Archaic Stereotypes.................19

CONCLUSION ...........................................................................................21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) ...........................................................7,11

*Bishop v. Smith*,
    760 F.3d 1070 (10th Cir. 2014) .........................................................5

*Boutillier v. Hartford Pub. Schs.*,
    221 F. Supp. 3d 255 (D. Conn. 2016)................................................6

*Brandt v. Rutledge*,
    — F. Supp. 3d —, 2023 WL 4073727 (E.D. Ark. June 20, 2023)....................13

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
    473 U.S. 432 (1985)................................................................4, 5

*Clark v. Ariz. Interscholastic Ass'n*,
    695 F.2d 1126 (9th Cir. 1982) .............................................16, 17, 18

*Doe 1 v. Trump*,
    275 F. Supp. 3d 167 (D.D.C. 2017), *vacated on other grounds sub*
    *nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019) .............................5

*Doe v. Horne*,
    — F. Supp. 3d —, 2023 WL 4661831 (D. Ariz. July 20, 2023) ...............*passim*

*Flack v. Wis. Dep't of Health Servs.*,
    328 F. Supp. 3d 931 (W.D. Wis. 2018) .............................................13

*González v. Douglas*,
    269 F. Supp. 3d 948 (D. Ariz. 2017) ...............................................6

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) .......................................................12

*Harrington v. City of Attleboro*,
    2018 WL 475000 (D. Mass. Jan. 17, 2018).........................................6

*Hecox v. Little*,
   479 F. Supp. 3d 930 (D. Idaho 2020) ........................................13, 15

*Hecox v. Little*,
   79 F.4th 1009 (9th Cir. 2023) ...................................................*passim*

*M.A.B. v. Bd. of Educ.*,
   286 F. Supp. 3d 704 (D. Md. 2018)...................................................13

*Perry v. Brown*,
   671 F.3d 1052 (9th Cir. 2012), *vacated on other grounds sub nom.*
   *Hollingsworth v. Perry*, 570 U.S. 693 (2013) ......................................5

*Romer v. Evans*,
   517 U.S. 620 (1996)...............................................................3, 4, 6

*United States Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973)...........................................................................5

*United States R.R. Bd. v. Fritz*,
   449 U.S. 166 (1980)......................................................................4, 5

*United States v. Windsor*,
   570 U.S. 744 (2013)...........................................................................5

*Vasquez v. Cnty. of Los Angeles*,
   349 F.3d 634 (9th Cir. 2003) ...........................................................6

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)......................................................................7,11

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017), *abrogated on other grounds by Ill.*
   *Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) .............13

**Statutes**

Arizona's Children Deserve Help Not Harm Act, codified at Ariz.
   Rev. Stat. § 32-3230 .........................................................................10

Save Women's Sports Act, codified at Ariz. Rev. Stat. § 15-120.02...................2, 8

iv

**Other Authorities**

*Consideration of Bills: Hearing on S.B. 1165 Before S. Comm. on Judiciary*, Jan. 20, 2022, 55th Leg., 2d Reg. Sess., 1:28:58–1:29:37 (Ariz. 2022) (statement of Sen. Warren Peterson, Chairman, S. Comm. on Judiciary)..............................................................................10

Jamie Schultz, *Breaking into the Marathon: Women's Distance Running as Political Activism*, 40(2) Frontiers: A Journal of Women Studies 1 (2019) .......................................................................20

Patricia Vertinsky et al., "*Skierinas*" *in the Olympics: Gender Justice and Gender Politics at the Local, National, and International Level over the Challenge of Women's Ski Jumping*, 18 Olympika 25 (2009)...............................................................................................20

*Senate Third Reading of Bills Before S. Committee of the Whole*, Feb. 2, 2022, 55th Leg., 2d Reg. Sess. (Ariz. 2022)...................................10

S.B. 1165, 55th Leg., 2d Reg. Sess. § 2 (Ariz. 2022)............................15

Shoshana K. Goldberg, et al., *LGBTQ+ Youth Report*, Human Rights Campaign Found. (Aug. 2023), https://reports.hrc.org/2023-lgbtq-youth-report..................................................................................11, 12

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are GLBTQ Legal Advocates & Defenders, the Human Rights Campaign Foundation, and the National Center for Transgender Equality, three organizations with strong interests and deep expertise in issues concerning the civil rights of LGBTQ+ people.

Through strategic litigation, public policy advocacy, and education, GLBTQ Legal Advocates & Defenders ("GLAD") works in New England and nationally to create a just society free of discrimination based on gender identity and expression, HIV status, and sexual orientation. GLAD has litigated widely in both state and federal courts in all areas of the law in order to protect and advance the rights of lesbians, gay men, bisexuals, transgender individuals, and people living with HIV and AIDS. GLAD has worked on numerous cases on behalf of transgender students seeking equality and inclusion in schools, including advocating for them to be able to participate equally in school athletic programs.

The Human Rights Campaign Foundation ("HRC Foundation") is the educational arm of the Human Rights Campaign, a national nonprofit organization with over 40 years of ceaseless advocacy on behalf of the rights and interests of LGBTQ+ people. Through its Transgender Justice Initiative, the HRC Foundation has partnered with communities nationwide to raise awareness and address issues impacting the transgender community including violence, discrimination, stigma, and HIV, and secure educational and professional opportunities.

1

The National Center for Transgender Equality ("NCTE") is a national advocacy organization founded in 2003 to change policies and society to increase understanding and acceptance of transgender people and safeguard their rights. Engaging at every level of government, NCTE works to replace disrespect, discrimination, and violence with empathy, opportunity, and justice.[1]

## SUMMARY OF ARGUMENT

Arizona's so-called "Save Women's Sports Act," Ariz. Rev. Stat. § 15-120.02 (the "Act"), is a transgender-status-based classification that warrants—and fails—heightened constitutional scrutiny. This Court's recent decision in *Hecox* compels that conclusion. *Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023). There, the Court held that a nearly identical Idaho law violates the Equal Protection Clause. Like that Idaho law, the Act at issue here "undermine[s]" its supposed objectives, *id.* at 1028, "is too overbroad to satisfy heightened scrutiny," *id.* at 1031, and fundamentally "serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes," *id.* at 1033

---

[1] *Amici* state that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than *amici*, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief. All parties have consented to *amici* filing this *amicus* brief.

(cleaned up). Defendants cannot validly distinguish *Hecox*. It is squarely on point, and it dictates the rejection of Defendants' appeal.

*Amici* submit this brief to underscore the following additional reason for this Court to affirm the ruling below, beyond this Court's sound reasoning in *Hecox*: Arizona's law has all the indicia of a specific effort to disadvantage a particular group without advancing any legitimate governmental interest—and thus fails even rational basis review. Nearly all factors courts have considered in determining whether a law is motivated by an improper purpose or animus lead to the inescapable conclusion that Arizona's law was motivated by a bare desire to harm transgender girls and young women. The text, scope, and history of the law show that it was enacted to disadvantage transgender girls and women and "inflict[] on them immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it." *Romer v. Evans*, 517 U.S. 620, 635 (1996). Transgender girls and women are a small and vulnerable minority who already experience high levels of discrimination, harassment, and violence, and Arizona has singled them out and categorically barred them from participating in student athletics at any level. This extreme measure was not enacted in response to any real-world problems or complaints, and it thwarts the goals it was purportedly enacted to advance. Indeed, rather than promoting women and sex equality, the law discriminates against a vulnerable group of women and harms them and all women

3

by perpetuating unfounded stereotypes that have long fueled sex discrimination in sports.

## **ARGUMENT**

### I. **The Act Fails Any Level Of Scrutiny Under The Equal Protection Clause.**

The district court correctly concluded that Arizona's sports ban is unconstitutional under even rational basis review. *See Doe v. Horne*, — F. Supp. 3d —, 2023 WL 4661831, at *19 (D. Ariz. July 20, 2023)*. Some laws are so patently discriminatory that they "fail[], indeed def[y] . . . conventional inquiry." *Romer*, 517 U.S. at 632. They do so when, for example, they have "the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and . . . invalid form of legislation." *Id*. Or when they "raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected. 'If the constitutional conception of "equal protection of the laws" means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.'" *Id*. at 634 (quoting *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)); *see also City of Cleburne v. Cleburne Living Ctr., Inc*., 473 U.S. 432 (1985) (government action rested on irrational prejudice against the affected class).

As Justice Stevens noted in his concurrence in *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166 (1980): "[i]f the adverse impact on the

disfavored class is an apparent aim of the legislature, its impartiality would be suspect." *Id*. at 181. Such an aim is clear when the government takes away a specific legal right enjoyed by everyone or otherwise "imposes a special disability upon those persons alone." *Romer*, 517 U.S. at 631. In the line of cases—stretching from *Moreno*, *Cleburne*, and *Romer* to *Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012) (challenging exclusion from marriage for same-sex couples), *vacated on other grounds sub nom. Hollingsworth v. Perry*, 570 U.S. 693 (2013), *United States v. Windsor*, 570 U.S. 744 (2013) (challenging federal law refusing to recognize marriages of same-sex couples), and *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 215 (D.D.C. 2017) (challenging transgender military ban as "a revocation from transgender people of rights they were previously given"), *vacated on other grounds sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019)—government action based in animus fails under any standard of scrutiny. In a concurrence in *Bishop v. Smith*, 760 F.3d 1070 (10th Cir. 2014), Judge Holmes discussed the "animus doctrine" and described a continuum of governmental motives that "may be equated with animus":

> On the weaker end of the continuum, a legislative motive may be to simply exclude a particular group from one's community for no reason other than an "irrational prejudice" harbored against that group. In this sense, animus may be present where the lawmaking authority is motivated solely by the urge to call one group "other," to separate those persons from the rest of the community (*i.e.*, an "us versus them" legal construct). On the more extreme end of the continuum, the legislative motive that implicates the animus doctrine may manifest itself in a more aggressive form—specifically, a "desire to harm a politically unpopular

group." At either end of this continuum, and everywhere in between, at its core, legislative motivation of this sort involves hostility to a particular group and, consequently, implicates the animus doctrine.

*Id*. at 1099–1100 (cleaned up).

In delineating these parameters, Judge Holmes could have recognized—like this Circuit and other courts—that line-drawing based on stereotypes about a group of people also evidences animus. *See, e.g.*, *González v. Douglas*, 269 F. Supp. 3d 948, 967 (D. Ariz. 2017) ("Where a 'code word[] consist[s] of stereotypes of Hispanics that would be well-understood in [the relevant community],' an inference of racial animus may be drawn.") (quoting *Ave 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 506 (9th Cir. 2016)); *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 647 (9th Cir. 2003) (Ferguson, J., dissenting) ("[E]xplicit stereotyping convey[s] discriminatory animus.") (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)); *see also Harrington v. City of Attleboro*, 2018 WL 475000, at *7 (D. Mass. Jan. 17, 2018) (admissible evidence of "stereotyping animus"); *Boutillier v. Hartford Pub. Schs.*, 221 F. Supp. 3d 255, 269 (D. Conn. 2016) ("[H]omosexuality is the ultimate gender non-conformity, the prototypical sex stereotyping animus.").

In determining whether animus motivates a law that specifically targets a disfavored group, courts may consider whether the harms it inflicts on the group are so "far removed from [the] particular justifications" offered to support the law that it is "impossible to credit them." *Romer*, 517 U.S. at 635. Courts may also consider the law's historical context, background, and any procedural irregularities or

6

departures from the legislature's normal practice. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977); *see also Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (summarizing "non-exhaustive factors that a court should consider in assessing whether a defendant acted with discriminatory purpose"). Here, as the Act's plain language and legislative history both demonstrate, these factors mandate that Arizona's ban be invalidated, because it was motivated by an unconstitutional purpose: to harm transgender girls and women.

### A. The Act's Manifest Purpose Is To Exclude Transgender Girls And Women From Girls' And Women's Sports.

As the district court correctly found, the Act's "disparate treatment of transgender girls because they are transgender is clear on the face of the statute and makes it facially discriminatory even if the statute does not expressly employ the term 'transgender.'" *Horne*, 2023 WL 4661831, at *16 (collecting cases). The Act draws lines on the basis of "biological sex" which the Act's legislative findings explain is "determined at 'fertilization and revealed at birth, or, increasingly, in utero.'" *Id.* at *8 (quoting S.B. 1165, 55th Leg., 2d Reg. Sess. § 2 (Ariz. 2022)). As this Court recently held in *Hecox*, using the term "biological sex" in this manner "functions as a form of '[p]roxy discrimination.'" *Hecox*, 79 F.4th at 1024 (quoting *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013)). As in *Hecox*, the use of the term "biological sex" in the Act "was designed *precisely as a pretext to exclude transgender women from women's*

*athletics.*" *Id.* at 1025 (emphasis added). Indeed, the Act—which is named the "Save Women's Sports Act"—precisely and exclusively targets transgender girls and women. The Act bars transgender girls and women from joining "athletic teams or sports designed for 'females,' 'women' or 'girls,'" while allowing transgender boys and men, as well as non-transgender girls, to play on boys' and men's teams. *Horne*, 2023 WL 4661831, at *8. *See also id.* at *9 ("[T]he Act allows 'biological girls' to play on boys' sports teams."); *see Hecox*, 79 F.4th at 1043 n.3 (Christen, J., concurring) ("Transgender women and girls are uniquely disadvantaged under the Act.").

The Act is extremely broad: It bans *all* transgender girls and women, irrespective of individual circumstances and, just like the Idaho ban in *Hecox*, "categorically exclud[es] them from female sports." *Hecox*, 79 F.4th at 1021; *see Horne*, 2023 WL 4661831, at *8 ("Unlike the prior case-by-case basis used to approve a transgender girl's request to play on a team consistent with her gender identity, which considered among other things the age and competitive level relevant to the request, the Act categorically bans all transgender girls' participation.").

The Act's legislative history and context confirm that it was enacted for the sole, improper purpose of excluding transgender girls and women from sports. As the lower court stressed, the Act was not enacted to respond to any actual, real-world problem. "The record does not support a finding that prior to the Act's enactment, there was a problem in Arizona related to transgender girls replacing non-

transgender girls on sports teams." *Horne*, 2023 WL 4661831, at *9; *see also Hecox*, 79 F.4th at 1030 ("Because transgender women represent about 0.6 percent of the general population, the district court did not err in finding it unlikely that they would displace cisgender women from women's sports."). The Arizona Interscholastic Association ("AIA") already developed and followed a comprehensive transgender policy. That policy "permit[ted] transgender students to play on teams consistent with their gender identity so long as they had a letter of support from their parent or guardian explaining when they realized they were transgender." *Horne*, 2023 WL 4661831, at *6. No legislator identified any problems or complaints associated with the AIA policy.

Nor did any legislator identify any problems or complaints associated with the actual participation of transgender girls in female sports in Arizona, as none existed. *See id.* at *9. Of roughly 170,000 Arizona students who play sports, "the AIA fielded approximately 12 requests" over the last 10–12 years and, applying its policy, approved only "seven students to play on a team consistent with their gender identity." *Id.* at *6. In other words, the actual impact of transgender girls participating in female sports in Arizona over the last 10–12 years (*i.e.*, approximately .003%, or 7 out of approximately 170,000) was beyond *de minimis*.

Statements from the legislative record further demonstrate the animus behind it. For instance, one Senator stated that "if somebody wants to identify as something

that they aren't, um, they're still free to do that,"[2] but that it was "absolute lunacy to think that it's okay to allow a male to dominate in a female sport."[3] *See also, e.g.*, *Senate Third Reading of Bills Before S. Committee of the Whole*, Feb. 2, 2022, 55th Leg., 2d Reg. Sess., 1:16:00–06 (Ariz. 2022) (statement of Sen. Javan Daniel Mesnard) ("We're not going to allow biological men to compete against women. It doesn't matter what their identity is."). Contrary to Defendants' assertion that the remarks are "from a tiny group of legislators," Defendants' Br. 19, many of the remarks are from the Chairman of the Senate Judicial Committee himself—one of the primary proponents of the Act—as well as other legislators that publicly advocated for and ultimately voted in support of it. These discriminatory remarks are *precisely* the type of statements that have supported courts' determination of animus.

The legislative context of the Act's enactment also demonstrates animus. On the same day that the Act was enacted, the Arizona legislature also enacted another statute targeting transgender persons, Senate Bill 1138 (the so-called "Arizona's Children Deserve Help Not Harm Act," now codified at Ariz. Rev. Stat. § 32-3230),

---

[2] *Senate Third Reading of Bills Before S. Committee of the Whole*, Feb. 2, 2022, 55th Leg., 2d Reg. Sess., 1:12:02–08 (Ariz. 2022) (statement of Sen. Warren Peterson, Chairman, S. Comm. on Judiciary).

[3] *Consideration of Bills: Hearing on S.B. 1165 Before S. Comm. on Judiciary*, Jan. 20, 2022, 55th Leg., 2d Reg. Sess., 1:28:58–1:29:37 (Ariz. 2022) (statement of Sen. Warren Peterson, Chairman, S. Comm. on Judiciary).

barring medically necessary surgery only when needed by a transgender patient. The contemporaneous enactment of these laws targeting transgender persons shows the invidiousness behind the law. *See Vill. of Arlington Heights*, 429 U.S. at 267 (animus may be found in "the historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"); *Arce*, 793 F.3d at 979 n.5 (simultaneous passage of multiple measures targeting a particular community may be evidence of animus).

### B.     The Act Disfavors A Vulnerable Population.

Transgender students already face pervasive discrimination and harassment in school. According to a recent report based on a national survey of nearly 13,000 LGBTQ+ youth, "[t]ransgender and gender-expansive youth . . . face unique challenges, with harmful anti-trans laws, and a lack of inclusive school policies and procedures, creating obstacles to their safety and well-being." Shoshana K. Goldberg, et al., *2023 LGBTQ+ Youth Report*, Human Rights Campaign Found. (Aug. 2023).[4] "Almost 6 in 10 (59.4%) LGBTQ+ youth—including 62.6% of transgender and gender-expansive youth—have been 'teased, bullied, or treated badly' at school for at least one reason in the prior year." *Id.*; *see also Hecox*, 79 F.4th at 1029 (citing recent CDC study on transgender students "'report[ing] significantly higher incidents of being bullied, feeling unsafe traveling to or from

---

[4] https://reports.hrc.org/2023-lgbtq-youth-report

school, being threatened with a weapon at school, and being made to engage in unwanted sexual relations.'"). The report also found "LGBTQ+ youth report much higher rates of depression, anxiety, and lower self-esteem than their cisgender and heterosexual peers, as well as higher rates of maladaptive coping mechanisms such as substance use" and "[t]ransgender and gender-expansive youth were more likely than LGBQ+ youth to report all four poor mental health outcomes." Goldberg, et al., *supra*.

At the same time, there has been "a spike in anti-LGBTQ+ legislation, much of which specifically targeted transgender and gender-expansive youth, and the spaces they can freely access at school while living authentically." *Id.* Demonstrating the detrimental impact of such harmful and stigmatizing legislation, "transgender and gender-expansive youth in states with a transgender and gender-expansive sports ban were significantly less likely to be currently playing at least one school sport, than transgender and gender-expansive youth living in states without a ban." *Id.*

This Court and many others have found transgender people have long been subjected to discrimination, harassment, and violence. *See, e.g.*, *Hecox*, 79 F.4th at 1029 (acknowledging "historic discrimination against . . . transgender women"); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 612 (4th Cir. 2020) ("Transgender people frequently experience harassment in places such as schools (78%), medical settings (28%), and retail stores (37%), and they also experience

physical assault in places such as schools (35%) and places of public accommodation (8%)."); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) ("There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity.")[5]; *Hecox v. Little*, 479 F. Supp. 3d 930, 977 (D. Idaho 2020) ("[L]ike women generally, women who are transgender have historically been discriminated against, not favored."); *Brandt v. Rutledge*, — F. Supp. 3d —, 2023 WL 4073727, at \*31 (E.D. Ark. June 20, 2023) ("Transgender people . . . have historically been subjected to discrimination."); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018) ("[O]ne would be hard-pressed to identify a class of people more discriminated against historically . . . than transgender people."); *M.A.B. v. Bd. of Educ.*, 286 F. Supp. 3d 704, 720 (D. Md. 2018) ("[T]ransgender people have been historically subjected to discrimination.").

The Act's singular purpose and effect is to exclude transgender women and girls from participation in sports, thereby subjecting this vulnerable group to even more stigma. Notably absent from Defendants' opening brief is any real acknowledgement of these historical harms that transgender girls and women face, or the harms directly caused by the Act. Instead, they treat these harms as an acceptable outcome. *See* Defendants' Br. 20 ("The number of athletes [that are

---

[5] *Abrogated on other grounds by Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020).

transgender girls who have not experienced male puberty] reflects a tiny minority of total athletes, and the record demonstrates that the Act accomplishes its purposes . . . .”). These arguments serve only to reinforce that the Act deliberately targets a small subset of individuals who have been historically disfavored.

### C. The Act Imposes Immediate, Continuing, And Real Injuries On Transgender Girls And Women.

The resulting harm to transgender girls and women due to being excluded from playing sports is real and significant. Depriving transgender girls of the benefit of school sports takes away a critical educational opportunity routinely provided to students. *See Hecox*, 79 F.4th at 1039 (“We also recognize that athletic participation confers to students not just an opportunity to win championships and scholarships, but also the benefits of shared community, teamwork, leadership, and discipline. Excluding transgender youth from sports necessarily means that some transgender youth will be denied those educational benefits.”) (cleaned up). School sports provide a unique opportunity for students to develop self-esteem, sportsmanship, leadership, and self-discipline that fosters healthy adolescent development. *See Horne*, 2023 WL 4661831, at *9 (describing the many benefits of sports in terms of physical and mental health and academic achievement). By singling out one group of girls uniquely deprived the chance to participate on school teams and in athletic

14

programs, the Act marks them as a disfavored class and invites more discrimination and further harassment.

As the district court found, "[t]ransgender girls will internalize the shame and stigma of being excluded for a personal characteristic (being transgender) over which they have no control and which already subjects them to prejudice and social stigma." *Id.* Moreover, "[f]or transgender girls who are already playing on girls' teams, a law that requires them to be excluded from continued participation on girls' teams would have a further negative impact on their health and well-being, causing them to feel isolated, rejected, and stigmatized, and thereby putting them at high risk for severe depression and/or anxiety." *Id.*

## D. The Act Undermines The Interests It Supposedly Seeks To Protect.

Banning transgender girls and women from sports does not further the Act's asserted justifications. In language nearly identical to the Idaho ban in *Hecox*, the Act asserts that it seeks "to protect girls from physical injury in sports and promote sex equality by providing opportunities for female athletes to demonstrate their skill, strength and athletic abilities while also providing them with opportunities to obtain recognition, accolades, college scholarships and the numerous other long-term benefits that flow from success in athletic endeavors." S.B. 1165, 55th Leg., 2d Reg. Sess. § 2 (Ariz. 2022); *see also Hecox*, 479 F. Supp. 3d at 987. Like the district court in *Hecox*, the court below correctly found: "The categorical preclusion of

transgender women, especially girls who have not experienced male puberty, appears unrelated to the interests the Act purportedly advances." *Horne*, 2023 WL 4661831, at *13; *see also Hecox*, 79 F.4th at 1028 (finding that district court "correctly determined" that the Act "categorically banning transgender women and girls from all female athletic teams . . . [is] not substantially related to, and in fact undermine[s], those asserted objectives.").

Rather than promoting sex equality, the Act undermines it directly by discriminating against a particular subset of girls and women—those who are transgender. In that fundamental respect, Arizona's law no more promotes sex equality than a rule excluding lesbian or bisexual women or any other subset of girls and women from playing on female teams.

The Act is not comparable to policies that exclude boys from girls' teams because it cannot be justified by the same interests used to justify sex-segregated teams. In *Clark I*, this Court held that sex-specific teams may be justified as a means of "redressing past discrimination against women in athletics" and "promoting equality of athletic opportunity between the sexes." *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("*Clark I*"). But, as this Court found in *Hecox*, neither of those rationales supports the exclusion here. *See Hecox*, 79 F.4th at 1029 ("Appellants argue that '[t]he only difference between Hecox and the Clark brothers is gender identity,' which does not change the physiological advantages that 'biological males' have over cisgender women. But that is a false assumption . . . As

16

the district court found, 'it is not clear that transgender women who suppress their testosterone have significant physiological advantages over cisgender women,' unlike the cisgender boys at issue in *Clark I* and *Clark II*.").

The Act does not advance any interest in redressing past discrimination against women in athletics because "women who are transgender have historically been discriminated against," not favored. *Horne*, 2023 WL 4661831, at *18 (cleaned up); *see also Hecox*, 79 F.4th at 1029 ("[A]s the district court noted, transgender women, 'like women generally . . . have historically been discriminated against, not favored.'"). Similarly, excluding transgender girls and women does not promote equality of athletic opportunity between the sexes. In *Clark I*, this Court upheld a policy preventing male students from playing on a girls' volleyball team based in part on a concern that, absent that policy, "males would displace females to a substantial extent," given that there are roughly equal numbers of males and females and that, on average, males have a physiological advantage. *Clark I*, 695 F.2d at 1131. But those considerations have no application here.

Transgender women are a small group, comprising only about half of one percent of the population. Thus, "transgender women have not and could not displace cisgender women in athletics to a substantial extent." *Horne*, 2023 WL 4661831, at *18 (cleaned up); *accord Hecox*, 79 F.4th at 1030 ("Because transgender women represent about 0.6 percent of the general population, the district court did

17

not err in finding it unlikely that they would displace cisgender women from women's sports.").

Likewise, there is no basis to assume transgender girls and women have a physiological advantage over other girls and women, absent the impact of male puberty. As the district court noted, "the well-established scientific consensus is that, before puberty, there are no significant physiological differences in athletic performance between boys and girls." *Horne*, 2023 WL 4661831, at *17; *see also Hecox*, 79 F.4th at 1029 ("As the district court found, 'it is not clear that transgender women who suppress their testosterone have significant physiological advantages over cisgender women.'"). In addition, many transgender girls medically transition before puberty, thereby never gaining any potential advantages that exposure to testosterone may create. Many others suppress their testosterone. Consequently, being transgender is not "a legitimate accurate proxy" for physiological advantage, as this Court required to uphold a sex-based classification in *Clark I*, 695 F.2d at 1129.

Defendants' own argument undercuts the suggestion that the Act is necessary to protect girls from physical injury. The Act does not ban non-transgender girls nor transgender boys from boys' teams, even though those athletes would, under Defendants' view, face additional risk from participating on boys' teams. *Horne*, 2023 WL 4661831, at *9. Moreover, Defendants' contention that "there is an obvious difference between a biological female who identifies as male voluntarily

18

choosing to compete with males, and a biological female suddenly finding herself forced to compete against a biologically male opponent," Defendants' Br. 49, rings hollow. To begin, Defendants do not, and cannot, show that a transgender girl who has not undergone male puberty poses any greater risk to a non-transgender girl, nor that such a transgender girl has any competitive advantage over a non-transgender girl *Id.* Further, Defendants' conceptualization of a purported "safety" risk would exist regardless of whether a transgender boy athlete *chooses* to play with boys. Finally, that transgender boys are permitted to play on boys' teams does not diminish the animus behind the law. The Act is thus not just unrelated to its stated purpose—it directly undermines that purported purpose. Such a law fails even rational basis review.

### E. The Act Perpetuates Invidious And Archaic Stereotypes.

The Act undermines the goal of sex equality because it perpetuates unfounded stereotypes that have long fueled discrimination against women in sports. The Act perpetuates the false stereotype that girls and women are not "naturally" strong or athletic, are uniquely vulnerable, and need to limit their physical exertion. These stereotypes are so deeply entrenched that statements like someone plays or runs "like a girl" are synonymous with asserting they are athletically incompetent or weak. That stereotype has long been used to prevent girls and women from playing sports, impose unwarranted restrictions on their ability to play, and call into question any association between girlhood and powerful athletic ability.

Recent history is replete with examples of women and girls facing barriers to participation in sports grounded in unfounded fears of injury and outdated notions about what activities are appropriate for them—from marathons to ski jumping.[6] Reality, of course, defies these stereotypes: Women and girls can be and are strong and competitive athletes.

In addition to trafficking in sexist stereotypes, the Act also perpetuates unfounded stereotypes about transgender girls particularly. The law excludes transgender athletes because of the baseless presumption that all transgender women and girls are stronger and fitter than non-transgender women and girls. As the district court correctly found, Defendants' argument "that the Act is necessary to protect girls' sports by barring transgender girls, who purportedly have an unfair athletic advantage over other girls and/or post a safety risk to other girls, is based on overbroad generalizations and stereotypes that erroneously equate transgender status with athletic ability." *Horne*, 2023 WL 4661831, at *18. The reality is that transgender girls, like non-transgender ones, have a range of athletic abilities. Just like most non-transgender girls, although some transgender girls may excel athletically, most will be run-of-the-mill bench-sitters and second-stringers, if they

---

[6] Jamie Schultz, *Breaking into the Marathon: Women's Distance Running as Political Activism*, 40(2) Frontiers: A Journal of Women Studies 1 (2019); Patricia Vertinsky et al., "*Skierinas*" *in the Olympics: Gender Justice and Gender Politics at the Local, National, and International Level over the Challenge of Women's Ski Jumping*, 18 Olympika 25, 34–35 (2009).

play sports at all. *See Hecox*, 79 F.4th at 1032 ("Lindsay's own athletic career belies the contention that transgender women who have undergone male puberty have an absolute advantage over cisgender women: she has never qualified for BSU's track team despite trying out in Fall 2020.").

## CONCLUSION

For the reasons set forth in Appellees' brief and herein, the preliminary injunction should be affirmed.

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

Dated: October 13, 2023

*s/ Jordan D. Hershman*
Jordan D. Hershman
Dana N. Bach
L. Felipe Escobedo
One Federal Street
Boston, MA 02110
T: (617) 951-8455
F: (617) 341-7701
jordan.hershman@morganlewis.com
dana.bach@morganlewis.com
felipe.escobedo@morganlewis.com

Stephanie Schuster
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: (202) 373-6596
F: (202) 739-3001
stephanie.schuster@morganlewis.com

*Counsel for Amici Curiae*

21

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 13, 2023. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: October 13, 2023

<div style="margin-left: 40%;">

*s/ Jordan D. Hershman*

Jordan D. Hershman
*Counsel for Amici Curiae*

</div>

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-16026, 23-16030

I am the attorney or self-represented party.

**This brief contains** | 4,954 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

   ☐ it is a joint brief submitted by separately represented parties.
   ☐ a party or parties are filing a single brief in response to multiple briefs.
   ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [         ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Jordan D. Hershman | **Date** | 10/13/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*