Nos. 23-16026, 23-16030

===================================================

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

HELEN DOE, et al.,

*Plaintiffs-Appellees*,

v.

THOMAS C. HORNE, in his official capacity as State Superintendent of Public Instruction, et al.,

*Defendants-Appellants*,

and

WARREN PETERSEN, SENATOR, PRESIDENT OF THE ARIZONA STATE SENATE; BEN TOMA, REPRESENTATIVE, SPEAKER OF THE ARIZONA HOUSE OF REPRESENTATIVES,

*Intervening Defendants-Appellants*.
_____

On Appeal from the United States District Court for the District of Arizona
Case No. 4:23-cv-00185
Honorable Jennifer G. Zipps
_____

**BRIEF OF *AMICI CURIAE* NATIONAL WOMEN'S LAW CENTER AND 33 ADDITIONAL ORGANIZATIONS IN SUPPORT OF APPELLEES AND AFFIRMANCE**
_____

ANYA MARINO
SHIWALI PATEL
EMILY MARTIN
AUDEN PERINO
NATIONAL WOMEN'S LAW CENTER
1350 I Street N.W., Suite 700
Washington, D.C. 20005
Telephone: (202) 588-5180
Amarino@nwlc.org

MAIA JORGENSEN (*COUNSEL OF RECORD*)
OREN S.A. KREPS
HOGAN LOVELLS US LLP
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: (415) 374-2300
Facsimile: (415) 374-2499
maia.jorgensen@hoganlovells.com
oren.kreps@hoganlovells.com

CAROLYN A. DELONE
KATHERINE I. CULORA
HOGAN LOVELLS US LLP
555 13th Street N.W., Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
carrie.delone@hoganlovells.com
katherine.culora@hoganlovells.com

SARAH W. KELLER
HOGAN LOVELLS US LLP
8350 Broad Street, 17th Floor
Tysons, VA 22102
Telephone: (703) 610-6100
Facsimile: (703) 610-6200
sarah.w.keller@hoganlovells.com

*Counsel for Amici Curiae*

October 13, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), the undersigned counsel certifies that none of the *amici curiae* are nongovernmental entities with a parent corporation or a publicly held corporation that owns ten percent or more of its stock.

*/s/ Maia H. Jorgensen*
Maia H. Jorgensen

# **<u>TABLE OF CONTENTS</u>**

**PAGE(S)**

STATEMENT OF INTEREST OF *AMICI* ............................................................1

INTRODUCTION ................................................................................................4

ARGUMENT .......................................................................................................7

I.   S.B. 1165 HARMS ALL WOMEN AND GIRLS AND FAILS TO ADDRESS ACTUAL BARRIERS TO GENDER EQUITY IN EDUCATION. ...........................................................................................7

    A.   S.B. 1165 Impermissibly Hurts Transgender Women And Girls By Denying Them Access To The Benefits Of School Sports..................8

    B.   S.B. 1165 Threatens All Women And Girls' Who Do Not Conform To Gender and Racial Stereotypes. ...........................................12

    C.   The Record Does Not Support Appellants And Intervenors Justification For S.B. 1165.............................................................16

II.  AS A DISCRIMINATORY BAN TARGETING WOMEN AND GIRLS, S.B. 1165 VIOLATES THE EQUAL PROTECTION CLAUSE AND TITLE IX. ..................................................................................18

    A.   S.B. 1165 Violates The Equal Protection Clause...............................18

    B.   S.B. 1165 Would Force Schools To Violate Title IX. ........................23

        i.   Discrimination Against Transgender Students Is Discrimination Based On Sex. ...........................................................24

        ii.  Trans-Inclusive Policies Are Required Under Title IX. ...........26

CONCLUSION ..................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*,
  75 F.4th 760 (7th Cir. 2023) ........................................................10, 26

*A.H. v. Minersville Area Sch. Dist.*,
  408 F. Supp. 3d 536 (M.D. Pa. 2019)..................................................26

*Bostock v. Clayton County Georgia*,
  140 S. Ct. 1731, 1747 (2020).......................................................25, 26

*Grabowski v. Ariz. Bd. of Regents*,
  69 F.4th 1110 (9th Cir. 2023) .............................................................25

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ............24, 25, 26, 29

*Hecox v. Little*,
  479 F. Supp. 3d 930 (D. Idaho 2020), *aff'd*, 79 F.4th 1009 (9th Cir.
  2023) ..............................................................................................*passim*

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005)............................................................................23

*N. Haven Bd. of Educ. v. Bell*,
  456 U.S. 512 (1982)............................................................................27

*Neal v. Bd. of Trustees of Cal. State Universities*,
  198 F.3d 763 (9th Cir. 1999) ..............................................................27

*Parents for Priv. v. Dallas Sch. Dist. No. 2*,
  326 F. Supp. 3d 1075 (D. Or. 2018), *aff'd sub nom. Parents for
  Priv. v. Barr*, 949 F.3d 1210 (9th Cir. 2020).....................................24

*Soule by Stanescu v. Conn. Ass'n of Sch., Inc.*,
  No. 3:20-CV-00201 (RNC), 2021 WL 1617206 (D. Conn. Apr. 25,
  2021), *aff'd*, 57 F.4th 43 (2d Cir. 2022) ............................................29

*U.S. v. Va.*,
518 U.S. 515 (1996) ................................................................19

**Statutes**

20 U.S.C. § 1681 (U.S. Const. Title IX) ..........................................1, 25

20 U.S.C. § 1681(a) ...........................................................23

42 U.S.C. § 2000e-2 ...........................................................25

Ariz. Rev. Stat. Ann. § 15-120.02(B) ...............................................3

**Other Authorities**

34 C.F.R. § 106.31(b)(4) ..........................................................23

34 C.F.R. § 106.41(b) ...........................................................30

Fourteenth Amendment ........................................................4, 5

Aamnha Modhin, For black women, femininity and feminism are not
mutually exclusive, Quartz (last updated July 20, 2022), available
at https://qz.com/quartzy/1158081/for-black-women-femininity-
and-feminism-are-not-mutuallyexclusive/ ..........................................14

American Civil Liberties Union, *Four Myths About Trans Athletes,
Debunked*, https://www.aclu.org/news/lgbtq-rights/four-myths-
about-trans-athletes-debunked (April 20, 2020) .....................................21

Angela Lumpkin & Judy Favor, *Comparing the Academic
Performance of High School Athletes and Non-Athletes in Kansas
in 2008-2009,* 4 J. Sport Admin. & Supervision 41 (2012) ..............................9

Anna North, *'I am a woman and I am fast': What Caster Semenya's
Story Says About Gender and Race in Sports,* Vox (May 3, 2019),
https://www.vox.com/identities/2019/5/3/18526723/caster-
semenya-800-gender-race-intersex-athletes .........................................15

Brooke Newman, *The Long History of Racist Attacks on Serena
Williams*, Wash. Post (Sept. 11, 2018),
https://www.washingtonpost.com/outlook/2018/09/11/long-
history-behind-racist-attacks-serena-williams/ ......................................13

Canadian Centre for Ethics in Sport, *Transgender Women Athletes and Elite Sport: A Scientific Review* 37 (2022), https://www.cces.ca/sites/default/files/content/docs/pdf/transgenderwomenathletesandelitesport-ascientificreview-e-final.pdf .........................17, 22

*Caster Semenya says testosterone case against IAAF has 'destroyed' her 'mentally and physically'*, BBC (July 1, 2019), https://www.bbc.com/sport/athletics/48820717 ................................................15

Deborah L. Brake, *Title IX's Trans Panic* 29 Wm. & Mary J. of Race, Gender, & Soc. Just. (2022)........................................................................28, 29

Elizabeth Adetiba, *Caster Semenya and the Cruel History of Contested Black Femininity*, SB Nation (Apr. 20, 2020), https://www.sbnation.com/2020/4/20/21227661/caster-semenya-world-athletics-regulation-body-racism ...........................................................13

Emine Yucel, *Men's And Women's NCAA March Madness Facilities, Separate and Unequal, Spark Uproar*, NPR (Mar. 19, 2021), https://www.npr.org/2021/03/19/979395795/mens-and-womens-ncaa-march-madness-facilities-separate-and-unequal-spark-uproar.................18

Erin E. Buzuvis, *Title IX: Separate but Equal for Girls and Women in Athletics*, in OXFORD HANDBOOK OF FEMINISM & L. IN THE U.S.......................................................................................................30

Erin E. Buzuvis, *Transgender Student-Athletes and Sex-Segregated Sport: Developing Policies of Inclusion for Intercollegiate and Interscholastic Athletics*, 21 Seton Hall J. Sports & Ent. Law 1 (2011) ......................................................................................................9, 11

Erin M. Boone & Bonnie J. Leadbeater, *Game On: Diminishing Risks for Depressive Symptoms in Early Adolescence Through Positive Involvement in Team Sports*, 16 J. Rsch. Adolescence 79 (2006).......................9

Fed. R. App. P. 29(a)(4)(E).................................................................................1

Fed. R. App. P. 29(a)(5).....................................................................................31

Fed. R. App. P. 32(a)(5).....................................................................................31

Fed. R. App. P. 32(a)(6).....................................................................................31

Fed. R. App. P. 32(f) ............................................................................... 31

*Fewer Suicide Attempts Among Transgender and Nonbinary Youth*,
   Transgender Health, Feb 2023,
   http://doi.org/10.1089/trgh.2021.0079 .............................................. 11

Gina Vivinetto, *Serena Williams on How She Struggles With Cruel
   Remarks About Her Body*, Today (Sept. 7, 2017),
   https://on.today.com/3rfwDLQ; Jason Pham, *Serena Williams Shut
   Down Body Critics: 'I Am Strong and Muscular —and Beautiful'*,
   Bus. Insider (May 31, 2018),
   https://www.businessinsider.com/serena-williams-shut-down-
   body-critics-who-said-she-was-born-a-guy-2018-5 .......................... 16

GLAAD Media Reference Guide, 11th Ed.,
   https://glaad.org/reference/trans-terms/ (last visited Oct. 9, 2023) ..... 3

*Hearing on S.B. 1165 Before the Arizona State Senate Committee on
   Judiciary*, 55th Leg., 2nd Reg. Sess. (Jan. 20, 2022),
   https://www.azleg.gov/videoplayer/?eventID=2022011057&startSt
   reamAt=508 ................................................................................ 7, 27

*How She Struggles With Cruel Remarks About Her Body*, Today
   (Sept. 7, 2017), https://on.today.com/3rfwDLQ; ................................ 15

InterAct, *What Is Intersex?*, https://interactadvocates.org/faq/ (last
   visited Oct. 9, 2023) ............................................................................. 1

J. Rafferty, et al., *Ensuring comprehensive care and support for
   transgender and gender-diverse children and adolescents*,
   American Academy of Pediatrics, Vol. 142 (4) (Oct. 1, 2018) .......... 10

Jennifer Y. Mak & Chong Kim, *Relationship Among Gender, Athletic
   Involvement, Student Organization Involvement and Leadership*
   25:2 Hum. Kinetics J. 89 (2016) ....................................................... 10

John Kinsey, *Second Female Penn Swimmer Steps Forward,
   Describes Teammates in Tears*, Fox News (Dec. 10, 2021) .............. 28

Joseph G. Kosciw, et al., *The 2019 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools* GLSEN (2020), available at https://www.glsen.org/sites/default/files/2021-04/NSCS19-FullReport-032421-Web_0.pdf .........................................................12

L.J. Elsas, et al. *Gender verification of female athletes,* 2 Genet Med. 4, 249 (2020)...............................................................28

Letter from NWLC et al. to Senate Judiciary Comm., *Statement of Women's Rights and Gender Justice Organizations in Support of the Equality Act* (Mar. 16, 2021), https://nwlc.org/wp-content/uploads/2021/10/Statement-of-Womens-Rights-And-Gender-Justice-Organizations-in-Support-of-the-Equality-Act-2.pdf/ .....................................................................................3

*Men's And Women's NCAA March Madness Facilities, Separate and Unequal, Spark Uproar*, NPR (Mar. 19, 2021), https://www.npr.org/2021/03/19/979395795/mens-and-womens-ncaa-march-madness-facilities-separate-and-unequal-spark-uproar.................18

M. N. Price & A. E. Green, *Association of Gender Identity Acceptance with Fewer Suicide Attempts Among Transgender and Nonbinary Youth*, Transgender Health, Feb 2023, http://doi.org/10.1089/trgh.2021.0079.............................................11

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts*, 2017, 68 Morbidity and Mortality Weekly Report 67 (2019) .................................................................12

Milton Kent et al., *Beating Opponents, Battling Belittlement: How African-American Female Athletes Use Community to Navigate Negative Images* Sch. Of Glob. Journalism & Commc'ns, Morgan State Univ., https://www.documentcloud.org/documents/4528427-The-Image-of-Black-Women-in-Sports2.html#document/ (last visited Oct. 9, 2023)..............................................................14

Nat'l Collegiate Athletic Assoc., *The State of Women in College Sports* 31 (2022), https://s3.amazonaws.com/ncaaorg/inclusion/titleix/2022_State_of_Women_in_College_Sports_Report.pdf............................................................18

*National Coalition for Women and Girls in Education* (2022), https://nwlc.org/resource/title-ix-at-50/.............................................................18

NWLC, *Fulfilling Title IX's Promise: Let Transgender and Intersex Athletes Play* 2 (2022), https://nwlc.org/resource/fulfilling-title-ixs-promise-let-transgender-and-intersex-students-play/ .........................................21

NWLC et al., *Statement of Women's Rights and Gender Justice Organizations in Support of Full and Equal Access to Participation in Athletics for Transgender People* (Apr. 9, 2019) ......................4

Pat Griffin & Helen J. Carroll, *On the Team: Equal Opportunity for Transgender Student Athletes* 16 (2010), https://www.goucher.edu/policies/documents/NCLR-Equal-Opportunity-For-Transgender-Student-Athletes.pdf.........................................21

Pat Griffin & Helen J. Carroll, *On the Team: Equal Opportunity for Transgender Student Athletes* (2010), https://www.goucher.edu/policies/documents/NCLR-Equal-Opportunity-For-Transgender-Student-Athletes.pdf.........................................21

Patricia Vertinsky et al., *More Myth than History: American Culture and Representations of the Black Female's Athletic Ability*, 25 J. of Sport Hist. 532 (1998) ......................................................................................14

Phil Mushnick, *Inequality Created by Transgender Swimmer Lia Thomas is Antithesis of Far Play,* N.Y. Post (Dec. 24, 2021)...........................28

Robert P. Dobosz & Lee A. Beaty, *The Relationship Between Athletic Participation and High School Students' Leadership Ability*, 34 Adolescence 215 (1999) .........................................................................................10

Ruth Padawer, *The Humiliating Practice of Sex-Testing Female Athletes,* N.Y. Times Magazine (June 28, 2016), https://www.nytimes.com/2016/07/03/magazine/the-humiliating-practice-of-sex-testing-female-athletes.html .....................................................15

Sarah J. Donaldson & Kevin R. Ronan, *The Effects of Sports Participation on Young Adolescents' Emotional Well-Being,* 41 Adolescence 369 (2006) ................................................................9

Sch. Of Glob. Journalism & Commc'ns, Morgan State Univ., 9, https://www.documentcloud.org/documents/4528427-The-Image-of-Black-Women-in-Sports2.html#document/ (last visited Oct. 9, 2023) ..............................................................................................14

*Serena Williams Shut Down Body Critics: 'I Am Strong and Muscular —and Beautiful'*, Bus. Insider (May 31, 2018), https://www.businessinsider.com/serena-williams-shut-down-body-critics-who-said-she-was-born-a-guy-2018-5 ..........................................15

Shoshana K. Goldberg, *Fair Play: The Importance of Sports Participation for Transgender Youth*, Ctr. for Am. Progress (2021), https://www.americanprogress.org/wp-content/uploads/sites/2/2021/02/Fair-Play-correction2.pdf ........................21, 22

Stewart A. Vella et al., *Sports Participation and Parent-Reported Health-Related Quality of Life in Children: Longitudinal Associations*, 164(6) J. Pediatrics 1469 (2014). ...................................................9

U.S. Const. amend. XIV ................................................................4, 5

U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, *Adolescent Health: What Works in Schools* (2020), https://www.cdc.gov/healthyyouth/whatworks/pdf/what-works-safe-supportive-environments.pdf. ..................................................12

Women's Sports Found., *50 Years of Title IX: We're Not Done Yet* (2022), https://www.womenssportsfoundation.org/wp-content/uploads/2022/05/Title-IX-at-50-Report-FINALC-v2-.pdf...................18

Zoe Cristen Jones, *Utah investigates winning student-athlete's gender after parents of second- and third-place finishers submit complaints*, CBS News (August 18, 2022), https://www.cbsnews.com/news/transgender-investigation-student-athelete-utah-high-school/ ........................................................13, 16

## STATEMENT OF INTEREST OF *AMICI*[1]

*Amici* National Women's Law Center ("NWLC") and 33 additional organizations are committed to gender justice, including the rights of lesbian, gay, bisexual, transgender, queer/questioning, and intersex[2] ("LGBTQI+") people, and to protecting women and girls, including women and girls of color from discrimination because of race and sex.

NWLC is a nonprofit organization that fights for gender justice—in the courts, in public policy, and in our society—working across issues central to the lives of women and girls with a particular focus on women and girls of color, LGBTQI+ people, and low-income women and families. Since 1972, NWLC has worked to secure equal opportunity in education for women and girls through full enforcement of the U.S. Constitution, Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq*., and other laws prohibiting sex discrimination. NWLC has often participated as counsel or *amicus curiae* in advocating for equal treatment

---

[1] This brief is filed with consent of all parties. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), undersigned counsel state that no party or party's counsel authored this brief in whole or part; that no party or party's counsel contributed money intended to fund preparation or submission of this brief; and that no person other than the *amici* and counsel identified herein contributed money intended to fund preparation or submission of this brief.

[2] "Intersex is an umbrella term for differences in sex traits or reproductive anatomy." InterAct, *What Is Intersex?*, https://interactadvocates.org/faq/ (last visited Oct. 9, 2023). "Intersex people are born with these differences or develop them in childhood. *Id.*

and opportunity based on sex, including in school athletics. NWLC has long advocated for the full enforcement of Title IX and seeks to ensure that all individuals, including LGBTQI+ individuals, are protected from sex discrimination.

Additional *amici* are:

- American Sexual Health Association
- California Women Lawyers
- Clearinghouse on Women's Issues
- Collective Power for Reproductive Justice
- Desiree Alliance
- Education Law Center-PA
- Feminist Majority Foundation
- FORGE, Inc.
- Gender Justice
- Japanese American Citizens League (JACL)
- Justice and Joy National Collaborative
- Justice and Joy National Collaborative (formerly National Crittenton)
- KWH Law Center for Social Justice and Change
- Lawyers Club of San Diego
- Legal Momentum, the Women's Legal Defense and Education Fund
- National Asian Pacific American Bar Association
- National Association of Social Workers
- National Health Law Program
- National Organization for Women Foundation
- National Women's Political Caucus
- People For the American Way
- Pride at Work
- Public Counsel
- Public Justice
- Reproaction
- She Leads Justice
- SIECUS: Sex Ed for Social Change
- SisterLove Inc.
- The Women's Law Center of Maryland
- The Womxn Project

- Tom Homann LGBTQ+ Law Association
- Women's Bar Association of the District of Columbia
- Women's Bar Association of the State of New York

*Amici* seek to protect LGBTQI+ students from sex discrimination, and are dedicated to using their expertise to ensure robust enforcement of Title IX and the Constitution. *Amici* focus on protecting all women and girls from discriminatory sex-based stereotypes, particularly women and girls of color who face heightened discrimination based on race and sex.

*Amici* write to underscore the harms that would result from reversal of the injunction here. Arizona Senate Bill 1165 ("S.B. 1165") (Arizona Revised Statutes ("A.R.S.") § 15-120.02(B)) would harm all women and girls, including cisgender[3] women and girls, in violation of the Equal Protection Clause and Title IX. As organizations committed to women's and girls' rights, *amici* recognize gender equity in schools requires equal access to participation in athletics for transgender women and girls.[4] Because cisgender and transgender women's and girls' rights are mutually

---

[3] "Cisgender" means "a person whose gender identity is aligned with the sex they were assigned at birth." GLAAD Media Reference Guide, 11th Ed., https://glaad.org/reference/trans-terms/ (last visited Oct. 9, 2023).

[4] *See, e.g.*, Letter from NWLC et al. to Senate Judiciary Comm., *Statement of Women's Rights and Gender Justice Organizations in Support of the Equality Act* (Mar. 16, 2021), https://nwlc.org/wp-content/uploads/2021/10/Statement-of-Womens-Rights-And-Gender-Justice-Organizations-in-Support-of-the-Equality-Act-2.pdf/; NWLC et al., *Statement of Women's Rights and Gender Justice Organizations in Support of Full and Equal Access to Participation in Athletics for Transgender People* (Apr. 9, 2019).

3

aligned the harms created by sex discrimination are appropriately addressed through enforcement of Title IX and the U.S. Constitution.

## INTRODUCTION

Sex and race discrimination pervade the history of athletics. S.B. 1165 stands as another chapter in this shameful history. S.B. 1165 categorically bans transgender women and girls from participating on women's and girls' intramural and interscholastic sports teams from kindergarten through university in the State of Arizona. At its core, S.B. 1165 deprives intersex, nonbinary, and transgender women and girls of their basic human dignity and their ability to access and participate in the same educational and athletic programming as their cisgender counterparts.

Plaintiffs Jane Doe and Megan Roe are transgender girls who have participated in girls' sports teams since a young age. S.B. 1165 would prohibit them from continuing to do so. Plaintiffs accordingly challenged S.B. 1165 under the Equal Protection Clause of the Fourteenth Amendment and Title IX, among other claims, to preserve their equal opportunity to try out for and participate on girls' sports teams. The District Court granted them preliminary injunctive relief. It properly recognized S.B. 1165 wrongly excludes students from playing school sports through sex discrimination, violating both the Equal Protection Clause and Title IX. ER26–33. The District Court ordered S.B. 1165 "shall not prevent Plaintiffs from

participating in girls' sports." *Id.* at 35. That decision was correct and should be affirmed.

S.B. 1165 precludes transgender women and girls from participating in school sports and receiving associated educational benefits. Including transgender and intersex youth in athletic programs is vital to establishing LGBTQI+ equality. Sports participation enhances students' physical health and emotional and psychological well-being, and provides students with a supportive network and social connectedness through positive peer relationships and acceptance. *Id.* at 15–16. Sports participation also improves students' academic outcomes and educational prospects. Through sports, children find role models, build healthy relationships, and learn values like teamwork, leadership, sportsmanship, and self-discipline. These benefits are especially important for girls who are transgender and intersex—who are at heightened risk for isolation, low self-esteem, and depression caused by discrimination and harassment—and they should not be excluded from these critical opportunities. *Id.* S.B. 1165's discriminatory regime undermines these education benefits. Inclusive athletic policies are essential to protect the well-being and educational opportunity of transgender students like Plaintiffs-Appellees.

*Amici* are gravely concerned about the harms S.B. 1165 would cause by banning all transgender women and girls in Arizona from playing school sports consistent with their affirmed gender. This law would deprive them of "social,

educational, physical, and emotional health benefits that both sides acknowledge come from school sports," *id.* at 33—benefits cisgender students enjoy. The loss of such benefits is profound. The law also perpetuates stereotypes regarding athleticism, biology, and gender, and requires policing and scrutiny of women's bodies—particularly of those who do not conform to sex stereotypes which harms both transgender and cisgender women and girls. S.B. 1165 promotes fundamentally incorrect stereotypes about all women and girl athletes and wrongly presumes athletic policies including transgender women and girls will harm cisgender women and girls.

*Amici* write to emphasize aspects of the District Court's decision. First, the District Court correctly recognized S.B. 1165 harms all women and girls, particularly Black and brown girls. Second, the District Court properly held S.B. 1165 impermissibly bans transgender girls from school sports in violation of protections against sex discrimination in the Constitution and Title IX. S.B. 1165's "disparate treatment of transgender girls because they are transgender is clear on the face of the statute and makes it facially discriminatory even if the statute does not expressly employ the term 'transgender.'" ER27. The District Court's decision is directly supported by this Circuit's recent decision affirming the preliminary injunction of a similar ban on participation of transgender athletes in Idaho. *See Hecox v. Little*, 79 F.4th 1009, 1039 (9th Cir. 2023).

6

This Court should affirm the preliminary injunction.

## ARGUMENT

### I. S.B. 1165 HARMS ALL WOMEN AND GIRLS AND FAILS TO ADDRESS ACTUAL BARRIERS TO GENDER EQUITY IN EDUCATION.

Athletics are more than a game: they are an integral part of education.[5]
Ensuring equal educational opportunities means providing opportunities for *all*
women and girls to play school sports—not gatekeeping *which* women and girls get
a chance to play. Appellants say S.B. 1165 promotes "fairness, opportunity, and
safety in girls' and women's sports," Appellants' Br. 1, but the result is the opposite:
S.B. 1165 promotes harmful, baseless stereotypes about athleticism, biology, and
gender to justify discrimination. This is exactly what the District Court found when
it correctly enjoined S.B. 1165, stating the facts "support Plaintiffs' assertions that
very serious damages will result[.]" ER34. Reversing the injunction would harm
Arizona's women and girls in several ways.

---

[5] *See Hearing on S.B. 1165 Before the Arizona State Senate Committee on Judiciary*,
55th Leg., 2nd Reg. Sess. (Jan. 20, 2022),
https://www.azleg.gov/videoplayer/?eventID=2022011057&startStreamAt=508, at
29:33 (statement of Erica Keppler, representing herself, in opposing the bill) ("To
say a trans girl cannot participate [in school athletics] out of some unproven
speculation that she may have an advantage misses the point of why the game is
being played. School athletics . . . are about teaching athletic skill along with
character, teamwork, leadership, camaraderie, social skills, healthful physical
activity and most important, building better adults and citizens.").

*First*, S.B. 1165 would categorically ban women and girls who are transgender from participating in team sports consistent with their gender identity, thereby depriving them of recognized health, social, and educational benefits their cisgender peers enjoy. *Second*, S.B. 1165 would perpetuate discrimination against transgender and intersex girls, and cisgender women and girls—particularly Black and brown women and girls—who do not conform to stereotyped notions of femininity, which often reflect racial stereotypes, by prompting schools to enforce the law in arbitrary and improper ways. *Third*, Appellants' arguments in support of S.B. 1165 distract from the documented, pervasive barrier that *actually* threatens opportunities in women's and girls' sports: the stark gap in funding for women's and girls' sports compared to boys and men, not transgender-inclusive policies.

### A. S.B. 1165 Impermissibly Hurts Transgender Women And Girls By Denying Them Access To The Benefits Of School Sports.

S.B. 1165 will harm all women and girls seeking to participate in sports who are transgender by categorically excluding them from education opportunities. This will lead to negative consequences and will deprive these students of the well-documented benefits of participating in sports.

Participation in sports provides transgender students with a supportive social network that can minimize feelings of difference and isolation.[6] ER15–16; Budge

---

[6] *See* Erin E. Buzuvis, *Transgender Student-Athletes and Sex-Segregated Sport: Developing Policies of Inclusion for Intercollegiate and Interscholastic Athletics*, 21

Decl. (Doc. 4) ¶ 35. Participating in school sports also provides a safe space for transgender student-athletes to build confidence and a positive self-image, to learn to manage stressful life events, and to regulate emotions.[7] ER15; Budge Decl. (Doc. 4) ¶ 36. Students who play high school sports are more likely to finish college and engage in planning for the future. Budge Decl. (Doc. 4) ¶ 38. *See also infra* Section II.B (discussing how S.B. 1165 amounts to unlawful denial of an educational benefit). They are also more likely to have better school attendance, achieve academic success throughout the school year,[8] and develop positive habits in leadership and discipline that benefit many aspects of life.[9] *See id.* ¶ 36.

---

Seton Hall J. Sports & Ent. Law 1, 48 (2011); Erin M. Boone & Bonnie J. Leadbeater, *Game On: Diminishing Risks for Depressive Symptoms in Early Adolescence Through Positive Involvement in Team Sports*, 16 J. Rsch. Adolescence 79 (2006).

[7] *See* Boone & Leadbeater, *supra*, n.6; *see also* Sarah J. Donaldson & Kevin R. Ronan, *The Effects of Sports Participation on Young Adolescents' Emotional Well-Being*, 41 Adolescence 369 (2006). *See, e.g.,* Stewart A. Vella et al., *Sports Participation and Parent-Reported Health-Related Quality of Life in Children: Longitudinal Associations*, 164(6) J. Pediatrics 1469 (2014).

[8] *See, e.g.*, Angela Lumpkin & Judy Favor, *Comparing the Academic Performance of High School Athletes and Non-Athletes in Kansas in 2008-2009*, 4 J. Sport Admin. & Supervision 41 (2012).

[9] *See, e.g.*, Jennifer Y. Mak & Chong Kim, *Relationship Among Gender, Athletic Involvement, Student Organization Involvement and Leadership*, 25:2 Hum. Kinetics J. 89 (2016); Robert P. Dobosz & Lee A. Beaty, *The Relationship Between Athletic Participation and High School Students' Leadership Ability*, 34 Adolescence 215 (1999).

The benefits from playing team sports with other girls are particularly important for transgender girls who experience gender dysphoria; "[f]or social transition to be clinically effective, it must be respected consistently across all aspects of a transgender individual's life." ER5; *see also A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 764 (7th Cir. 2023) (refusing access to gender-affirming restroom exacerbated plaintiff's gender dysphoria); *Hecox v. Little*, 479 F. Supp. 3d 930, 977 (D. Idaho 2020), *aff'd*, 79 F.4th 1009 (9th Cir. 2023) ("Participating in sports on teams that contradict one's gender identity . . . has [been] found to be dangerous and unethical.") (internal quotations and citations omitted). Social and medical support is the single, best evidence-based intervention for youth who experience gender dysphoria.[10] ER5 (discussing components of affirmation), ER16 (concluding, "[T]o be clinically effective, gender transitioning must be respected consistently").

Excluding transgender girls from sports creates additional health and safety risks to these students, who already face significant discrimination. ER15–16. Inclusive athletic opportunities provide transgender youth much-needed school belonging, community connectedness, and self-esteem, and mitigate health risks

---

[10] J. Rafferty, et al. (Oct. 1, 2018), *Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents*, American Academy of Pediatrics, Vol. 142 (4), 4, 6-7. Retrieved October 5, 2023, from https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/?autologincheck=redirected.

they disproportionately face.[11] Some transgender youth experience mental health symptoms caused by pervasive oppression and discrimination, but for many, the support of even one adult can decrease the mental health risks, including suicidal thoughts or actions.[12] In contrast, discrimination such as social isolation or verbal or physical abuse causes "higher risk for suicide and other life threatening behaviors."[13] The CDC's 2019 Youth Risk Behavior Survey found transgender students were many times more likely than their cisgender peers to experience violence or harassment.[14] It follows that creating a safe and supportive environment at school, including through sports, can promote academic success and reduce emotional

---

[11] As the District Court found, "[f]or transgender girls who are already playing on girls' teams, a law that requires them to be excluded from continued participation on girls' teams would have a further negative impact on their health and well-being, causing them to feel isolated, rejected, and stigmatized, . . . putting them at high risk for severe depression and/or anxiety." ER16.

[12] M. N. Price & A. E. Green, *Association of Gender Identity Acceptance with Fewer Suicide Attempts Among Transgender and Nonbinary Youth*, Transgender Health, Feb 2023: 56-63, http://doi.org/10.1089/trgh.2021.0079.

[13] Erin E. Buzuvis, *Transgender Student-Athletes and Sex-Segregated Sport: Developing Policies of Inclusion for Intercollegiate and Interscholastic Athletics*, 21 Seton Hall J. Sports & Ent. L. 1, 48 (2011).

[14] Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts*, 2017, 68 Morbidity and Mortality Weekly Report 67, 70 (2019) ("CDC 2019 Survey").

distress well into adulthood.[15] This can be "particularly helpful for transgender youth, who are more likely to be bullied at school and may lack family support."[16]

Trans-inclusive policies are crucial, both in athletics and generally, to address these alarming disparities.[17]

### B.   S.B. 1165 Threatens All Women And Girls' Who Do Not Conform To Gender and Racial Stereotypes.

Enforcing sports bans like S.B. 1165 relies on illegal, inappropriate, and harmful policing of all women's and girls' bodies, appearances, and gender expressions. It is implicit in S.B. 1165 that schools will engage in sex verification processes, leading to arbitrary reinforcement of sexist notions of "femininity"[18] that

---

[15] U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, *Adolescent Health: What Works in Schools* (2020), https://www.cdc.gov/healthyyouth/whatworks/pdf/what-works-safe-supportive-environments.pdf.

[16] *Id.* at 1. 27% of U.S. transgender high school students feel unsafe at school or traveling to or from school, 35% are bullied at school, and 35% have attempted suicide. *See* CDC 2019 Survey, *supra*, n. 14 at 69; *see also* Gay Lesbian and Straight Education Network (GLSEN), *The 2021 National School Climate Survey* (2021) at 10–13 (discussing statistics involving LGBTQ+ students' feeling of safety at school).

[17] *See, e.g.*, Joseph G. Kosciw, et al., *The 2019 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools*, GLSEN, xxi-xxv (2020), available at https://www.glsen.org/sites/default/files/2021-04/NSCS19-FullReport-032421-Web_0.pdf (students less likely to experience harassment or violence with trans-inclusive policies and educators).

[18] *See* Elizabeth Adetiba, *Caster Semenya and the Cruel History of Contested Black Femininity*, SB Nation (Apr. 20, 2020),

harm all women and girls who do not conform to gender stereotypes, whether cisgender or transgender. Any girl who appears too strong, fast, agile, or talented in her sport—i.e., girls who fall outside of traditional notions of white femininity— risks having their gender challenged for not being a "real girl."[19]

Such stereotypes are particularly harmful to Black and brown cisgender and intersex women and girls who are often cast as "overly strong" or "manly"[20] and who are perceived as "less feminine" than gender stereotypes prescribe.[21] For example, when Tidye Pickett and Louise Stokes became the first Black women to

---

https://www.sbnation.com/2020/4/20/21227661/caster-semenya-world-athletics-regulation-body-racism.

[19] *See, e.g.,* Brooke Newman, *The Long History of Racist Attacks on Serena Williams*, Wash. Post (Sept. 11, 2018), https://www.washingtonpost.com/outlook/2018/09/11/long-history-behind-racist-attacks-serena-williams/; Zoe Cristen Jones, *Utah investigates winning student-athlete's gender after parents of second- and third-place finishers submit complaints*, CBS News (August 18, 2022), https://www.cbsnews.com/news/transgender-investigation-student-athlete-utah-high-school/.

[20] *See, e.g.*, Patricia Vertinsky et al., *More Myth than History: American Culture and Representations of the Black Female's Athletic Ability*, 25 J. of Sport Hist. 532, 541 (1998).

[21] Dating back to their enslavement, Black women in the U.S. have faced a long and disgraceful history of being systematically stereotyped as too muscular, aggressive, or unattractive to be "real" women. Today, Black feminists continue to fight against racialized scrutiny of their femininity and gender expression. *See* Aamnha Modhin, *For black women, femininity and feminism are not mutually exclusive*, Quartz (last updated July 20, 2022), available at https://qz.com/quartzy/1158081/for-black-women-femininity-and-feminism-are-not-mutuallyexclusive/.

represent the U.S. in the 1936 Olympics, an official proposed that the IOC "should create a special category of competition for them [Pickett and Stokes]—the unfairly advantaged 'hermaphrodites' who regularly defeated 'normal women' …."[22]

In more recent years, international athletics bodies forced Santhi Soundarajan and Dutee Chand of India and Caster Semenya of South Africa to undergo humiliating sex-verification testing because competitors and coaches saw their bodies as "suspiciously masculine."[23] Time Magazine ran an article, "Could This Women's World Champ Really Be a Man?," and an Australian newspaper labeled Semenya a "hermaphrodite."[24] On top of this public scrutiny, Semenya was subjected to invasive tests to assess whether she should be allowed to compete.

---

[22] Milton Kent et al., *Beating Opponents, Battling Belittlement: How African-American Female Athletes Use Community to Navigate Negative Images,* Sch. Of Glob. Journalism & Commc'ns, Morgan State Univ., 9, https://www.documentcloud.org/documents/4528427-The-Image-of-Black-Women-in-Sports2.html#document/ (last visited Oct. 9, 2023).

[23] *See* Ruth Padawer, *The Humiliating Practice of Sex-Testing Female Athletes,* N.Y. Times Magazine (June 28, 2016), https://www.nytimes.com/2016/07/03/magazine/the-humiliating-practice-of-sex-testing-female-athletes.html.

[24] Anna North, *'I am a woman and I am fast': What Caster Semenya's Story Says About Gender and Race in Sports,* Vox (May 3, 2019), https://www.vox.com/identities/2019/5/3/18526723/caster-semenya-800-gender-race-intersex-athletes.

14

Semenya reported feeling targeted and "crucified" by this scrutiny, which "destroyed" her "mentally and physically."[25]

Serena Williams is perhaps the most prominent woman to experience body-policing based on racism, misogyny and misdirected transphobia. Because of her athletic physique and dominance in tennis, with its own history of elitism and racial discrimination, people have said that "[s]he is built like a man" and "[she] was born a guy, all because of [her] arms, or because [she's] strong."[26] This bigotry against Williams rests on narrow and sexist notions of femininity which equate muscular strength with masculinity and muscular weakness with femininity.

These are just a few of the examples of women athletes who suffered sexist and racist body policing throughout their careers, with detriment to their mental and physical well-being. And it's not just professional athletes. Daily, young women who are perceived as gender nonconforming face similar sex harassment and exclusion in school sports.[27]

---

[25] *See Caster Semenya says testosterone case against IAAF has 'destroyed' her 'mentally and physically'*, BBC (July 1, 2019), https://www.bbc.com/sport/athletics/48820717.

[26] Gina Vivinetto, *Serena Williams on How She Struggles With Cruel Remarks About Her Body,* Today (Sept. 7, 2017), https://on.today.com/3rfwDLQ; Jason Pham, *Serena Williams Shut Down Body Critics: 'I Am Strong and Muscular —and Beautiful'*, Bus. Insider (May 31, 2018), https://www.businessinsider.com/serena-williams-shut-down-body-critics-who-said-she-was-born-a-guy-2018-5.

[27] *See* CBS News Article, *supra*, n. 19 (discussing gender policing of Utah high school swimmer).

By requiring both public and private schools to enforce S.B. 1165, the law all but guarantees arbitrary policing of their bodies and invasion of *all* women's and girls' privacy—a practice already rejected by this Court. *See Hecox*, discussed *infra* Part II.A.

Because "suspicions" of gender nonconformity are projected more often on the bodies of those who do not align with white-centric ideas of femininity, cisgender women and girls who do not conform to these archaic "ideals"—particularly Black and brown women and girls and intersex women and girls—will continue to be targeted by intrusive "anti-trans ban" policies like S.B. 1165, in addition to transgender women and girls who are categorically excluded from play. This Court's precedent already prohibits similar blatant discrimination.

## C. The Record Does Not Support Appellants And Intervenors Justification For S.B. 1165.

The District Court correctly rejected Appellants' and Intervenors' argument that S.B. 1165 is necessary to protect cisgender girls' sports and athletic opportunities in Arizona. As the District Court pointed out, that argument is based on overbroad generalizations and stereotypes that harmfully equate transgender status with categorical athletic advantage. ER30; *accord Hecox*, 479 F. Supp. 3d at 982 (asserted advantage between transgender and cis-transgender female athletes "is based on overbroad generalizations without factual justification"), *aff'd*, 79 F.4th

1009.[28] It is also unsupported by the record. ER15 ("The record **does not support** a finding that prior to the Act's enactment, there was a problem in Arizona related to transgender girls replacing non-transgender girls on sports teams.") (emphasis added).

In reality, inequities in funding and resources continue to result in women and girls having fewer opportunities to participate in sports and second-class resources and facilities.[29] There were still fewer high school participation opportunities for

---

[28] Canadian Centre for Ethics in Sport, *Transgender Women Athletes and Elite Sport: A Scientific Review* 37 (2022), https://www.cces.ca/sites/default/files/content/docs/pdf/transgenderwomenathletes andelitesport-ascientificreview-e-final.pdf (hereinafter "CCES") at 6 ("[O]nly certain biomedical factors are policed under a mandate of 'fairness' in elite sport," even though there is "strong evidence that financial material resources (such as access to infrastructure and equipment, nutrition, time to train, higher salaries) are associated with advantage in sport.").

[29] *See, e.g.*, Emine Yucel, *Men's And Women's NCAA March Madness Facilities, Separate and Unequal, Spark Uproar*, NPR (Mar. 19, 2021), https://www.npr.org/2021/03/19/979395795/mens-and-womens-ncaa-march-madness-facilities-separate-and-unequal-spark-uproar; Nat'l Collegiate Athletic Assoc., *The State of Women in College Sports* 31 (2022), https://s3.amazonaws.com/ncaaorg/inclusion/titleix/2022_State_of_Women_in_College_Sports_Report.pdf (noting that among the largest U.S. universities, the "spending for men's athletics is almost three times more than what is reported for women's athletics").

girls in 2019 than existed for boys in 1972, the year Title IX was enacted.[30] For girls of color, there are fewer spots on teams than both boys of color and white girls.[31]

## II. AS A DISCRIMINATORY BAN TARGETING WOMEN AND GIRLS, S.B. 1165 VIOLATES THE EQUAL PROTECTION CLAUSE AND TITLE IX.

### A. S.B. 1165 Violates The Equal Protection Clause.

This Circuit recently confirmed that a state statute prohibiting transgender women and girls from participating in girls' sports violates the Equal Protection Clause. *Hecox*, 79 F.4th at 1019–21. That ruling is directly on point. *Hecox* holds discrimination based on a person's transgender status, even without reference to sex, is sex discrimination. *Id.* at 1021–28. Such a statute can only be upheld based on an "exceedingly persuasive justification" for the discrimination. *Id.* at 21 (citing *U.S. v. Va.*, 518 U.S. 515, 533 (1996)). As the District Court correctly found, S.B. 1165 has not met, nor could it meet, this heightened scrutiny based on flimsy justifications unsupported by the facts. Because Arizona's law violates the Equal Protection Clause, like Idaho's did in *Hecox*, it was properly enjoined.

---

[30] Women's Sports Found., *50 Years of Title IX: We're Not Done Yet* 31 (2022), https://www.womenssportsfoundation.org/wp-content/uploads/2022/05/Title-IX-at-50-Report-FINALC-v2-.pdf.

[31] See Nat'l Coal. for Women and Girls in Educ., Title IX at 50: *A Report by The National Coalition for Women and Girls in Education* (2022), https://nwlc.org/resource/title-ix-at-50/.

A comparison of the statutes is telling. The Idaho statute at issue in *Hecox* categorially banned transgender women and girls from participation in any public-school-funded women's sport. It separated sports teams based on "biological sex" as: "(a) Males, men, or boys; (b) Females, women, or girls; or (c) Coed or mixed," and prohibited anyone of a male "biological sex" from participating on sports teams for "[f]emales, women, or girls." *Hecox*, 79 F.4th at 1019. This Court concluded "biological sex" classifications were a pretext for "proxy discrimination" against transgender women and girls. *Id.* at 1024 (internal punctuation omitted). It recognized even without an explicit reference to transgender people, "seemingly neutral criteria" could be used to discriminate against a disfavored group, similar to a tax on wearing yarmulkes or criminalization of gay relationships. *Id.* (internal citations omitted).[32] Applying heightened scrutiny to the statute, this Court found the supposed justifications did not meet the "exceedingly persuasive" standard required to uphold it. *Id.* at 1028 ("[T]he District Court correctly determined that the Act's means […] are not substantially related to, and in fact undermine, those asserted objectives.").

---

[32] The act would only limit participation for youth assigned male at birth. It does nothing to prevent those assigned female at birth from playing on boys' sports teams, due in part to the false stereotype that this group has a permanent *disadvantage* in athletics. ER34. Even by its own logic, and even ignoring the directly-on-point decision in *Hecox*, S.B. 1165 discriminates based on sex.

The Arizona statute is on all fours with the Idaho statute. It has the same purpose: banning transgender girls from participating in women's and girls' sports teams. ER15–16 (citing legislative comments showing the purpose of the act was discrimination against transgender women and girls). It requires the same school team designations and bans anyone assigned male at birth from competing on sports teams for "[f]emales, women, or girls." S.B. 1165, 1:7–16. And it encourages intrusive sex verification procedures. Similar to the Idaho law, S.B. 1165 relies on the nonexistent need for protection of women's and girls' sports from dominance by transgender girls as justification for discriminatory treatment. ER15–16. Just as Idaho's law failed heightened scrutiny review, so does Arizona's. ER25–30.

The purported "problem" Arizona sought to solve with this law was fabricated—the opposite of an "exceedingly persuasive" justification.[33] It was also based on an inaccurate assumption that transgender girls and women have categorical athletic advantages over cisgender women and girls, an assumption flowing from false stereotypical gender norms around the connection between physical characteristic, athletic advantage, and athleticism.[34] Nor does the record

---

[33] The District Court noted S.B. 1165 cannot even pass muster on a rational basis test. A "bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." ER30–31 (citation omitted).

[34] *See* The American Civil Liberties Union, *Four Myths About Trans Athletes, Debunked*, https://www.aclu.org/news/lgbtq-rights/four-myths-about-trans-athletes-debunked (April 20, 2020); *see also* Pat Griffin & Helen J. Carroll, *On the*

20

reflect that transgender girls have displaced anyone in school sports. Since 2008, 17 states and the District of Columbia have implemented inclusive sports policies protecting transgender students' participation in accordance with their gender identity.[35] Since these laws and association policies were adopted, the inclusion of transgender girls has not led to the dominance of transgender athletes or even to any evidence of *any* exclusion or fewer opportunities of cisgender girls.[36] In fact, where these policies have been implemented, participation in sports by cisgender girls has *increased*.[37]

Because S.B. 1165 violates the Equal Protection Clause on its face, it is properly enjoined. The law impermissibly harms all transgender women and girls in Arizona schools, irrespective of whether they have undergone endogenous puberty. Research refutes the notion that transgender women and girls, including those who

---

*Team: Equal Opportunity for Transgender Student Athletes* 16 & n.11 (2010), https://www.goucher.edu/policies/documents/NCLR-Equal-Opportunity-For-Transgender-Student-Athletes.pdf.

[35] *See, e.g.*, Shoshana K. Goldberg, *Fair Play: The Importance of Sports Participation for Transgender Youth*, Ctr. for Am. Progress 14–15 (2021), https://www.americanprogress.org/wp-content/uploads/sites/2/2021/02/Fair-Play-correction2.pdf ("CAP Report"); NWLC, *Fulfilling Title IX's Promise: Let Transgender and Intersex Athletes Play* 2 (2022), https://nwlc.org/resource/fulfilling-title-ixs-promise-let-transgender-and-intersex-students-play/.

[36] *See infra* n.38.

[37] *See* CAP Report, *supra* n.35 (participation in sports increased faster among girls than among boys where transgender-inclusive policies were implemented.)

21

have transitioned later in life and undergone endogenous male puberty, have any consistent competitive advantage over cisgender women and girls in sports.[38] And indeed, in states that protect transgender students' rights to participate in school sports, there has been no dominance by transgender girls, regardless of whether they have undergone endogenous male puberty. *See Hecox*, 79 F.4th at 1032; ER17–19. Nor has there been any evidence that the sporting opportunities of cisgender girls have been curtailed in these states.[39] Appellants' arguments to the contrary are outdated, unscientific, and based on overbroad generalizations; a far cry from the "exceedingly persuasive" justification required to engage in sex discrimination. S.B. 1165 violates the Equal Protection Clause as applied to all nonbinary, intersex, and transgender women and girls.

---

[38] *See* CCES, *supra* n. 28.

[39] The assumption that transgender women and girls have categorical athletic advantages over cisgender women and girls is inaccurate and based on stereotypical gender norms around the types of bodies that are more athletic and the qualities connected with athleticism. This assumption is "especially inaccurate when applied to youth who are still developing physically and who therefore display more significant variation in size, strength, and skill than older youth and adults." Pat Griffin & Helen J. Carroll, *On the Team: Equal Opportunity for Transgender Student Athletes* 16 (2010), https://www.goucher.edu/policies/documents/NCLR-Equal-Opportunity-For-Transgender-Student-Athletes.pdf. The simple fact that Plaintiffs have never entered endogenous puberty due to puberty blocker treatment highlights the absurdity of relying upon broad generalizations about one's sex assigned at birth.

## B.  S.B. 1165 Would Force Schools To Violate Title IX.

Title IX prohibits discrimination on the basis of sex under educational programs or activities receiving federal financial assistance. *See* 20 U.S.C. § 1681(a). In practice, this means education programs receiving federal assistance cannot subject a student to "separate or different rules of behavior, sanctions, or other treatment" on the basis of sex that results in the denial of educational benefits. 34 C.F.R. § 106.31(b)(4). This includes sports programming. S*ee Jackson v. Birmingham Bd. of Educ*., 544 U.S. 167, 173 (2005). As a result, because enforcement of S.B. 1165 will necessarily cause schools to discriminate against transgender youth, the law stands in direct violation of Title IX.

Providing equal access opportunities requires consideration of affirmed sex and gender. Forcing students to engage in a school activity inconsistent with their gender identity "undoubtedly harm[s] those students and prevent[s] them from equally accessing educational opportunities and resources." *Parents for Priv. v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075, 1106 (D. Or. 2018), *aff'd sub nom. Parents for Priv. v. Barr*, 949 F.3d 1210 (9th Cir. 2020). As such, courts applying Title IX to sex-segregated educational programming, like athletics, consistently state students ***must*** be afforded an opportunity to participate in educational opportunities consistent with their gender identity. *See Hecox,* 79 F.4th at 1039 ("Excluding transgender youth from sports necessarily means that some

23

transgender youth will be denied [] educational benefits"); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020). Title IX prohibits discrimination on the basis of sex, which is inextricably linked with affirmed sex and gender. An educational program that excludes a student who is transgender, thus, discriminates on the basis of that student's sex. S.B. 1165 seeks to do just that, and leaves schools in an untenable position, forced to choose between violating Title IX or state law.

### i. *Discrimination Against Transgender Students Is Discrimination Based On Sex.*

.B. 1165's express purpose is to exclude women and girls who are transgender from participating in athletics in the State of Arizona. ER12. S.B. 1165's purported purpose is nothing more than thinly-veiled discrimination. ER13 ("The Act was adopted for the purpose of excluding transgender girls from playing on girls' sports teams"). On its face, S.B. 1165 discriminates against transgender students, and courts have overwhelmingly held this discrimination is impermissible sex discrimination under Title IX.

As this Circuit clarified in *Hecox*, discrimination based on transgender status is sex discrimination in the Equal Protection context, *see supra* Section II.A. As the Supreme Court stated in *Bostock v. Clayton County Georgia*, the same logic applies more broadly. 140 S.Ct. 1731, 1747 (2020). Discriminating based on sexual orientation or gender identity "necessarily entails discrimination based on sex; the

24

first cannot happen without the second." *Id.* The Court explained, "it is impossible to discriminate against a person for being [] transgender without discriminating against an individual based on sex." *Id.* The two are inextricably linked. *Id.* at 1742.

The logic of *Bostock*, which was interpreting Title VII, applies equally to Title IX. Title VII's language prohibiting discrimination "because of" sex is substantially similar language to Title IX's prohibition of discrimination "on the basis of sex." *Compare* 20 U.S.C. § 1681 *with* 42 U.S.C. § 2000e-2. That is why appellate courts across the country—including this one—have consistently applied *Bostock*'s reasoning in the Title IX context. *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023); *Metro. Sch. Dist. of Martinsville*, 75 F.4th at 769; *Grimm*, 972 F.3d at 617–18.

S.B. 1165 forces transgender girls to compete on incorrect athletic teams, inconsistent with their affirmed sex and gender identity. ***No*** other students are required to do the same. This disparate treatment is exactly what Title IX's promise of equal educational opportunity prohibits. When an educational entity deprives a student "of the benefits of sports programs and activities that their non-transgender classmates enjoy" that is sex-based discrimination under Title IX. ER32. Because sex includes transgender status, excluding students based on transgender status is sex-based deprivation of educational opportunity. Such exclusion clearly violates Title IX. ER32 ("Exclusion from athletics on the basis of sex is a cognizable harm

25

under Title IX."); *see also Hecox,* 79 F.4th at 1026 (discrimination based on transgender status is discrimination based on sex); *Grimm*, 972 F.3d at 618.

If all students ***except*** a transgender student can engage in an activity consistent with their gender identity, then that student is singled out, excluded, and discriminated against based on their sex. *Grimm*, 972 F.3d at 617; *A.H. v. Minersville Area Sch. Dist.*, 408 F. Supp. 3d 536, 564 (M.D. Pa. 2019). This is unequivocally a violation of Title IX.

### ii. *Trans-Inclusive Policies Are Required Under Title IX.*

Title IX promises equal treatment for all women and girls. Excluding transgender women and girls defies this promise. No evidence bears out the fearmongering from opponents of including transgender girls in school sports, e.g., ER13–14 (citing Consideration of Bills: Hearing on S.B. 1165 Before S. Comm. on Judiciary, Jan. 20, 2022, 55th Leg., 2d Reg. Sess., 1:17:32–39 (Ariz. 2022). There is no evidence in the record that cisgender girls have ever been displaced by transgender girls on sports teams. ER15. By codifying sex discrimination without basis, Arizona violated Title IX's ***requirement*** of including transgender student-athletes.

Trans-exclusionary policies in athletics are a step backwards from equal treatment, and contrary to Congress' intent in enacting Title IX.[40] From 1968 until 1998, women athletes competing in the Olympics faced demeaning gender verification procedures.[41] The rationale for sex verification **only for** women during those years "was to prevent masquerading males and women with 'unfair male-like' physical advantage from competing in female only events."[42] These procedures were only outlawed following the 1996 Summer Olympics.[43] But what remains is a "panic" that transgender or intersex girls may "displace" cisgender women and girls in sport.[44] No evidence substantiates that concern. Brake, 29 Wm. & Mary J. Race, Gender & Soc. Just. at 41, 51. This Court recently observed: "Because transgender

---

[40] *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) ("There is no doubt that if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language.") (internal quotation omitted) (alteration in original). A narrow reading ignores that "Title IX is a dynamic statute, not a static one." *Neal v. Bd. of Trustees of Cal. State Universities*, 198 F.3d 763, 779 (9th Cir. 1999).

[41] L.J. Elsas, et al. *Gender verification of female athletes*, 2 Genet Med. 4, 249 (2020).

[42] *Id*.

[43] *Id*.

[44] *See* discussion *supra* Part I.D; John Kinsey, *Second Female Penn Swimmer Steps Forward, Describes Teammates in Tears*, Fox News (Dec. 10, 2021); Phil Mushnick, *Inequality Created by Transgender Swimmer Lia Thomas is Antithesis of Far Play*, N.Y. Post (Dec. 24, 2021). *See also* Deborah L. Brake, *Title IX's Trans Panic*, 29 Wm. & Mary J. of Race, Gender, & Soc. Just., 41, 61–62 (2022) (discussing the tenuous balance between the success of title IX and the perceive scarcity of athletic opportunities for women despite Title IX's advances, arguing that the perception of scarcity increases panic about trans inclusion).

women represent about 0.6 percent of the general population, the district court did not err in finding it unlikely that they would displace cisgender women from women's sports." *Hecox,* 79 F.4th at 1030.

In 2020, four cisgender student-athletes challenged the inclusion of transgender girls in high school track, arguing their inclusion violated Title IX and harmed athletic participation opportunities for cisgender girls. *Soule by Stanescu v. Conn. Ass'n of Sch., Inc.*, No. 3:20-CV-00201 (RNC), 2021 WL 1617206, at *1 (D. Conn. Apr. 25, 2021), *aff'd*, 57 F.4th 43 (2d Cir. 2022), *rehearing en banc* held June 6, 2023, awaiting decision. The district court and Second Circuit disagreed and determined Title IX *requires* schools to permit transgender students to compete in sex-segregated activities consistent with their affirmed sex and gender identity. *Id*. at 55–56; *see also Grimm*, 972 F.3d at 617–18 (holding that the school violated Title IX when it treated a transgender boy worse than other boys). Schools violate Title IX when they **exclude** transgender students, not when they **include** them.

Attacks on transgender girls in sport are a thinly veiled attempt to define for society who "counts as a girl."[45] Drawing lines based exclusively on "biological sex" inaccurately assumes boys and men have an inherent biological advantage, excludes transgender individuals, is discriminatory, and sends an unmistakable "message of

---

[45] Brake, 29 Wm. & Mary J. Race, Gender & Soc. Just. at 41, 56.

innate biological female inferiority."[46] In 1975, Congress reviewed and approved of Title IX regulations making clear that gender-separated school sports teams are permitted, but not required, for competitive and/or contact sports to foster equitable participation of girls and women in the context of being systematically denied those opportunities, in favor of boys and men's teams.[47] As discussed *supra* Part II.B.i, it is a violation of Title IX to provide disparate educational opportunities on the basis of sex, including transgender status.

Ensuring protections against sex discrimination for all women and girls, including for women and girls who are transgender, is required by Title IX.

## CONCLUSION

For the foregoing reasons, as well as those set forth in Plaintiff-Appellee's brief, the District Court's order should be affirmed.

---

[46] *Id*. at 67; 72–73; 92.

[47] Unlike the current regulatory process, in 1975 Congress had the authority to decide if proposed regulations from the Department of Health, Education, and Welfare matched the intent of Title IX, and Congress adopted resolutions to disapprove certain sections of proposed regulations. *See* Brake, 29 Wm. & Mary J. Race, Gender & Soc. Just. at 70–74 (citing Erin E. Buzuvis, *Title IX: Separate but Equal for Girls and Women in Athletics*, in OXFORD HANDBOOK OF FEMINISM & L. IN THE U.S. at 11 ("explaining that some supporters of sex separation emphasized the structural inequities that have deprived girls and women from fully developing their athletic talents, such that lumping girls and women into competition with male athletes would exacerbate an already unequal playing field."). Current Title IX regulations do not authorize separation based on Arizona's stereotyped conception of sex. See 34 C.F.R. § 106.41(b) (permitting but not requiring sex segregation).

October 13, 2023

ANYA MARINO
SHIWALI PATEL
EMILY MARTIN
AUDEN PERINO
NATIONAL WOMEN'S LAW CENTER
1350 I Street N.W., Suite 700
Washington, D.C. 20005
Telephone: (202) 588-5180
Amarino@nwlc.org

Respectfully submitted,

*/s/ Maia H. Jorgensen*

MAIA H. JORGENSEN (*COUNSEL OF RECORD*)
OREN S.A. KREPS
HOGAN LOVELLS US LLP
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: (415) 374-2300
Facsimile: (415) 374-2499
maia.jorgensen@hoganlovells.com
oren.kreps@hoganlovells.com

CAROLYN A. DELONE
KATHERINE I. CULORA
HOGAN LOVELLS US LLP
555 13th Street N.W., Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
carrie.delone@hoganlovells.com
katherine.culora@hoganlovells.com

SARAH W. KELLER
HOGAN LOVELLS US LLP
8350 Broad Street, 17th Floor
Tysons, VA 22102
Telephone: (703) 610-6100
Facsimile: (703) 610-6200
sarah.w.keller@hoganlovells.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6769 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 360 in Times New Roman 14-point font.

*/s/ Maia H. Jorgensen*
Maia H. Jorgensen

31

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 13, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Maia H. Jorgensen*
Maia H. Jorgensen