No. 23-16026 c/w No. 23-16030

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

HELEN DOE, parent and next friend of Jane Doe; et al.,

*Plaintiffs-Appellees,*

v.

THOMAS C. HORNE, in his official capacity as State Superintendent of Public Instruction; et al.,

*Defendants-Appellants,*

and

WARREN PETERSEN, Senator, President of the Arizona State Senate; BEN TOMA, Representative, Speaker of the Arizona House of Representatives,

*Intervenor-Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Arizona

## CONSOLIDATED REPLY BRIEF OF APPELLANT AND
## INTERVENOR-DEFENDANTS-APPELLANTS

| | | |
|---|---|---|
| D. John Sauer | Dennis I. Wilenchik | Maria Syms |
| Justin D. Smith | Karl Worthington | Arizona Department |
| Michael E. Talent | Wilenchik & | of Education |
| James Otis Law Group LLC | Bartness, P.C. | 1535 W. Jefferson, |
| 13321 N. Outer Forty Rd., Suite 300 | 2810 N. Third St. Phoenix, AZ 85004 | BIN #50 Phoenix, AZ |
| St. Louis, MO 63017 | (602) 606-2810 | 85007 |
| (314) 562-0031 | | (602) 542-5240 |
| *Attorneys for Intervenor-Defendants-Appellants* | | *Attorneys for Appellant Thomas C. Horne* |

**TABLE OF CONTENTS**

TABLE OF CONTENTS .............................................................................ii

TABLE OF AUTHORITIES................................................................. iii

INTRODUCTION......................................................................................1

ARGUMENT .............................................................................................2

    I.   The SWSA does not violate the Equal Protection Clause...............2

      A.   The SWSA is subject to, and passes, rational-basis review.......2

          1.   Plaintiffs bring an underinclusiveness challenge to a remedial law. 2

          2.   Animus does not motivate the SWSA. ....................................9

          3.   The SWSA passes rational basis review. ..............................16

      B.   The SWSA passes intermediate scrutiny. ...............................18

          1.   Plaintiffs do not meaningfully defend the district court's factual findings.....................................................................18

          2.   The SWSA satisfies intermediate scrutiny...........................25

    II.   Plaintiffs offer no convincing response to the Legislative Leaders' and Superintendent Horne's Title IX analysis. ...................29

    III.   The equities do not support relief. ...........................................32

CONCLUSION .......................................................................................35

CERTIFICATE OF COMPLIANCE.......................................................37

## TABLE OF AUTHORITIES

**CASES**

*Abbott v. Perez,*
  138 S. Ct. 2305 (2018) ........................................................... 14

*Adams ex rel. Adams v. Sch. Bd. of St. Johns Cty.,*
  57 F.4th 791 (11th Cir. 2022) .................................................. 11, 12, 30

*Anderson v. City of Bessemer City,*
  470 U.S. 564 (1985) ................................................................. 18, 19

*Arc of Cal. v. Douglas,*
  757 F.3d 975 (9th Cir. 2014) ................................................... 32

*B.P.J. v. W. Va. State Bd. of Educ.,*
  649 F. Supp. 3d 220 (S.D. W. Va. 2023) ................................. 29

*Bostock v. Clayton County,*
  140 S. Ct. 1731 (2020) ........................................................... 30, 31

*Brandt ex rel. Brandt v. Griffin,*
  No. 23-2681 (8th Cir. Oct. 6, 2023) ........................................ 3

*Bucklew v. Precythe,*
  139 S. Ct. 1112 (2019) ........................................................... 27

*Citizens United v. FEC,*
  558 U.S. 310 (2010) ............................................................... 27

*Clark ex rel. Clark v. Ariz. Interscholastic Athletic Ass'n,*
  695 F.2d 1126 (9th Cir. 1982) ................................................ 4, 5, 15, 17, 28

*Clark ex rel. Clark v. Arizona Interscholastic Ass'n,*
  886 F.2d 1191 (9th Cir. 1989) ................................................ 29

*Cuviello v. City of Vallejo,*
  944 F.3d 816 (9th Cir. 2019) ................................................. 32

*D.N. v. DeSantis,*
  No. 21-CV-61344 (S.D. Fla. Nov. 6, 2023) ............................. 3, 30

*Doe v. Snyder,*
  28 F.4th 103 (9th Cir. 2022) .................................................. 31

*Eknes-Tucker v. Governor of Ala.,*
  80 F.4th 1205 (11th Cir. 2023) .............................................. 10

*FCC v. Beach Commc'ns, Inc.,*
  508 U.S. 307 (1993) ............................................................... 17

*First Choice Chiropractic, LLC v. DeWine,*
  969 F.3d 675 (6th Cir. 2020) ................................................. 28

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ............................................................ 32

*Geduldig v. Aiello*,
   417 U.S. 484 (1974) ................................................................... 9, 11

*Gillette Co. v. Ed Pinaud, Inc.*,
   178 F. Supp. 618 (S.D.N.Y. 1959) ............................................... 32

*Grabowski v. Arizona Board of Regents*,
   69 F.4th 110 (9th Cir. 2023) .................................................... 30, 31

*Hecox v. Little*,
   479 F. Supp. 3d 930 (D. Idaho 2020) ........................................... 3

*Hecox v. Little*,
   79 F.4th 1009 (9th Cir. 2023)..............2, 9, 11, 12, 13, 15, 17, 27, 28, 30

*Heller v. District of Columbia*,
   801 F.3d 264 (D.C. Cir. 2015)...................................................... 28

*Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*,
   438 F.3d 195 (2d Cir. 2006)..................................................... 6, 7, 8, 9

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) ..................................................... 27

*Katzenbach v. Morgan*,
   384 U.S. 641 (1966) ........................................................................ 6

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023)................................................... 3, 10, 14

*Lahoti v. VeriCheck, Inc.*,
   586 F.3d 1190 (9th Cir. 2009) ..................................................... 19

*Lydo Enters., Inc. v. City of Las Vegas*,
   745 F.2d 1211 (9th Cir. 1984) ..................................................... 32

*Martin v. Int'l Olympic Comm.*,
   740 F.2d 670 (9th Cir. 1984) ....................................................... 10

*McDonald v. Bd. of Election Comm'rs of Chi.*,
   394 U.S. 802 (1969) ........................................................................ 6

*Mich. Gambling Opposition v. Kempthorne*,
   525 F.3d 23 (D.C. Cir. 2008) ........................................................ 6

*Miller v. Johnson*,
   515 U.S. 900 (1995) ...................................................................... 14

*Monterey Mech. Co. v. Wilson*,
   125 F.3d 702 (9th Cir. 1997) ......................................................... 4

*Nguyen v. INS*,
   533 U.S. 53 (2001) ........................................................................ 26

*O'Connor v. Bd. of Ed. of Sch. Dist. 23,*
  449 U.S. 1301 (1980) .................................................................. 15

*Peightal v. Metropolitan Dade County,*
  26 F.3d 1545 (11th Cir. 1994) ...................................................... 8

*Personnel Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979) ........................................................... 11, 13

*Poe v. Drummond,*
  2023 WL 6516449 (N.D. Okla. Oct. 5, 2023) ............................. 3

*Pom Wonderful LLC v. Hubbard,*
  775 F.3d 1118 (9th Cir. 2014) .................................................. 25

*Roe ex rel. Roe v. Critchfield,*
  2023 WL 6690596 (D. Idaho Oct. 12, 2023) ........................... 30

*SmithKline Beecham Corp. v. Abbott Laboratories,*
  740 F.3d 471 (9th Cir. 2014) .............................................. 16, 17

*Turner Broad. Sys., Inc. v. FCC,*
  512 U.S. 622 (1994) .................................................................. 28

*United States v. Blackstone,*
  903 F.3d 1020 (9th Cir. 2018) .................................................. 33

*United States v. Carrillo-Lopez,*
  68 F.4th 1133 (9th Cir. 2023) ............................................. 10, 14

*United States v. Hinkson,*
  585 F.3d 1247 (9th Cir. 2009) ....................................... 18, 20, 22

*United States v. Sineneng-Smith,*
  140 S. Ct. 1575 (2020) ............................................................... 3

*United States v. Valencia-Lopez,*
  971 F.3d 891 (9th Cir. 2020) .................................................... 18

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,*
  429 U.S. 252 (1977) .................................................................. 16

*Walsh v. La. High Sch. Athletic Ass'n,*
  616 F.2d 152 (5th Cir. 1980) .................................................... 33

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ............................................................... 6

*Witt v. Department of Air Force,*
  527 F.3d 806 (9th Cir. 2008) .................................................... 27

## STATUTES

20 U.S.C. § 1681 .........................................................................30

Ariz. Rev. Stat. § 32-3230..................................................... 13, 14

Ariz. Rev. Stat. § 15-120.02 .................................................................... 5, 6

Idaho Code Ann. § 33-202 ...................................................................... 13

Idaho Code Ann. § 33-6203 .................................................................... 12

**OTHER AUTHORITIES**

Mira A. Atkinson et al., *Sex Differences in Track and Field Elite Youth* 9
   (Aug. 31, 2023) (preprint),
   https://sportrxiv.org/index.php/server/preprint/view
   /324/654 ............................................................................................ 23

## <u>INTRODUCTION</u>

Plaintiffs' answering brief misapprehends and misstates governing law, the record, and the Legislative Leaders' and Superintendent Horne's arguments.

*First*, Plaintiffs misunderstand that the SWSA is a remedial statute; their challenge is an underinclusiveness challenge; and the SWSA is not motivated by animus. Thus, the law passes rational basis scrutiny.

*Second*, Plaintiffs misapprehend and misstate the record which clearly establishes that there are athletic differences between prepubescent boys and girls. To be sure, Plaintiffs do not miss that the SWSA fulfills its purposes in almost every instance. Indeed, they do not dispute that fact. But Plaintiffs overlook the plethora of authority showing that is all the Constitution requires for the law to pass intermediate scrutiny.

*Third*, Plaintiffs ignore the fact that the Title IX question here is one of statutory interpretation, which requires consideration of text, context, canons of construction, and clear statement rules to determine whether "sex" in the context of Title IX refers to biological sex or to

biological sex and gender identity. Plaintiffs' favored caselaw does not address this issue. In fact, it cuts against them.

*Fourth*, Plaintiffs did not timely file this suit—which undercuts their claim of irreparable harm. Further, it is their gender dysphoria diagnosis, and not any law Arizona has passed, that affects their ability to play sports. And Plaintiffs dismiss the other female-athletes who will be displaced by them. Ultimately, they fail to make a plausible showing of irreparable harm, and they simply disregard countervailing harms and the public interest.

The Court should reverse the district court's preliminary injunction.

## ARGUMENT

### I. The SWSA does not violate the Equal Protection Clause

#### A. The SWSA is subject to, and passes, rational-basis review.

##### 1. Plaintiffs bring an underinclusiveness challenge to a remedial law.

Plaintiffs argue (at 26) that *Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023), "did not analyze the plaintiff's claim as an underinclusiveness challenge because it was not one." But *Hecox* did not analyze whether the challenge there was an underinclusive challenge because no one

raised the issue. The defendants argued that the Idaho law at issue "does not discriminate on the basis of transgender status or sex" and that it withstood "heightened scrutiny." *Hecox v. Little*, 479 F. Supp. 3d 930, 974–75 (D. Idaho 2020). The *Hecox* panel was thus limited to addressing those arguments. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[C]ourts normally decide only questions presented by the parties.") (quotations and alterations omitted). *Hecox* therefore does not "control[]," *contra* Answering Br. 26, this unanswered question. *See* Br. Appellants 37–38.[1]

Plaintiffs also argue (at 26) that the SWSA "is not a remedial program for women and girls analogous to an affirmative action program." Importantly, Plaintiffs do not claim that sex-segregated sports

---

[1] The case for en banc review has strengthened since the Legislative Leaders and Superintendent Horne filed their original brief. The Southern District of Florida dismissed equal protection and Title IX challenges to a law comparable to the SWSA. *See* Order, *D.N. v. DeSantis*, No. 21-CV-61344 (S.D. Fla. Nov. 6, 2023) (attached as Exhibit A). The Sixth Circuit reaffirmed that transgender individuals are not a quasi-suspect class. *See L.W. ex rel. Williams v. Skrmetti (L.W. II)*, 83 F.4th 460, 486–88 (6th Cir. 2023). So has the Northern District of Oklahoma. *See Poe v. Drummond*, 2023 WL 6516449, at *7 (N.D. Okla. Oct. 5, 2023). And the Eighth Circuit has granted initial en banc hearing in a case challenging Arkansas's prohibition on gender transition procedures for minors. *See* Order, *Brandt ex rel. Brandt v. Griffin*, No. 23-2681 (8th Cir. Oct. 6, 2023).

programs are something besides affirmative-action programs. Like many affirmative-action programs, sex-segregated sports exist to "redress[] past discrimination … and promot[e] equality of … opportunity." *Clark ex rel. Clark v. Ariz. Interscholastic Athletic Ass'n (Clark I)*, 695 F.2d 1126, 1131 (9th Cir. 1982). *Compare id. with Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 713 (9th Cir. 1997) ("For a racial classification to survive strict scrutiny in the context before us, it must be a narrowly tailored remedy for past discrimination."). Rather, Plaintiffs' argument (at 26) is that the SWSA is not remedial because—according to them—it did not do much that is not already done.

The argument is unconvincing. If a policy is remedial *ab initio*, reenactments of that policy—even with slight tweaks—remain remedial. Because sex-segregated sports programs served remedial purposes before the SWSA, *see Clark I*, 695 F.2d at 1131, the SWSA continues to serve the same remedial purpose. Indeed, that is why the Arizona legislature passed the law: "Having separate sex-specific teams furthers efforts to promote sex equality … ." 2-ER-100 (§ 2(14)).

Plaintiffs' own evidence shows the need for such measures. Plaintiffs—and the district court—tried to explain differences in athletic

4

performance between prepubertal boys and girls by pointing to "greater societal encouragement of athleticism in boys" as well as "greater opportunities for boys to play sports." 1-ER-19. But the SWSA exists to ameliorate both of those sources of inequality. *See Clark I*, 695 F.2d at 1131 (permitting boys to play on female sports teams diminishes "athletic opportunities for women"); *see also* 2-ER-100 (§ 2(14)).

Plaintiffs are also wrong as to what the SWSA did. They claim (at 26) that "Arizona law has segregated teams by sex at least since 1982," citing *Clark I. Clark I* involved AIA rules—and the AIA only "sets rules for governing interscholastic sports, *grades 9-12*" and only for member schools. 1-ER-11 (emphasis added). The SWSA, however, applies to all sports teams, regardless of grade level. *See* Ariz. Rev. Stat. § 15-120.02(A); *see also* 1-ER-31. No one has claimed a state-wide rule like that existed before the SWSA.

The SWSA therefore *did* change State law. Before the SWSA, only high school sports programs belonging to AIA member schools had to be sex-segregated, and even that policy lacked force of law; now, all are. Furthermore, the SWSA removes the AIA's ability to weaken or eliminate women's sports programs. Codifying sex-segregated sports thus adds

procedural protections for female athletes. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2618 (2022) (Gorsuch, J., concurring) (noting the difficulty of passing laws through bicameralism and presentment procedures). The SWSA also adds public accountability through an elected legislative body rather than the unelected AIA officials. *See Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 34 (D.C. Cir. 2008) (Brown, J., dissenting in part) ("The nondelegation principle is integral to any notion of democratic accountability.").

In short, the SWSA is "a 'reform' measure aimed at eliminating an existing barrier," *contra* Answering Br. 28, by providing biological girls the "material benefit[]" of their own sports teams, *contra id.* at 26.[2]

This case is therefore indistinguishable from *Jana-Rock Construction, Inc. v. New York State Department of Economic Development*, 438 F.3d 195 (2d Cir. 2006). Both involve affirmative action programs that classify on suspect lines (here, biological sex, *see* Ariz. Rev. Stat. § 15-120.02(B); in *Jana-Rock*, race, *see* 438 F.3d at 202).

---

[2] Plaintiffs mention the SWSA "does not provide funding" for women's sports. But a program can be remedial without providing funding. *See*, *e.g.*, *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 810–11 (1969) (absentee voting); *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966) (voting).

But neither involves a challenge to that classification. *Compare* 1-ER-20 ("[T]he Plaintiffs do not challenge the existence of separate teams for girls and boys."), *and* Br. Appellants 26–27 (gathering citations), *with Jana-Rock*, 438 F.3d at 205 ("[P]laintiffs conceded that Article 15–A is justified by a compelling state interest in remedying past discrimination and that it is generally narrowly tailored to achieve that end."). Instead, both involve challenges to the narrowness of who may access the law's benefits. In *Jana-Rock*, the alleged problem was "that New York's definition of Hispanic is fatally underinclusive for not including persons of Spanish descent." 438 F.3d at 205. Here, Plaintiffs say that limiting the definition of "females," "women," or "girls" to biological sex as opposed to biological sex and gender identity excludes people who "are girls." *See* Answering Br. 44; Resp. Emergency Mot. for a Stay, Dkt. 13, at 15; *see also* Answering Br. 36.

Plaintiffs, to be sure, claim (at 27) that while *Jana-Rock* involves "plaintiffs [who] were not attempting to *escape* the law's discriminatory impact upon them but instead hoping to *access* the law's benefits[, they] challenge the constitutionality of the Ban itself." That argument is mere semantics. It is not hard to phrase an attempt to access a benefit as a

challenge to discrimination. *See Peightal v. Metropolitan Dade County (Peightal II)*, 26 F.3d 1545, 1561 (11th Cir. 1994) ("Peightal also attacks the Plan as under-inclusive, arguing that it benefits those of Spanish descent, while excluding, and therefore discriminating against, persons of other European national origin."); *see also Jana-Rock*, 438 F.3d at 210 (noting that definitions must resort to some degree to the "'stereotypes'" driving the discrimination a law seeks to remedy) (quoting *Peightal II*, 26 F.3d at 1561 n.25). In addition, Plaintiffs' reference to the "Ban" obscures that what they mean by the word is the SWSA's defining of Plaintiffs as male as opposed to "female," "women," or "girls" for purposes of designating sports teams. *See* Answering Br. 8–9 (discussing the SWSA's reliance on biological sex to define its designation categories); 3-ER-583 ("The Ban, therefore, defines Plaintiffs, who are transgender girls, as male" pointing to subsection (A)); *see also* 1-ER-14. Word games cannot obscure the reality that Plaintiffs believe the SWSA too narrowly defines who is a woman.

That Plaintiffs' argument is sleight-of-hand is clear from how they frame their case. Plaintiffs do not contend that the SWSA is unconstitutional because it excludes *all* transgender women from its

definition of "females," "women," or "girls," but because it excludes a *subset* of transgender females: those who have not, and will not, go through male puberty. Indeed, they do not dispute the Legislative Leaders' and Superintendent Horne's argument that as to at least certain classes of transgender females (those who have gone through male puberty), the SWSA *does* advance its important purposes. *See* Answering Br. 33 (dismissing that fact as "hypothetical").

Claiming a law is invalid for failing to include a subset (transgender females who have not and will not go through male puberty) of a subset (transgender females) of a defined group (females) is plainly a challenge to "the contours of the specific … classification … ." *Jana-Rock*, 438 F.3d at 210. Thus, "so long as the line drawn by the State is rationally supportable, the courts will not interpose their judgment as to the appropriate stopping point." *Geduldig v. Aiello*, 417 U.S. 484, 495 (1974).

### 2. Animus does not motivate the SWSA.

At core, Plaintiffs' arguments against application of rational-basis review turns on the animus analysis. *See* Answering Br. 27; *see also id.* at 22–24. Indeed, that was how the *Hecox* panel distinguished *Adams* and *Geduldig*. *See* 79 F.4th at 1025. This case, however, is not *Hecox*.

**1.** Plaintiffs claim (at 22) the SWSA "is facially discriminatory." Since the SWSA's substantive provisions do not reference gender identity, this argument necessarily turns on the law's references to biological sex. *See id.* But it cannot be that "any reference to sex in a statute dictate[s] higher review" on the theory of transgender discrimination. *L.W. ex rel. Williams v. Skrmetti (L.W. II)*, 83 F.4th 460, 482 (6th Cir. 2023). For one, where, as here, a State is creating a benefits program for women, "the state refers to sex only because" sex-segregated sports "are themselves sex-based." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1228 (11th Cir. 2023). For another, gender identity and sex are not coterminous. *See* 1-ER-4. Gender identity—according to *amicus* American Medical Association—can be "a blend of male or female, or an alternative gender." Br. *Amici Curiae* AMA, Dkt. 69, at 8 n.2. Absent a one-to-one fit, not every reference to sex is a reference to gender identity; and a sex-based classification does not, by itself, evidence gender identity discrimination. Thus, laws like the SWSA that reference only biological sex are "facially neutral as to" gender identity. *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1142 (9th Cir. 2023); *see also Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 678 (9th Cir. 1984).

10

That refutes Plaintiffs' proxy discrimination argument. *See* Answering Br. 25. The lack of a one-to-one relationship between biological sex and gender identity means "the fit between" sex and gender identity is not "sufficiently close" to treat the former as a proxy for the latter, "[g]iven the [SWSA's] context"—*i.e.*, lack of animus. *Hecox*, 79 F.4th at 1043 (quotations omitted).[3]

Thus, Plaintiffs complain about at most a disparate impact—something *Hecox* recognized occurs when laws reference biological sex. *See* 79 F.4th at 1025 (distinguishing *Adams ex rel. Adams v. Sch. Bd. of St. Johns Cty.*, 57 F.4th 791 (11th Cir. 2022) (en banc) and *Geduldig*). Absent evidence of discriminatory intent, that does not establish an Equal Protection violation. *See, e.g., Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979).

**2.** While the law at issue in *Hecox* and the SWSA overlap, *see* Answering Br. 22–24, much of the overlap is overstated. For example, the SWSA references "biological sex" just like the Idaho law in *Hecox*, *see id.* at 22 (noting the fact)—but the two laws use the phrase differently.

---

[3] And in all events, proxy discrimination only matters in determining the constitutionality of the original classification. *See* Br. Appellants 33.

The Idaho law analyzed in *Hecox* defines biological sex by reference to a sex-verification procedure. *See* Idaho Code Ann. § 33-6203(3). The SWSA, by contrast, says "biological sex" "'is synonymous with the term 'assigned sex,'" which is the biological sex of a child as observed and recorded at birth. 1-ER-4. That is like the policy at issue in *Adams*, which required students to use bathrooms based on "the gender identified on a student's birth certificate." *Hecox*, 79 F.4th 1025 (citing *Adams*, 57 F.4th at 797). That law "was not targeted at transgender students—at most, it had a disparate impact upon them which did not rise to the level of a constitutional violation because no animus was shown." *Id.*

Similarly, the SWSA cites "an article entitled 'Transgender Women in the Female Category of Sport,'" Answering Br. 22 (quoting 2-ER-98–100), and the Idaho law's legislative findings discuss "transgender women athletes," *Hecox*, 79 F.4th at 1022. But the SWSA cites that article to support the proposition that "[s]econdary sex characteristics that develop during puberty … generate anatomical divergence beyond the reproductive system, leading to adult body types that are measurably different between sexes." 2-ER-98 (quotations omitted). That has nothing to do with gender identity and simply reflects a biological

12

reality—a reality that is foundational to Plaintiffs' case, which hinges on their allegation that they have not, and will not, go through male puberty with its attendant physiological development. *See*, *e.g.*, Answering Br. 1, 31, 32, 34; 3-ER-513, 516, 519–20, 587–88.

The two laws also reference testosterone suppression. *See* Answering Br. 22. *Compare* 2-ER-100, *with* Idaho Code Ann. § 33-202(11). But the effect of testosterone suppression is an issue of concern at the highest levels of competition—including the International Olympic Committee. *See* 2-ER-99–100. That shows the Arizona legislature "studied the issues" involved, which does not establish animus. *See Hecox*, 79 F.4th at 1025. It is consistent with the legislature acting "in spite of" the SWSA's effect on transgender individuals as opposed to acting "because of" those effects. *Feeney*, 442 U.S. at 279; *see also* Br. Appellants 36.

**3.** Then there is legislative history. Plaintiffs do not discuss the legislative debates or what Arizona's attorney general thought of the law.[4] They rely solely on statements from Senator Leach and Senator

---

[4] One amicus points to the contemporaneous passage of Ariz. Rev. Stat. § 32-3230 as providing "legislative context" demonstrating "animus." *See*

Petersen. *See* Answering Br. 22–23. These statements do not reflect any plausible animus, but instead reflect good-faith consideration of legislative issues. *See id.* Further, such statements "must be considered in light of the strong 'presumption of good faith' on the part of legislators." *Carrillo-Lopez*, 68 F.4th at 1140 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).[5] Thus, "the statements of a handful of lawmakers" are generally insufficient to show discriminatory intent because they "may not be probative of the intent of the legislature as a whole." *Id.* And unlike in the district court, Plaintiffs do not point to Governor Ducey's statement, *see* 1-ER-15 (citing Plaintiffs' Exhibit 25)—thus conceding it does not show animus, *see also* Br. Appellants 34.

---

Br. *Amici Curiae* GLBTQ Legal Advocate & Def., Dkt. 68, at 10–11. Section 32-3230 prohibits "irreversible gender reassignment surgery" for minors—which are surgeries that alter the minor's physical characteristics. § 32-3230(C)(4). A law that protects minors from medical treatments that lack "a meaningful pedigree" and follows the lead of "European countries that pioneered these treatments" does not show animus towards transgender individuals; it shows concern for the well-being of children. *L.W. II*, 83 F.4th at 477. Indeed, Plaintiffs' own expert admits that such surgeries are not appropriate for minors. *See* 3-ER-567. Plaintiffs thus rightly do not make this argument.

[5] Plaintiffs' argument (at 40) that the presumption of legislative good faith applies only to redistricting cases ignores that *Carrillo-Lopez* is an Equal Protection case and cites *Abbott v. Perez*, 138 S. Ct. 2305 (2018), in discussing the presumption. *Carrillo-Lopez*, 68 F.4th at 1140.

In any event, Senator Petersen's and Senator Leach's statements do not show animus. *See id.* at 34–36. Their comments express concern about biological males competing with females—a concern that Plaintiffs admit is valid for at least post-pubertal males, *see*, *e.g.*, Answering Br. 12, and is one shared by athletics associations, *see*, *e.g.*, Br. Appellants 35 (discussing the World Aquatics' policy), female athletes, *see*, *e.g.*, *Hecox*, 79 F.4th at 1038–39, and courts, *see*, *e.g.*, *O'Connor v. Board of Education of School District 23*, 449 U.S. 1301, 1307 (1980) (Stevens, Circuit Justice) ("Without a gender–based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events."); *see also Clark I*, 695 F.2d at 1131. In fact, one of the comments—Senator Petersen's comment—discusses an attempt to *accommodate* transgender athletes.[6] *See* Br. Appellants 34–35. That is the opposite of animus.

---

[6] The same holds for two other statements *amici* reference: one by Senator Petersen and one by Senator Mesnard. *See* Br. *Amici Curiae* GLBTQ Legal Advocate & Def., Dkt. 68, at 9–10. Both statements express the legitimate concern about biological males competing with biological females.

In the end, all Plaintiffs do is provide perfectly benign quotes from two senators and assert they establish discriminatory purpose. That is far from the required "sensitive inquiry into [the] circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977).

### 3. The SWSA passes rational basis review.

Plaintiffs' argument that the SWSA does not pass rational basis review relies solely on "the [SWSA's] legislative history demonstrat[ing] that it was enacted to exclude transgender girls from school sports in Arizona." Answering Br. 39. As just discussed, *see also* Br. Appellants 38–39, that is incorrect, so Plaintiffs' argument fails.

There is thus no need to grapple with Plaintiffs' claim that a court must "scrutinize the government's actual purposes" in evaluating their challenge. Answering Br. 40 (quotations omitted). In any event, Plaintiffs misstate the passage of *SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471 (9th Cir. 2014), which is not about applying rational-basis review but about ascertaining the level of scrutiny applied to classifications based on sexual orientation. *See id.* at 479–84. *SmithKline* in fact reiterates that rational basis review requires only

16

"some conceivable rational purpose," and it quotes *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993), to note that the conceivable purpose need not have "'actually motivated the legislature.'" *Id.* at 481.

Moreover, Plaintiffs' arguments show why the SWSA meets that standard. Plaintiffs rely on the fact they have not, and will not, go through male puberty in attacking the law. *See*, *e.g.*, Answering Br. 1, 31, 32, 34; 3-ER-513, 516, 519–20, 587–88. Thus, Plaintiffs implicitly claim that the Arizona legislature can rationally segregate sports based on testosterone levels instead of biological sex.

But that would require expensive, burdensome tests that this Court found are "objectively degrading and disturbing . . . ." *Hecox*, 79 F.4th at 135. It is also inconsistent with *Clark I*, which recognized that while segregation "on the basis of specific physical characteristics other than sex" could "more fully" equalize athletic opportunities, the Constitution permits "trade-offs between equality and practicality" in this context. 695 F.2d at 1131–32. There is no reason to find them constitutionally deficient now.

17

### B. The SWSA passes intermediate scrutiny.

#### 1. Plaintiffs do not meaningfully defend the district court's factual findings.

Findings of fact are clearly erroneous, and constitute a reversible abuse of discretion, when they are either illogical, implausible, or without support in the record:

> If the trial court identified the correct legal rule, we move to the second step of our abuse of discretion test. … [T]he second step of our abuse of discretion test is to determine whether the trial court's application of the correct legal standard was (1) "illogical," (2) "implausible," or (3) without "support in inferences that may be drawn from the facts in the record."

*United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 577 (1985)). *See also United States v. Valencia-Lopez*, 971 F.3d 891, 897 (9th Cir. 2020) (citing the same standard and reversing the district court for abusing its discretion by qualifying unreliable witness as an expert).

Plaintiffs' defense of the district court's conclusion that there are no athletic differences between biological males who have not experienced male puberty (*e.g.*, transgender girls like Plaintiffs) and biological girls is, at its core, that the district court's factual findings justify themselves. Their argument (at 36–38) consists almost exclusively of quotes and cites of the district court's decision. Contrary to Plaintiffs' argument,

18

appellate courts review factual findings "in light of the record viewed in its entirety," *Anderson*, 470 U.S. at 574—not in light of how the district court viewed the record. *See also Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196 (9th Cir. 2009).

To the extent Plaintiffs discuss the record, they fail to address the Legislative Leaders' and Superintendent Horne's points. They say that Dr. Shumer's declaration supports the claim that "before puberty, there are no significant differences in athletic performance between boys and girls." Answering Br. 36. But they ignore the Legislative Leaders' and Superintendent Horne's point (grounded in the record) that "'minor' and 'small' differences have an enormous influence in competitive sports." Br. Appellants 56; *see also id.* at 58–59. The acknowledgement that prepubertal boys do have an advantage, even if small, is dispositive. It requires reversal because in sports even small advantages result in unfair victories over and displacement of biological girls.

But the male physical advantages are not minor. A one percent advantage in speed in a 100-meter race translates to a clear and decisive win. *See* 3-ER-392 ("As serious runners will recognize, differences of 3%, 5%, or 8% are not easily overcome. During track competition the

difference between first and second place, or second and third place, or third and fourth place (and so on) is often 0.5-0.7%, with some contests being determined by as little as 0.01%.").  And the Legislative Leaders and Superintendent Horne provided literally pages of data showing that prepubertal males have significant performance advantages over prepubertal females.  *See* 3-ER-378–93.  The district court thus clearly erred in assuming that no girls will be unfairly harmed because prepubertal boys only have what the court chose to describe as a "minor" advantage in sports competition.  *See Hinkson*, 585 F.3d at 1262 (finding of fact clearly erroneous when illogical, implausible or without support in the record).

The balance of Plaintiffs' argument is just repetition of the district court's unsupported conclusions.  *See* Br. Appellants 51–59.  Plaintiffs repeat the district court's claim (which repeats Dr. Shumer's) that the Legislative Leaders' and Superintendent Horne's evidence fails "to account for other factors that could explain the data," such as greater encouragement and opportunities for boys to participate in athletics and preference differences between boys and girls.  Answering Br. 36–37 (quotations omitted).

That is clearly erroneous because it is implausible speculation. There is no reason to believe that every advantage prepubertal males possess is the product of unknown, undocumented cultural or social factors. It is certainly a conclusion outside the district court's bailiwick; it is not an expert in the effect of social factors on the athletic performance of prepubertal athletes. For that matter, neither is Plaintiffs' expert Dr. Shumer—the source of the district court's erroneous conclusion. *See* 1-ER-19–20. He is a medical doctor specializing in endocrinology, not a sociologist, *see* 3-ER-549–52 (providing his qualifications), and was never qualified as an expert to testify on the effect of social factors on prepubescent athletic performance.

Thus, nothing in the record supports the finding that the entirety of prepubertal male athletic advantages results from non-biological, social factors, as opposed to biological differences. Indeed, the record provides persuasive reasons to conclude otherwise. For example, performance differences persist after training. Appellant Br. 57. And prepubescent boys' track and field records are consistently better than those of girls—which is unexplainable if differences between the two sexes are essentially nonexistent. *Id.*

Furthermore, the Legislative Leaders' and Superintendent Horne's experts provided extensive data showing that observed differences in performance "persist across countries with varying social norms when it comes to gender." *Id.* at 57–58. Dr. Brown and Dr. Hilton provided data from a diverse array of countries and cultures around the world, which inherently controls for at least some cultural factors—and which, as Dr. Carlson said, means the data suggest a link between biological sex and athletic performance. *See* Br. Appellants 57–58. Data from Arizona and Kyrene middle school is no different. Dr. Brown compiled data "from Arizona showing that, among 6th grade racers, the average performance of the top 10 boys was consistently faster than the average performance of the top 10 girls, and Dr. Hilton provided data from a Kyrene track and field meet showing that males had an athletic advantage in every event except shot put." *Id.* at 55–56 (quotations and citations omitted).

The district court either ignored that data or implicitly assumed—without any evidence—that the differences the data show stem from the same or similar cultural and social factors. There is no justification for either approach. *See Hinkson*, 585 F.3d at 1262 (finding of fact clearly erroneous when illogical or implausible or without record support). By

22

contrast, the Legislative Leaders and Superintendent Horne provided evidence supporting their conclusion; they provided evidence of physiological differences between prepubescent boys and girls—such as differences in shoulder internal rotation strength—that naturally translate to athletic differences. *See* Br. Appellants at 51–53.

These arguments are not just unrebutted, they are confirmed by a preprint study published after the preliminary injunction ruling. That study shows "'a consistent sex difference in performance'" between prepubescent boys and girls. Br. Appellants 60 (quoting Mira A. Atkinson et al., *Sex Differences in Track and Field Elite Youth* 9 (Aug. 31, 2023) (preprint), https://sportrxiv.org/index.php/server/preprint/view /324/654. The study focuses on elite performance, so "the potential impact of sociocultural factors, such as biological talent and sex differences in participation, *were limited*." *Id.* at 4 (emphasis added).[7]

Plaintiffs also point (at 37) to the district court's finding that transgender girls who do not undergo puberty "will develop the skeletal structure, fat distribution, and muscle and breast development typical of

---

[7] In discussing this study (at 37 n.6), Plaintiffs misleadingly elide the phrase "were limited."

other girls" and have similar estrogen and testosterone profiles as other girls. But puberty blockers and hormone treatments do *not* reverse *existing* advantages biological males have over women. *See* 2-ER-150, 191 (providing Dr. Hilton's and Dr. Brown's opinion on this point); *see also* 3-ER-394–95 (providing three studies, two from the same researcher, showing that transgender girls who were on puberty blockers had higher lean body mass and lower percent body fat than a comparison group of biological girls); Br. Appellants 51–56. So, again, this point does not support the district court's conclusion that prepubertal males and females are athletically fungible.[8]

In short, Plaintiffs attempt to defend the district court's factual conclusions by appealing to the district court's factual findings. That is plainly insufficient. It is, however, the best they can do. The record does not support the district court's conclusion that transgender girls who have not and will not experience male puberty are athletically the same as biological girls. Because that conclusion is key to Plaintiffs' case, the

---

[8] Plaintiffs also point (at 37–38) to the district court's conclusions about safety risks. These are linked to the physical differences between boys and girls.

district court's erroneous factual findings require reversal. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014).

## 2. The SWSA satisfies intermediate scrutiny.

Even if the district court's factual findings are correct, the SWSA satisfies intermediate scrutiny because it is closely tailored to achieve important government interests. No one disputes that the interests the SWSA is to serve—protecting girls playing sports, promoting equality in athletics, and redressing past discrimination—are legitimate and important. *E.g.*, Br. Appellants 40; Answering Br. 29. The problem is that the district court required, in effect, perfect tailoring. *See* Br. Appellants 41–50. That is, it required the SWSA to advance its interests relative to *each individual Plaintiff*, regardless of whether it advances its interests in every other context.

Plaintiffs rest entirely on the rectitude of that analysis. That means Plaintiffs do not dispute that if they are wrong then the SWSA passes constitutional muster. It also means they do not contest the Legislative Leaders' and Superintendent Horne's analysis. That is, Plaintiffs do not dispute that the SWSA does indeed advance its interest in every other instance. *See* Br. Appellants 41–43. Nor do they dispute

that the law advances its interests roughly 99.996 percent of the time *at worst*. *Id.* Rather, they dismiss those points as irrelevant. *See* Answering Br. 32–33 (calling those examples "hypothetical cases not before the Court [that] are not sufficient to justify the law in an as-applied constitutional challenge").[9]

Plaintiffs' gamble fails. Even assuming the SWSA does not advance its interests in Plaintiffs' case or the vanishingly small number of cases similar to Plaintiffs (*i.e.*, that the district court's factual findings are not clearly erroneous), binding precedent says that intermediate scrutiny does not require "that the statute under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen v. INS*, 533 U.S. 53, 70 (2001); *see* Br. Appellants 45–48.

That this is an as-applied challenge is irrelevant. *Contra* Answering Br. 32–33. That affects the "breadth of the remedy," *Citizens*

---

[9] Plaintiffs also misrepresent the arguments. Plaintiffs suggest that the Legislative Leaders and Superintendent Horne do not address these plaintiffs and only "describ[e] other types of transgender women," and then use that misrepresentation to bolster their animus argument. Answering Br. 32. But the Legislative Leaders and Superintendent Horne point out that the SWSA undisputedly advances its interests as applied to *all* males regardless of their gender identity as well as to large classes of transgender females who did not block their male puberty. Appellants Br. 41–43.

*United v. FEC*, 558 U.S. 310, 331 (2010), not "the substantive rule of law necessary to establish a constitutional violation," *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) (per curiam), and *Witt v. Department of Air Force*, 527 F.3d 806 (9th Cir. 2008), do not change that. *Contra* Answering Br. 32. *Karnoski* quotes *Witt*. And the cited portion of *Witt* discusses the test for determining when a governmental intrusion "upon the personal and private lives of homosexuals" is constitutional. *Witt*, 527 F.3d at 819. This case, however, is not about the personal and private lives of Plaintiffs but about their right to play on girls' sports teams.

*Hecox* also involved only as-applied claims, *see* 79 F.4th at 1037, and its analysis contradicts Plaintiffs' position. Rather, its analysis tracks the Legislative Leaders' and Superintendent Horne's: The court reviewed the law's "means-end fit" as applied broadly, and not just to the specific transgender plaintiff. *See id.* at 1030–33.

Plaintiffs' remaining arguments fare no better. They take issue (at 33–34) with the First Amendment intermediate scrutiny cases cited by the Legislative Leaders and Superintendent Horne. But "[i]ntermediate scrutiny has its genesis in the Supreme Court's equal protection *and* free

speech jurisprudence." *Heller v. District of Columbia*, 801 F.3d 264, 281 (D.C. Cir. 2015) (Henderson, J., concurring in part and dissenting in part) (emphasis added). No authority suggests that the tests are materially different. *See First Choice Chiropractic, LLC v. DeWine*, 969 F.3d 675, 684–85 (6th Cir. 2020) (equating the two). Indeed, *Hecox* cites a First Amendment case for the proposition that "when applying heightened scrutiny, we 'must accord substantial deference to the predictive judgments' of legislative bodies." 79 F.4th at 1032 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994)).

It is unclear what Plaintiffs' point is in discussing (at 34) the Legislative Leaders' and Superintendent Horne's other cases besides arguing they are factually different (though they do not dispute that those cases are legally relevant and analytically helpful) or rehashing meritless positions (such as the SWSA is not a remedial law). Plaintiffs also note (at 35–36) that *Hecox* distinguishes *Clark I*. To be sure, the tension between the two cases justifies en banc review of *Hecox*. But *Clark I* is relevant to this case for other reasons—and it is for those reasons that the Legislative Leaders and Superintendent Horne cite it. *See* Br. Appellants 41–50 (citing *Clark I* throughout the analysis). And

Plaintiffs' discussion (at 36–37) of *Clark ex rel. Clark v. Arizona Interscholastic Association (Clark II)*, 886 F.2d 1191 (9th Cir. 1989)—to the extent it does not address the fact that *Clark II* and *Hecox* are in tension—merely revisits their incorrect perfect-tailoring theory.  *See* Answering Br. 36 (focusing on whether "the goal of equal protection … is advanced by allowing" Plaintiffs onto women's sports teams) (emphasis omitted).

## II.  Plaintiffs offer no convincing response to the Legislative Leaders' and Superintendent Horne's Title IX analysis.

Plaintiffs are not challenging Title IX's separation of sports by sex. Answering Br. 42.  Thus, Plaintiffs do not deny that their Title IX claim fails if "sex" in Title IX means biological sex and not gender identity.  And "[t]here is no serious debate that Title IX's endorsement of sex separation in sports refers to biological sex." *B.P.J. v. W. Va. State Bd. of Educ.*, 649 F. Supp. 3d 220, 223 (S.D. W. Va. 2023).  If there were any doubts about that, Plaintiffs fail to present any statutory interpretation arguments addressing them.

Plaintiffs do not dispute that the contemporaneous dictionary definitions that the Eleventh Circuit reviewed show that "when Congress prohibited discrimination on the basis of 'sex' in education, it meant

biological sex, *i.e.*, discrimination between males and females." *Adams*, 57 F.4th at 812. Plaintiffs instead try (at 42–43) to distinguish *Adams* on grounds that are facile, sometimes wrong (*Hecox*, for example, distinguished *Adams*; it did not reject it, *see* 79 F.4th at 125 n.9 (reserving the merits dispute)), and have nothing to do with how to interpret "sex" in 20 U.S.C. § 1681(a). On the other side of the ledger, however, the District of Idaho found *Adams* persuasive and rejected a Title IX challenge to a state law that required students to use the restroom and locker room matching their biological sex. *Roe ex rel. Roe v. Critchfield*, 2023 WL 6690596, at *7 (D. Idaho Oct. 12, 2023), *appeal docketed* No. 23-2807; *see also* Ex. A, *D.N.*, at 25–28.

Nor do Plaintiffs contest that statutory context, purpose, and the major-questions and federalism clear-statement rules all support Appellants' reading. *See* Br. Appellants 65–66. Plaintiffs do argue that *Grabowski v. Arizona Board of Regents*, 69 F.4th 110 (9th Cir. 2023), and *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), put Arizona on notice that the SWSA "violate[s] Title IX" for Spending Clause purposes. Answering Br. 43–44. But because neither case interprets the word "sex" in Title IX, *see*, *e.g.*, Br. Appellants 62–63, that is incorrect.

Plaintiffs' argument really seeks to extend and expand *Bostock*. But that ignores that the *Bostock* Court (1) assumed that "sex" as used in Title VII "referr[ed] only to biological distinctions between male and female;" *id.* at 1739; (2) declined to address sex-segregation in facilities that closely match Title IX's exemptions, *see id.* at 1737, 1753; (3) said "transgender status [is a] distinct concept[] from sex," *id.* at 1746–47; and (4) limited its ruling to Title VII, *see id.* at 1753. Nor does *Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022), extend "*Bostock*'s holding to Title IX" in any relevant way. *Contra* Answering Br. 42. The most it does is "construe Title IX's protections consistently with those of Title VII," *Doe*, 28 F.4th at 114, "so that discrimination on the basis of [gender identity] is a form of sex-based discrimination under Title IX," *Grabowski*, 69 F.4th at 1116. It does not say "sex" as used in Title IX includes gender identity. *See* Br. Appellants 62–63.

In short, Title IX prohibits discrimination on the basis of biological sex—not biological sex and gender identity. It authorizes sports and facilities for biological women that are separate from biological men. The SWSA does just that. Plaintiffs' Title IX claim fails.

## III. The equities do not support relief.

**<u>Irreparable harm and Plaintiffs' delay:</u>** First, whatever harm Plaintiffs suffer is undercut by their admitted delay in waiting an entire academic year to bring this suit. *Contra* Answering Br. 46–48. A shorter delay than Plaintiffs—just five months—"undercut [plaintiff's] claim of irreparable harm." *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc). Because "[a] preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights," a plaintiff who sleeps on his rights "demonstrates the lack of need for speedy action." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (quoting *Gillette Co. v. Ed Pinaud, Inc.,* 178 F. Supp. 618, 622 (S.D.N.Y. 1959)). The cases Plaintiffs cite (at 48) affirm that delay *is* a factor the district court should consider—though it did not here. *See Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019); *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014).

Nor will Plaintiffs suffer irreparable harm. To start, there is no constitutional violation that needs amelioration. *Contra* Answering Br. 44. That also means Plaintiffs do not suffer dignitary harms, since they link those to the merits as well. *See* Answering Br. 45–46. So, too, for

Plaintiffs' harms stemming from their claimed exclusion for school sports. *See* Answering Br. 45. Since the SWSA is lawful, there is no irreparable harm in enforcing it. *See Walsh v. La. High Sch. Athletic Ass'n*, 616 F.2d 152, 159 (5th Cir. 1980) ("A student's interest in participating in a single year of interscholastic athletics amounts to a mere expectation rather than a constitutionally protected claim of entitlement.").

Moreover, Plaintiffs' claimed harm does not follow from any transgender identity discrimination—it follows from their gender dysphoria diagnosis, which is separate from transgender status.[10] *See, e.g.*, 1-ER-5 ("Transgender individuals *may* experience gender dysphoria.") (emphasis added) (quotations omitted). But many students contend with various medical conditions that make participating in athletics more difficult, or even impossible. This claimed harm is thus a

---

[10] Plaintiffs claim the Appellants waived this argument. Not so. First, "[a]s the Supreme Court has made clear, it is claims that are deemed waived or forfeited, not arguments." *United States v. Blackstone*, 903 F.3d 1020, 1025 n.2 (9th Cir. 2018). Appellants have consistently claimed Plaintiffs will not suffer irreparable harm from the Act. Second, the Legislative Leaders and Superintendent Horne raised this very point in the district court. *See* 5-ER-691; *see also* Br. Appellants 68.

normal incident of student-athlete life that is caused by Plaintiffs' medical condition, not by state action. *See* Br. Appellants 68.

**Balance of Equities and the Public Interest:** Plaintiffs' argument as to these factors again relies, in large part, on the SWSA's alleged unlawfulness. *See* Answering Br. 48–49. Since the SWSA is lawful, the injunction irreparably injures the State. *See* Br. Appellants 68–69.

Independently, biologically female student-athletes who face unfair displacement by biological males will be harmed by the injunction. Plaintiffs dismiss the potential displacement of female athletes as "speculative." Answering Br. 50. But the record shows that the sports in which Plaintiffs wish to compete involve zero-sum try-outs and competition. *See* Br. Appellants 69 (providing citations). The former is evidence "that the schools limit the number of girls who participate in any of the sports at issue." *Contra* Answering Br. 50–51. The latter shows that Plaintiffs will take up playing time and potential accolades that properly belong to biological girls. The injury inflicted on these unfairly displaced female athletes counterbalances and outweighs the

injuries asserted by Plaintiffs here—yet the district court failed to consider them.

## CONCLUSION

For those reasons, the Legislative Leaders and Superintendent Horne respectfully request that the Court reverse the district court's order granting Plaintiffs' motion for a preliminary injunction.

Dated: November 7, 2023

Respectfully submitted,

James Otis Law Group, LLC

*/s/ D. John Sauer*
D. John Sauer
Justin D. Smith
Michael E. Talent
13321 N. Outer Forty Road,
Suite 300
St. Louis, MO 63017
(314) 562-0031
john.sauer@james-otis.com
*Counsel for Intervenor-Defendants-Appellants*

WILENCHIK & BARTNESS, P.C.

*/s/ Dennis Wilenchik*
Dennis I. Wilenchik, Esq.
Karl Worthington, Esq.
Wilenchik & Bartness Building
2810 North Third Street
Phoenix, Arizona 85004
admin@wb-law.com

*/s/ Maria Syms*
Maria Syms, Esq.
Director of Legal Services
Arizona Department of
Education
1535 West Jefferson, BIN #50
Phoenix, Arizona 85007
Maria.Syms@azed.gov

*Counsel for Thomas C. Horne*

## **CERTIFICATE OF COMPLIANCE**

9th Cir. Case Number(s): 23-16026 c/2 23-16030

I am the attorney or self-represented party.

This brief contains **6,992** words, including **0** words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief (select only one):

[**x**] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

[**x**] it is a joint brief submitted by separately represented parties.

[ ] a party or parties are filing a single brief in response to multiple briefs.

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


*/s/ D. John Sauer*
November 7, 2023